1 08:35:11                UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3              HONORABLE MICHAEL W. FITZGERALD, U.S. DISTRICT JUDGE

4

5

UNITED STATES OF AMERICA,        )

6                                 )
            Plaintiff,            )

7                                 )
                 vs.              )

8                                 )     2:19-CR-164-MWF
SALOUMEH RAHBARVAFAEI,           )

9                                 )
            Defendant.           )

10 _____)
                                  )

11                                )
                                  )

12

13

14

15              REPORTER'S TRANSCRIPT OF JURY TRIAL

16                   Los Angeles, California

17                  Monday, August 15, 2022

18

19

20

21           _____

22                AMY DIAZ, RPR, CRR, FCRR
                  Federal Official Reporter

23                350 West 1st Street, #4455
                  Los Angeles, CA 90012

24

25

           *Please order court transcripts here:  www.amydiazfedreporter.com*

```
 1          APPEARANCES OF COUNSEL:

 2
            For the Plaintiff:
 3
 4                          Office of the United States Attorney
                            By:  Benedetto Balding
 5                               Assistant United States Attorney
                                 Skyler Cho
 6                               Assistant United States Attorney
                            United States Courthouse
 7                          312 North Spring Street
                            Los Angeles, California 90012
 8

 9

10
            For the Defendant:
11
                            OFFICE OF THE FEDERAL DEFENDER
12                          By:  Erin Murphy
                                 Assistant Federal Defender
13                               Michael Driscoll
                                 Assistant Federal Defender
14                          321 East 2nd Street
                            Los Angeles, California 90012
15

16

17

18

19

20

21

22

23

24

25
```

THE COURT:  I just saw the *Rosenblum* matter a few minutes ago, but I did review the motion to dismiss in the Ohio case and the ALJ findings.

What is it that specifically the defense is proposing?  The right to examine on this or forbid Dr. Munzing to testify?  Or what is your position?

MS. MURPHY:  Your Honor, I would like to just flesh out a couple of things.  This has all been developing very quickly.

THE COURT:  And may I ask why we weren't doing this at 8:15 before -- I mean, I've been here since 8:00, and I assume if counsel want to discuss something, they will let Ms. Sanchez know, and start certainly at 8:15 or even earlier.  I don't understand why we are doing this.  There is 13 jurors here.  When the 14th juror arrives, we will be cutting into their time, so I am not happy about this.

MS. MURPHY:  Your Honor, we are very sorry about that, we wanted a chance to consult with government counsel before --

THE COURT:  Presumably, you can -- you could have done that at 6 this morning.  So do not waste the jury's time.

And I'm not saying that just to you, I'm saying it to both sides.  Do not waste the jury's time.

MS. MURPHY:  Understood, Your Honor.  We are very

1  08:36:25   sorry for that.

2  08:36:25          THE COURT:  Go ahead.

3  08:36:26          MS. MURPHY:  We are very concerned about the fact

4  08:36:28   that there is a government witness, their main witness, who

5  08:36:32   has been accused of perjury in this other matter.  I

6  08:36:35   understand that it's an allegation from defense counsel.  But

7  08:36:39   based on what I'm reading, it does seem to be a colorable

8  08:36:42   claim.

9  08:36:42          And I have spoken with defense counsel in the *Romano*

10 08:36:46   case.  I understand that what happened was this ALJ decision

11 08:36:49   was disclosed to them while the jury was deliberating.  And

12 08:36:53   so that is an issue for government counsel out there.  And I

13 08:36:58   understand that the judge in that case was extremely

14 08:37:00   disturbed by this, and was initially considering just setting

15 08:37:05   the verdict aside immediately, and instead has ordered

16 08:37:08   briefing on the issue.

17 08:37:09          We have an unofficial transcript, which is cited in

18 08:37:12   the motion.  But they don't have an official transcript of

19 08:37:16   what has happened in the *Romano* case yet.

20 08:37:18          The reason why this is so concerning to us, is that

21 08:37:21   the allegedly perjured testimony is a core component of

22 08:37:26   Dr. Munzing's testimony.  It is a core component of his

23 08:37:30   reporting that supported the indictment in this case.

24 08:37:32          Which is to say that the CDC guidelines either apply

25 08:37:36   to primary care physicians alone, or they apply to broader

specialists, like pain management.  Like the pain management doctor that our client worked for.

Now, another concerning thing to us is just the timing here.  We were supposed to go to trial on July 26th.  We heard -- we learned that government counsel was ill, and we accommodated.  We tried to be professional, and fair, and accommodate that situation.  And so that is why we briefly continued trial.

We received on Saturday *Brady* and *Giglio* material for Dr. Munzing, including this ALJ opinion, the one that came to light just last Friday in *Romano.*  And I asked government counsel, when did you have this?  And they had it three weeks ago.

In other words, they had it when we were supposed to go to trial.  They had it last week.  When Dr. Munzing -- when we, again, agreed to allow Dr. Munzing to testify on Monday instead of Friday.

Why do we get it on Saturday?

And that ALJ opinion, I understand that it was ultimately superseded by the DEA agency itself, but that opinion, it's 160 pages, and it is eviscerating of Dr. Munzing's credibility, absolutely eviscerating.

This is a former chief judge of -- I think -- I looked Judge Dorman up, very respectable judge.  He wrote a very thorough opinion, absolutely eviscerating Dr. Munzing's

1 08:39:03  testimony.

2 08:39:04        And then they also gave us some other *Brady/Giglio*

3 08:39:08  material, which I'm accepting their representation that they

4 08:39:10  gave it to us as soon as possible.

5 08:39:11        But this is really disturbing to us.

6 08:39:12        And we also have just real practical concerns at

7 08:39:15  this point about how the government can call this witness.

8 08:39:18  He, I think, has exposure right now.

9 08:39:21        THE COURT:  All right.  Counsel, I want to hear from

10 08:39:23  the -- the point is, we have a jury, and we have a witness.

11 08:39:26  So exactly what are you asking me -- what is it exactly that

12 08:39:31  you are asking for on behalf of your client to -- for me to

13 08:39:35  send them home and us deal with this tomorrow?  To forbid him

14 08:39:38  to testify, in which case it seems the government's case

15 08:39:42  falls apart.

16 08:39:44        Look, we all know that this is not a particularly

17 08:39:46  strong case for two reasons:  One is, because you have an

18 08:39:48  expert against Dr. Munzing.  So if reasonable doubt means

19 08:39:53  anything, you would think if the jury thought, oh, here is

20 08:39:57  two doctors, they disagree, this isn't a malpractice case,

21 08:40:00  proof beyond a reasonable doubt, let's acquit.

22 08:40:02        That would be a perfectly reasonable thing for the

23 08:40:05  jury to do.

24 08:40:05        And the other thing, of course, is because the

25 08:40:07  defendant's employer is not here.  There is a certain element

1 08:40:09    of jury nullification in that, but the point is, the jury --

2 08:40:13    the jury could use their sympathy for her in that regard to

3 08:40:17    reach a reasoned decision to acquit her under the

4 08:40:23    instructions.

5 08:40:23            So I -- the point is, I, it's not as if anything

6 08:40:27    dealing with Dr. Munzing in light of my view of the case

7 08:40:30    would be harmless error.  But the point is, I assume you were

8 08:40:34    asking me to do something, so tell me what it is, so the

9 08:40:37    government can respond, so I can decide what to do when we

10 08:40:40   have, as I said, a witness and the jurors here.

11 08:40:43           MS. MURPHY:  Understood, Your Honor.

12 08:40:44           I think at a minimum, Dr. Munzing should be excluded

13 08:40:46   from testifying at this point.

14 08:40:48           And I mean, I think -- I've asked the government to

15 08:40:52   just dismiss this case.  I understand that that is not an

16 08:40:54   option from their perspective.

17 08:40:56           Short of that, I think Dr. Munzing should be

18 08:40:59   excluded from this trial.  And at a minimum, I think -- he

19 08:41:04   has real exposure here.  I think there should be a

20 08:41:07   conversation between government counsel and someone over

21 08:41:11   whether he needs counsel.

22 08:41:13           And I think -- Your Honor, I'm sort of thinking out

23 08:41:17   loud here.  This is such a bizarre situation.  I think the

24 08:41:20   most minimum remedy here is that he should be excluded as a

25 08:41:24   witness.

08:41:24    1     THE COURT:  All right.  And then if he is, then

08:41:26    2  either to exclude him and declare a mistrial, which would be

08:41:33    3  decisions subject to review, or then I would have to decide

08:41:37    4  whether there is enough evidence here for -- to allow the

08:41:41    5  case to go forward.  And if I determined otherwise, that

08:41:43    6  would not be subject to review.

08:41:45    7     Although, of course, I could let it go forward to

08:41:47    8  the jury and then, determining on what they do, let it --

08:41:54    9  grant a Rule 29 motion later.

08:41:56   10     So this is -- that is what you are asking for.

08:41:59   11     What is the government's position in regard to all

08:42:02   12  of this?

08:42:02   13     MR. BALDING:  Well, the government would obviously

08:42:04   14  oppose excluding his testimony.

08:42:07   15     I think the *Rosenblum* decision is just -- it's an

08:42:11   16  interim decision that was overruled.  And as strong and as

08:42:17   17  powerful as it is, the reason that I -- it looks bad, I

08:42:19   18  guess, that I didn't disclose it, and maybe I should have

08:42:22   19  earlier, but it wasn't a final decision.  And I disclosed it

08:42:25   20  before his testimony.  We don't think it bears the same

08:42:28   21  weight as they do, they disagree on that.

08:42:30   22     THE COURT:  The problem with that is, even if this

08:42:32   23  was something just on a matter of collateral impeachment

08:42:39   24  bearing on truthfulness, and I think it's much more than

08:42:45   25  that, it is something that should have been disclosed

1 08:42:47  earlier.

2 08:42:48        It's not so much the -- it's not so much the

3 08:42:51  opinion, but it's, rather, his marshalling of the reasons to

4 08:42:54  think that there -- this occurred.  And, therefore, at a

5 08:42:56  minimum it would be a basis for -- to cross-examine him on.

6 08:43:00        And the point is, I don't think that this is

7 08:43:03  something which is just -- that it's collateral and,

8 08:43:06  therefore, there is no ability to prove it up.  I mean, here,

9 08:43:09  I think that there has to be a robust cross-examination.

10 08:43:14  There can be.  There can be whatever defense counsel wishes.

11 08:43:16        But there -- defense counsel has the right to a

12 08:43:20  robust cross-examination, which goes beyond simply accepting

13 08:43:24  his answer as such.  The same way it would be -- you know,

14 08:43:29  the same way if it was something trivial or not material to

15 08:43:36  the case here.

16 08:43:36        So the -- the point is, so what -- does the

17 08:43:48  government want more time with this, to decide what it's

18 08:43:51  going to do?  Should I just say that it turns out that

19 08:43:54  Dr. Munzing wasn't available today, and then send them home?

20 08:43:57  Should I then, therefore, say -- or just go forward, let him

21 08:44:02  be cross-examined on this, and then we decide what to do

22 08:44:05  about it?

23 08:44:06        You know, the further we go into this, then the

24 08:44:09  government has to recognize that two things are possible:

25 08:44:12        One is, if I exclude this, I let the case go to the

1 08:44:15   jury under a Rule 29, or I grant a Rule 29, in which the

2 08:44:19   acquittal would not be reviewable.

3 08:44:22        If I decide to commit -- forbid him testimony or

4 08:44:28   strike certain portions of it and, thereby, declare a

5 08:44:32   mistrial or dismiss the indictment myself, that would be

6 08:44:35   reviewable.  But then, of course, jeopardy is attached.  The

7 08:44:38   defense would have every right to argue, either to me or to

8 08:44:40   the Ninth Circuit, that it was the government that caused

9 08:44:43   this and, therefore, whatever decisions I make shouldn't be

10 08:44:46   reviewable.

11 08:44:47        So the government is definitely putting itself in a

12 08:44:51   situation here where it might very well be that whatever

13 08:44:55   decision is made is not subject to appeal.

14 08:44:57        So you've got to keep that in mind.

15 08:45:00        MR. BALDING:  Understood, Your Honor.

16 08:45:01        And, you know, I think what I would propose

17 08:45:04   generally before I had the conversation with counsel this

18 08:45:07   morning would have been to let him testify and seek to

19 08:45:10   exclude reference to the pending -- the fact of a pending

20 08:45:14   perjury allegation by defense counsel, which I think is

21 08:45:17   inflammatory.  I think they would be entitled to ask about,

22 08:45:21   did you testify in --

23 08:45:21        THE COURT:  No, it's about the -- look, I think the

24 08:45:24   point here -- but they also get to say that he doubled down.

25 08:45:28   I mean, whether -- that there is a matter pending in the

1  08:45:32   other court is not germane.  The fact that they could say,
2  08:45:35   after doing this in California, you did this -- you then did
3  08:45:40   this.  I mean, they have the right to testify about -- to
4  08:45:43   cross-examine him on both incidents.
5  08:45:45        MR. BALDING:  I would -- I think at this point, that
6  08:45:47   would be fair to go forward on that basis.
7  08:45:50        What they raised was the concern that he might have
8  08:45:54   potential exposure, being subject to a pending perjury
9  08:45:57   allegation, and that if he testifies specifically in this
10 08:45:59   case about things pertinent to that, he could be exposing
11 08:46:03   himself.
12 08:46:04        I had not considered that until just before court
13 08:46:06   this morning, because it wasn't something -- they flagged it
14 08:46:10   for me, I appreciate that they did.  I would like maybe --
15 08:46:12        THE COURT:  Having been both a defense attorney and
16 08:46:15   a prosecutor, I would have, if they hadn't.  I'm glad they
17 08:46:18   did, so you had a chance to start thinking about it.
18 08:46:20        I mean, he really does have to decide whether he's
19 08:46:22   willing to testify or not.
20 08:46:23        MR. BALDING:  We spoke with him, and he's willing to
21 08:46:26   testify.  However, I think it would be prudent to give us
22 08:46:28   perhaps half an hour, 45 minutes to talk to counsel for -- or
23 08:46:32   supervisor to figure out, do we need to do something more
24 08:46:34   before we put him up on the stand.  I don't think that is
25 08:46:37   overburdening the jury to -- he would be ready to go.  I've

1  08:46:41   already truncated his testimony for other reasons, so I don't

2  08:46:43   think it's going to take as long as I initially thought.

3  08:46:46        But I think it would be prudent to at least explore

4  08:46:49   that briefly for some period of time.

5  08:46:50        THE COURT:  I -- I'll give you 20 minutes to figure

6  08:46:56   this, and then he can -- he's clearly a sophisticated enough

7  08:47:03   witness, and he knows what he did or that.  I mean, unless he

8  08:47:06   comes in and says that he wants to discuss this with his own

9  08:47:10   lawyer or that, I think for what the government wants to do

10 08:47:14   on this, is that you are the one who has known about this

11 08:47:17   issue for quite some time.  I'm not going to inconvenience

12 08:47:20   the jury more than that.

13 08:47:21        I'm going to go in and tell them that we are working

14 08:47:23   to cut down on the length.  Apologize for the delay, we are

15 08:47:27   cutting down on the length of Dr. Munzing's testimony.  So

16 08:47:29   the time is well spent on that.

17 08:47:32        And then at 9:05, you can tell me whether he's

18 08:47:36   willing to testify or not.  And if he's willing to testify,

19 08:47:38   we'll go forward.  Defense counsel can cross-examine him on

20 08:47:43   both alleged incidents of perjury.

21 08:47:47        The fact that that allegation has been made is not

22 08:47:54   germane.  The fact that the ALJ reached certain conclusions

23 08:47:59   is not germane, it's what he did.  And then the jury can

24 08:48:04   judge for themselves, listening to this on that.

25 08:48:07        You are going to be cross-examining him on the

1 08:48:11    point -- on the underlying point anyway.

2 08:48:14          And then later on, perhaps I'll decide that it is

3 08:48:17    appropriate to dismiss the indictment, to let it go to the

4 08:48:20    jury with virtually no evidence, which either would lead to

5 08:48:24    their acquittal, or my acquitting the person, or whatever.  I

6 08:48:28    mean, or like I said, declare a mistrial, and then let the

7 08:48:31    Ninth Circuit sort out whether it's the government's fault or

8 08:48:34    not.

9 08:48:35          So this -- that is what we'll do.  Go talk to

10 08:48:40   Dr. Munzing, I'll go talk to the jurors.  And --

11 08:48:42         We are still missing one juror.  So we aren't

12 08:48:45   cutting into the jury's time at this point then.  So I'll --

13 08:48:49   in that case, since the juror is not here, I'll give you

14 08:48:52   until 9:15.  So just go, talk to Dr. Munzing and see what it

15 08:48:56   is that he wants to do.

16 08:48:57         Yes?

17 08:48:58         MS. MURPHY:  I have -- I just want to make sure if

18 08:49:00   the Court has made a decision on our motion to exclude

19 08:49:04   Dr. Munzing.  And also, I just want to flag, we don't have

20 08:49:07   the official transcripts from the *Romano* case yet.  I will

21 08:49:11   reach out to the defense attorney there to see if we have it.

22 08:49:14   I think for us to do an effective cross-examination on this,

23 08:49:17   we need those transcripts.

24 08:49:18         THE COURT:  Well, do you have the -- I mean, you

25 08:49:21   have unofficial transcripts.  Look, I can't imagine it's

08:49:25   anything -- if it turns out later that there was something of

08:49:27   huge substance, but I think for the moment we'll just proceed

08:49:31   with the unofficial transcripts.

08:49:33          MS. MURPHY:  Understood.  Thank you.

08:49:34          THE COURT:  Then I'll wait until the last juror --

08:49:39          The juror did call this morning.  I didn't talk to

08:49:43   the juror personally.  But did indicate that there was going

08:49:49   to be a delay.  Again, I'm not sure how much.  But when that

08:49:53   juror is here, I'll go talk to them and say what is going on.

08:49:57   And then, like I said, for now you have at least until 9:15.

08:50:02   And if the juror doesn't show up obviously until 9:05 or

08:50:06   something, then I'll give you a bit more time than that.

08:50:08          Thank you, counsel.

08:50:09          (Thereupon, there was a brief recess.)

09:17:02          THE COURT:  Does the government have a witness?

09:17:07          MR. BALDING:  Yes, Your Honor.

09:17:08          THE COURT:  All right.  Then we will proceed.

09:17:10          MS. MURPHY:  Your Honor -- I'm sorry to interrupt

09:17:14   Your Honor.  I think there are still some things we need on

09:17:16   the record, before we begin.

09:17:17          THE COURT:  Then you will be able to do that, but

09:17:21   please don't interrupt me.

09:17:22          It is my intention to proceed then while allowing

09:17:25   full cross-examination on both incidents.  However, without

09:17:30   the judicial gloss on, one, either the ALJ's findings on --

09:17:40  in California, or the fact that the motion was filed in

09:17:45  District Court.

09:17:46          So, yes, Ms. Murphy?

09:17:50          MS. MURPHY:  I'm sorry to have interrupted

09:17:51  Your Honor.

09:17:52          I think we need on the record some things here if we

09:17:56  are going to proceed.

09:17:57          First, I think we need a record on why the

09:18:00  government did not --

09:18:02          THE COURT:  No.  Counsel, the jury arrived.  The

09:18:05  14th juror arrived shortly after -- almost immediately after

09:18:09  my leaving the bench.  So we don't need it on the record.

09:18:12  What we -- we will take those things up, but we don't need to

09:18:15  take them up now, when they are cutting into the jury's time.

09:18:18          You will be free to make a record, but for right

09:18:21  now, the only thing that matters is whether the witness is

09:18:25  testifying or not.

09:18:26          He is testifying, and the defense is not waiving

09:18:29  anything, and we will proceed.

09:18:31          All right.  Ms. Sanchez, please get the jury.

09:18:35          THE CLERK:  Yes, Your Honor.

09:18:36          MS. MURPHY:  Your Honor, I'm sorry to --

09:18:38  apologize -- to interrupt again.  I don't think I've heard an

09:18:41  explanation from the government about whether this witness

09:18:44  has been appointed counsel on the perjury issue.

THE COURT:  All right.  I take it he's -- the witness has -- the issue has been raised and the witness is choosing to testify?

MR. BALDING:  That's correct, Your Honor.

MS. MURPHY:  Your Honor, my concern is that the government is the same entity that is going to be deciding whether this person should be charged with --

THE COURT:  We can deal with this -- look, we have a very sophisticated witness here.  He's taking his risk.  He's making his decision.  And he's aware that it's an issue.  He's aware that -- I take it he's aware that the allegation is perjury?

MR. BALDING:  That's correct, Your Honor.

THE COURT:  So he's in a position to make his decision.

MS. MURPHY:  And, Your Honor, I just think that it's appropriate for him to be appointed CJA counsel.  So I just would like on the record, and if the Court is going to deny that.

THE COURT:  The Court is going to deny it, because I am not going to waste the jury's time.  If it turns out that that should have happened, then we can strike his testimony.  But he's proceeding on his own risk.  I am not going to waste the jury's time here.

MS. MURPHY:  Understood, Your Honor.

09:19:52   1         MR. DRISCOLL:  Your Honor, may Dr. Murphy, the

09:20:00   2   defense's expert witness --

09:20:00   3         Sorry about that.

09:20:01   4         Your Honor, may the defense's expert witness

09:20:01   5   Dr. Murphy watch Dr. Munzing's testimony in court?

09:20:04   6         THE COURT:  Yes.  That is typical in dealing with

09:20:06   7   experts.

09:20:07   8         MR. DRISCOLL:  Thank you.  I'll bring him in.

09:20:41   9         (Thereupon, the jury returned to the courtroom.)

09:21:19   10        THE COURT:  Good morning, ladies and gentlemen.

09:21:20   11        All 14 of you are here, as are the defendant and the

09:21:25   12  lawyers.

09:21:25   13        I want to welcome you back, and apologize for our

09:21:32   14  delay.  As I said, we've been working.  Nonetheless, I'm very

09:21:38   15  appreciative of your time.

09:21:39   16        Let me share with you that -- something that

09:21:43   17  happened to me on Friday, is that I got my own jury summons

09:21:47   18  from the Superior Court.  So while the lawyers were working,

09:21:51   19  I was trying to get in touch with the jury department to see

09:21:54   20  if I could get an extension, since it's set on a date that I

09:21:57   21  have -- that I'll almost certainly be in trial myself.

09:22:01   22        But we all have to obey the jury summons, and I

09:22:05   23  appreciate the fact that you are doing that here.

09:22:08   24        The government may call its next witness.

09:22:12   25        MR. BALDING:  Your Honor, the government calls

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 09:22:14  Dr. Timothy Munzing.

2 09:22:40          THE CLERK:  This way, please.

3 09:22:50          Raise your right hand.

4 09:22:51  THEREUPON:

5 09:22:51                    DR. TIMOTHY MUNZING,

6 09:22:51  called in these proceedings and being first duly sworn

7 09:22:51  testifies as follows:

8 09:22:59          THE CLERK:  Please be seated.

9 09:23:07          Please state and spell your name for the record.

10 09:23:10          THE WITNESS:  Sure.  Timothy, T-I-M-O-T-H-Y,

11 09:23:16  Munzing, M-U-N-Z-I-N-G.

12 09:23:18          THE CLERK:  Thank you.

13 09:23:20          THE COURT:  Ladies and gentlemen, I've alluded to

14 09:23:24  this previously, there are going to be two witnesses in this

15 09:23:28  case, one for the prosecution, one for the defense, who are

16 09:23:31  not testifying because they have any firsthand knowledge of

17 09:23:36  what happened here.

18 09:23:38          However, the law allows certain witnesses to offer

19 09:23:43  an opinion on certain topics, and then give the reasons for

20 09:23:48  those opinions.  And that is what is happening here.

21 09:23:53          The law allows that, because certain people have the

22 09:23:57  education and experience to form an opinion and offer it to

23 09:24:05  you.

24 09:24:06          This testimony differs, as I said, because it's not

25 09:24:11  based on firsthand knowledge of the events that took place,

although both witnesses have reviewed some of the evidence that you've reviewed or seen already.

The purpose of these witnesses is not to give you an opinion directly on the innocence or guilt of the defendant. However, they are allowed to offer certain opinions within their areas of expertise, which here is being physicians.

One way in which this testimony is like the other testimony you've heard, and I instructed you on this at the beginning of the case, is that it's for you to decide what weight, if any, to give to the testimony of either opinion witness. You can accept all of the opinions, or you can accept some of the opinions, or you can accept none of the opinions.

Moreover, you can weigh the reasons that are given for that opinion. In other words, the education and experience of the witnesses, and the specific support that is being offered to you for those specific opinions.

And I'll give you a similar instruction at the end of the case so you will have it in writing in the jury room, but I wanted to instruct you now so you can keep all that in mind listening to the testimony of this witness. And also, just so you know why it is that somebody is testifying for you who was not, you know, in the clinic or there when the statements were made, or something like that.

All right. The government may proceed.

1 09:26:12          MR. BALDING:  Thank you, Your Honor.

2 09:26:12                    DIRECT EXAMINATION

3 09:26:14   BY MR. BALDING:

4 09:26:14    Q. Good morning, Dr. Munzing.

5 09:26:15          Dr. Munzing, what do you do for a living?

6 09:26:16    A. I'm a family medicine doctor.

7 09:26:19    Q. Where did you go to medical school?

8 09:26:21    A. UCLA School of Medicine.

9 09:26:23    Q. Did you receive any training after medical school?

10 09:26:26   A. Yes.  I did a three-year residency, sometimes you call it

11 09:26:29   internship and residency, at the Kaiser Permanente

12 09:26:34   Los Angeles Medical Center in Hollywood.

13 09:26:36   Q. And have you continued training throughout your medical

14 09:26:39   career?

15 09:26:39   A. Yes.  One needs -- to maintain your board certification,

16 09:26:46   one needs to maintain a variety of activities, including

17 09:26:51   continuing medical education, classes, credits, et cetera.

18 09:26:55   Q. You mentioned board certification.  What does that mean?

19 09:26:57   A. Board certification, it's once you complete a residency,

20 09:27:02   and in family medicine, you complete -- successfully complete

21 09:27:06   a residency, you pass a detailed, lengthy examination, and

22 09:27:13   one can become board certified.

23 09:27:14          It's kind of an added certification from our

24 09:27:18   American Board of Family Medicine in my case, or in other

25 09:27:21   specialties, whether it be general surgery or OBGYN.

1 09:27:25    Q. And you mentioned you are board certified, is that

2 09:27:28    correct?

3 09:27:28    A. Yes.

4 09:27:29    Q. In what?

5 09:27:29    A. Family medicine since 1985.

6 09:27:34    Q. As of today, so how many -- approximately how many years

7 09:27:38    of experience do you have?

8 09:27:39    A. Counting a residency, I think close to 40.

9 09:27:46    Q. And what type of work do you do now?

10 09:27:49    A. In the last year and a half -- I'm with Kaiser

11 09:27:54    Permanente, and the last year and a half, I'm officially

12 09:27:57    retired.  You hit a magic age and you have to retire.  So I

13 09:28:02    work at Kaiser Permanente, I continue -- I for 32 years

14 09:28:07    directed a residency program in family medicine.  And I no

15 09:28:12    longer am the director, I passed that on, but I'm the Program

16 09:28:16    Director Amerituss.

17 09:28:18         So I work with the program director in helping her

18 09:28:22    both in clinical work, in teaching, and a lot of

19 09:28:28    administrative running of the residency program.  We have 24

20 09:28:32    residents as part of the program.

21 09:28:33    Q. Does that include, on your part, training and similar

22 09:28:38    tasks and duties?

23 09:28:39    A. I mean, you are both giving lectures and listening to

24 09:28:43    lectures on a regular basis.

25 09:28:44    Q. Do you also do work that is affiliated with the Medical

09:28:49  Board of California?

09:28:49   A. I've been a consultant for the Medical Board of

09:28:54  California, looking at quality cases for over 18 years.

09:28:59   Q. What does that mean, to look at quality cases?

09:29:01   A. They will contact you.  They say, we have a case of a

09:29:06  physician or nurse practitioner, physician assistant, that we

09:29:10  have -- there is either a complaint, they have done some

09:29:14  investigation, and ask if I would be willing to review it.

09:29:20       It -- they are dealing with either quality

09:29:25  complaints, whether someone was appropriately managing chest

09:29:29  pain, or appropriately prescribe opiates, or many other, you

09:29:35  know, quality issues.

09:29:36   Q. And do you do any other type of consulting work?

09:29:39   A. I do consulting for the -- yes, I do.  With the DEA, FBI,

09:29:49  Health and Human Services, Department of Justice.

09:29:53   Q. And --

09:29:54   A. Do case reviews for them.

09:29:56   Q. What kind of cases do you review for them?

09:29:59   A. Almost exclusively dealing with prescribing of opiates

09:30:04  and other controlled substances.

09:30:05   Q. Do you ever testify in other cases?

09:30:09   A. Yes.

09:30:10   Q. In what kinds of cases?

09:30:12   A. The vast majority have related to prescribing of opiates

09:30:17  and controlled substances.  A small number, many, many years

09:30:23  ago dealt with -- did not deal with prescribing, dealt with

09:30:26  the physician's management of either chest pain or other

09:30:31  conditions.

09:30:31  Q. And does your -- have you testified in both criminal

09:30:35  proceedings and also proceedings to determine whether someone

09:30:39  should keep their license?

09:30:40  A. Yes.

09:30:42  Q. And when you -- in your testimony, have you testified in

09:30:46  Federal Court?

09:30:47  A. Yes.

09:30:47  Q. And your testimony in federal cases, has that been only

09:30:51  on behalf of the government as opposed to on behalf of a

09:30:54  defendant?

09:30:54  A. Yes, just on behalf of the government.

09:30:56  Q. Is there a reason for that?

09:30:57  A. Yes.  The reason is, while I was a partner -- and most of

09:31:04  this work was while I was a partner with Permanente Medical

09:31:09  Group or Kaiser Permanente, our rules and regs of our

09:31:13  partnership forbid you to do any work for others, other than

09:31:17  the Medical Board, and then I had to get special approval of

09:31:20  the board of directors to actually do work for federal law

09:31:25  enforcement reviews.

09:31:27      They would not allow -- they would not allow me to

09:31:32  review or testify on behalf of the defense, or in medical

09:31:37  malpractice cases.

1 09:31:38          Now that I'm officially retired, I could do that.  I

2 09:31:42    don't market myself, but I certainly could do that in the

3 09:31:46    future.  I just don't go out and try to seek that kind of

4 09:31:50    work.

5 09:31:50    Q. Are you being paid to testify here today?

6 09:31:53    A. I am.

7 09:31:54    Q. And were you paid to review the files and evidence in

8 09:31:57    this case and form opinions?

9 09:31:59    A. Yes.

10 09:31:59   Q. What -- how are you being paid, at what rate?

11 09:32:03   A. For the reviews, it's $400 an hour, and for testifying,

12 09:32:08   it's $6,000 for a day in court.

13 09:32:13   Q. In addition to your work at Kaiser, and for the Medical

14 09:32:16   Board, do you do other kinds of academic activities?

15 09:32:19   A. I would say in conjunction with that, I'm a full clinical

16 09:32:24   professor at University of California Irvine.  And so I work

17 09:32:28   with medical students and have for, I believe over 30 --

18 09:32:34   approximately 30 or more years.  And that is in conjunction

19 09:32:37   at Kaiser Permanente.  We have a lot of medical students that

20 09:32:40   come from either UC Irvine, or one of the many other medical

21 09:32:47   or osteopathic medical schools.

22 09:32:51          I also was involved at the early stages of the

23 09:32:54   development -- some of the planning and development of the

24 09:32:57   Kaiser Permanente School of Medicine.  It's now up and

25 09:33:00   running.  It's soon to start its -- in fact, I think a week

09:33:05   ago it started its third medical student class.

09:33:08       I'm no longer -- because of other responsibilities,

09:33:12   I'm no longer involved in their teaching structure, though I

09:33:18   may very well be now that there is third year students coming

09:33:22   out to our offices in Orange County.  The last two years have

09:33:27   been too far for students in Pasadena to make their way down

09:33:30   to Orange County.

09:33:31   Q. And how about writing, have you written any medical

09:33:33   papers?

09:33:34   A. I published one journal article.  There has been other

09:33:38   articles written about some of my lectures.  But I published

09:33:43   one peer-reviewed journal article, yes.

09:33:46   Q. What does it mean for a publication to be peer reviewed?

09:33:50   A. You write the article, you submit it to the journal -- in

09:33:53   a peer-reviewed journal, then they send it to a number of

09:33:56   other individuals to review it.  I believe the -- I believe

09:34:02   they sent it to five individuals.  It's blinded, so I have no

09:34:06   idea who reviewed my paper.

09:34:10       And they reviewed it, sometimes they make

09:34:13   grammatical changes, sometimes they say, sounds great, and

09:34:17   sometimes they go, why don't you adjust this, this isn't

09:34:20   quite clear.

09:34:21       So it went through two or three revisions, and then

09:34:24   finally was accepted for publication.

09:34:27   Q. So if something is published in a peer-reviewed

09:34:30  publication, is it safe to say that other doctors and

09:34:32  prescribing physicians have agreed with what you've written?

09:34:34          MS. MURPHY:  Objection.  Leading.  Calls for

09:34:37  speculation.

09:34:38          THE COURT:  Overruled.

09:34:40          THE WITNESS:  Yes.  They have agreed -- basically,

09:34:44  it gets to the point where they sign off and they say, okay,

09:34:48  that's -- I'm not only in agreement with the -- with the

09:34:52  information, but also with the grammatical structure, et

09:34:56  cetera.

09:34:56  Q. And what was the specific topic of your peer-reviewed

09:34:59  publication?

09:34:59  A. The appropriate prescribing of opiates for noncancer

09:35:06  pain.

09:35:08  Q. When you did your research then and now, are you familiar

09:35:11  with prescribing medications?

09:35:13  A. Yes.

09:35:14  Q. How are you familiar with that?

09:35:18  A. Well, part of it, I have been a clinician for

09:35:24  approximately 40 years, not counting medical school, though

09:35:27  you learn some of that even in medical school.

09:35:31          I have been a teacher, residency director, lecturer

09:35:40  for over 30 years.  I've taught thousands of medical students

09:35:48  and hundreds of residents during that time.  So part of it is

09:35:53  just inherent to being a clinician.

1   09:35:55   Q. How about specifically the prescribing pain medication,
2   09:36:00   are you familiar with that?
3   09:36:00   A. Yes.
4   09:36:01   Q. And specifically with prescribing opioid pain medication,
5   09:36:05   are you familiar with that?
6   09:36:06   A. Yes.
7   09:36:06   Q. And for the same reasons generally or --
8   09:36:08   A. The same reasons and others, yes.
9   09:36:11   Q. Including your research for the peer-reviewed publication
10  09:36:14   you spoke of earlier?
11  09:36:16   A. Yes.
12  09:36:16   Q. Is hydrocodone an opioid that is commonly prescribed for
13  09:36:23   pain?
14  09:36:23   A. Yes.
15  09:36:23   Q. Is hydrocodone -- does it have any other brand names the
16  09:36:27   jury might be more familiar with?
17  09:36:28   A. Norco, Vicodin, Lortab are the three names that is pop
18  09:36:33   into my mind.
19  09:36:34   Q. Are you also familiar with a substance called tramadol?
20  09:36:37   A. Yes.
21  09:36:37   Q. Is tramadol an opioid that is prescribed for pain?
22  09:36:40   A. Yes.
23  09:36:40   Q. Dr. Munzing, in your training and experience and
24  09:36:47   expertise, are there certain practices that a doctor or a
25  09:36:50   nurse practitioner should use in prescribing opioids?

1 09:36:54  Without getting into detail on what those are.

2 09:36:55   A. Yes, absolutely.

3 09:36:56   Q. And do those practices apply, like I said, to anyone

4 09:37:00  authorized to prescribe opioids, including a nurse

5 09:37:03  practitioner?

6 09:37:03   A. Yes.

7 09:37:05   Q. I would like to discuss the standard of care.

8 09:37:09        And first I would like to ask you, are you going to

9 09:37:15  testify today about your understanding of the standard of

10 09:37:17  care?

11 09:37:17   A. Am I going to?

12 09:37:18   Q. Yes.

13 09:37:18   A. Yes.

14 09:37:19   Q. And in developing your understanding of what that is,

15 09:37:24  were there agencies or boards or entities that you consulted

16 09:37:27  or looked at in forming your opinions?

17 09:37:29   A. Yes, multiple.

18 09:37:30   Q. Can we talk about some of those?  Can you tell me what

19 09:37:35  the Federation of State Medical Boards is?

20 09:37:36   A. Federation of State Medical Boards is an organization

21 09:37:41  that develops guidelines, they -- there are -- for example,

22 09:37:49  in California, we have the Medical Board of California.

23 09:37:52  Medical Board of California likes to develop, at least in

24 09:37:56  some areas, their own guidelines.  They may use some from the

25 09:38:01  Federation of State Medical Boards, but they want to kind of

09:38:04   customize it for the state.

09:38:06          Some states either don't have the resources or

09:38:10   don't -- don't choose to develop their own, and so they adopt

09:38:15   some of the guidelines from the Federation of State Medical

09:38:17   Boards.

09:38:17          That is an organization encompassing, as far as I

09:38:23   know, the complete United States of America.

09:38:26   Q. You mentioned the Medical Board of California.  Did you

09:38:28   also take into consideration that body when forming your

09:38:33   opinion as to what the standard of care is?

09:38:34   A. Yes.  Especially on California cases.  It really -- it

09:38:39   doesn't necessarily apply for cases outside of California

09:38:45   because it's a State of California entity.

09:38:47          But it definitely, you know, contributes for

09:38:53   physicians practicing -- physicians, nurse practitioners, PAs

09:38:57   practicing within the state.

09:38:58   Q. Did you also consult the American Society of

09:39:02   Interventional Pain Practitioners?

09:39:03   A. Yes.  I looked at their guidelines, as well.

09:39:06   Q. What is that entity?

09:39:07   A. That entity is a -- that organization is an organization

09:39:11   primarily, as I say, interventional pain practitioners, which

09:39:16   would be the people who may be doing the epidurals or some of

09:39:23   the more advanced procedures.

09:39:26          My intent was not only to look at guidelines

covering primary care family medicine, but also encompassing a wider, broader network.

Q. And did you also consult the Agency Medical Directors' Group?

A. Yes, I did.

That group happens to be in the State of Washington. It encompasses both primary care and specialty care.

And actually, one of the reasons that I looked there is that it is certainly an agency that Kaiser Permanente nationally looks towards.  And actually, the CDC at times references the Agency Medical Directors' Group.

Q. And what about the Centers for Disease Control and Prevention, did you also consider what they had to say on the relevant topics that you are testifying about today?

A. Yes.  That is one of many organizations I looked at. Sure.

Q. And how about the American Academy of Pain Medicine?

A. Once again, that was one of many.

Most, but potentially not all of those physicians, may be specialists.  My understanding is that some in that organization are primary care as well.

Q. Now, is it fair to say that your testimony as to the standard of care is not necessarily based on any one specific agency or guideline or something promulgated?

A. No, it's not based on any one individual guideline.

Q. Have you attempted to get kind of things that are consensus or widely accepted -- widely accepted on -- in this field?

A. Yes.

Q. And specifically, with the topics you are testifying about today, such as pain history, pain function and assessment, physical examination, treatment goals, et cetera, those types of things?

A. Yes.  There is great alignment between these guidelines. Not every element is addressed in every guideline, but I would say at the high level there is great -- there is great alignment consensus.

        And part of the guidelines are really -- they are not just focused on pain management.  There is parts of the guidelines that really are true whether you are treating a patient for pain or diabetes or cancer.  There is a lot of -- some of those guidelines really apply to all those.

Q. And when you say "apply," I mean, they may be true as to somebody, but a guideline that might bind somebody in one state is not necessarily -- is that what you mean, or do you mean just that they apply in the general sense of the term?

A. Apply in general --

        MS. MURPHY:  Objection.  Leading.

        THE COURT:  Excuse me, Doctor.

        Overruled.  It is leading, but it's foundational.

1 09:42:06  But if you feel that it's getting into being testimonial,

2 09:42:10  then object.

3 09:42:11          Go ahead, Mr. Balding.

4 09:42:14          THE WITNESS:  For example, in any of those areas,

5 09:42:16  you take a history, you do an examination, you come up with

6 09:42:20  what is the most likely diagnosis, and you manage

7 09:42:23  appropriately.

8 09:42:24          So at -- so pieces of the guidelines really apply

9 09:42:29  across medicine in general.

10 09:42:31   Q. And again, just to clarify, when you say "apply," you

11 09:42:33  mean -- do you mean that in a general sense, as opposed to a

12 09:42:39  requirement that is applicable to somebody that if they

13 09:42:41  violate, they could be subject to some discipline?

14 09:42:44          MS. MURPHY:  Objection.  Vague.

15 09:42:45          THE COURT:  Overruled.

16 09:42:46          If the witness understands it.

17 09:42:48          THE WITNESS:  I would say that they -- it is a more

18 09:42:53  general application that it's just part of medicine, rather

19 09:42:57  than a specific -- those issues, rather than a specific

20 09:43:01  guideline.  But it's just taught from medical school on.

21 09:43:09          MR. BALDING:  Thank you.

22 09:43:10          At this time, Your Honor, the government would ask

23 09:43:11  to publish Exhibit 51.  We are not seeking to introduce it in

24 09:43:15  evidence, we have discussed with defense counsel, and my

25 09:43:17  understanding is they don't object to it being published

09:43:19   during his testimony as an aid, but not submitted as an

09:43:22   exhibit.

09:43:22              THE COURT:  Yes.

09:43:24              Ladies and gentlemen, occasionally, there are

09:43:26   summaries or charts or like maps or drawings a witness might

09:43:33   make that a lawyer thinks might be useful in your

09:43:38   understanding the testimony of the witness, but they

09:43:41   aren't -- they -- they themselves aren't the testimony, and

09:43:44   therefore, they are here in the jury room -- I mean, they are

09:43:49   here in the courtroom, but they will not be with you in the

09:43:51   jury room.  And apparently Exhibit 51 is one such exhibit.

09:43:59              So this, as Demonstrative Number 1 for Dr. Munzing,

09:44:05   will be displayed to the jury and marked for identification

09:44:09   only.

09:44:10              MR. BALDING:  Thank you, Your Honor.

09:44:11   Q. Dr. Munzing, can you see the sheet that I put up as

09:44:16   Exhibit 51, page 1?

09:44:16   A. Yes, I can.

09:44:17   Q. Are you familiar with -- I'll show you, I guess, page 6,

09:44:23   which is the second portion of this slide before I ask you

09:44:27   about it.

09:44:30              This appears to have approximately 10 entries across

09:44:32   the center.  Are you familiar with this PowerPoint --

09:44:35   A. Yes.

09:44:37   Q. -- presentation?

1 09:44:38          So going back to page 1.

2 09:44:45          When a patient comes to a doctor or a physician or a

3 09:44:48 nurse practitioner seeking pain treatment, are there general

4 09:44:51 questions the physician should ask the patient?

5 09:44:55 A. Yes.

6 09:44:56 Q. Is that -- if we call that the medical history, is that

7 09:44:58 what you meant by this portion of the slide?

8 09:45:00 A. Yes.  Regardless of -- typically regardless of why you go

9 09:45:06 to a provider -- I'll use provider in the broad context of

10 09:45:10 physician, nurse practitioner and nurse practitioner, and

11 09:45:14 physician assistant -- is that you take a medical history.

12 09:45:19 If someone comes in with a sore throat, you get a detail

13 09:45:22 about the sore throat.  If someone comes in with a back pain,

14 09:45:25 you get details about the back pain.  If someone comes in

15 09:45:30 with diabetes, you get a history regarding the diabetes.

16 09:45:34          And so, yes, the medical history is just something

17 09:45:39 we do regardless of really the piece of medicine that you are

18 09:45:44 dealing with.

19 09:45:45 Q. And with respect to specifically pain management, what

20 09:45:48 types of questions should a physician ask about with the

21 09:45:55 medical history inquiry?

22 09:45:56 A. Sure.  One wants to do a detailed pain history.  So I'll

23 09:46:01 use back pain as an example.  Is someone comes in with back

24 09:46:06 pain, and you want to know kind of how long you've had it,

25 09:46:09 was there any specific injury that caused it, or did it just

09:46:14  happen?  Where specifically location is?  Well, it's my lower

09:46:20  back.  Does it radiate to your -- or does it travel to your

09:46:23  legs?  Do you have any numbness, weakness, incontinence,

09:46:29  et cetera?

09:46:29          So you are trying to get information regarding the

09:46:31  pain.

09:46:32          One also wants to know if this is an ongoing chronic

09:46:36  issue.  What have you done for it in the past?  Have you seen

09:46:39  another provider?  Have you gotten any imaging or x-rays?

09:46:43  Have you gotten any laboratory testing, seen physical

09:46:46  therapy, taking medications?  Had any procedures, surgeries,

09:46:46  et cetera?

09:46:52          And so one wants to get a good idea about both

09:46:57  the -- whether this is acute pain that happened four hours

09:47:01  ago, three days ago, or is it, this is chronic pain I've had

09:47:05  for three years, is it constant, is it off and on?

09:47:10  Q. Is there also a benefit to asking questions like this

09:47:15  when it comes to risk assessment?

09:47:16  A. Sure.  In addition to looking at the specifics of the

09:47:23  pain, part of the medical -- part of the medical history is

09:47:27  that you put it in context of the patient.  Is this a

09:47:32  20-year-old otherwise healthy patient, or is this a

09:47:35  75-year-old person who has heart and lung disease?  The

09:47:39  management of those patients risk-wise may be very different.

09:47:45          And so one needs to find out chronic medical

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

problems.  They also need to look at mental health history, especially for chronic pain.  There is a great overlap between chronic pain, mental health history and substance abuse, current and in past.

So mental health history may include something such as anxiety, depression, bipolar disease, ADHD, et cetera.

One also wants to know whether one has any current or past abuse or -- I'll use the term addiction.  In medicine we use substance abuse disorder.  But for clarity sake, I'll just use the word addiction.

So one wants to know, have you had any problems with alcohol or other drugs prescribed or not prescribed?  Because it goes into your decision making, risk assessment of what treatments may be safe for the management of this patient.

Q. Is there anything a physician should do outside of talking to the patient directly to verify things the patient tells them about the medical history?

A. Absolutely.

The next -- the next step is -- well, I guess before you get there, if you -- sometimes people will come in with old medical -- prior medical records.  If they have those, you peruse those.  If you don't have those available, ordering them is exceedingly helpful if the individual is -- has sought medical care previously.

I think the next thing you do is you move to the

physical exam.  So based on the history, you are starting to come up with what -- what I or what one may think is going on.  The physical exam is to kind of pursue that further.

Again, we talked about back pain.  So you want a detailed examination of the back.  But also recognizing that this is a human being.  Human beings are individualized.  And I mentioned the healthy 20-year-old, and the not so healthy 75-year-old.  And so looking at things such as, you know, a brief review of vital signs, of heart, of lung.

Because some of those, if there is problems in those areas, could increase the risk to the patient of any controlled substance, and even some noncontrolled substances.

Q. You are talking about physical examination.  Before we get there, is there a danger with the medical history in just taking a patient's word for what they say?

A. I use the term frequently, not just when I'm testifying, trust but verify.  Having seen thousands of patients in my career, I trust my patients, but sometimes they come in with ulterior motives than what they are telling me.

So if someone has a substance abuse problem or addiction, they -- the individual may say or do things to try to convince me to prescribe to them based on their addiction. So they may say, I've got this terrible arm pain where trying to get me to prescribe to them an opioid or other.

However, one needs to, again, trust but verify.

1 09:51:25  Look at the whole situation.  And see, does -- does it flow

2 09:51:30  well?  Most patients, what they say is, at least in my -- in

3 09:51:37  my experience, most patients what they say is, is certainly

4 09:51:39  true to them.  But there are times when people will come in

5 09:51:45  using things like pain when they don't really have pain, what

6 09:51:50  they are trying to get from you is the prescription.

7 09:51:54  Q. Is that another reason why the physical examination and

8 09:51:57  these other steps are important?

9 09:51:59  A. Yes.

10 09:51:59  Q. And going back to the physical examination, does this

11 09:52:04  involve physically touching a patient, as opposed to simply

12 09:52:07  taking vital signs or range of motion?

13 09:52:09  A. Oh, absolutely.  One must, as part of the exam,

14 09:52:13  especially touching the -- I use the example of the back,

15 09:52:21  looking at the back, touching the back, having them do

16 09:52:25  certain range of motion, you know, bend forward, bend

17 09:52:30  backward, some of these to see how their range of motion is.

18 09:52:33         Also, looking at things such as, you know, some back

19 09:52:40  problems can cause problems with your reflexes, your elbows,

20 09:52:48  your knee reflections.  Checking for your strength, checking

21 09:52:53  for what we sensation.  Can you feel me when I touch you?

22 09:52:55  Certain problems with the back or the neck, the spine may

23 09:52:59  affect both the -- may cause you to have weakness, may cause

24 09:53:04  you to have some numbness, et cetera.

25 09:53:06         And so the exam kind of helps guide you to try to

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

109:53:11 say, how serious is it?  Are there other physical findings,

209:53:17 such as weakness, numbness, et cetera, that I need to pay

309:53:21 close attention to?

409:53:23 Q. Would it be appropriate for a physician not to perform a

509:53:27 physical exam when assessing a patient who is complaining of

609:53:31 pain?

709:53:31 A. Certainly not if you are considering prescribing a

809:53:36 controlled substance.

909:53:37 Q. And what about subsequent appointments after the initial

1009:53:41 visit, should subsequent appointments generally also include

1109:53:45 physical examination?

1209:53:46 A. Yeah.  Especially -- especially the detailed focused exam

1309:53:53 on the area of the pain.  Do you need a full physical exam at

1409:53:57 every visit?  No.  But if you are managing and you are

1509:54:01 treating pain, then an examination of the area of pain is

1609:54:04 necessary.

1709:54:05 Q. Now, with respect to, if you are considering prescribing

1809:54:08 controlled substances, if you did not conduct a physical exam

1909:54:15 on the initial visit, would it be appropriate to fail to

2009:54:19 conduct a physical exam on subsequent visits?

2109:54:21 A. Definitely not.

2209:54:23 Q. Why is that?

2309:54:23 A. Well, even if you do a physical exam at the first visit,

2409:54:30 you need to do an examination down the road.  People change

2509:54:35 over time.  People are dynamic.  I may come in today and say

I've got terrible pain on my lower back, but a week from now

or a month from now, in being seen, I may say, wow, my back

is feeling much better.  And so one would repeat at least

that portion of the exam to see, has there been any changes?

Or on the alternative, is the patient getting worse?

You know, fortunately, most of the time people are

improving, but sometimes people are getting worse, and it may

drive you to either do more investigation; imaging,

laboratory testing, consultations, et cetera.

Q. Speaking of those things -- imaging, lab testing,

consultation -- are those other steps you might take in

making an initial diagnosis when considering prescribing

controlled substances?

A. Yes.  And that would be -- it's kind of the, even though

we don't have a box that says imaging or labs, is that based

on the history, based on the examination, the provider needs

to determine, do I need any additional information or is any

additional information warranted?  Sometimes it is, and

sometimes it's not.

And so it would be -- whether it be something you

can get stat in your office and have it before the patient

leaves, or it may be an x-ray or an MRI, or something that is

done, that may be done in the next two days or two weeks.

And so it would -- it would be at that point, which

then -- do you want me to go to the treatment and the --

09:56:18  Q. I'll ask another question if you are done.  You finished

09:56:21  your answer, then I can ask another question.

09:56:23  A. So you are using all of that information to come up with,

09:56:27  what is the most likely diagnosis or diagnoses?  Sometimes

09:56:32  it's very obvious, and sometimes it's not so obvious.

09:56:35       So we call it -- if you are not sure, we call it a

09:56:40  differential diagnosis.

09:56:41       So I think it's, you know, arthritis in the spine,

09:56:46  degenerative disc disease of the spine, but it could be this,

09:56:52  this, this.  And so looking at what are some other options

09:56:56  based on the history exam that you have, and potentially, if

09:57:00  you have imaging, based on the imaging.

09:57:03  Q. Now, going forward to treatment plan and objectives, the

09:57:07  next entry on the slide, what is a treatment plan?

09:57:10  A. Treatment plan is once one has arrived at, what do I

09:57:14  think is going on, diagnosis, differential diagnosis, one

09:57:19  comes up with a treatment plan appropriate for the diagnosis

09:57:24  or diagnoses.

09:57:26       It says objectives.  Looking at what are some

09:57:30  objective things -- what are the goals of the treatment?  If

09:57:35  someone comes in with very severe pain they've had for

09:57:38  30 years, my goal typically is -- it's not realistic to think

09:57:42  I'm going to get him completely out of pain, but if I can

09:57:46  lessen the pain, if I can improve their function, improve

09:57:50  what they can do and lessen the pain, that -- for some people

09:57:56 that is kind of, that is what your goals are or your

09:58:00 objectives.

09:58:01     For some people who have acute -- you know, if you

09:58:04 bump your arm and it's bad enough you need to come in and be

09:58:08 seen, but there is no evidence of a fracture, it may be,

09:58:13 we'll have you try some treatment, whether it be heat or ice

09:58:17 or a acetaminophen, Tylenol, what have you.

09:58:22     And one would expect that the pain would be -- would

09:58:26 be totally resolved within a matter of hours, days, at the

09:58:31 most a week or 10 days or something like that.

09:58:34     And so you are coming up with kind of what

09:58:38 management plan, typically talk about a multimodal, using

09:58:44 multiple strategies, and so using things like heat or ice.

09:58:50 With chronic pain many times physical therapy is beneficial.

09:58:55 Sending them to the physical therapist, and then getting the

09:58:58 report back from the physical therapist with detailed

09:59:01 instructions of what was recommended.

09:59:06     There are many noncontrolled medications that can be

09:59:08 used.  There are -- as this case has shown there are some

09:59:13 controlled medications.  There are some procedures that can

09:59:15 be used, whether it be joint injections, whether it be a TENS

09:59:21 unit that you place that gives electrostimulation for pain.

09:59:25 There is a lot of different things that can be done for the

09:59:28 management of pain.

09:59:29 Q. Is a treatment plan usually the exact same for every

patient?

A. No, because every patient has -- the areas of pain may be very well different.  Some people the pain may be extremely painful, and some people it may be very mild.  And so one needs to individualize treatment management based on location, severity of the pain, the whole aspect of the patient we talked about before, chronic medical problems, history of substance abuse, history of current or history of mental illness.

Q. Once a physician and a patient agree on a treatment plan, an individualized treatment plan, does the physician make any kind of record about that plan?

A. Basically, everything we do, especially when you are prescribing -- in medicine, everything we do should be documented.  That is especially true in the area if you are prescribing controlled substances, is documenting in detail the history, the examination, your assessment with specifics on, you know, why you think it's this, and not potentially something more severe, if it could potentially be in there.  And then in detail documenting your management plan.

Q. Why is it important to make detailed records like that?

A. There is many reasons.  Both -- both state law or statutes, but also the most important is patient safety and quality of care is -- it's rare for a patient to only see one provider, whether it be a physician, nurse practitioner,

10:01:21  et cetera, forever.  Many times patients will either at some

10:01:27  point switch to another physician or provider, they may end

10:01:30  up into an urgent care or the emergency room.  And so it's

10:01:34  documenting such that someone else taking care of the patient

10:01:38  can go, this is how they were on this date, are they getting

10:01:42  better?  Are they getting worse?  Or, they may go to the ER

10:01:46  for some totally separate thing, but an ER physician would

10:01:51  want to know, gee, why are they taking whatever medications

10:01:54  they are taking?

10:01:55       In medicine, we often use the mantra, if it's not

10:01:59  documented, it didn't happen, unless you can kind of prove

10:02:02  otherwise that it did happen.  And so when one looks -- when

10:02:08  I look and when physicians look at medical records, we have

10:02:14  to base kind of what we do on the information we have, and

10:02:18  the medical progress note is one key piece of that.

10:02:22  Q. Is this particularly important when prescribing

10:02:25  controlled substances such as opioids?

10:02:27  A. It's very important when prescribing opioids and

10:02:33  controlled substances.  It's also very important for many

10:02:35  other parts of medicine as well; cancer, heart disease,

10:02:41  et cetera.

10:02:42  Q. I'm going to quickly move on to the next entry, which is

10:02:46  morphine milligram equivalent.

10:02:51       Briefly, Dr. Munzing, could you tell us what that

10:02:52  means?

1 10:02:53  A. Sure.  We try to standardize, because there is many

2 10:02:57  different opioids; hydrocodone, oxycodone, oxymorphone, and

3 10:03:05  many others.  And their inherent dosage, 1 milligram of one

4 10:03:11  isn't necessarily the same as 1 milligram of the next.

5 10:03:13        So morphine milligram equivalent is a way to kind of

6 10:03:18  normalize where they are -- what it is.  The analogy is, I

7 10:03:24  know what a dollar is, at least I kind of think I know what a

8 10:03:28  dollar is.  But if I go to Mexico, they use pesos.  I don't

9 10:03:32  really know what is the value of a peso, compared to a

10 10:03:37  dollar.  If I see something for 25 pesos, I don't know, is

11 10:03:40  that a lot of money or a little money?

12 10:03:41        And so there is a conversion factor converting pesos

13 10:03:45  to dollars or euros in Europe to dollars.  This is the same

14 10:03:51  kind of thing.  There is a conversion factor.

15 10:03:54  Q. Does that allow -- sorry.

16 10:03:55  A. And you are converting it -- and just one example is that

17 10:04:00  oxycodone is one point -- you multiply it by 1.5.  So

18 10:04:07  30 milligrams of oxycodone times 1.5 equals an MME of 45.

19 10:04:12        Hydrocodone, it's a multiplier factor of 1.  So

20 10:04:16  30 milligrams of hydrocodone is 30 milligrams MME.

21 10:04:20  Q. And now, informed consent, see if I've got that right.

22 10:04:26  Tell us about informed consent in the context of patients.

23 10:04:29  A. Sure.  In medicine, any time we do anything that is

24 10:04:32  potentially risky, whether it be prescribing controlled

25 10:04:35  substances, whether it be taking -- doing a skin biopsy, or a

1 10:04:42   surgeon taking you to the OR, they go over, you know, what

2 10:04:46   are the potential risks of what we are going to be doing,

3 10:04:51   whether it be the skin biopsy, whether it be taking your

4 10:04:55   gallbladder out, whatever the risks are, whether it's -- here

5 10:04:59   is the chemotherapy, here is the risks of the chemotherapy.

6 10:05:03   You know, what are the most important risks?

7 10:05:06        There may be a whole laundry list of lists that the

8 10:05:10   pharmacist may give you a long sheet, but what are the most

9 10:05:16   important ones?  And what are the potential benefits?

10 10:05:21        And certainly when using the opioids -- and I'll use

11 10:05:27   opioid and Opiate interchangeably, most healthcare providers

12 10:05:33   do, there are slight differences.  But whether prescribing an

13 10:05:38   opioid, the most serious ones -- and that is part of the

14 10:05:41   reason why they are classified as a Schedule II, which was

15 10:05:48   the highest schedule for anything that you can prescribe, is

16 10:05:53   because there is risk of dependence, risk of addiction, risk

17 10:05:57   of overdose, and risk of death.  Are there also risks such as

18 10:06:02   constipation?  Of course.  And we'll often mention

19 10:06:05   constipation, because it's a very common side effect.

20 10:06:09        But we want to make sure that we hit the most

21 10:06:11   important ones, that people can die from opioid.  People be

22 10:06:16   overdose.  People can get addicted or dependent on them.

23 10:06:20   Q. Now, you mentioned that some of these risks are told to

24 10:06:24   the patient when they fill the prescription by a pharmacist,

25 10:06:27   is that correct, or they can be?

1  10:06:31   A. They can be, yes.

2  10:06:32   Q. Now is that a substitute, though, for the physician

3  10:06:34   having that discussion with the patient directly?

4  10:06:36   A. The physician prescriber needs to kind of review the most

5  10:06:41   important -- the most dangerous ones.  I -- I know the

6  10:06:49   pharmacists, you know, may give them a sheet, may spend

7  10:06:53   30 seconds with them, but I don't know exactly what the

8  10:06:56   pharmacist is going to tell them.  And so the most important

9  10:06:59   ones I need to make sure that I spell those out to the

10 10:07:02   patient, so it's clear that they know what the most important

11 10:07:06   risks are.

12 10:07:07   Q. Is the informed consent ever memorialized in writing?

13 10:07:12   A. It needs to be memorialized in writing in the progress

14 10:07:16   note.

15 10:07:16   Q. And do you ever have the patient fill out some sort of

16 10:07:20   informed consent form, or is that an option that a physician

17 10:07:23   might have?

18 10:07:24   A. One needs to document that you've -- that you've reviewed

19 10:07:29   the informed consent with some, you know, mild specifics.

20 10:07:34   Sometimes we'll use a form, and -- which lays all this stuff

21 10:07:39   out, and then have the patient sign and date it.  But just

22 10:07:47   having someone sign and date a form, you know, isn't

23 10:07:51   sufficient.  One needs to make sure.  And it may just be a

24 10:07:55   couple of words, discussed informed consent.  So it doesn't

25 10:07:58   have to be a long, lengthy discussion if you have given the

1  10:08:02   patient and discussed the form with them.

2  10:08:04   Q. Going on to the sixth page of this exhibit, it talks

3  10:08:12   about periodic review.

4  10:08:13        Once a physician has prescribed in this case an

5  10:08:16   opioid medication to a patient, is there any kind of followup

6  10:08:19   that the physician should do?

7  10:08:20   A. Yes.  Seeing the patient back in the office to see, are

8  10:08:25   you getting better?  Are you getting worse?  Are you staying

9  10:08:28   the same?  Did what we give you help matters?  And you know,

10 10:08:36   if you are improving, we frequently will start tapering down

11 10:08:41   the medication, because it is inherently dangerous.  And so

12 10:08:46   trying to mitigate or decrease the risk whenever possible.

13 10:08:50        So if you can, start bringing the dosage down based

14 10:08:54   on how the patient is doing.

15 10:08:56        If the patient is getting worse, again, it's looking

16 10:09:01   in detail to try to see, did I get the diagnosis correct?

17 10:09:06   Did I get the wrong diagnosis?  I need to kind of tweak it.

18 10:09:10   Or I may have the right diagnosis, but we are not improving,

19 10:09:13   we need to adjust our management strategy.

20 10:09:16   Q. Do you also discuss whether progress is being made

21 10:09:22   towards the treatment plan we discussed earlier and those

22 10:09:25   objectives?

23 10:09:26   A. Right.  We talked about the goals and objectives.  Are we

24 10:09:28   making progress towards that?

25 10:09:30   Q. Does the followup also -- a periodic review also involve

10:09:35  additional physical examination?

10:09:36  A. Oh, yes.  One needs to certainly -- especially the

10:09:41  focused area of pain, the exam of the area of pain.

10:09:47  Q. Is urine testing an important part of a periodic review,

10:09:54  urine drug testing?

10:09:55  A. Yeah.  Frequently checking urine drug testing, looking

10:10:02  for -- you know, are the -- is the medicine that I'm

10:10:06  prescribing to you showing up in your urine?  And are there

10:10:10  other things showing up in your urine that I'm not aware of

10:10:14  that shouldn't be there based on what is being prescribed?

10:10:19          And so there is a number of reasons for periodic

10:10:23  urine drug testing, and that is one of them.

10:10:27          Also, periodically checking the PDMP CURES in

10:10:31  California.

10:10:33  Q. Let me interrupt you.  Sorry.  What is a PDMP CURES in

10:10:38  California, what does that mean?

10:10:38  A. In California, we call it the PDMP, Prescription Drug

10:10:43  Monitoring Program, it's a database that when you fill a

10:10:47  controlled substance in California -- really in any state, it

10:10:50  gets reported to the state's PDMP.  In California, the PDMP

10:10:58  is called CURES, Controlled Substance Utilization Review and

10:11:01  Evaluation System.  In some other states they have other

10:11:07  names for theirs.

10:11:09          But basically, the -- it's a database of the

10:11:14  controlled medications that you filled.  We can pull it up

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 10:11:20   over three months, over a year, and see what you filled from

2 10:11:26   what providers, in what dosages, in what pharmacies,

3 10:11:32   et cetera.

4 10:11:32   Q. I'm going to briefly just show you what has been admitted

5 10:11:35   into evidence as Exhibit 41, the first page.  Let me just ask

6 10:11:44   you, is this -- start on this page, and if I show you pages 1

7 10:11:49   and 2, does that look like entries from a CURES database that

8 10:11:53   shows those prescriptions?

9 10:11:54   A. Yes.  This would be -- you know, this would be an example

10 10:11:59   of a CURES-type report.

11 10:12:11   Q. Now, you mentioned urine drug testing possibly not

12 10:12:14   showing positive for medication that has been prescribed.

13 10:12:17   Can you explain why that might be a concern for a physician?

14 10:12:19   A. Of course.  If I'm prescribing to a patient a controlled

15 10:12:26   substance, the expectation -- especially on a regular basis,

16 10:12:33   on a monthly basis or what have you, and not just, you know,

17 10:12:37   take one a week, or, you know, I'll give you, you know, five

18 10:12:41   for the month.  But if I -- if one is being prescribed on a

19 10:12:45   regular basis, then the understanding is the patient is

20 10:12:49   taking the medicine on a regular basis, and the urine drug

21 10:12:52   test should show that if I'm prescribing, I guess,

22 10:12:57   hydrocodone as an example to you, as an example, then when we

23 10:13:01   do your urine drug test, it should show hydrocodone.

24 10:13:05        If it doesn't, then my question -- then we call it

25 10:13:09   an aberrant result, it's an unexpected, inconsistent result.

1  10:13:15   There could be lots of reasons why it's not showing up.  But

2  10:13:19   we need to have that conversation, myself and the patient, as

3  10:13:24   soon as possible.  It doesn't have to be, you know, that day,

4  10:13:28   but within -- depending on the result, within a matter of a

5  10:13:32   day, two or three days, reaching out, going, gee, this isn't

6  10:13:38   showing up.  You know, where is it going?

7  10:13:43        And there is many possibilities, and I try to go and

8  10:13:48   let the patient tell me.  Sometimes they will go, well, I,

9  10:13:53   you know, I am doing much better, so I stopped taking it.

10 10:13:58   Great.  Then they probably shouldn't be asking for a refill,

11 10:14:01   you know, a few weeks down the road.

12 10:14:03        Or it may be my spouse, you know, had an injury, and

13 10:14:07   I gave my medicine to my spouse.  And I let them know that,

14 10:14:12   you know, that is not legal activity.  You can't do that.

15 10:14:16        And, you know, we -- you know, I'll document that

16 10:14:21   we've done that.  We'll need to monitor it more closely to

17 10:14:24   make sure that doesn't happen in the future.

18 10:14:29        Or there is obviously many other reasons why

19 10:14:33   prescriptions prescribed to a patient don't end up in the

20 10:14:35   urine.

21 10:14:37        I try to let the patient tell me, you know, what the

22 10:14:40   reason is, if the patient is aware.  And then I will document

23 10:14:47   kind of what we decided -- what I decided we are going to do

24 10:14:50   moving forward.

25 10:14:51    Q. Moving on to consultation.  What, if anything, should a

1 10:15:01  physician do with regard to consulting other physicians or

2 10:15:04  consulting -- what does consultation refer to?

3 10:15:07   A. If patients aren't responding as expected, or if you find

4 10:15:11  something that is well outside your scope -- if I have a

5 10:15:15  patient come in with hip pain, they fell and have hip pain

6 10:15:19  and I diagnose him with a hip fracture, I'm not an

7 10:15:23  orthopedist, I don't do hip surgery, so I would refer them to

8 10:15:28  the emergency room to be seen by the orthopedist, because the

9 10:15:34  likelihood is, unless they are extremely elderly, most people

10 10:15:40  with hip fractures need surgery.

11 10:15:43       Occasionally -- those very advanced in years,

12 10:15:49  depending on the fracture, occasionally the potential surgery

13 10:15:54  is too risky for some patients.

14 10:15:56       If people are following -- are seeing me for chronic

15 10:16:01  pain and are not improving, or getting worse, then one will,

16 10:16:09  and I will, potentially refer a patient, going, this person

17 10:16:14  might need an epidurale.  I don't do epidurals, I'm going to

18 10:16:18  send them to someone that -- to evaluate whether or not they

19 10:16:21  need an epidurale, and do that.

20 10:16:23       I have rarely but occasionally referred people to

21 10:16:29  neurosurgeons.  I don't do surgery on the back.

22 10:16:31  Neurosurgeons are the ones that -- occasionally orthopedists,

23 10:16:35  but neurosurgeons typically are the ones doing major back

24 10:16:39  surgery.  And if a patient needs that, then I refer the

25 10:16:46  patient to a neurosurgeon.

10:16:49   Q. So I believe we talked earlier about records.  And just

10:16:52   briefly, what sorts of things should be in the medical

10:16:57   records, in the file?

10:17:00   A. Certainly any imaging studies, your progress notes,

10:17:04   detailed progress notes as we discussed earlier.  Laboratory

10:17:09   results, urine drug test results.  If you have referred

10:17:15   somebody to, for example, physical medicine -- physical

10:17:18   therapy, or general surgery, orthopedic surgery, you know,

10:17:25   responses back for them.  You send -- you know, if I send a

10:17:29   patient to orthopedics, you know, they will -- you know, they

10:17:34   send the report back, so I'm aware, they saw the patient,

10:17:37   they didn't think this fracture -- I'm not talking hip

10:17:40   fracture, but the other fracture was significant, it -- you

10:17:44   know, splint for two weeks, splint for a month, and then I

10:17:49   would manage that.

10:17:51        Physical therapy, again, will send the information

10:17:54   back, so I know how to act on, A, I know that they actually

10:17:59   went to physical therapy, and B, that I know how to act based

10:18:02   on what my consultant recommended.

10:18:07   Q. And that kind of segues into the next entry, which is

10:18:13   compliance with laws and regulations, but how do keeping

10:18:17   records relate to compliance with laws and regulations?

10:18:19   A. I mean, one of the laws and regulations in California is

10:18:24   you need to have well -- you know, when you are prescribing

10:18:27   controlled substances, there needs to be -- it needs to be

1 10:18:30   well documented.

2 10:18:31          Also, laws and regulations in California now

3 10:18:35   requires checking CURES.  And so there is, you know, I guess

4 10:18:42   I -- well, I didn't actually put this together, but I had

5 10:18:48   reviewed it.  And one, if there is other laws and regulations

6 10:18:53   that pertain in that state, one needs to follow those.  Not

7 10:18:58   every state requires checking the PDMP.  California does.

8 10:19:05          And so I guess that is a catchall.  If there is

9 10:19:08   other laws and regulations, you need to make sure you follow

10 10:19:11   those, too.

11 10:19:11   Q. In other words, to act within the standard of care, does

12 10:19:14   that require you to be familiar with and follow the laws in

13 10:19:16   your particular jurisdiction?

14 10:19:17   A. Yes.

15 10:19:22   Q. Now, we've gone through kind of the standard of care

16 10:19:25   generally.  Does that standard of care apply also to

17 10:19:28   prescribing controlled substances to addicts, briefly?

18 10:19:30   A. Yes.  And actually prescribing to addicts, the standard

19 10:19:35   of care would be closer monitoring, recognizing that

20 10:19:40   individuals who have had addictions to one drug, could be

21 10:19:45   alcohol, could be an opiate, could be a benzodiazepine, or

22 10:19:52   others, gives them a higher risk for having addictions to

23 10:19:58   other addictive medications, alcohol, et cetera.

24 10:20:04          And so it's closer monitoring, because these

25 10:20:08   individuals are at higher risk for addiction and substance

1  10:20:13   abuse.

2  10:20:13   Q. Let's talk about red flags.  In the context of what we

3  10:20:17   have been discussing, what does a red flag mean to you?

4  10:20:21   A. A red flag is when you see an issue that -- most red

5  10:20:26   flags are not absolute.  It isn't -- most red flags are, if

6  10:20:32   you see it, you kind of look at it and you go, well, that is

7  10:20:37   out of the norm.  Is that a problem -- is that, you know, out

8  10:20:42   of the standard of care or is that out of, you know, what

9  10:20:47   ought to be done or not?

10 10:20:49          An example is if you are looking down the street and

11 10:20:51   you see -- you see smoke rising, it could be something

12 10:20:55   harmless, or it could be a blazing fire.  You just see smoke.

13 10:20:59   And so it means you need to investigate, you need to pursue

14 10:21:03   it further.

15 10:21:04          And so when one is going through and managing

16 10:21:08   patients, not only for controlled substance, but for other

17 10:21:13   things as well, one is, we are looking for red flags that may

18 10:21:17   say, this is something more important, this is something you

19 10:21:20   need to pay close attention to, this is something you need to

20 10:21:23   get more history or more exam or more imaging or something.

21 10:21:32   Q. Now, if a physician finds inconsistencies in what a

22 10:21:36   patient tells them, and what appears to be the facts, what

23 10:21:40   should a physician do?

24 10:21:41   A. Get more information, and mention to the patient that,

25 10:21:52   you know, you said this, but over here you said something

1 10:21:56  totally different.  Or you said this, you said, I can't even

2 10:22:02  walk standing up, but then you walked into the room and you

3 10:22:05  were walking standing up without any trouble.

4 10:22:07       Or you get a urine drug test that there is

5 10:22:11  inconsistencies.  It's more kind of delving deeper, trying to

6 10:22:16  pursue and see, is there an issue there?

7 10:22:19  Q. Let's talk about diversion.

8 10:22:21       What does that phrase mean?

9 10:22:23  A. If I prescribe a medication to a patient for a particular

10 10:22:30  issue, then -- and they fill it, and they take it for, for

11 10:22:38  example, back pain or what have you, they take it as

12 10:22:41  prescribed, as directed, that is how legally opioids -- we

13 10:22:48  are talking -- I'm assuming we are talking opioids.  That is

14 10:22:52  how legally opioids are being prescribed.

15 10:22:54       But if I prescribe it to you and you give it to your

16 10:23:01  significant other, to your friend, then it's being diverted

17 10:23:05  to an individual who I'm not treating, and they don't have

18 10:23:11  the kind of medical oversight.

19 10:23:13       And so it's either intentional.  Obviously if people

20 10:23:18  are getting it and they are selling it on the street, it's

21 10:23:21  being diverted.  It's being -- it's being moved from the

22 10:23:25  legitimate practice, the legitimate treatment, to an area

23 10:23:31  that is not legitimate.

24 10:23:33  Q. Does the standard of care require physicians to, you

25 10:23:36  know, investigate and be aware, on the lookout for signs of

1 10:23:40  diversion?

2 10:23:40  A. Yeah.  We are -- when one is prescribing -- when we are

3 10:23:45  prescribing, we being me and the medical community, are

4 10:23:50  prescribing controlled substances, is that -- part of our

5 10:23:53  responsibility is to do everything within our power to keep

6 10:23:59  these medicines legitimate being used and not being diverted

7 10:24:03  in other ways.

8 10:24:05       You know, we can't control every piece of it, but

9 10:24:08  there is certainly things we can use, and we've already

10 10:24:10  talked about, that play a piece in that.

11 10:24:13  Q. Now, when you talk about the standard of care, are you

12 10:24:19  talking about a specific -- a threshold, a range?  Can you

13 10:24:26  explain what it is a little more broadly?

14 10:24:26  A. Sure.  The standard of care is a range, from the bear

15 10:24:30  minimum is that you have to do at least this.  You can do a

16 10:24:34  lot more, but you've got to do it at least -- at least the

17 10:24:39  bear minimum.

18 10:24:40       And so if one is doing the minimum standard of care,

19 10:24:45  they are still doing the standard of care.

20 10:24:46       Now, does that mean that if I had a cancer, I may

21 10:24:51  want to go to an institution somewhere in the country that

22 10:24:57  they specialize on that cancer?  They may do best practice

23 10:25:03  or, you know, the best care for that cancer.  That would be

24 10:25:08  within standard of care as well.

25 10:25:11       So standard of care is a range, but there is a floor

1 10:25:14   to the standard of care that you need to stay above.

2 10:25:17   Q. And the things we've talked about, are those things

3 10:25:21   expected, whether at the top of the range or the bottom of

4 10:25:23   the range, the expectations we have just discussed?

5 10:25:26   A. What we have discussed is you need to do at least that.

6 10:25:30   Q. And when you talk about -- I'm going to ask about the

7 10:25:33   usual course of professional practice.  Is that -- to go

8 10:25:37   below that, would that be consistent in your mind with below

9 10:25:39   the minimal acceptable floor of the standard of care?

10 10:25:42   A. The --

11 10:25:45         MS. MURPHY:  Objection.  Calls for a legal opinion.

12 10:25:47         THE COURT:  Overruled.

13 10:25:50         But so the jury will be able to understand the

14 10:25:53   language in the jury instructions.  The instructions will be

15 10:25:56   coming from me.

16 10:25:57         Go ahead, Mr. Balding, you may ask the question.

17 10:26:00   Q. To ask again, when you think of the usual course of

18 10:26:03   professional practice, what does that represent to you?

19 10:26:05   A. Yeah.  When I look at the standard of care, if you

20 10:26:13   slightly divert below the standard of care, but basically

21 10:26:18   everything -- most everything else is above the standard of

22 10:26:20   care, but one or two items are minimally below that, have you

23 10:26:24   gone below the standard of care?  Yes.  But it may --

24 10:26:27   depending on the specifics, it may still be within the usual

25 10:26:31   course of professional practice.

10:26:32    For example, if a medical record -- everything is

10:26:39  doing great, but the legibility is -- you know, not every

10:26:43  word can be read, but everything else is fine.  Has it

10:26:47  completely met the standard of care?  Not completely.  But

10:26:52  would that fall within the usual course of professional

10:26:54  practice?  Yes.

10:26:56  Q. Doctors writing sloppily is not considered outside the

10:27:00  bounds of the discipline?

10:27:01  A. It would depend on the specifics.

10:27:04  Q. Bad joke.  Sorry.

10:27:06  A. But solely that, and thank goodness that -- you know, now

10:27:12  many physicians and others are using electronic medical

10:27:15  records, but not everybody.  And -- but that has helped a

10:27:22  lot.

10:27:22  Q. Now when you talk about the standard of care, does that

10:27:25  apply regardless of the financial or other demographics of

10:27:29  the patients that are being treated?

10:27:30  A. Yeah.  That doesn't really go into the minimal standard

10:27:33  of care.

10:27:34  Q. In other words, rich people, poor people, all entitled to

10:27:36  be treated with the standard of care, is that correct?

10:27:38  A. Correct.

10:27:39  Q. Now, I'm going to move on to some specific questions

10:27:46  about this case, Dr. Munzing.

10:27:47    Did you review materials in connection with this

10:27:50   1   case?

10:27:50   2      A. Yes, I did.

10:27:51   3      Q. What kinds of materials did you review?

10:27:53   4      A. Undercover audio and videotapes.  I reviewed medical

10:28:04   5   records for both the undercovers, and some other additional

10:28:10   6   patients.  I was provided with -- my recollection was I was

10:28:21   7   given the CURES PDMP database information.  And I believe I

10:28:28   8   also was given some DEA brief summaries pertaining to the

10:28:36   9   undercovers.

10:28:36  10      Q. And did you review materials for -- if I refer to either

10:28:41  11   UC1, the undercover name was Dewayne Brooks, and then UC2,

10:28:44  12   the undercover name being Emile Paul, did you review --

10:28:48  13   excuse me -- review materials related to those two

10:28:50  14   individuals?

10:28:51  15      A. Yes, I did.

10:28:51  16      Q. And those would have been -- to your understanding, were

10:28:54  17   those law enforcement officers acting in an undercover

10:28:57  18   capacity in visiting the defendant in this case?

10:28:58  19      A. That's my understanding, yes.

10:28:59  20      Q. And you've never -- to be clear, you've never met the

10:29:03  21   defendant in this case, is that correct?

10:29:03  22      A. I've never met the defendant.

10:29:06  23      Q. Let's start by talking about UC1.

10:29:09  24           THE COURT:  Before we do that, let's take our

10:29:12  25   morning break.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 10:29:14          Ladies and gentlemen, remember what I told you.

2 10:29:18    Don't investigate the case, don't use your phones, don't do

3 10:29:22    anything else, don't discuss the case with anyone, don't

4 10:29:25    allow anyone to discuss the case with you.

5 10:29:28          We are going to end at 1:30 today.  There were some

6 10:29:32    matters -- I took most of my matters off calendar today, so

7 10:29:37    the trial could continue.  But there were a couple of things

8 10:29:40    that absolutely had to go forward this afternoon.  And,

9 10:29:44    therefore, we'll be breaking at 1:30.

10 10:29:48          All right.  Thank you.

11 10:29:50          (Thereupon, the jury retired from the courtroom.)

12 10:30:27          THE COURT:  Counsel, Ms. Rahbarvafaei, Dr. Munzing,

13 10:30:32    I expect you back in the courtroom at 10 to 11.  And then

14 10:30:38    we'll start working with the jurors.  We won't be able to

15 10:30:41    start right then, but I don't want, again, them waiting on

16 10:30:46    us.

17 10:30:46          Is there -- when you -- I have to give the

18 10:30:51    instruction, obviously, about the patient files, which are

19 10:30:55    out -- not the eight counts of the indictment.  So I guess I

20 10:31:03    was prepared to do that now, and then you were focusing,

21 10:31:08    Mr. Balding, on the undercover agents.

22 10:31:10          So just when is it that -- there was a brief

23 10:31:13    reference to the other files, but I would rather give the

24 10:31:17    instruction when it will have the most impact.

25 10:31:19          Do you intend to go over what happened with

```
 1  10:31:23   Detective Mimms and Detective Delery, and then go into those?
 2  10:31:26   I just want to figure out when to give the instruction.
 3  10:31:29            MR. BALDING:  That's correct.  And I can take a
 4  10:31:30   pause when it's time, and I'll just signal to you that -- to
 5  10:31:34   Your Honor that you can give that instruction.
 6  10:31:35            THE COURT:  Yes, Ms. Murphy.
 7  10:31:37            MS. MURPHY:  Thank you, Your Honor.
 8  10:31:37            There are some matters that I would like to take up
 9  10:31:39   with the Court, just some exhibit -- I understand, I would
10  10:31:41   like to do it with the witness outside of our presence.
11  10:31:44            THE COURT:  Dr. Munzing, if you would please step
12  10:31:46   outside the courtroom.
13  10:31:47            But, again, we've got to give Ms. Diaz a real break.
14  10:31:53            MS. MURPHY:  Understood.  We could come back
15  10:31:55   earlier, Your Honor, to give Ms. Diaz a break.
16  10:31:56            THE COURT:  I think it's more the amount of time
17  10:31:58   than right now we haven't been going that long.  Let's just
18  10:32:01   get it done.
19  10:32:02            MS. MURPHY:  I'll just wait.
20  10:32:03            I may ask our expert to go ahead and step outside as
21  10:32:06   well.
22  10:32:19            Thank you, Your Honor.
23  10:32:19            So there are, I have some logistical issues.  The
24  10:32:23   government, I've spoken with them about this already,
25  10:32:25   Government Exhibit 53.
```

1  10:32:27          MR. BALDING:  I'm sorry, we are not going to seek to

2  10:32:29   introduce that.

3  10:32:30          MS. MURPHY:  That takes care of that.

4  10:32:31          There is also a -- there is a fact that we want to

5  10:32:35   get out on cross-examination that concerns the extent of the

6  10:32:40   federal awards that have been given to Dr. Munzing by the

7  10:32:44   Department of Justice.

8  10:32:46          We -- Mr. Driscoll alluded to that in his opening.

9  10:32:50   We have the documents and we have a declaration to lay the

10 10:32:53   foundation for it.

11 10:32:55          I can either do that through a live witness or I can

12 10:32:58   give the government -- I had prepared a little pocket brief

13 10:33:01   so it lays out the foundation for this coming in.  I would

14 10:33:04   prefer to just save the time.

15 10:33:05          THE COURT:  It sounds like something to discuss with

16 10:33:07   the government.  I'm giving you the benefit of the doubt that

17 10:33:09   it is something which is not collateral where you would

18 10:33:13   simply have to accept his answer one way or the other.

19 10:33:17          MS. MURPHY:  In my mind, Your Honor, it goes to

20 10:33:19   bias.  And there is a hearsay exception, because it's a

21 10:33:22   public record.

22 10:33:22          THE COURT:  Well, discuss it with the government and

23 10:33:24   see what you can work out otherwise.  You can raise it with

24 10:33:26   him, but you would have to prove it up in your case in chief.

25 10:33:29   So we'll have the opportunity to determine that.

1 10:33:31          MS. MURPHY:  Understood.

2 10:33:32          The other -- I think we just have more issues that

3 10:33:36   we need to address concerning this perjury issue.  I would

4 10:33:39   like to be able to lay a record for that, whether we want to

5 10:33:42   do that now or we want to do that later.  But there are

6 10:33:45   several things that I still need to create a record for.

7 10:33:48          THE COURT:  Mr. Balding, how much longer do you

8 10:33:50   expect the direct testimony to be?

9 10:33:53          MR. BALDING:  If we come back at 10:50, I was going

10 10:33:56   to go through --

11 10:33:57          THE COURT:  More likely 10:55, I want you here --

12 10:34:00          MR. BALDING:  My plan is to go through the video,

13 10:34:03   not in the entirety, but to replay the bulk of them.  They

14 10:34:05   take 40 minutes or so, with the questions probably another

15 10:34:08   30.  So an hour, 15, maybe.  And then an hour and a half, I

16 10:34:14   think it will be done.

17 10:34:15          THE COURT:  Then that would pretty much take up our

18 10:34:17   time before the next break.

19 10:34:22          So let's do this for now, and then you will have the

20 10:34:24   opportunity to make a record.

21 10:34:29          I will say, Ms. Murphy, I was -- found myself being

22 10:34:32   amused when you said I should appoint CJA counsel for this

23 10:34:35   witness, as you of all people should know, I very much doubt

24 10:34:39   that this witness will qualify for CJA counsel.  He certainly

25 10:34:42   would have the opportunity to -- have an opportunity for

1  10:34:45  quite sometime now to hire --

2  10:34:46          MS. MURPHY:  I would have found someone for him,

3  10:34:48  Your Honor.

4  10:34:48          THE COURT:  All right.

5  10:34:49          MS. MURPHY:  Thank you.

6  10:34:49          (Thereupon, there was a brief recess.)

7  10:55:58          (Thereupon, the jury returned to the courtroom.)

8  10:56:33          THE COURT:  Ladies and gentlemen, welcome back.

9  10:56:37          All 14 of you are here, as are Ms. Rahbarvafaei and

10 10:56:40  the lawyers.

11 10:56:41          Mr. Balding, you may proceed with your direct

12 10:56:43  examination.

13 10:56:43          MR. BALDING:  Thank you, Your Honor.

14 10:56:45   Q. Dr. Munzing, before we broke, I mentioned some undercover

15 10:56:51  recordings -- or you had mentioned some undercover recordings

16 10:56:54  you had reviewed.  I'm going to play you now Exhibit 6, which

17 10:56:57  has been admitted into evidence.  And this is a

18 10:57:00  February 22nd, 2018, visit of UC1, or the person using the

19 10:57:06  name Dewayne Brooks.  I'm going to play a portion and then

20 10:57:09  I'm going to ask you some questions.

21 10:57:10   A. Okay.

22 10:57:17          (Thereupon, the video was played.)

23 11:00:17   Q. I'm pausing it after a few minutes of play.

24 11:00:22          Dr. Munzing, it appears that the defendant asked

25 11:00:25  some general background questions in this meeting.  Did you

1 11:00:28  hear that part of the recording?

2 11:00:30  A. Yes.

3 11:00:31  Q. Were those -- how did those compare with what she would

4 11:00:34  have been expected to ask under the standard of care?

5 11:00:36  A. She asked some of the questions that we talked about

6 11:00:39  earlier.  She failed to ask some of the other questions that

7 11:00:42  we -- the specifics that we had talked about earlier.

8 11:00:45  Q. Were the questions she asked, you know, sufficient, given

9 11:00:48  the context of a new patient who is coming in requesting pain

10 11:00:51  medication specifically?

11 11:00:52  A. If that is all she asked, that would not be sufficient to

12 11:00:58  justify prescribing controlled substances.

13 11:01:00  Q. I'm going to turn to the physical examination we spoke of

14 11:01:05  earlier.

15 11:01:05        Did any physical examination occur during this

16 11:01:08  portion of the video?

17 11:01:09  A. We have a limited view, but there is no evidence that she

18 11:01:15  did any physical exam, that she actually touched the patient

19 11:01:18  at all.

20 11:01:19  Q. When she asked about moving the leg up and side to side,

21 11:01:22  would that constitute an adequate physical exam?

22 11:01:24  A. That is -- that may be a portion of an examination, but

23 11:01:31  that is not -- that is not an appropriate, adequate exam, no.

24 11:01:35  Q. And particularly when someone is complaining of pain in

25 11:01:38  the shoulder or neck, would that be adequate to take the

11:01:41   place of the physical examination we discussed earlier?

11:01:43   A. No.   The patient's complaint was kind of the shoulder and

11:01:47   the neck.   And again, she didn't touch the patient, she

11:01:52   didn't examine the shoulder and neck, based on what we could

11:01:57   see here and heard here.

11:01:58   Q. Now, there was a discussion by the undercover officer

11:02:01   talking about taking someone else's Norco.   Do you recall

11:02:03   that discussion?

11:02:04   A. Yes.

11:02:07   Q. Is that of any concern to you as a physician reviewing

11:02:09   this?

11:02:09   A. That's very concerning.   We talked about diversion.   So

11:02:13   the individual -- the undercover was obtaining an opiate --

11:02:19   an opioid from another person, not prescribed, and so that is

11:02:26   certainly not legal activity.

11:02:28   Q. Now, would a patient telling a physician that they have

11:02:32   obtained a controlled substance through diversion substitute

11:02:36   from -- for a medical record that they have been properly

11:02:40   prescribed that medication?

11:02:41   A. No, not at all.

11:02:43   Q. Why is that?

11:02:43   A. Well, if one has properly been prescribed an opioid, or

11:02:49   other medication, if it's a proper prescription, they have

11:02:55   been properly evaluated.   Taking Norco, getting it from his,

11:03:02   quote, unquote, his girl, end quote, there is -- there is no

11:03:08    proper evaluation.  There is no informed consent.  All the

11:03:12    things that we talked about that go into kind of legally -- a

11:03:17    legal prescription, and legally prescribing controlled

11:03:20    substances, those are not part of it, those factors are not

11:03:28    utilized when obtaining it from someone else.

11:03:30    Q. I'm going to continue playing a portion of the video.

11:03:37            (Thereupon, the video was played.)

11:04:22    Q. So here do you see it appears she's noting that he had

11:04:28    mentioned taking Norco?  Do you see that portion?

11:04:30    A. Yes.

11:04:30    Q. And I'm going to show you briefly Exhibit 30, at page 24,

11:04:37    which has been admitted in evidence.

11:04:48            And is this -- does this appear to be a page from

11:04:52    the patient file of UC1 of Dewayne Brooks that you reviewed?

11:04:55    A. Yes.

11:04:56    Q. And what type of document does this appear to be, some

11:05:02    sort of medical record?

11:05:03    A. It's like a summary document, it includes problem list,

11:05:10    medications, past surgeries, et cetera.

11:05:15    Q. Do you see in the center of the part I've expanded under

11:05:22    medications prescription name, do you see the word there?

11:05:24    A. I do.

11:05:25    Q. What is that?

11:05:25    A. Norco or hydrocodone.

11:05:29    Q. What is the dose?

11:05:29   A. 5/325.

11:05:31   Q. And is that consistent with what he had reported to the

11:05:35   defendant -- what UC1 had reported to the defendant about

11:05:38   having taken five of the Norco in the -- in the strength of 5

11:05:44   when she had asked him about it earlier?

11:05:47   A. Yes.

11:05:48   Q. Is there any way, from your review, to tell whether this

11:05:51   notation that he's taken Norco dosage of 5 was through

11:05:54   diversion or some other means, or was properly prescribed,

11:05:58   excuse me?

11:05:58   A. From this I can't tell.

11:05:59   Q. And would you expect some sort of notation that if you

11:06:04   are noting that he's taking Norco in the past by these means,

11:06:08   in other words, diversion, would that be noted or should that

11:06:10   be noted in the file?

11:06:11   A. If you are going to include it, yes.  Most of the time

11:06:16   one would not include medications that -- on this kind of

11:06:20   document, that are obtained through diversion.

11:06:27   Q. Go back to Exhibit 6.

11:06:33        Now, she prescribed -- the defendant prescribed

11:06:37   tramadol and some other substances in this -- it appears, in

11:06:40   this encounter.  Do you recall that?

11:06:42   A. Yes.

11:06:42   Q. And based on the examination, both discussion, the

11:06:48   physical examination, the other facts that you can see, was

that appropriate to go straight to opioids in this context?

A. Not based on the limited information we have here.

Q. Is that changed even though -- considering that she prescribed other non-opioids as part of the treatment plan?

A. No.

Q. Did you hear the portion where the defendant said, don't take it if you don't need it, referring to the tramadol?

A. Yes.

Q. Is that an adequate warning for informed consent purposes or other things we've discussed?

A. That is not really an informed consent.  That is just the direction on how to take a medication.

Q. And would you expect, when prescribing an opioid in the first meeting, more than simply saying, don't take it if you don't need it?

A. Yes, of course.

Q. Now, for a physician to prescribe something that is -- with an instruction like that, would you expect a limited dosage of that prescription?

A. Yes.  If the instruction's just take it for severe pain, at no point do we really know how frequently the patient has severe pain, et cetera.  There has been minimal history. There has been no -- the physical exam, we have vital signs, and potentially, you know, move your leg, but nothing really about the neck and the shoulder.  And if one is going to

11:08:16 start a medication just to be used for a severe pain, first,

11:08:22 you need to figure out how often the patient has severe pain,

11:08:25 and prescribe appropriate -- accordingly.

11:08:29       If you've done all the other things appropriately,

11:08:34 she gave enough -- she gave, my recollection, is 60 tablets.

11:08:40 And that would not be kind of, here, let's do a trial of a,

11:08:45 you know, 10 or 15.

11:08:47 Q. All right.  I was just going to get to the actual

11:08:50 prescription that day.

11:08:51       Putting up Exhibit 22, which has been admitted into

11:08:54 evidence.

11:08:54       This appears to be the prescription to Dewayne

11:08:58 Brooks, who we know is UC1, on that date, February 22nd,

11:09:02 2018.  Do you see Exhibit 22?

11:09:04 A. I do see that.

11:09:05 Q. And does that confirm that, you know, what she prescribed

11:09:07 in terms of the tramadol and the 60 pills?

11:09:10 A. Sixty tablets.  And the direction was to take it twice a

11:09:14 day for pain.

11:09:17 Q. All right.  And again, is that -- in your mind, is that

11:09:19 consistent with the instruction, the verbal instruction, only

11:09:22 take it if your pain is really serious?

11:09:24 A. No.

11:09:26 Q. Now, I'm not going to play the rest of the encounter, but

11:09:30 did you review the entire portion of the video in which UC1

11:09:34    and defendant met on that date?

11:09:35    A. I did.

11:09:36    Q. Was there anything else later in that visit that changes

11:09:38    how you -- the conclusion you reached as to the propriety of

11:09:44    that prescription that we are looking at?

11:09:45    A. No.

11:09:46    Q. Now, in your opinion, based on your training and

11:09:51    experience and review, was this prescription, Exhibit 22,

11:09:56    within the usual course of professional practice?

11:09:58    A. No.

11:09:58    Q. Was it made for a legitimate medical purpose?

11:10:00    A. No.

11:10:00    Q. Now, was it a departure from the standard of care?

11:10:05    A. Yes.

11:10:05    Q. And are there degrees in your mind of departures from the

11:10:09    standard of care?

11:10:09    A. Yes.

11:10:10    Q. Are those -- what are those degrees?

11:10:13    A. And I use the same -- I conform with what the Medical

11:10:18    Board of California uses, is a simple departure, some might

11:10:23    call it a minor departure, or an extreme departure.  So I

11:10:28    either look at it as no departure, simple departure, or an

11:10:33    extreme departure.

11:10:34    Q. In your opinion, based on your review of the files and

11:10:36    the video -- or the video and audio, was this a simple

1 11:10:40   departure or an extreme departure?

2 11:10:41   A. Based on the entirety of the review, it would be an

3 11:10:47   extreme departure.  You are prescribing a controlled

4 11:10:50   substance which has inherent risk to them.

5 11:10:55   Q. And you are doing that -- what are the -- what are the

6 11:10:58   main concerns with having done that, in this context?

7 11:11:01   A. Well, here you have minimal history.  There is -- she

8 11:11:07   never touched the patient.  So there certainly is not an

9 11:11:10   appropriate examination.

10 11:11:14          When prescribing, we talked about it earlier, is she

11 11:11:19   didn't get a very limited past pain history.  There is -- so

12 11:11:27   there is limited history when one looks at -- and you haven't

13 11:11:38   shown it, but when one looks at the progress note there is a

14 11:11:38   lot of information that needed to be there that just isn't

15 11:11:41   there.

16 11:11:41   Q. Now, are you familiar with the second -- I'm going to put

17 11:11:45   up the second recording.  This one is an audio recording.

18 11:11:49   It's from Dewayne Brooks, or UC1, undercover 1, March 22nd,

19 11:11:54   2018, and I'm going to play a portion of that and then ask

20 11:11:57   you about it.

21 11:11:57          This is Exhibit 1.

22 11:12:00          (Thereupon, the audio was played.)

23 11:12:51   Q. I paused it about a minute in.

24 11:12:54          Anything concerning about the portion of the

25 11:12:56   video -- or the audio you just heard?

1 11:12:58   A. Yes.  And I also -- I mean, similar for the first visit

2 11:13:05   is, he comes in and he really wants Norco.  And at the first

3 11:13:09   visit, the first thing he says is, I'm here for pain

4 11:13:13   medications.

5 11:13:13        So when someone comes in requesting specifics like

6 11:13:16   that, that is a red flag.  Not a definitive, but certainly it

7 11:13:23   is something of concern when somebody either says, I want

8 11:13:29   pain medication, and then went on to say, I want Norco.  And

9 11:13:34   here he says, you know, tramadol didn't work, I want Norco.

10 11:13:38        That is -- that is concerning.

11 11:13:40   Q. And I'm going to play a little more portion and then ask

12 11:13:44   you a few more questions.

13 11:13:45        (Thereupon, the audio was played.)

14 11:14:29   Q. So I played another portion.

15 11:14:33        What, if anything, concerns you with this portion of

16 11:14:35   the interaction?

17 11:14:36   A. Once again, he is admitting that he is obtaining Norco

18 11:14:42   from his girlfriend.  As we talked about, this is another

19 11:14:45   episode of opiate diversion.

20 11:14:49   Q. And then defendant talks about changing slowly, and

21 11:14:55   something being illegal.

22 11:14:57        Do you have any concerns with going straight from

23 11:14:59   tramadol to Norco generally?

24 11:15:00   A. If it's an -- I mean, if it's based on appropriate

25 11:15:07   evaluation and appropriate documentation, I have no

11:15:13  significant concerns about going from one medication -- from

11:15:16  tramadol to Norco, if it's based on appropriate -- an

11:15:21  appropriate evaluation.

11:15:22   Q. Is the issue here, though, still, to you -- any issue

11:15:25  with the fact that a physical examination still doesn't

11:15:28  appear to be conducted?

11:15:29   A. That is part of why I said an appropriate evaluation,

11:15:32  appropriate history, appropriate examination, which we

11:15:36  haven't seen either one of those thus far.

11:15:38   Q. Let's take a step back, I guess, for talking about

11:15:42  tramadol versus hydrocodone.  Is tramadol a Schedule IV

11:15:48  controlled substance?

11:15:48   A. Yes, my recollection it's a Schedule IV.

11:15:51   Q. And is hydrocodone considered a Schedule II?

11:15:55   A. Yes.

11:15:55   Q. What generally does that mean?  I mean, why would

11:16:00  something be a higher schedule or lower number, 2 versus a 4?

11:16:03   A. The lower the number -- they come in schedules I through

11:16:07  V.  Schedule I can't be prescribed.  So the prescriptions can

11:16:10  be schedules II, III, IV and V.  As you go down the chart, or

11:16:16  the number goes higher, from II, III, IV, V, the risk of

11:16:21  dependence decreases, the risk of potential harm decreases,

11:16:33  but even Schedule Vs certainly can -- they are scheduled,

11:16:37  they are controlled, because they have been deemed to have a

11:16:41  certain level of risk that they have been deemed to be

1  11:16:47   controlled substances.

2  11:16:48   Q. So is it fair to say that the risk associated with

3  11:16:51   tramadol, Schedule IV, are considered to be less than the

4  11:16:53   risks associated with hydrocodone or Norco in this case,

5  11:16:57   which is Schedule II?

6  11:16:58   A. Yes.

7  11:16:59   Q. But they are both considered opioids and controlled

8  11:17:01   substances that need to be subject to all the things we have

9  11:17:05   talked about with prior to prescribing, is that correct?

10 11:17:08   A. That is correct.

11 11:17:09   Q. And then there is talk about codeine, Tylenol 3 or 4 with

12 11:17:14   codeine.  Are those also controlled substances?

13 11:17:17   A. Yes.

14 11:17:18   Q. And do they fall between tramadol in the range and Norco?

15 11:17:22   A. I believe in California, I believe they are a

16 11:17:24   Schedule III.

17 11:17:26   Q. But at any rate, considered -- is it consistent with what

18 11:17:30   defendant says in this video, that that would be a stronger,

19 11:17:32   but less strong -- or associated with less risks than Norco,

20 11:17:38   in other words, Tylenol 3 or 4?

21 11:17:40   A. Inherently based on the medicine, disregarding any

22 11:17:44   specifics about dosing, yes.

23 11:17:48   Q. Again, UC1 talks about taking his girlfriend's Norco

24 11:17:54   again.  Do you -- was defendant's response appropriate, in

25 11:17:59   your opinion?

1 11:17:59   A. No.  Neither time has she informed him that that is not

2 11:18:03   appropriate, it's not legal.

3 11:18:04   Q. And it appears when she says something is illegal, she's

4 11:18:13   talking about going directly from tramadol to Norco, as

5 11:18:16   opposed to warning him that taking Norco is illegal.  Is that

6 11:18:20   what that appears to you?

7 11:18:21   A. That is what it appears.

8 11:18:22   Q. I'm going to play another portion of the video.

9 11:18:25            (Thereupon, the audio was played.)

10 11:18:49   Q. Now, here, any concern with the way it appears she

11 11:18:55   arrived at the conclusion that Tylenol makes UC1 nauseous?

12 11:18:59   A. I do have significant concerns about it.  You know, it

13 11:19:06   almost -- it almost gives the idea that she potentially is

14 11:19:10   coaching the patient.  She knows that the patient doesn't

15 11:19:13   want --

16 11:19:15            MS. MURPHY:  Objection.  Speculation.  Lacks

17 11:19:17   foundation.  He cannot speak to my client's intent.

18 11:19:20            THE COURT:  It's -- ladies and gentlemen, we

19 11:19:23   discussed this on Friday.  A witness can't read the

20 11:19:28   defendant's mind.  You will have to determine her intent from

21 11:19:31   all the evidence available to you.

22 11:19:33            However, the witness can state how this strikes him,

23 11:19:40   or his understanding of it.  And with that understanding of

24 11:19:45   his testimony, the objection is overruled.

25 11:19:51            THE WITNESS:  Can you re-ask that question, please?

Q. Any concerns with the manner in which it seemed to be
determined that Tylenol makes UC1 nauseous?

A. Yeah.  Offering that is some concern.  The appropriate
way to do it is say, do you have any side effects from
Tylenol?  Rather than kind of saying, well, does it cause
this?

So the defendant offering that up is certainly of
concern.

Q. I'm going to start the video again.

(Thereupon, the audio was played.)

Q. So anything concerning in the last portion of the video I
just played?

A. It certainly appears that his complaining about how much
he's paid influenced the decision of what medication to
prescribe.

Q. Now, whether or not the physician actually receives
payment for a prescription, or related to a prescription, is
it ever appropriate for a physician to write a prescription
because of a patient's complaint about the cost of the visit?

A. No.

Q. Is that -- would that be a legitimate medical purpose?

A. No.  One needs to decide how you are going to manage a
patient, prescriptions, other management of the patient,
based on history, exam, other information.  There may be
things that you recommend that the patient goes, well, I

11:22:24  can't afford an MRI, or I can't afford that surgery, and that

11:22:28  would be included.  But the decision of what one is

11:22:32  recommending, especially here, the prescribing of a

11:22:36  Schedule II controlled substance, based on a complaint of,

11:22:41  gee, I paid a lot of money, so I really want a Norco, would

11:22:46  not be appropriate.

11:22:48  Q. Are there any other concerns with the kind of the

11:22:51  customer's always right mentality when it comes to

11:22:53  prescribing opioids?

11:22:55          MS. MURPHY:  Objection.  Argumentative.

11:22:56          THE COURT:  Overruled.

11:22:58          THE WITNESS:  Many times patients, they come in,

11:23:01  they think they know what they want.  And in this case, there

11:23:08  is no evidence that this patient was a medical personnel,

11:23:14  medical individual.  And so patients will sometimes come in,

11:23:19  they think they know what they want, but then once you have

11:23:25  evaluated them and say, you know, you may want this, but

11:23:28  medically something else is more appropriate for you, safer

11:23:33  for you.

11:23:33          And people come with all kinds of, you know, I want

11:23:39  this, or I think I have that condition.  And that -- if you

11:23:46  just follow that, that provides for a significant potential

11:23:50  for -- for an unsafe medical practice for patients.

11:24:00  Q. I'm going to resume the video.

11:24:03          (Thereupon, the audio was played.)

1 11:26:17   Q. Now, there is a few things to discuss in that portion,

2 11:26:21   but I stopped it.

3 11:26:22        The MRI, did you look at the MRI that undercover

4 11:26:27   submitted?

5 11:26:28   A. I looked at the MRI report.

6 11:26:33   Q. Pulling up Exhibit 43, which is in evidence.

7 11:26:36        And this appears to be the MRI dated March 6, 2018,

8 11:26:43   for Dewayne Brooks.

9 11:26:48        Looking at this MRI, were the reactions to it that

10 11:26:52   you just saw there by defendant appropriate?

11 11:26:54   A. First of all, it's an MRI of the lower back.  The

12 11:27:01   patient, remember back at the first visit, the complaint was

13 11:27:03   the shoulder and the neck, had nothing to do with the lower

14 11:27:07   back.

15 11:27:08        Secondly, is the referring physician is Dr. John

16 11:27:13   Wolf, not the defendant, so I have no idea who that is.  And

17 11:27:20   secondly, why the MRI was done of the lower back, because

18 11:27:26   lower back wasn't the key issue at the first visit.

19 11:27:29        And then if you go down to the impression at the

20 11:27:35   near bottom, and maybe you can blow that up.

21 11:27:37        So the impression is -- so the radiologist reads it,

22 11:27:40   and the impression is mild degenerative changes at these two

23 11:27:47   different levels as detailed above.

24 11:27:48        And studies have shown that for people in their --

25 11:27:52   and he was in his 50s, is that over 50, in fact, probably

1 11:28:00  somewhat over about 80 percent of people will have similar

2 11:28:05  changes in studies for patients who have zero symptoms, no

3 11:28:10  back pain.

4 11:28:11         But as individuals age, our -- an MRI would show

5 11:28:19  certain things.  And these are things that show fairly

6 11:28:24  frequently, even in patients who have zero symptoms.

7 11:28:28         So this is -- an MRI is helpful in treating a

8 11:28:34  patient, but it is consistent with the rest of the story.

9 11:28:37  But it certainly does not justify alone treating anybody with

10 11:28:42  anything.

11 11:28:43   Q. In other words, a patient presenting with shoulder pain

12 11:28:47  who presents an MRI of some other area of the body, would

13 11:28:51  that be -- would that MRI be very helpful in determining

14 11:28:54  whether or not to prescribe opioids?

15 11:28:58   A. It has no -- it doesn't tell us anything about the

16 11:29:01  shoulder, anything about the neck.  And even what it shows

17 11:29:03  with the lower back is, you know, a large percentage, over

18 11:29:08  50 percent of people who are in his age range would have

19 11:29:12  similar findings, even though they have zero symptoms.

20 11:29:16   Q. And going back to the actual recording, it does appear at

21 11:29:20  some point they are discussing, and she suggests -- defendant

22 11:29:24  suggests pain in the back, to which the undercover confirms.

23 11:29:26  Do you recall that portion of the second visit?

24 11:29:28   A. Yes, about sciatica and things like that.  And he said

25 11:29:31  no.

1 11:29:31   Q. And then prior to -- just play the portion regarding the

2 11:29:35   back pain briefly.

3 11:29:39           But is there any concern when the kind of complained

4 11:29:42   of pain for someone seeking a specific opioid changes from

5 11:29:48   meeting to meeting?

6 11:29:52   A. Yeah.  There is significant --

7 11:29:55   Q. Let me play the video before I finish that question.

8 11:29:57           (Thereupon, the audio was played.)

9 11:30:06   Q. So it does appear they talk about back pain, almost a

10 11:30:10   migrating pain.  What is the concern, if any, with pain

11 11:30:13   changing location from visit to visit?

12 11:30:14   A. Well, the change -- I mean, here we had the defendant

13 11:30:17   saying, any neck pain?  The defendant saying, just the back

14 11:30:21   pain.  The patient doesn't offer neck pain or back pain, that

15 11:30:28   is the defendant speaking.

16 11:30:30           The patient at the first visit was complaining of

17 11:30:35   shoulder pain and neck pain.  The patient is now saying the

18 11:30:40   neck pain isn't causing him any problems.  And I don't

19 11:30:45   believe there is any mention about the shoulder, which was

20 11:30:48   the key problem at the first visit.  I don't think there is

21 11:30:51   any discussion regarding the shoulder pain.  And certainly

22 11:30:53   the imaging did not deal with the shoulder pain.

23 11:30:56   Q. And are these concerns particularly important when

24 11:31:00   dealing with chronic pain?  In other words, is there -- does

25 11:31:06   it suggest it's not really chronic pain if it seems to be

1 11:31:09   moving around?

2 11:31:10            MS. MURPHY:  Objection.  Leading.

3 11:31:11            THE COURT:  Sustained.

4 11:31:12   Q. Are there any particularly heightened concerns with

5 11:31:15   respect to chronic pain treatment?

6 11:31:16   A. Chronic pain is the -- kind of the loose definition is

7 11:31:21   three or more months.  And here we don't really know what the

8 11:31:27   pain is at this visit by the defendant.  When asked about the

9 11:31:32   neck, he says no.  When asked about sciatica, numbness,

10 11:31:36   shooting pain, he says no.

11 11:31:37            So we don't know if we are talking about pain in the

12 11:31:43   shoulder earlier, we are talking about pain -- it's unclear

13 11:31:48   based on what we see here, what we heard here.

14 11:31:54   Q. Later we hear with blood work and then she -- the

15 11:31:57   defendant says something to the effect of she can keep

16 11:32:00   writing the meds.  Any concerns with that statement?

17 11:32:03   A. Can we go back to the specifics?  So I know exactly what

18 11:32:06   she said.

19 11:32:10   Q. I'll replay the portion.

20 11:32:17            (Thereupon, the audio was played.)

21 11:32:44   Q. Do you recall my question?

22 11:32:45   A. Yes.  That was -- I was trying to recall the keep writing

23 11:32:49   issue.  And I see it there pertaining to the liver and

24 11:32:54   kidney.

25 11:32:55            A provider, a physician, physician's assistant,

1 11:33:02  nurse practitioner, doesn't decide to keep writing opioids

2 11:33:05  based on your liver and kidney tests being okay.  You make

3 11:33:10  that determination based on how the patient is doing.

4 11:33:15        So I guess my concern is not that she checked the

5 11:33:19  kidney and liver tests.  That is fine.  That is actually a

6 11:33:22  good idea.  But says that I need to check it and then we'll

7 11:33:28  keep on writing the meds.  That is the piece that is

8 11:33:32  concerning.  If your determination in keeping writing the

9 11:33:38  meds is based on checking the liver and kidney, that is

10 11:33:40  certainly not acceptable.

11 11:33:46  Q. Again, I'm not going to play the rest of the recording.

12 11:33:50  You reviewed the entire recording of that visit as well, is

13 11:33:53  that correct?

14 11:33:53  A. I did.

15 11:33:54  Q. Anything in the remainder of the recording that changes

16 11:33:57  your opinion as to that transaction?

17 11:33:59  A. No.

18 11:33:59  Q. Or, excuse me, that visit.

19 11:34:01        I'm showing you Exhibit 23, which is a prescription

20 11:34:04  written March 22nd, 2018, to Dewayne Brooks, undercover 1.

21 11:34:10  Do you see that exhibit?

22 11:34:11  A. I do.

23 11:34:12  Q. And what was the prescription for that day for the -- the

24 11:34:19  opioid prescription?

25 11:34:20  A. Norco 10/325.  I should mention that the /325, the

11:34:28   hydrocodone is 10 milligrams, and acetaminophen or Tylenol is

11:34:33   the -- makes up the 325.  It's one twice a day for the pain,

11:34:37   number 60.

11:34:38   Q. When you say that mix between essentially Tylenol and

11:34:41   hydrocodone, that is what makes the brand Norco, is that

11:34:44   correct?

11:34:44   A. That's correct.

11:34:45   Q. At least in this strength.

11:34:47          So it's 60 doses of Norco that were written?

11:34:50   A. That's correct.

11:34:52   Q. Based on your training and experience, and your review in

11:34:57   this case, is it your opinion that this prescription for

11:35:00   Norco or hydrocodone was within the usual course of

11:35:04   professional practice?

11:35:05   A. My opinion is that it's outside the course of usual

11:35:10   professional practice.

11:35:11   Q. And was the prescription, in your opinion, made for a

11:35:13   legitimate medical purpose?

11:35:14   A. No.

11:35:15   Q. Was it a departure from the standard of care?

11:35:17   A. Yes.

11:35:18   Q. Was it a -- an extreme departure from the standard of

11:35:22   care, in your opinion?

11:35:23   A. Yes.

11:35:25   Q. I'm going to move to the third visit of undercover 1,

1 11:35:28    which is April 19th, 2018.  That is at Exhibit 2.

2 11:35:36              Have you reviewed this audio and video recording?

3 11:35:38    A. Yes.

4 11:35:42    Q. I'm going to play a lengthy portion of it and then ask

5 11:35:46    you some questions.

6 11:35:48              (Thereupon, the video was played.)

7 11:37:13    Q. Dr. Munzing, what concerns, if any, do you have of this

8 11:37:16    portion of the video?

9 11:37:17    A. This is the third time that the -- in three consecutive

10 11:37:23   visits that he admits that he obtained medication through

11 11:37:30   diversion.  He obtained oxycodone, which was not prescribed.

12 11:37:35   And so that is certainly -- and it's an aberrant finding on

13 11:37:43   the urine drug test.

14 11:37:45   Q. Is this -- have you seen the drug test, the urine drug

15 11:37:50   test that was submitted by the undercover, as part of the

16 11:37:53   patient file?

17 11:37:54   A. I saw the results of it, yes.

18 11:37:56   Q. And, excuse me, not the test, the results of the test.

19 11:37:59             Did -- and it showed positive for oxycodone, is that

20 11:38:03   correct?

21 11:38:03   A. It did.

22 11:38:03   Q. And so any concerns with the defendant's reaction --

23 11:38:07   setting aside the diversion issue we just talked about, with

24 11:38:10   her reaction to seeing a positive drug that had not been

25 11:38:13   prescribed?

11:38:14   A. Yeah.  I mean, he says, oh, I took one, but, you know,

11:38:20   the next question is when did you take it?  If you just took

11:38:25   one, and it was more than a few days ago, it probably isn't

11:38:30   going to turn positive.  So the next question ought to be, so

11:38:33   when did you take it, to find out, did he really only just

11:38:38   take one, or has he been using oxycodone regularly.  We can't

11:38:43   tell that -- it's impossible to tell that just by looking at

11:38:47   the urine drug test.

11:38:48   Q. And is it appropriate to lower the prescription of what

11:38:53   she had been prescribing, Norco, solely because -- solely

11:38:58   because of concerns with being seen or caught by the DEA?

11:39:03   A. No.  One decides how they are going to prescribe, not

11:39:10   because the DEA is coming down hard on us, but it's what is

11:39:14   appropriate.  What is the appropriate response to this?

11:39:20         And here we have the third consecutive visit that

11:39:24   the patient has admitted obtaining controlled substances from

11:39:29   another individual, not prescribed.  In addition, there are

11:39:37   other -- other things on the urine drug test that we -- that

11:39:44   also are concerning.

11:39:47   Q. I'm going to continue playing this video.

11:39:55         (Thereupon, the video was played.)

11:42:57   Q. I've stopped the video.

11:43:00         Anything concerning in the portion I just played for

11:43:02   you, Dr. Munzing?

11:43:03   A. Yes.  He's not even sure that -- you know, he goes, I

1 11:43:09  think he took his girl's oxy by mistake, he wasn't even sure.

2 11:43:14        Secondly, is that she is basically -- the defendant

3 11:43:17  is saying that, if you have a normal urine drug test, we'll

4 11:43:21  go back to the normal dosing.

5 11:43:25   Q. Why is that -- sorry to cut you off.

6 11:43:29        Why would that be of concern?

7 11:43:30   A. Basically, you manage patients based on what is medically

8 11:43:34  indicated.  You base it based on their pain and other

9 11:43:38  symptoms, related symptoms and findings on exam.

10 11:43:42        You don't base it on, well, you had a clean urine

11 11:43:45  test, so we can go back up there.  You know, he may very well

12 11:43:52  not even need that.  Certainly even to this point, we still

13 11:43:58  haven't examined the patient to confirm that he needs any

14 11:44:01  controlled -- he needs any controlled substances, or any

15 11:44:04  opiates at this point.

16 11:44:05        And to base your determination on, well, you had a

17 11:44:11  urine test that was consistent with what I'm giving you,

18 11:44:15  doesn't justify what I'm giving you.

19 11:44:19        And certainly doesn't give you, as a prescriber, the

20 11:44:24  okay -- it's okay to increase the number, just because it was

21 11:44:28  consistent, where on three consecutive times we have, you

22 11:44:32  know, diversion going on.

23 11:44:33   Q. All right.  And then she mentions we should reduce it to

24 11:44:37  show we are concerned.

25 11:44:39        Now, I'm not asking you to get inside anyone's head,

1 11:44:41  but assuming the following hypothetical, if doctor were

2 11:44:46  asking -- were changing medication because they are concerned

3 11:44:49  about the DEA overseeing them, would that be of concern to

4 11:44:52  you?

5 11:44:52          MS. MURPHY:  Objection.  Leading.  Argumentative.

6 11:44:54  Calls for speculation.

7 11:44:55          THE COURT:  Sustained.

8 11:44:55  Q. All right.  Is there any concern when you hear defendant

9 11:44:58  say, we should lower your prescription to show that we are

10 11:45:00  concerned?

11 11:45:02  A. Once you change what you are doing based on what is

12 11:45:09  medically appropriate, and what is medically indicated, not

13 11:45:14  to show -- I'm concerned, you know, you do what is medically

14 11:45:19  appropriate and medically justified.

15 11:45:22  Q. And again, overarching concern -- is an overarching

16 11:45:27  concern still that she's never actually evaluated the

17 11:45:31  patient?

18 11:45:32          MS. MURPHY:  Objection.  Leading.

19 11:45:33          THE COURT:  Sustained.

20 11:45:33  Q. Did she evaluate -- physically exam the patient any of

21 11:45:36  the three times we just reviewed?

22 11:45:38  A. Not that we have seen or heard, no.

23 11:45:40  Q. Do you have any concerns with that?

24 11:45:41  A. Absolutely.

25 11:45:47  Q. I'm showing you the prescription that was written that

1 11:45:51  day.

2 11:45:52          Actually, I'm not playing the rest of the video, but

3 11:45:55  have you reviewed the rest of that visit?

4 11:45:58   A. I have.

5 11:45:58   Q. Is there anything in the portion that wasn't played in

6 11:46:02  court here that changes your opinions as to whether or not

7 11:46:05  that prescription that day was appropriate?

8 11:46:07   A. No.

9 11:46:07   Q. And I'm showing you Exhibit 24, which appears to be an

10 11:46:13  April 19th, 2018 prescription to undercover 1, Dewayne

11 11:46:17  Brooks.

12 11:46:17          What is the prescription -- the opioid prescription

13 11:46:20  for in this one, Doctor?

14 11:46:22   A. The Norco 10/325, one twice daily, as needed for pain,

15 11:46:27  number 45.

16 11:46:28   Q. And so that is, again -- previously she had prescribed 60

17 11:46:34  tablets of Norco.  Is this consistent with what we heard the

18 11:46:38  reduction to 45?

19 11:46:39   A. This is what she said, yes.

20 11:46:41   Q. And in your opinion, and based on your review and your

21 11:46:47  experience, was this prescription for Norco or hydrocodone

22 11:46:52  within the usual course of professional practice?

23 11:46:54   A. Based on all that we have talked about before, no.

24 11:46:56   Q. And was it made -- was the prescription made for a

25 11:46:59  legitimate medical purpose?

11:47:00   A. No.

11:47:00   Q. And was it a departure from the standard of care?

11:47:02   A. Yes.

11:47:03   Q. What level of departure from the standard of care would

11:47:06   you characterize it?

11:47:06   A. Extreme departure.

11:47:10   Q. I'm going to move to the next undercover visit for UC1 or

11:47:16   Dewayne Brooks, which was May 17th, 2018.  I'm going to play

11:47:20   the entire visit, it's Exhibit 3.

11:47:30           (Thereupon, the video was played.)

11:50:46   Q. All right.  Dr. Munzing, in Exhibit 3, did the defendant

11:50:53   conduct an appropriate examination of UC1 in that visit?

11:50:57   A. No.

11:50:57   Q. Was there any physical examination at all?

11:51:00   A. No.

11:51:01   Q. Any -- what concerns, if any, do you have about this

11:51:04   visit?

11:51:05   A. Patient comes in.  The primary focus was the urine test,

11:51:12   the fact that the urine test did not have oxycodone on it,

11:51:18   and decided because of that could increase it, I think.

11:51:30   Q. Increase -- and when you say increase it, increase --

11:51:34   A. Increase the quantity, from 45 back up to 60.

11:51:37   Q. And from your review, does it appear that this change in

11:51:42   opioid prescription was based on medical need or just based

11:51:46   on the clean urine test?

1 11:51:47   A. It's based on the urine test.  It's not a clean urine

2 11:51:52   test, but it's based on the urine test not having oxycodone.

3 11:51:57   Q. And I put up in Exhibit 30, page 7, which has been

4 11:52:01   admitted in evidence.  This is -- this is the urine test

5 11:52:11   results from May 11, 2018.  So this would have been, it

6 11:52:17   appears, the test that had negative for oxycodone, but

7 11:52:22   positive for hydrocodone, which had been prescribed.

8 11:52:24   A. That's correct.

9 11:52:25   Q. Any concerns with the results in this that were not

10 11:52:31   addressed by defendant in the visit?

11 11:52:33   A. Yes, indeed.  This urine test has -- as you can see down

12 11:52:40   near the bottom, has -- the benzodiazepine was positive.  And

13 11:52:47   in addition to that, up higher, the test result for THC,

14 11:52:53   marijuana, is positive as well.

15 11:52:56        So this also is an aberrant urine drug test with

16 11:53:03   these findings, and she's essentially addressing it as a

17 11:53:09   normal urine drug test, which it's not.

18 11:53:12        And it's not consistent with -- fully consistent

19 11:53:16   with what is being prescribed.  We have no idea where the

20 11:53:19   benzodiazepines are coming from.  And then the issue about

21 11:53:24   marijuana, THC, is not addressed as well.

22 11:53:27   Q. Now, the undercover did ask her for the 15 pills back, so

23 11:53:31   to speak.  In other words, it would appear that he's asking

24 11:53:35   for an additional 15 in addition to the 60, because she had

25 11:53:38   reduced his prescription by 15 the prior time.

1 11:53:40          MS. MURPHY:  Objection.  Leading.

2 11:53:42          THE COURT:  Overruled.  It's foundational.

3 11:53:45          THE WITNESS:  He actually asked for 20 pills back,

4 11:53:48  not 15.

5 11:53:49  Q. But he's asking for additional pills, and she said -- she

6 11:53:52  rejects that request, is that --

7 11:53:54  A. That's correct.

8 11:53:55  Q. And is that an appropriate response, to say no to that?

9 11:54:00  A. That piece of it is -- yes, it's appropriate not to --

10 11:54:06  not to give extra back.

11 11:54:07  Q. But is her response sufficient in the context to meet the

12 11:54:11  standard of care, given that she still prescribed the 60

13 11:54:16  Norco?

14 11:54:16  A. Yeah, it's my opinion that -- that there is no basis

15 11:54:20  medically legitimate for prescribing the 60.  So it was

16 11:54:26  appropriate not to prescribe 80.  But based on what we have

17 11:54:32  seen so far, we are four visits in, we still don't have --

18 11:54:36  other than vital signs, we don't have a physical exam, and we

19 11:54:41  have another aberrant urine drug test.

20 11:54:44  Q. In other words, is it -- in your opinion, is it possible

21 11:54:47  to fail to meet the standard of care, even if you do some

22 11:54:51  things that are entirely appropriate as a physician?

23 11:54:55  A. Of course.

24 11:55:02  Q. I'm showing you now Exhibit 25, which is in evidence.

25 11:55:05          This is the prescription from May 17, 2018, to

11:55:09  Dewayne Brooks, undercover 1.  Do you see that?

11:55:12  A. I do.

11:55:12  Q. And based on what we have just discussed and your review

11:55:16  of the records and the video and the audio, is it your

11:55:20  opinion that this prescription for Norco was within the usual

11:55:26  course of professional practice?

11:55:27  A. No, it was not within the course of -- usual course of

11:55:31  professional practice.

11:55:32  Q. And was it made for a legitimate medical purpose?

11:55:34  A. Based on the entirety that we have talked about, no.

11:55:37  Q. And was it a departure from the standard of care?

11:55:41  A. Yes.

11:55:41  Q. Was it an extreme departure from the standard of care?

11:55:44  A. Yes.

11:55:47  Q. And again, this is a prescription for Norco 60 pills, is

11:55:54  that correct?

11:55:54  A. That is correct.

11:55:55  Q. Going to the final undercover visit, which was June

11:55:58  14th -- undercover 1, June 14, 2018, that is at Exhibit 5,

11:56:01  I'm going to play that for you.  I'm going to start a little

11:56:07  bit after -- about the one-minute mark.

11:56:23          (Thereupon, the video was played.)

11:59:20  Q. Dr. Munzing, did the defendant conduct an appropriate

11:59:24  examination of UC1 during this visit?

11:59:27  A. No.

11:59:28  Q. And did she conduct any physical examination during this

11:59:31  visit?

11:59:31  A. No.

11:59:32  Q. Any concerns with the way this visit played out?

11:59:37  A. Yeah.  There is a number of things.

11:59:40       I mean, basically, there was no query into the

11:59:46  details of -- before we were -- we talked about a number of

11:59:53  diversions, and getting medicines from others.  The issue

11:59:57  about using other's medicines, the use or abuse of alcohol

12:00:03  and other drugs was not addressed.

12:00:07       Secondly, is that he asks for medication for his

12:00:11  buddy.  That is certainly another red flag.  It's not a

12:00:17  definitive, but it is a red flag.

12:00:20       You know, we have another exam of which there has

12:00:22  been no -- she hasn't touched him for a physical exam.

12:00:27       And you know, he says he's feeling better, but we

12:00:31  don't know, is it his shoulder, is it his back?  It's really

12:00:35  uncertain kind of what we are talking about.

12:00:37  Q. Now, when the defendant refuses to write the requested

12:00:45  script -- prescription for the friend, is that an appropriate

12:00:49  response by the defendant in that instance?

12:00:50  A. Yeah.

12:00:51  Q. And again, even though that was appropriate, overall, was

12:00:56  her conduct in this case appropriate, in your opinion?

12:00:59  A. No.

1 12:01:01   Q. And you were saying it's a red flag.  Were there steps

2 12:01:05   that should have been taken if someone is requesting -- other

3 12:01:09   than just denying it, are there other steps that should be

4 12:01:11   taken if a patient is requesting narcotics or controlled

5 12:01:16   substances for another person?

6 12:01:18    A. If that was the only issue, the answer is no.

7 12:01:20       But here we have an individual who has been seen

8 12:01:23   multiple times, multiple different visits, where he's

9 12:01:28   admitted diversion.  He's admitted he's obtained medication

10 12:01:33   from others that he's taken.  He's had two aberrant urine

11 12:01:38   drug tests.

12 12:01:40       So there is -- you know, here is another issue added

13 12:01:46   onto that, and so it's not -- this is someone who, there has

14 12:01:52   been repeated red flags with substance.  This is another red

15 12:01:57   flag, as is his requesting for the prometh, is certainly a

16 12:02:02   red flag.  It's appropriate for her not to -- not to do

17 12:02:08   either one of those, but that doesn't mean that the visit is

18 12:02:10   okay.

19 12:02:11   Q. And the prometh, what is the concern with the requesting

20 12:02:14   prometh?  What is prometh?

21 12:02:16   A. Well, prometh is -- it's antihistamine, but it also is

22 12:02:21   sometimes combined with codeine.  He didn't specifically ask

23 12:02:26   for the codeine brand.  But promethazine is sometimes used by

24 12:02:31   those that are abusing drugs to augment the effect.  You

25 12:02:40   know, he didn't say that, but that is -- that is kind of the

1 12:02:44  red flag.  And she shut that down appropriately.

2 12:02:50  Q. Overall, is it appropriate for a patient to come in and

3 12:02:54  just be written refills without any examination when no

4 12:02:59  physical examination has been taken in the past?

5 12:03:01  A. No.

6 12:03:02        MS. MURPHY:  Objection.  Leading.

7 12:03:03        THE COURT:  Overruled.

8 12:03:05        THE WITNESS:  No.

9 12:03:10  Q. Putting up Exhibit 26.  This is a prescription that was

10 12:03:13  written dated June 14th, 2018, to Dewayne Brooks, or

11 12:03:18  undercover 1.

12 12:03:19        Do you see that, Doctor?

13 12:03:20  A. I do.

14 12:03:21  Q. Was that for 60 doses of Norco, 10/325?

15 12:03:27  A. Yes.

16 12:03:27  Q. Now, based on your review and everything we have

17 12:03:32  discussed, is it your opinion that this prescription for

18 12:03:35  hydrocodone, or Norco, was within the usual course of

19 12:03:38  professional practice?

20 12:03:39  A. My opinion that it was not within the usual course of

21 12:03:42  professional practice.

22 12:03:43  Q. Was it made -- was the prescription made for a legitimate

23 12:03:46  medical purpose?

24 12:03:47  A. Not based on the entirety of the information, no.

25 12:03:50  Q. And was it -- did it fall within or outside the standard

1  12:03:53  of care?

2  12:03:54   A. Outside the standard of care.

3  12:03:56   Q. What level of departure from the standard of care would

4  12:03:59  you characterize it as?

5  12:04:00   A. Extreme departure.

6  12:04:02   Q. All right.  I'm going to move on to Emile Paul, who is --

7  12:04:07  that was the undercover name for undercover 2 or UC2, as he's

8  12:04:11  referred to sometimes.

9  12:04:12        THE COURT:  Counsel, before we do that, we'll take

10 12:04:13  our second break.

11 12:04:14        Ladies and gentlemen, we'll start again at 12:30.

12 12:04:20  Remember what I told you, do not discuss or investigate the

13 12:04:23  case.

14 12:04:24        Thank you.

15 12:04:25        (Thereupon, the jury retired from the courtroom.)

16 12:05:00        THE COURT:  All right.  Dr. Munzing, if you and any

17 12:05:02  other witness would leave the courtroom, please.

18 12:05:12        Ms. Murphy, you indicated that you wished to make a

19 12:05:34  record before your cross-examination of Dr. Munzing.

20 12:05:36        So what is it that you want to say?

21 12:05:39        MS. MURPHY:  Sorry to interrupt, Your Honor.

22 12:05:41        There are a few things.  I think that -- I really

23 12:05:47  think there needs to be on the record why the ALJ underlying

24 12:05:52  the interim decision was not disclosed to us in a timely

25 12:05:55  fashion.

1 12:05:55        THE COURT:  And again, we will investigate that, but

2 12:05:58   there is no need for you to do that before your

3 12:06:00   cross-examination.

4 12:06:01        MS. MURPHY:  Understood.

5 12:06:02        And what I'll do, Your Honor, is I'll go through the

6 12:06:05   list, and if there are things you think we can do later, that

7 12:06:08   is fine for me.  I just want to let you know what I'm

8 12:06:11   thinking.

9 12:06:11        I'm just going through my list.

10 12:06:13        I think we -- I understand that Your Honor has made

11 12:06:15   an order about excluding Dr. Munzing, and that that request

12 12:06:19   was denied.

13 12:06:20        I would like to also -- I may need to do this in

14 12:06:28   writing, Your Honor, to put forth a proffer of all of the

15 12:06:31   evidence of bias and the areas of cross-examination that we

16 12:06:36   would want to get into with him, as it relates to both the

17 12:06:40   ALJ interim decision, the *Romano* case.  And also there were

18 12:06:46   some other, I'll call them impeachment materials, that the

19 12:06:51   government disclosed to us over the weekend that I think are

20 12:06:53   all germane to his cross-examination, both as to his bias and

21 12:06:57   his credibility.

22 12:06:58        I understand that the Court has put some limits on

23 12:07:03   how much we can cross into this perjury issue.  I would

24 12:07:08   really like to have really clear to me before I start my

25 12:07:11   cross-exam of what I can get into and what I can't get into.

1 12:07:14          THE COURT:  You are free to use the transcripts and

2 12:07:21     the evidence that is available to you to show that he

3 12:07:25     perjured himself.  But what you can't do is tell the jury

4 12:07:30     what some other jurist thought about that, or what is going

5 12:07:38     on.  The fact that there is a motion pending where he's

6 12:07:40     accused of that, that is neither here nor there.  Nor the

7 12:07:43     fact that the ALJ made the findings that he did is -- the

8 12:07:52     interim findings, as the government correctly said, is not

9 12:07:56     that, but you are certainly free to say, you said X, but the

10 12:07:59    truth is Y, and then cross-examine him on the why the truth

11 12:08:03    is Y.

12 12:08:04          So -- but so you are free to do that.

13 12:08:10          MS. MURPHY:  Respectfully, Your Honor, my concern is

14 12:08:11    that, first, I would not be trying to get these findings in

15 12:08:17    as substantive evidence.  They are hearsay.  Those aren't

16 12:08:21    coming in as substantive evidence.  But I can cross-examine

17 12:08:25    him on the fact that he has been found to be non-credible by

18 12:08:30    a judge.

19 12:08:30          THE COURT:  No, you cannot.  No, you cannot.

20 12:08:33          MS. MURPHY:  My understanding, though, Your Honor,

21 12:08:35    is that he is the government's main witness.  He is the

22 12:08:38    lynchpin of their case.  The Supreme Court law able and --

23 12:08:41          THE COURT:  Well, then we can do it -- if you feel

24 12:08:43    that there has to be an evidentiary basis for some motion to

25 12:08:46    dismiss, then that could be perhaps done -- assuming it's

1  12:08:50  necessary, which I doubt, it could be done outside the

2  12:08:53  presence of the jury.

3  12:08:54          It's for the jury to determine if he perjured

4  12:08:57  himself or not, not some defense attorney who none of us

5  12:09:00  know.

6  12:09:01          MS. MURPHY:  I want to be -- I'm not talking about

7  12:09:03  the perjury portion anymore.  I'm focusing on the specific

8  12:09:07  findings that the ALJ judge made, in the interim decision,

9  12:09:11  and the specific remarks he made about Dr. Munzing's

10 12:09:14  testimony.

11 12:09:15          I believe that, because he is the government's main

12 12:09:17  witness here, his biases --

13 12:09:20          THE COURT:  No, it's his opinion, which, of course,

14 12:09:22  counts ordinarily more than someone else's opinion.  If you

15 12:09:25  just want to say, isn't it true that you testified all these

16 12:09:29  times, isn't it true that you are always in favor of the

17 12:09:32  government?  Isn't it true when you testified here that you

18 12:09:34  did this, or that you did that?  You've got this -- that you

19 12:09:38  can certainly -- you just don't need to have the judicial --

20 12:09:43  nor is it appropriate for you to have the judicial gloss on

21 12:09:46  that.  It's just -- it was the ALJ's opinion.  The jury can

22 12:09:50  reach its own opinion.

23 12:09:52          MS. MURPHY:  I understand the jury can reach their

24 12:09:54  own opinion, but I think that the fact that there has been

25 12:09:57  not only an ALJ, but a California Board of Medical Review,

1  12:10:02   two opinions, where they have found that he is not credible,

2  12:10:05   those are absolutely germane to his credibility here, because

3  12:10:08   he's testifying about the same things.  It goes to his bias.

4  12:10:12        THE COURT:  And if they had said that he was the

5  12:10:13   greatest witness in the history of the world, would that be

6  12:10:16   germane as well?  It's just simply, it is -- it doesn't go to

7  12:10:21   his -- the fact that somebody else determined that he -- it

8  12:10:27   wasn't bias.  I face this all the time.  In a Section 1983

9  12:10:31   case, the jury isn't told whether the police commission

10 12:10:34   determines that is a shooting is within or without policy,

11 12:10:37   although many of the facts that were examined on that are the

12 12:10:40   facts on which the jury has to rely.

13 12:10:43        And the jury is told the standard of care to assist

14 12:10:45   them in that.  But they aren't told what the result is,

15 12:10:48   because it's just -- nobody else can tell this jury whether

16 12:10:52   he's credible or not, short of a conviction for perjury,

17 12:10:56   which has not occurred here.

18 12:10:58        MS. MURPHY:  Your Honor, if it's -- I would like to

19 12:11:01   brief this issue for the Court.

20 12:11:03        THE COURT:  Well, we aren't going to brief it.  If

21 12:11:05   you get it done before he's done, of course I'll read it.  I

22 12:11:09   read what you submitted yesterday.  If I had gotten all of

23 12:11:11   this, I would have read that as well.

24 12:11:13        We aren't going to delay his examination just on

25 12:11:18   this, when it seems to me that it's clear cut.  I don't

1  12:11:21  see -- and if it truly is admissible for reasons I don't

2  12:11:25  grasp, then we'll stipulate to the admissibility, and you can

3  12:11:28  just tell the jury.  You don't need -- you don't need to

4  12:11:31  cross-examine him on it.  You can say, you are hereby

5  12:11:34  informed that the California Medical Board did thus and so.

6  12:11:37        And if that can be done before the trial ends, then

7  12:11:39  it will be done.  But I don't see the basis for it.

8  12:11:42        So what else?  Is there anything else?

9  12:11:46        MS. MURPHY:  Let me check my notes, Your Honor.

10  12:12:06        Your Honor just mentioned a jury instruction.  I can

11  12:12:13  consult with government counsel about that, if that may be a

12  12:12:16  suitable --

13  12:12:17        THE COURT:  Well, but that would only be if you

14  12:12:19  could convince me that the finding of the Medical Board is

15  12:12:22  something that the jury should know.  I mean, we have -- that

16  12:12:26  is a big first step.

17  12:12:27        But if we get there, then it seems to me it's

18  12:12:30  something that we could deal with by stipulation.

19  12:12:34        MS. MURPHY:  What I want to make sure, I'm not

20  12:12:36  talking about getting those things in substantively.  I'm

21  12:12:39  just talking about cross-examination.

22  12:12:40        THE COURT:  But what is -- you say, what is the

23  12:12:43  cross-examination?  I'm just not grasping that.

24  12:12:47        MS. MURPHY:  To me the cross-examination is, you

25  12:12:48  have been found to be not credible before by the California

1  12:12:51   Board of Medicine.

2  12:12:52         THE COURT:  And he says -- and other than for the

3  12:12:55   truth of that, what is the -- what is the cross-examination?

4  12:12:58   He says yes or he says no.  And then how are you

5  12:13:01   cross-examining him?

6  12:13:03         MS. MURPHY:  Well, I'm questioning him on his own

7  12:13:06   credibility.  And he can either accept my answer -- say yes

8  12:13:10   or --

9  12:13:10         THE COURT:  No, it's -- it's a device to get into

10 12:13:12   evidence the merits of that, which are simply not germane to

11 12:13:18   this jury, unless you convince me that they are.  And if they

12 12:13:21   are, the jury can be told that.

13 12:13:23         I think we are running around in circles here, and

14 12:13:25   all of us need a break, including Ms. Diaz.

15 12:13:28         I will see you at 12:30.

16 12:13:31         (Thereupon, there was a brief recess.)

17 12:30:10         MR. BALDING:  If we may squeeze it in before the

18 12:30:13   jury gets here.  There was a discussion about the 404(b)

19 12:30:19   instruction other acts.  Were you planning to pre-instruct

20 12:30:20   had you decided which of the two proposed --

21 12:30:21         THE COURT:  I'm closer to -- neither, but closer to

22 12:30:24   yours, because it's closer to the Ninth Circuit model

23 12:30:27   instruction.

24 12:30:27         MR. BALDING:  We don't need to take it up?

25 12:30:29         THE COURT:  Correct.

1  12:30:30          MR. BALDING:  Okay.  Thank you.

2  12:31:30          (Thereupon, the jury returned to the courtroom.)

3  12:32:09          THE COURT:  Ladies and gentlemen, welcome back.

4  12:32:12          All of you are here, as well as the defendant and

5  12:32:20  counsel.

6  12:32:20          The witness is on the stand, still under oath.

7  12:32:22          I realized, ladies and gentlemen, that I've said

8  12:32:26  occasionally this morning 14 of you are here, when that is

9  12:32:29  obviously the wrong number.  It's -- typically for a trial

10 12:32:32  this length, it would be the number of alternates we would

11 12:32:35  have, because of COVID the thought is that it's better to be

12 12:32:40  safe than sorry in that regard, which is why there are more

13 12:32:44  of you.

14 12:32:44          Mr. Balding, you may proceed.

15 12:32:47          MR. BALDING:  Thank you, Your Honor.

16 12:32:48  Q. Dr. Munzing, before we took a break, I was about to start

17 12:32:53  asking you about the other undercover officer, Emile Paul.

18 12:32:57  Do you recall reviewing recordings in the file of that

19 12:33:00  individual?

20 12:33:01  A. Yes.

21 12:33:01  Q. I'm going to play -- again, there were three visits.  Is

22 12:33:06  that consistent with your review?

23 12:33:07  A. Yes.

24 12:33:08  Q. And did you review all of those recordings and the

25 12:33:12  related file in their entirety?

1  12:33:13   A. Yes.

2  12:33:13   Q. I'm going to play Exhibit 7, which is an audio recording

3  12:33:21   of the first visit of Emile Paul, or UC2, on February 22nd,

4  12:33:26   2018.

5  12:33:30          (Thereupon, the audio was played.)

6  12:36:00   Q. I've stopped it partway through the recording,

7  12:36:02   Dr. Munzing.

8  12:36:03          So is it your understanding this was the first visit

9  12:36:07   that UC2 had with the defendant?

10 12:36:09   A. Yes.

11 12:36:09   Q. Now, you heard a lot of background questions.  Is that

12 12:36:12   consistent with the medical history we talked about earlier

13 12:36:17   and the standard of care?

14 12:36:18   A. We talked about the pain history.  And I think she asked

15 12:36:21   about the pain specifics.  That piece of the history she did

16 12:36:26   take.

17 12:36:26   Q. Now, we'll play the rest of the recording in a bit.

18 12:36:31          At this point, has any physical examination taken

19 12:36:33   place?

20 12:36:33   A. No.

21 12:36:34   Q. And you heard, it sounded like, asking if he can move his

22 12:36:39   arms.  Did you hear that part?

23 12:36:41   A. I did.

24 12:36:41   Q. And is that sufficient to satisfy the need to conduct a

25 12:36:44   physical examination for someone in pain --

1  12:36:47    A. No.

2  12:36:47    Q. -- treatment?

3  12:36:49          Why not?

4  12:36:49    A. Well, first of all, I mean, this is an audio, and we are

5  12:36:53    not looking at it, so she asked if he could do it.  We are

6  12:36:57    not sure he actually did it.  But as we discussed earlier,

7  12:37:01    the things that go into a physical exam is actually touching

8  12:37:05    the patient, observing the patient, watching to see if there

9  12:37:08    is any kind of redness, swelling.  Actually touching the

10 12:37:12    patient, you know, where specifically is it tender.  With the

11 12:37:17    shoulder, different parts of the shoulder will be

12 12:37:19    different -- different diagnoses will cause tenderness and

13 12:37:23    discomfort at different parts of the shoulder.  That was not

14 12:37:27    done.

15 12:37:29          We don't know any specifics about the range of

16 12:37:31    motion.  Was it actually done?

17 12:37:34          And there is some question whether or not -- you

18 12:37:40    know, he occasionally has numbness in his hands.  That would

19 12:37:44    certainly generate needing to evaluate the pulses, reflexes,

20 12:37:52    and both a motor testing for strength, testing for sensation,

21 12:37:57    none of which we have seen here.

22 12:37:59    Q. Now did you also review in the patient file kind of the

23 12:38:01    early -- the questionnaire that the undercovers filled out

24 12:38:04    before they saw the defendant?

25 12:38:05    A. Yes.

1 12:38:06   Q. And I'm going to put up a portion of Emile Paul's,

2 12:38:13   Exhibit 31, which is in evidence, at page 20.

3 12:38:17        Does this appear to be the assessment that you

4 12:38:19   reviewed?

5 12:38:20   A. Yes.  It's --

6 12:38:22   Q. I'm going to go to --

7 12:38:23   A. -- the first page.

8 12:38:24   Q. I'm going to go to the second page of the assessment,

9 12:38:26   which is page 21 of the exhibit.

10 12:38:28        Anything in that assessment that causes you concern

11 12:38:32   when you review this video?

12 12:38:34   A. Yes, there was a couple of them.  If you want to go back

13 12:38:38   to the first page.

14 12:38:42        Yeah, if you could blow it up a little bit.

15 12:38:58        A couple of things is, one is, I noticed that under

16 12:39:04   number 9, do you feel safe where you live?  No.  Have you

17 12:39:08   been hit, slapped, kicked, or physically hurt in the last

18 12:39:11   year?  Yes.

19 12:39:14        Those are questions not specific to someone coming

20 12:39:19   in with shoulder pain, but certainly needs to be addressed.

21 12:39:24   You know, was the shoulder pain at all related to any of

22 12:39:27   that?  And is there any -- you know, is there anything that

23 12:39:31   needs to be pursued, whether it be by the defendant or by

24 12:39:35   another healthcare provider.  But those are relatively

25 12:39:39   concerning -- concerning things for a patient to admit, and

1  12:39:47  may relate to why the patient is having shoulder pain.  We

2  12:39:51  just don't know because it wasn't asked.

3  12:39:53          MS. MURPHY:  Objection.  Your Honor, I need to

4  12:39:54  request a sidebar on this issue.

5  12:39:56          THE COURT:  Counsel approach.

6  12:39:57          (At the bench.)

7  12:40:09          MS. MURPHY:  He has never opined on this in any of

8  12:40:12  his reports, in any of his hundreds of pages of reporting on

9  12:40:17  this.  This is outside of the scope of his notice testimony.

10 12:40:19  He's never said anything in his reports about these

11 12:40:22  particular things on these questionnaires giving cause, I

12 12:40:26  mean.  And these are also completely irrelevant to the issue

13 12:40:29  of prescribing pain medication.  This is --

14 12:40:33          THE COURT:  Let me hear from the government.

15 12:40:35          MR. BALDING:  This level of specificity wasn't

16 12:40:37  disclosed, but the reports clearly say he's looked at the

17 12:40:40  files, he's looked at this.  Part of the standard of care is

18 12:40:43  conducting an adequate background check.

19 12:40:44          We are just saying, you know, the file has -- is 30

20 12:40:47  pages.  It's not a lengthy document.  30-page file, and then

21 12:40:50  the questionnaire is two pages of it.  Did she adequately

22 12:40:53  respond to it?  I don't think we need to lay that

23 12:40:57  specificity, particularly compared to their reports.

24 12:40:59          THE COURT:  This reminds me in civil cases when

25 12:41:02  something is offered, it is said in violation of Rule 26.

1  12:41:06   It's something I want to -- I need to take seriously.  On the

2  12:41:09   other hand, I have no ability to deal with it right now.

3  12:41:11        I think the thing here is, it's limited, it's not --

4  12:41:15   frankly, I just don't think it really matters all that much.

5  12:41:18   And also, your own expert is sitting here, and in a position

6  12:41:21   to deal with it.

7  12:41:22        So on that sense, while you've made your record, I'm

8  12:41:25   going to overrule the objection for those reasons.  In part,

9  12:41:29   because I just don't think it's going to be very prejudicial

10  12:41:32   to Ms. Rahbarvafaei.

11  12:41:33        MS. MURPHY:  Understood.  Thank you.

12  12:41:35        (In open court:)

13  12:41:46        THE COURT:  Mr. Balding, you may proceed.

14  12:41:48        MR. BALDING:  Thank you, Your Honor.

15  12:41:49   Q. I'm going to go back to Exhibit 7 and resume playing.

16  12:42:09   Try to find the right spot.

17  12:42:18        (Thereupon, the audio was played.)

18  12:47:36   Q. All right.  I've stopped the recording.

19  12:47:39        Dr. Munzing, what concerns, if any, do you have with

20  12:47:43   the prior portion of the recording that just played?

21  12:47:45   A. Well, she's prescribing the tramadol, and other -- the

22  12:47:53   other medications I don't really have concerns with.  The

23  12:47:57   tramadol, being an opioid, I do.

24  12:48:00        The -- she has taken some pain history, not the

25  12:48:05   other parts of the history we talked about.  There is no

1  12:48:09   evidence that she touched the patient, did an examination.

2  12:48:17   And then she's jumping to -- I have no major -- no

3  12:48:23   significant concerns in regards to ordering some imaging,

4  12:48:28   physical therapy, but then she's jumping to starting an

5  12:48:33   opioid based on very limited information.

6  12:48:36   Q. What about the reference to having taken Vicodin

7  12:48:39   previously by undercover 2, any concerns with the reaction to

8  12:48:43   that?

9  12:48:43   A. She didn't clarify, you know, was it prescribed?  Was

10 12:48:48   it -- you know, where did it come from?  How often?  When?

11 12:48:53   And so that should have been explored in detail, not only for

12 12:48:58   timing, but was it even for, you know, for your shoulder

13 12:49:05   pain, or was it for something else?  And where did it come

14 12:49:09   from?  We don't know any of that information.

15 12:49:10   Q. Now, similar to earlier, it sounds like she's giving some

16 12:49:17   warnings about only taking the tramadol if your pain is

17 12:49:21   severe, if you really need it, things to that effect.

18 12:49:24        What is your reaction to the appropriateness of

19 12:49:26   those comments?

20 12:49:27   A. Well, it's -- it's a good warning, but it's not -- it

21 12:49:32   certainly is not an informed consent.

22 12:49:35        She does talk about some potential side effect of

23 12:49:38   the Flexeril, that the patient may get sleepy, but she never

24 12:49:43   goes over any of the mild or more serious potential side

25 12:49:48   effects of tramadol, an opioid.

1 12:49:52   Q. Now, this is the -- I'm putting up Exhibit 27, which is

2 12:49:57   the prescription that was written to Emile Paul on

3 12:49:59   February 22nd, 2018.

4 12:50:01            This is -- do you see that?

5 12:50:03   A. Yes.

6 12:50:04   Q. It appears it's tramadol, and 60 tablets is the dose?

7 12:50:09   A. That's what it appears to say.

8 12:50:10   Q. Now, is -- again, similar to the question I think we

9 12:50:15   talked about earlier, is the tramadol, the dosage of 60,

10 12:50:18  consistent with telling someone to only take it when they

11 12:50:22  need it?

12 12:50:24            MS. MURPHY:  Objection.  Leading.

13 12:50:25            THE COURT:  Overruled.

14 12:50:29            THE WITNESS:  She's writing it to be taken twice

15 12:50:33  daily as needed for pain.  The patient is brought back in in

16 12:50:39  one month, so if you get 60 divided by approximately 30 days,

17 12:50:44  that is twice daily.

18 12:50:47            So that would not be consistent with telling to take

19 12:50:50  that medicine strictly for severe pain.  Where the others are

20 12:50:55  written for a month's supply, Diclofenac twice a day, and

21 12:51:01  Flexeril appears to be once a day at bedtime, number 30.

22 12:51:07  Q. Also, did you -- do you recall the portion where she says

23 12:51:10  not to take the tramadol until he gets the MRI?  Do you

24 12:51:13  recall that portion of the recording?

25 12:51:14  A. She made some reference, I don't remember exactly the

1  12:51:19  verbiage.

2  12:51:23  Q. See if I can pull up that portion.

3  12:51:30          (Thereupon, the audio was played.)

4  12:51:54  Q. So have you now seen the portion where she discusses not

5  12:51:58  taking the tramadol until the MRI?

6  12:52:00  A. Yes.

7  12:52:00  Q. And is that consistent, in your view, with prescribing 60

8  12:52:04  pills of tramadol for a month?

9  12:52:06  A. No.

10  12:52:06  Q. Is it possible to prescribe less than 60 pills of

11  12:52:14  tramadol?

12  12:52:15  A. Sure.  You can prescribe one pill, if you choose to.

13  12:52:23  Q. Now, I'm not going to play the remainder, but have you

14  12:52:27  reviewed the remainder of the recording for this transaction?

15  12:52:30  A. Yes.

16  12:52:30  Q. Is anything that wasn't played affect your ultimate

17  12:52:33  analysis with respect to this transaction?

18  12:52:35  A. No.

19  12:52:36  Q. Going back to Exhibit 27, which is the prescription that

20  12:52:40  day.

21  12:52:41          Dr. Munzing, based on your review and your

22  12:52:45  experience, is it your opinion that the prescription for

23  12:52:48  tramadol to Emile Paul on February 22nd, 2018, was within the

24  12:52:53  usual course of professional practice?

25  12:52:54  A. No.  It was outside the course of professional practice.

1 12:52:57   Q. Was the prescription for tramadol made for a legitimate

2 12:53:01   medical purpose?

3 12:53:01   A. Not based on the entirety of the information we have

4 12:53:05   reviewed.

5 12:53:05   Q. And was it within the standard of care or outside the

6 12:53:09   standard of care?

7 12:53:10   A. It would be outside the standard of care.

8 12:53:11   Q. And what level of departure from the standard of care

9 12:53:14   would you characterize that prescription as?

10 12:53:16   A. Being an opioid, it would be an extreme departure.

11 12:53:20   Q. Now, I'm going to move forward to the second visit of

12 12:53:24   Emile Paul, undercover 2, which occurred on April 19th, 2018.

13 12:53:29        Have you reviewed that recording?

14 12:53:31   A. I did.

15 12:53:32   Q. Exhibit 8, I'm now pulling up.  I'm going to play the

16 12:53:39   first few minutes of that exhibit.

17 12:53:43        (Thereupon, the video was played.)

18 12:56:09   Q. I paused the recording.

19 12:56:12        Dr. Munzing, what concerns, if any, do you have with

20 12:56:14   this portion of the recording I've played?

21 12:56:16   A. Well, here, similar to the UC1, we have an aberrant urine

22 12:56:23   drug test that showed oxycodone, and other aberrances.  And

23 12:56:30   she is saying that she can't change the medicine because of

24 12:56:34   the urine drug test.  The patient said that the tramadol

25 12:56:40   didn't work at all.  But I would say that the aberrant urine

1 12:56:46   drug test is a pretty significant issue.

2 12:56:48    Q. And when you say it's a significant issue, what concerns

3 12:56:52   do you have with the aberrant drug test?

4 12:56:55    A. Well, it showed oxycodone, that clearly it wasn't

5 12:56:58   prescribed.  It also showed other substances that were not

6 12:57:05   prescribed.  And it did not show the tramadol.  Though not

7 12:57:13   showing the tramadol may be because he hadn't been seen for

8 12:57:18   over a month.  Though, he said that -- I think he said that

9 12:57:22   he just used one, and it didn't help, so he didn't use the

10 12:57:26   rest.  I believe that is --

11 12:57:30    Q. So, in other words, if he's -- if he's saying he's not

12 12:57:33   taking the tramadol, then would that be consistent with

13 12:57:36   testing negative for the tramadol?

14 12:57:38    A. Yes.

15 12:57:38         MS. MURPHY:  Objection.  Leading.

16 12:57:40         THE COURT:  It is.  But, again, it's just

17 12:57:43   foundational to move things along.

18 12:57:47         MR. BALDING:  Yeah.

19 12:57:48    Q. Is -- one moment.

20 12:57:54         So when the defendant talks about getting in

21 12:57:59   trouble, what -- sorry.  Bad question.

22 12:58:04         Would it be appropriate to lower a dosage just

23 12:58:07   because of a urine drug test?

24 12:58:11    A. The appropriate response to an aberrant urine drug test

25 12:58:19   is varied.  It may be reducing dosing.  It may be

1 12:58:24   discontinuing prescribing, because it's not being used.  It

2 12:58:27   may -- there are many different things one may -- how one may

3 12:58:31   respond.  But reducing the dosing, if the only -- if the only

4 12:58:40   factor in that is an aberrant urine drug test, it may be

5 12:58:45   appropriate, but it may very well be inappropriate, depending

6 12:58:49   on the specifics.

7 12:58:57   Q. Have you reviewed the drug test that was being reviewed

8 12:59:00   during this time -- during this visit?

9 12:59:03   A. I've looked at the result, yes.

10 12:59:04   Q. And I'm pulling up Exhibit 31, which is page 24.

11 12:59:12          This is the -- of course, the fake result of the

12 12:59:16   drug test that was submitted to the defendant.  Do you see

13 12:59:18   that?

14 12:59:18   A. I do.

15 12:59:20   Q. And any other concerns about what is on there that

16 12:59:24   wasn't -- that weren't discussed in this visit?

17 12:59:26   A. Sure.  Oxycodone is positive, the benzodiazepines are

18 12:59:33   positive, and the THC marijuana is positive.

19 12:59:43   Q. Now, pulling up Exhibit 28, which is the ultimate

20 12:59:50   prescription that day, April 19th, 2019.  Do you see that?

21 12:59:56   A. I do.

22 12:59:57   Q. That indicates it was for tramadol, 45 pills, amongst

23 13:00:01   other prescriptions.  Do you see that?

24 13:00:03   A. I do.

25 13:00:04   Q. So it appears she stuck with tramadol, not withstanding

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 13:00:11 he had indicated it was not helping.

2 13:00:12      Do you have any thoughts on that prescription in

3 13:00:14 this context?

4 13:00:16      MS. MURPHY:  Objection.  Leading.  Argumentative.

5 13:00:17      THE COURT:  Overruled.

6 13:00:19      THE WITNESS:  The patient already said that it

7 13:00:21 wasn't working.  And my recollection was that he wasn't -- he

8 13:00:27 wasn't taking it, and that would be consistent with the urine

9 13:00:30 drug test, that he was not taking it.  So it makes no sense

10 13:00:34 to prescribe some more of a medicine that he said didn't

11 13:00:40 work, and I'm not taking.

12 13:00:43      And cutting it down from 60 to 45 -- you know, 45

13 13:00:49 pills of a pill that he says doesn't work, isn't going to

14 13:00:52 work any better than 60 pills of a pill that he says doesn't

15 13:00:56 work.

16 13:00:57 Q. They also talk about an MRI that was submitted.  Have you

17 13:01:02 reviewed the MRI that was submitted by this undercover?

18 13:01:06 A. Yes.

19 13:01:07 Q. And I've pulled it up at Exhibit 44.

20 13:01:09      Do you recognize that as the document you reviewed?

21 13:01:11 A. Yes.

22 13:01:13 Q. And this looks very similar to the MRI that was submitted

23 13:01:18 for UC1.  Have you compared the two?

24 13:01:21      MS. MURPHY:  Objection.  Leading.

25 13:01:22      THE COURT:  Overruled.

1 13:01:23          THE WITNESS:  Yes, I've compared the two.

2 13:01:26    Q. And what was your conclusion as to how they compare?

3 13:01:29    A. The bulk of the reading is identical.  Obviously the

4 13:01:37    patient name is different.  The date of -- the date that it

5 13:01:43    was done was slightly different.

6 13:01:47          The referring physician is actually a physician

7 13:01:51    assistant Carlos Almonte.  Once again, have no idea who that

8 13:01:57    individual is.

9 13:01:59          Once again, the patient's complaint at the first

10 13:02:02    visit was shoulder pain.  This is an MRI of the lumbar spine.

11 13:02:07          And then if you go -- if you can just highlight the

12 13:02:09    impression.

13 13:02:15          The impression is essentially the same as what the

14 13:02:18    prior MRI was of just mild degenerative changes at a couple

15 13:02:25    of the lumbar levels.  And even in 30-year-olds who have no

16 13:02:32    back pain, studies have shown that -- that at least half of

17 13:02:36    them will have a result similar to this.

18 13:02:38    Q. And having watched Exhibit 7, the primary complaint was

19 13:02:44    that it was -- was it the shoulder, was that your

20 13:02:46    recollection?

21 13:02:46    A. The back was mentioned.

22 13:02:52    Q. So I'm going to ask you about the recording where he

23 13:02:57    talks about taking narcotics from his grandmother.  Any

24 13:03:02    concern with how that portion of the proceeding was treated

25 13:03:06    by the defendant?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 13:03:07   A. I would say, similar to what the defendant did with UC1,

2 13:03:16   when the undercover stated was using medicine from someone

3 13:03:22   else, is somewhat of a similar response.

4 13:03:30   Q. And what is that response?

5 13:03:32   A. There was no -- there was no, you know, absolute you

6 13:03:38   cannot do this.  The basic emphasis was, it's important for

7 13:03:41   us to have a urine drug test that is consistent.  And if I --

8 13:03:47   you know, I can't raise or adjust your medicines with an

9 13:03:53   aberrant urine drug test.

10 13:03:55          There is really no significant focus on the fact

11 13:03:58   that he had obtained medicine diverted from someone else.

12 13:04:04   Q. Now, whether or not a physician chooses to take any

13 13:04:10   action on when informed of diversion, would it be important

14 13:04:14   to document the reference to something like that?

15 13:04:17   A. It's vitally important.  As we mentioned earlier, vitally

16 13:04:22   important to document, you know, the whole visit, especially

17 13:04:28   how one is dealing with an aberrant urine drug test.

18 13:04:34   Q. And again, was there any physical examination in this

19 13:04:37   portion of the visit?

20 13:04:38   A. Not that we could identify, and not that we could see.

21 13:04:43   Q. I'm going to --

22 13:04:44   A. "We," being myself.

23 13:04:47   Q. I'm going to resume playing this exhibit.

24 13:05:00          (Thereupon, the video was played.)

25 13:08:41   Q. All right.  Dr. Munzing, any concerns with the remainder

1 13:08:45   of that visit that we just saw?

2 13:08:46    A. Sure.  Especially when she said, you know, come back and

3 13:08:51   do a urine test when it's like consistent.  So she's

4 13:08:54   basically telling him, you know, make sure your urine test is

5 13:09:02   going to show what we want it to show.

6 13:09:06          He's already asked her to up the medicine, change

7 13:09:08   the medicine, which she says she can't do when there is an

8 13:09:11   inconsistent urine drug test.  So she's basically told him

9 13:09:14   come back when it's consistent.

10 13:09:16          And she has written a prescription for Toradol and

11 13:09:23   other medications.  Toradol, despite the fact that he already

12 13:09:27   told her it didn't work, and I've stopped taking it, and the

13 13:09:31   urine drug test confirmed that, that it was not being taken.

14 13:09:37    Q. Sorry.  Did you say Toradol or tramadol, I'm sorry?

15 13:09:40    A. I'm sorry, tramadol.  Not Toradol.

16 13:09:42    Q. Did the fact that she discussed pain patches as an

17 13:09:47   alternative change your view that you just mentioned about

18 13:09:51   the propriety?

19 13:09:52    A. I mean, I have no objection to the pain patches.  And

20 13:09:57   that certainly may help.  I have no objection to those.  I do

21 13:10:02   have concern with the prescription for the tramadol.

22 13:10:11    Q. Now, Exhibit 28, I pulled up.  That is the prescription

23 13:10:16   for the 45 tramadol that we saw earlier.  Do you see that?

24 13:10:18    A. I do.

25 13:10:19    Q. This is the April 19th, 2018 prescription to UC2, or

1 13:10:24   Emile Paul.  Based on your experience and in your opinion,

2 13:10:29   was this prescription for tramadol within the usual course of

3 13:10:32   professional practice?

4 13:10:32    A. No.

5 13:10:33    Q. And was it made for a legitimate medical purpose?

6 13:10:37    A. No, as previously discussed.

7 13:10:39    Q. And was it within the standard of care or outside?

8 13:10:42    A. Outside.

9 13:10:43    Q. And what level of departure would you characterize this

10 13:10:47   prescription as?

11 13:10:47    A. As discussed before, an extreme departure.

12 13:10:52    Q. I'm going to go to the final visit that UC2 had, or

13 13:10:57   Emile Paul, which is on May 17th, 2018.  It's Exhibit 4.  I'm

14 13:11:01   going to play that visit.

15 13:11:10           (Thereupon, the video was played.)

16 13:13:00    Q. And, Dr. Munzing, I paused the video.

17 13:13:03           Do you have any concerns with what you've seen in

18 13:13:05   this third visit so far?

19 13:13:07    A. Once again, he's saying that the tramadol really didn't

20 13:13:13   work at all.  And she mentions codeine this time.  She does

21 13:13:22   not kind of offer potential side effects, but he mentions

22 13:13:27   some.  So I would -- I think it was better that she didn't

23 13:13:32   offer any, and -- but he came up with something.

24 13:13:37    Q. Does she first mention the possibility of side effects

25 13:13:44   and then he responds?

1  13:13:45   A. Yeah.  She asked whether or not he has side effects, and

2  13:13:50   then the undercover states that it makes him feel drunk.

3  13:13:54   Q. Any concerns with him talking about Norco again?  I

4  13:14:02   believe he spoke of Vicodin in an earlier visit, but he's

5  13:14:07   also discussing Norco.  Any concerns with the way she reacted

6  13:14:10   to that?

7  13:14:10   A. Yeah.  I mentioned with UC1, is that both patients came

8  13:14:16   in kind of focused on, they want to get Norco or Vicodin or

9  13:14:22   both of those, or hydrocodone.  And so it's not a definitive,

10 13:14:27   but it certainly is a red flag to pay attention to.

11 13:14:31   Q. And in this visit, did you see any physical examination

12 13:14:36   undertaken by defendant?

13 13:14:38   A. Not to the point -- not at this -- not so far.

14 13:14:49        (Thereupon, the video was played.)

15 13:17:37   Q. All right.  Dr. Munzing, what concerns, if any, do you

16 13:17:41   have with the remainder of that encounter?

17 13:17:44   A. She prescribes an opioid.  She still has not touched the

18 13:17:52   patient, done an exam.  The first visit, the problems were

19 13:17:56   kind of the shoulders, a little bit the neck, but mostly the

20 13:17:59   shoulders.  Now sounds like it's the lower back.  At least we

21 13:18:06   presume it's the lower back.  She didn't really go into any

22 13:18:10   detail at all at this visit.

23 13:18:12        And she, you know, went ahead and prescribed Norco,

24 13:18:19   despite the fact that we had the aberrant urine drug test

25 13:18:24   that we talked about before.

1 13:18:25   Q. So I'm putting up a subsequent drug test that looks like

2 13:18:48   it's a clean, so to speak, drug test.  Do you see that?

3 13:18:53   A. I do.

4 13:18:54   Q. So would that have been -- this looks like it would have

5 13:18:57   been submitted before the Norco prescription.  So is that

6 13:19:00   consistent with what we discussed before, where, if you get a

7 13:19:02   clean drug test, she can change the medication?

8 13:19:06   A. That's -- that was what she stated.  And here the

9 13:19:13   oxycodone, the benzodiazapine and the THC were all negative.

10 13:19:21   And then what she did was then she prescribe the Norco.

11 13:19:25   Q. Now I'm putting up Exhibit 29, which is the prescription

12 13:19:28   on May 17, 2018, to Emile Paul, or UC2.  Do you see that?

13 13:19:33   A. I do.

14 13:19:33   Q. And that is a prescription for Norco 5/325.  Is that a

15 13:19:38   different dosage than the earlier Norcos with UC1?

16 13:19:42   A. Yes.  UC1 got 10/325.

17 13:19:48   Q. And how many pills did this prescription contain?

18 13:19:50   A. Sixty.

19 13:19:51   Q. Now, in your opinion, based on your review and your

20 13:19:54   experience, was this prescription for hydrocodone or Norco

21 13:19:59   within the usual course of professional practice?

22 13:20:01   A. Not based on the entirety of what we have talked about,

23 13:20:05   no.

24 13:20:05   Q. Was -- in your opinion, was it made -- this prescription

25 13:20:08   made for a legitimate medical purpose?

1  13:20:09   A. No.

2  13:20:09   Q. Was it within the standard of care?

3  13:20:11   A. No.

4  13:20:12   Q. And what level of departure was it from the standard of

5  13:20:15   care?

6  13:20:15   A. As a Schedule II opioid, it would be an extreme

7  13:20:18   departure.

8  13:20:21         MR. BALDING:  Your Honor, at this time I'm going to

9  13:20:23   inquire as to some of the additional patient files.

10 13:20:25         THE COURT:  Yes.

11 13:20:27         Ladies and gentlemen, you will recall that I

12 13:20:32   previously told you that the defendant is not on trial for

13 13:20:40   anything except the eight counts which were alleged in the

14 13:20:46   indictment, which is to say, the prescriptions to the

15 13:20:50   undercover officers, which the government alleges occurred,

16 13:20:55   and on which you heard testimony last week, and then today,

17 13:20:59   have been reviewed in the direct examination of Dr. Munzing.

18 13:21:05         Since Ms. Rahbarvafaei is not on trial for anything

19 13:21:11   else, it might seem strange now that the government intends

20 13:21:16   to elicit testimony about other patient files, I believe nine

21 13:21:23   other patients.

22 13:21:23         So what I'm going to now do is explain to you the

23 13:21:27   limited purpose for which you are receiving that information

24 13:21:31   about the other patient files.

25 13:21:36         You are about to hear testimony that the defendant

1 13:21:38   treated other patients not charged in the indictment.  The

2 13:21:40   evidence of these other acts will be admitted only for a

3 13:21:44   limited purpose.  You may consider this evidence only for the

4 13:21:48   purpose of deciding whether the defendant had the state of

5 13:21:51   mind, knowledge, or intent necessary to commit the crimes

6 13:21:55   charged in the indictment, or did not commit the acts for

7 13:22:00   which the defendant is on trial by accident or mistake.

8 13:22:03          Do not consider this evidence for any other purpose.

9 13:22:07          Of course, it is for you to determine whether you

10 13:22:10   believe this evidence and, if you do believe it, whether you

11 13:22:14   accept it for the purpose offered.

12 13:22:16          You may give it such weight as you feel it deserves,

13 13:22:19   but only for the limited purpose that I described to you.

14 13:22:22          The defendant is not on trial for committing these

15 13:22:25   other acts.  You must not consider the evidence of these

16 13:22:28   other acts as a substitute for proof that the defendant

17 13:22:32   committed the crimes charged beyond a reasonable doubt.

18 13:22:35          You may not consider this evidence as proof that the

19 13:22:38   defendant has a bad character or any propensity to commit

20 13:22:44   crimes.  Specifically, you may not use this evidence to

21 13:22:47   conclude that because the defendant may have committed these

22 13:22:52   other acts, she must also have committed the acts charged in

23 13:22:55   the indictment.

24 13:22:56          Remember that the defendant is on trial here only

25 13:22:58   for the prescriptions issued on the charged dates to the

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 13:23:02   undercover officers, or so the government's alleged, and not

2 13:23:06   for these other acts.  Which is to say, for the prescriptions

3 13:23:09   that were reflected in the other patient files about which

4 13:23:14   you are about to hear.

5 13:23:15          Do not return a guilty verdict unless the government

6 13:23:18   proves the eight crimes charged in the indictment beyond a

7 13:23:23   reasonable doubt.

8 13:23:23          Mr. Balding, you may go forward.

9 13:23:26          MR. BALDING:  Thank you, Your Honor.

10 13:23:27  Q. Dr. Munzing, in the course of your engagement in this

11 13:23:31  matter, did you review other patient files besides those of

12 13:23:35  the two undercover officers?

13 13:23:36  A. I did.

14 13:23:37  Q. Now for those patient files, were those, to your

15 13:23:39  understanding, patient files retrieved from the Good Neighbor

16 13:23:43  Clinic for patients that the defendant had treated?

17 13:23:45  A. Yes.

18 13:23:46  Q. And for those patient files, we are going to focus on

19 13:23:51  your review of approximately nine of those files, we'll go

20 13:23:53  rather quickly.  But were there corresponding video or

21 13:23:57  undercover -- or video recordings or audio recordings as

22 13:24:01  there were with the undercovers?

23 13:24:03  A. No.

24 13:24:03  Q. So was your review just limited to the data in the

25 13:24:06  patient files or data available such as CURES data that is

1 13:24:10   available from the State?

2 13:24:11    A. That's correct.

3 13:24:12    Q. Now, when you -- without going specifically yet, did you

4 13:24:16   find in your review of those files concerns that were similar

5 13:24:21   to the concerns we've talked about with respect to UC1 and

6 13:24:25   UC2?

7 13:24:25    A. Yes.

8 13:24:25    Q. And can you briefly discuss some of those concerns?

9 13:24:28    A. Sure.

10 13:24:30         And again, I did not have any audio or video

11 13:24:33   recordings.  But based strictly on the medical records that I

12 13:24:39   reviewed, the history was fairly limited for each of the

13 13:24:45   patients.  The exam portion of the progress note, sometimes

14 13:24:53   there was no exam documented, sometimes there was a minimal

15 13:24:58   exam documented.  But never was there an appropriate, more

16 13:25:04   complete exam documented.

17 13:25:06         Urine drug tests were done on -- excuse me, aberrant

18 13:25:14   urine drug tests were obtained on nine of the 10 patients.

19 13:25:21         Informed consent, I don't recall seeing any informed

20 13:25:25   consent forms signed or documentation about the specifics

21 13:25:31   that we talked about earlier in any of the -- any of the

22 13:25:36   patients reviewed.

23 13:25:39    Q. With respect to -- thank you.

24 13:25:41         With respect to the aberrant urine drug tests, were

25 13:25:45   any of those, based on the files, raise similar concerns with

1 13:25:52   what we saw with the undercovers?

2 13:25:53    A. Yes.

3 13:25:55    Q. And any of them contain substances that warranted further

4 13:26:02   review, in your opinion?

5 13:26:03    A. Yes, definitely.

6 13:26:04    Q. Can you give us an example?

7 13:26:06    A. One patient had methamphetamine in the urine drug test.

8 13:26:13   One patient had both methamphetamine and another drug test

9 13:26:17   had cocaine -- excuse me, I got that wrong.

10 13:26:21         One patient had methamphetamine and cocaine.  One

11 13:26:25   patient had cocaine.  Many patients had THC.  There were also

12 13:26:31   patients that the medication being prescribed did not show

13 13:26:37   up.

14 13:26:38    Q. I'm going to look specifically at a patient we'll refer

15 13:26:42   to as MH by their initials, rather than their real name.  I'm

16 13:26:46   going to pull up a file.

17 13:26:48         Did you review the file of patient MH?

18 13:26:50    A. Yes.

19 13:26:50    Q. And here, if you look at the first page, of course, is

20 13:26:54   last name first.  But is this the file which you recall

21 13:26:58   reviewing for MH?

22 13:27:01         And if you want the entire file, it's in Exhibit 35

23 13:27:05   to your right.  There should be a binder, a black binder on

24 13:27:08   the lower portion of that carriage.

25 13:27:11    A. That is okay.  This is -- this does appear to be a urine

1 13:27:22    drug test for MH.

2 13:27:24    Q. Did you review the file to see the various prescriptions

3 13:27:28    that were written for this patient?

4 13:27:31    A. Yes.

5 13:27:32    Q. And in your review, was hydrocodone frequently prescribed

6 13:27:38    between 2017 and 2019?

7 13:27:41    A. Yes.

8 13:27:41    Q. And now I'm going to pull up five separate urine drug

9 13:27:48    tests in succession, but I'm going to attempt to go in

10 13:27:54    chronological order.

11 13:27:55            So if I go to page 69 of Exhibit 35, this appears to

12 13:27:59    be --

13 13:28:00            THE COURT:  Excuse me, Mr. Balding.  All of these

14 13:28:02    are from Exhibit 35 as to MH?

15 13:28:04            MR. BALDING:  Yes.  All of these -- I'm sorry.

16 13:28:06            THE COURT:  Are you mixing in other patients, or are

17 13:28:08    you just taking drug tests from this one file?

18 13:28:11            MR. BALDING:  Yes, Your Honor, this is just drug

19 13:28:13    tests from the single patient file.  It's Exhibit 35.  And

20 13:28:16    they all come from this exhibit.  I'll try to identify the

21 13:28:19    page number as I pull them up, but yes.

22 13:28:21            So this looks like patient MH, and it's collected on

23 13:28:27    March 22nd, 2018.

24 13:28:29    Q. Do you see that?

25 13:28:29    A. Yes, I do.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 13:28:34   Q. And I'm going to go to the next one, and then I'm just

2 13:28:40   going to have you summarize.

3 13:28:43            This is page 74 of that same exhibit.  It appears to

4 13:28:47   be a urine drug test from -- collected April 19th, 2018, for

5 13:28:52   patient MH.  Do you see that?

6 13:28:53   A. I do.

7 13:28:56   Q. I'm going to show you page 31 of Exhibit 35, which

8 13:29:06   appears to be a urine drug test collected on April -- excuse

9 13:29:11   me -- May 17th, 2018.  Do you see that?

10 13:29:14   A. Yes.

11 13:29:14   Q. And was this positive for hydrocodone, this third test?

12 13:29:26   A. Yes.

13 13:29:27   Q. And the prior two that we looked at, pages 69 and 74,

14 13:29:31   were those positive or negative for hydrocodone?

15 13:29:34   A. They appeared to be negative.

16 13:29:38   Q. Now I'm going to Exhibit 35, page 13.

17 13:29:46            This is a test dated November 29th, 2018.  Do you

18 13:29:53   see that?

19 13:29:53   A. I do.

20 13:29:53   Q. And was that positive or negative for hydrocodone or

21 13:29:59   opiates?

22 13:29:59   A. It's negative for opiates.

23 13:30:03   Q. And finally, that first page we looked at, which is

24 13:30:10   collected on January 24th, 2019.  And what were the results

25 13:30:16   of that with respect to hydrocodone?

1 13:30:17    A. It was negative for hydrocodone.

2 13:30:24    Q. Now, what, if any, concerns do you have with reviewing

3 13:30:28    this file with respect to the urine drug tests and the

4 13:30:30    prescriptions that were issued?

5 13:30:31    A. Well, the patient was receiving -- based on the records

6 13:30:34    we had, the patient was receiving regular prescriptions of

7 13:30:39    hydrocodone, acetaminophen, over extensive periods of time.

8 13:30:46    And here we showed that four of the five urine drug tests

9 13:30:50    were negative for hydrocodone.

10 13:30:52    Q. Is that -- for the reasons we discussed earlier, what is

11 13:30:55    the concern with that negative test for a drug that is being

12 13:30:59    prescribed?

13 13:31:00    A. If it's not in your system, it's not working.

14 13:31:05    Prescribing for something that is not working is, you know,

15 13:31:11    not medically justified, not the usual course of professional

16 13:31:16    practice.  And so we don't know what is happening with the

17 13:31:18    hydrocodone, but we have multiple prescriptions that we have

18 13:31:25    five urine drug tests, four of them are negative for the

19 13:31:29    medication that one is prescribing.  So there is a

20 13:31:34    significant inconsistency there that needs to be addressed.

21 13:31:41    And not addressed just at the fifth time, but inconsistent or

22 13:31:49    aberrant urine drug test need to be addressed in some manner

23 13:31:53    each and every time they pop up.  And how you react to it may

24 13:31:57    change over time when, gee, this is the second time, the

25 13:32:02    third time.  Your actions may be different the first time,

1 13:32:05  but when it happens again, your actions may certainly be

2 13:32:08  different.

3 13:32:09   Q. And in reviewing the Norco prescriptions, did you see

4 13:32:14  that prescriptions get reduced but not change the type of

5 13:32:21  drug with respect to the opioid prescribed?

6 13:32:24   A. My recollection is early on it was 90, and then it got

7 13:32:28  reduced to 60 and 30.  And then ultimately it went back up to

8 13:32:32  60.

9 13:32:33          So prescribing -- the number prescribed was reduced,

10 13:32:42  but despite the fact that multiple -- on multiple occasions

11 13:32:46  the urine drug test was negative, the prescriptions

12 13:32:51  continued, though be it in smaller dosing.

13 13:32:53   Q. And again, you don't know exactly what happened at any of

14 13:32:56  the visits with that patient, correct?

15 13:32:58   A. All I know is what I read in the progress notes.

16 13:33:01   Q. And are these just concerns that you have when you look

17 13:33:05  at the file itself, that are similar to what we have

18 13:33:08  discussed with UC1 and UC2?

19 13:33:09   A. Yes.

20 13:33:11   Q. Now, in conducting your review, you know, were you made

21 13:33:17  aware -- you've reviewed, it appears -- if I represent it's

22 13:33:21  approximately 30 minutes of visits for UC1 with the

23 13:33:25  defendant, does that sound about right?

24 13:33:26   A. Can you ask that again, please?

25 13:33:28   Q. Yeah.  In conducting your review, were you made aware

1 13:33:31   that the defendant saw --

2 13:33:33          THE COURT:  Mr. Balding, are you finished now with

3 13:33:36   MH, or is this preparatory additional MH questions?

4 13:33:39          MR. BALDING:  This is done with MH.

5 13:33:41          THE COURT:  Then in that case, we'll break for the

6 13:33:43   day for the reason I previously said.

7 13:33:45          Ladies and gentlemen, please remember what I told

8 13:33:47   you.  Do not investigate the case in any way, including using

9 13:33:51   your phones.  Don't use a search engine to have any of these

10 13:33:57   concepts here, the medications, the prescriptions, the whole

11 13:34:03   issue of opioids, the standards of care about which you've

12 13:34:07   heard testimony about, which you have not yet seen a

13 13:34:11   cross-examination.  Don't do any of those things.  And

14 13:34:13   likewise, don't discuss the case with anyone, including your

15 13:34:17   family and friends, and don't allow anyone to discuss the

16 13:34:19   case with you.

17 13:34:21          Do your best to get here tomorrow by 8:30.

18 13:34:25          The trial is still going forward as predicted.  I

19 13:34:30   see no reason that you shouldn't receive the case perhaps

20 13:34:33   tomorrow afternoon, but more likely sometime early on

21 13:34:37   Wednesday.

22 13:34:38          Thank you.

23 13:34:39          (Thereupon, the jury retired from the courtroom.)

24 13:35:10          THE COURT:  Dr. Munzing, you may step down.

25 13:35:21          Wait in case the government wants to talk to you,

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 13:35:23    but for now, wait in the witness room.

2 13:35:26             Be seated, please.

3 13:35:27             There was a mention that there might be progress on

4 13:35:33    the jury instructions, perhaps that was superseded by events.

5 13:35:37    But is the current state of the instructions what I've --

6 13:35:43    what I have here, or has there been further areas of

7 13:35:46    agreement?

8 13:35:47             MS. MURPHY:  Your Honor, we did meet and confer

9 13:35:49    yesterday.  The plan right now -- if I'm saying anything

10 13:35:52   incorrect, I'm sure they will correct me.  We are trying to

11 13:35:55   come to the meeting of minds.  We are going to create sort of

12 13:35:58   like a Dr. Frankenstein's combination, we think, of what they

13 13:36:02   want and what we want, and see if we can come to some

14 13:36:05   agreement.

15 13:36:05             THE COURT:  All right.  Then if -- it looks like

16 13:36:10   there is going to be enough -- that means it won't be

17 13:36:15   possible for the jury to get the case tomorrow, even if the

18 13:36:20   witnesses go quickly, and Ms. Rahbarvafaei chooses not to

19 13:36:23   testify.

20 13:36:25             But in that case, we'll just -- if need be, we'll go

21 13:36:28   forward on Wednesday.  And it sounds then that there

22 13:36:32   shouldn't be that many issues to discuss if you are

23 13:36:35   successful on that.  And if not, then we'll just have to have

24 13:36:38   a long night on Tuesday, but so be it.

25 13:36:43             For now then it doesn't sound like there is any --

1  13:36:46   it would make sense for my law clerk to or I to really get

2  13:36:51   involved when you are still working with each other.

3  13:36:53        Then what I would like is for government counsel --

4  13:37:01   excuse me, not government counsel -- defense counsel to

5  13:37:05   appear here at 4:00.  Let's make it 4:15, so Ms. Diaz can

6  13:37:13   have a rest if the hearing at 3:00 goes long, which I don't

7  13:37:20   expect it will.  But at 4:15, be back here, and I'll discuss

8  13:37:24   with you what I'll allow by way of your proffer.

9  13:37:31        And, of course, this isn't to say that when it's

10 13:37:34   fully revealed, the government isn't free to make an

11 13:37:37   objection.  But like I said, there are some things where it

12 13:37:41   seems to me that at least at a certain level that they have

13 13:37:48   the right to come in, but then there are some specific things

14 13:37:51   that shouldn't be allowed, even if under Rule 403, even if

15 13:37:56   they might technically be relevant.

16 13:38:00        So we can discuss that, and then you will know.  And

17 13:38:02   then that way you will be able to go forward tomorrow with

18 13:38:06   Ms. Rahbarvafaei's testimony if she chooses to testify.

19 13:38:11        Ms. Rahbarvafaei, you are free to be here at 4:15,

20 13:38:16   but you aren't required to be if your lawyers want -- is

21 13:38:22   there a written waiver for the defendant for matters of law

22 13:38:25   on the record?

23 13:38:26        MS. MURPHY:  There isn't.  I assume she will want to

24 13:38:28   be here, though.  If she does want to leave, I'll get a

25 13:38:31   waiver.

1 13:38:31           THE COURT:  Okay.  Then I will see all of you

2 13:38:36    tomorrow, I'll see the defense later.

3 13:38:42           There are going to be victims testifying preparatory

4 13:38:47    to a sentence, so they can confront the defendant, so if you

5 13:38:50    could kind of tidy up your desks, I would appreciate it.

6 13:38:55           MR. BALDING:  Just one very minor matter.  The

7 13:38:57    government has pulled two publically available documents

8 13:39:00    about other cases Dr. Munzing testified in that might be for

9 13:39:07    rebuttal, or I guess rehabilitation.

10 13:39:10           THE COURT:  That he didn't -- I'm sure he's --

11 13:39:13           MR. BALDING:  Essentially it's the same judge says,

12 13:39:15    I give great credibility or great weight to his testimony.

13 13:39:18    And I thought --

14 13:39:19           THE COURT:  Which judge?

15 13:39:20           MR. BALDING:  The administrative law judge in a

16 13:39:22    different -- not the case we are talking about here, this is

17 13:39:25    a separate case.  I was going to provide copies to the Court.

18 13:39:27    If the Court prefers --

19 13:39:27           THE COURT:  I take your word for it.

20 13:39:31           It just seems -- I can't say as I'm very impressed

21 13:39:34    by that, if I were.  But I think really the issue is whether

22 13:39:40    the findings that were made on that one occasion are

23 13:39:43    something which are in and of themselves admissible as if it

24 13:39:47    was like the government report on an airplane crash.  Like I

25 13:39:51    said, I don't see it, maybe the defense can find me some

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 13:39:54  case.

2 13:39:55       But I don't see what the fact that he's testified on

3 13:39:57  other occasions appropriately, or didn't go out of his way to

4 13:40:02  be a government shill particularly impresses me.

5 13:40:06       MR. BALDING:  I was trying to comply with your order

6 13:40:08  providing copies if we intend to look -- to seek to use it.

7 13:40:12  But it would be to just refresh his recollection only.

8 13:40:17       THE COURT:  I see.  Well then, make sure that the

9 13:40:19  defense has them.  And if you try to use them, we'll deal

10 13:40:21  with it then.

11 13:40:22       MR. BALDING:  Yes, sir.

12 13:40:23       (Thereupon, the Court was in recess.)

13                    *****     *****     *****

14

15  I certify that the foregoing is a correct transcript from the

16  record of proceedings in the above-titled matter.

17

18

19

20  ---------------------------

21

22  Amy C. Diaz, RPR, CRR              August 27, 2022

23  S/  Amy Diaz

24

25    DR. TIMOTHY MUNZING                             18

```
1        DIRECT EXAMINATION                                    20

2        BY MR. BALDING

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```