108:18:59                    UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3              HONORABLE MICHAEL W. FITZGERALD, U.S. DISTRICT JUDGE

4

5

UNITED STATES OF AMERICA,        )
6                                 )
              Plaintiff,          )
7                                 )
                   vs.            )
8                                 )    2:19-CR-164-MWF
SALOUMEH RAHBARVAFAEI,            )
9                                 )
              Defendant.          )
10    _____)
                                  )
11                                )
                                  )
12

13

14

15                  REPORTER'S TRANSCRIPT OF JURY TRIAL

16                      Los Angeles, California

17                     Tuesday, August 16, 2022

18

19

20

21         _____

22                  AMY DIAZ, RPR, CRR, FCRR
                    Federal Official Reporter
23                  350 West 1st Street, #4455
                    Los Angeles, CA 90012
24

25
           *Please order court transcripts here:  www.amydiazfedreporter.com*

```
1        APPEARANCES OF COUNSEL:

2

         For the Plaintiff:
3

4                          Office of the United States Attorney
                           By:  Benedetto Balding
5                               Assistant United States Attorney
                                Skyler Cho
6                               Assistant United States Attorney
                           United States Courthouse
7                          312 North Spring Street
                           Los Angeles, California 90012
8

9


10

         For the Defendant:
11

                           OFFICE OF THE FEDERAL DEFENDER
12                         By:  Erin Murphy
                                Assistant Federal Defender
13                              Michael Driscoll
                                Assistant Federal Defender
14                         321 East 2nd Street
                           Los Angeles, California 90012
15

16

17

18

19

20

21

22

23

24

25
```

08:18:59          THE COURT:  All right.  Counsel, I have reviewed the

08:19:05   defense motion to dismiss the indictment, which was filed

08:19:11   this morning.  That will be dealt with after trial when the

08:19:17   government's had a chance to respond in writing.  There is no

08:19:20   particular urgency about it.

08:19:24          The further request in the motion was to

08:19:29   cross-examine Dr. Munzing fully.

08:19:32          It is my intention that Dr. Munzing be

08:19:38   cross-examined fully, but that will happen without throwing

08:19:43   the Rules of Evidence out the window, including hearsay.

08:19:47          As I said, you are free to examine Dr. Munzing on

08:19:54   what happened in *Rosenblum*, but what you are not free to do

08:20:01   is to inquire of him or to bring in the conclusions which the

08:20:06   ALJ reached.

08:20:08          If the ALJ wants to come in here and say, I saw him

08:20:14   roll his eyes, I saw him say the following, I did this,

08:20:19   then -- so he can be cross-examined, then fine, good luck

08:20:23   with that.  Obviously, it's not going to happen, nor does it

08:20:28   need to happen, because you have the transcript.

08:20:30          In the *Menen* decision, there is, I -- again, you are

08:20:39   free to cross-examine him on mistakes that he might have

08:20:45   made, but you are not free to use the Board's determination

08:20:52   here.

08:20:53          I note -- and then finally on the perjury

08:20:57   allegation, you are free to say to him, isn't it true that

1 08:20:59   you deliberately lied under oath in the *Romano* case?  And

2 08:21:03   that was the case where you were testifying similar to here.

3 08:21:06   And that was the case where the government was paying you

4 08:21:09   this money.  And by the way, you don't want your gravy train

5 08:21:14   of millions of dollars to leave the station, isn't that

6 08:21:17   right, Doctor?

7 08:21:17         You know, you are free to ask him all of that.  But

8 08:21:19   what you are not free to do is to treat the fact that some

9 08:21:23   defense attorney -- I don't mean this in a way to denigrate

10 08:21:32   who is doing his or her job.  And for all I know, he did

11 08:21:39   perjure himself.

12 08:21:40         But the fact that that has not been raised does not

13 08:21:43   mean that the fact of that allegation is, therefore,

14 08:21:47   something that has to be raised.

15 08:21:49         You are free to prove that he lied.  But you are not

16 08:21:52   free to essentially piggyback on what a defense attorney has

17 08:21:59   chosen to say when the Court hasn't ruled on it.

18 08:22:02         If he had been indicted, that would be one thing,

19 08:22:05   but he's not.

20 08:22:07         In terms of your request to get into the

21 08:22:11   government -- if the government has made some sort of promise

22 08:22:14   to Dr. Munzing, that clearly would be *Giglio*.  I'm quite

23 08:22:19   certain that these prosecutors would have provided that

24 08:22:22   information.  And since that information has not been

25 08:22:25   provided, it doesn't exist.  It certainly is not something

1 08:22:29   which you will be allowed to get into in front of the jury.

2 08:22:38          It -- if nothing else, it's -- if it's admissible at

3 08:22:42   all, then it would be inadmissible under Rule 403 and its

4 08:22:47   balancing test.

5 08:22:49          The focus here should be, did he lie or not?  And

6 08:22:53   you have a huge amount of ammunition to make that point to

7 08:22:59   the jury.

8 08:22:59          I -- yesterday, I, in a sense, hinted to you that I

9 08:23:07   did not see any of this as being the equivalent of a

10 08:23:11   government report, which might be an exception to the hearsay

11 08:23:17   rule.  The closest that anything here would come to that

12 08:23:22   would be the *Menen* decision.

13 08:23:24          I note -- and again, I don't fault you for this

14 08:23:27   since you filed it at 2 in the morning.  But the fact is,

15 08:23:30   there is no case law in that section of your brief.

16 08:23:35          Yeah, you've got case law on Brady, including

17 08:23:41   Judge Kuczynski's throwaway comment, with which I disagree in

18 08:23:45   a dissent.  But that is not the same as saying that the Ninth

19 08:23:50   Circuit believes that information of this sort is admissible.

20 08:23:53   And if it is admissible, would not be in violation of

21 08:23:57   Rule 403.

22 08:23:58          So that is -- like I said, the Court is not ruling

23 08:24:03   on the motion to dismiss.

24 08:24:07          In terms of the evidentiary issues, which are

25 08:24:11   requested in section B, nothing has changed.  You are free to

08:24:14 get into the merits of these matters.  Whether -- I mean, you

08:24:22 can pick out something in *Rosenblum*, and just say, you were

08:24:27 acting as an advocate.  You have a good faith basis for it,

08:24:32 because the ALJ said it, you were acting as an advocate

08:24:35 there, and not as a witness, isn't that right?  And didn't

08:24:37 you do this, and didn't you do that?  You aren't going to

08:24:40 spend all day on that, but you certainly have a right to pick

08:24:43 out a few choices examples.  The ALJ has told you where you

08:24:46 are, you've got a roadmap, and you are free to do that.

08:24:48        But that is not the same as, as I said, of getting

08:24:53 into what it is that he concluded, getting into the fact that

08:24:56 the perjury allegation has been made, or getting into what

08:25:01 the Medical Board determined.  Although, like I said, if you

08:25:05 give me a Ninth Circuit case that allows it, that is where

08:25:09 the matter becomes closest.

08:25:11        Does the defense have anything to say?

08:25:20        MR. DRISCOLL:  Thank you, Your Honor.  And thank you

08:25:21 for reading our early-morning submission.

08:25:24        We understand the Court's clarification of its

08:25:28 rulings regarding the scope of Dr. Munzing's

08:25:32 cross-examination.  We appreciate that clarification.  I

08:25:35 don't think we have any followup.

08:25:37        MS. MURPHY:  Your Honor, I do have one matter.

08:25:40 There is an exhibit -- well, actually three exhibits -- three

08:25:45 pages of one document, really, that I want to get in as

1 08:25:49   evidence.  I want to address it with the Court beforehand.

2 08:25:51   It should be in the binder at exhibit -- Volume 8, Exhibits

3 08:25:57   441, 442 and 443.

4 08:26:11        THE COURT:  All right.  I am looking at 441, 442 and

5 08:26:17   443.

6 08:26:17        MS. MURPHY:  Thank you, Your Honor.

7 08:26:18        So we would like to admit these as public records.

8 08:26:22        We have a declaration that I can give to the Court

9 08:26:25   laying the foundation.  We have a live witness who can do it.

10 08:26:28  To save time, I would like to just get this preadmitted.  I

11 08:26:33  understand THAT the government may have some issue with that.

12 08:26:35        The reason I want to get into it is because it goes

13 08:26:38  directly into Dr. Munzing's bias.  It shows he has been

14 08:26:41  awarded $3.3 million worth of contracts, over 326

15 08:26:45  transactions.  That is at 441.

16 08:26:47        At 442, it shows a chart of when these contracts

17 08:26:50  were awarded, all the way at 2019.  That is critical here,

18 08:26:55  because that is the year that, one, our client was indicted,

19 08:26:59  and two, the year that he wrote the second report.

20 08:27:02        And then finally, at 443, it shows -- it breaks it

21 08:27:05  down by the awarding agency.  That is the Department of

22 08:27:08  Justice.

23 08:27:09        THE COURT:  What would be the purpose of insisting

24 08:27:14  on the live witness?  What could -- this is addressing the

25 08:27:17  government obviously.

1 08:27:18          MR. BALDING:  No, Your Honor, we have no problem

2 08:27:20     with foundation or authenticity.  For one thing, it's not

3 08:27:23     clear what types of cases these were.  If they just want to

4 08:27:27     say --

5 08:27:28          THE COURT:  He must know.

6 08:27:29          MR. BALDING:  She can ask him.  My thought was she

7 08:27:32     can ask him, and if he deny it is, she can use it to impeach

8 08:27:36     him.

9 08:27:36          If she wants to introduce this -- I don't see the

10 08:27:37    value if the fact is in evidence that -- if he's admitted.

11 08:27:39    She could, I guess, submit this.  I just think it risks

12 08:27:43    confusing, because it doesn't say what types of cases --

13 08:27:45          THE COURT:  Look, he's -- certainly if somebody was

14 08:27:47    testifying say on Northrop, you could overall get into very

15 08:27:53    generally that Northrop has -- in a sense is dependent on its

16 08:27:56    relationship with the Federal Government, even if it was

17 08:27:58    beyond that particular Pentagon contract.

18 08:28:03          I think here, the fact that he is receiving this

19 08:28:05    much money from the Department of Justice, it isn't even

20 08:28:07    Health and Human Services, it's the Department of Justice, is

21 08:28:11    germane.  He can explain it or he can say he was doing lots

22 08:28:15    of other things.  That is fine.

23 08:28:16          But in and of itself, it seems to me to be a

24 08:28:22    summary -- the question is, it's going to come in.  The

25 08:28:25    question is, will the government insist on this live witness

1 08:28:28   coming in --

2 08:28:29          MR. BALDING:  No.

3 08:28:30          THE COURT:  -- and waste our time.

4 08:28:31          MR. BALDING:  No, no -- not to cut you off.  No, no,

5 08:28:33   of course not, Your Honor.  If you think it's admissible on

6 08:28:36   the substance, we are not going to insist on a live witness.

7 08:28:39   We already said that beforehand.

8 08:28:41          THE COURT:  Then 441, 442 and 443 will be admitted.

9 08:28:41          MS. MURPHY:  Thank you, Your Honor.

10 08:28:45          THE COURT:  Does the government have anything to say

11 08:28:46   in response to the motion to dismiss and the request for the

12 08:28:52   scope of the cross-examination?

13 08:28:54          MR. BALDING:  No, Your Honor.  I think the

14 08:28:57   question -- and we can take up briefing on the motion later,

15 08:29:00   I suppose.  But as I understand it, they are able to ask

16 08:29:06   questions about, you know, you perjured yourself, you did

17 08:29:09   this, but never to get into, the ALJ made this determination

18 08:29:13   or someone has alleged this, it's just --

19 08:29:15          THE COURT:  Correct.  It's whether it happened.  You

20 08:29:17   know, without the gloss of the ALJ's findings, the Medical

21 08:29:22   Board's findings, or the fact that a specific allegation has

22 08:29:27   been made in the District Court.

23 08:29:30          MR. BALDING:  Thank you.

24 08:29:30          THE COURT:  Again, this is on the assumption, as I

25 08:29:32   said, that there isn't any *Giglio* here.  If you obviously

08:29:36  1    said to him yesterday -- I just don't think that is something

08:29:39  2    that is appropriate to get into in front of the jury.

08:29:42  3    Obviously if yesterday you said to him, well, don't worry

08:29:45  4    about testifying, because I promise you you will never be

08:29:49  5    prosecuted, then that obviously would be *Giglio* and that

08:29:51  6    should be turned over.

08:29:52  7         I'm taking the fact that it hasn't been as proof

08:29:55  8    that such a conversation never occurred.

08:29:57  9         MR. BALDING:  I appreciate the Court's confidence in

08:30:00  10   the government.  That conversation did not occur.

08:30:02  11        I can say exactly what occurred if the Court wants,

08:30:04  12   but that conversation did not occur.

08:30:06  13        THE COURT:  What you say to him obviously isn't

08:30:08  14   privileged.  So, in general, the defense can inquire about

08:30:14  15   that, as it could any witness.  He's not your client.  But at

08:30:20  16   the same time, I'm not going to ask you to say what it was,

08:30:22  17   because it has -- the defense has to do it at its peril, the

08:30:26  18   same way it would in any other case.  Just as you have the

08:30:29  19   right to inquire what was said between the defense expert and

08:30:34  20   defense counsel.  But again, you don't get a heads up on

08:30:37  21   that, you have to decide whether it's worth the risk to ask a

08:30:40  22   question in front of the jury to which you really don't know

08:30:42  23   the answer.

08:30:43  24        Ms. Sanchez, where are we on the jurors getting

08:30:46  25   here?

| | | |
|---|---|---|
| 1 | 08:30:47 | THE CLERK:  We are still missing quite a few, |
| 2 | 08:30:50 | Your Honor.  I think there is about eight here. |
| 3 | 08:30:51 | THE COURT:  Off the record for a moment. |
| 4 | 08:30:53 | (Thereupon, there was a brief off-the-record |
| 5 | 08:31:17 | discussion.) |
| 6 | 08:31:17 | THE COURT:  All right.  I will leave the bench, and |
| 7 | 08:31:20 | when the jurors are here, Ms. Sanchez will let you know, and |
| 8 | 08:31:23 | we will commence trial. |
| 9 | 08:31:26 | (Thereupon, there was a brief recess.) |
| 10 | 08:43:10 | (Thereupon, the jury returned to the courtroom.) |
| 11 | 08:43:44 | THE COURT:  Good morning, ladies and gentlemen. |
| 12 | 08:43:45 | All 16 of you are here.  The lawyers are here with |
| 13 | 08:43:52 | Ms. Rahbarvafaei.  The witness is on the stand, still under |
| 14 | 08:43:55 | oath. |
| 15 | 08:43:55 | Mr. Balding, you may proceed with your direct |
| 16 | 08:43:58 | examination. |
| 17 | 08:44:01 | MR. BALDING:  Thank you, Your Honor. |
| 18 | 08:44:01 | CONTINUED DIRECT EXAMINATION |
| 19 | 08:44:02 | BY MR. BALDING: |
| 20 | 08:44:02 | Q. Good morning, Mr. Munzing. |
| 21 | 08:44:07 | A. Good morning. |
| 22 | 08:44:07 | Q. So yesterday I believe you testified about the fact that |
| 23 | 08:44:14 | you are being compensated, you are being paid to be here |
| 24 | 08:44:17 | today.  Do you recall that testimony? |
| 25 | 08:44:18 | A. Yes. |

1 08:44:19   Q. Have you testified in other cases for the government?

2 08:44:21   A. Yes.

3 08:44:22   Q. Have you conducted other investigations for the DEA and

4 08:44:27   other government entities under the Department of Justice?

5 08:44:31   A. I do reviews.  I don't do investigations.

6 08:44:34   Q. Excuse me.  As part of investigations that are ongoing,

7 08:44:36   are you hired to conduct reviews of doctors, physicians,

8 08:44:40   other types of things?

9 08:44:42   A. Yes.

10 08:44:43   Q. And over the years, you have been paid for those

11 08:44:48   services, is that correct?

12 08:44:49   A. Yes.

13 08:44:49   Q. Now, would it surprise you to hear you have been paid

14 08:44:56   approximately $3.3 million by the government in your entire

15 08:44:59   career?

16 08:45:01   A. Sounds like a lot, but I don't know exactly the number.

17 08:45:05   I have reviewed a lot of cases, yes.

18 08:45:07   Q. And you have been paid -- typically you are paid hourly

19 08:45:11   like you are in this case, is that correct?

20 08:45:12   A. Yes.

21 08:45:13   Q. Now, I'm going to go back to asking you about patient

22 08:45:15   files, as we were discussing yesterday.

23 08:45:18         Do you recall we were discussing the patient file of

24 08:45:21   MH?

25 08:45:22   A. Yes.

| | | |
|---|---|---|
| 1 | 08:45:23 | THE COURT:  Just one moment, Mr. Balding. |
| 2 | 08:45:25 | Ladies and gentlemen, please keep in mind the |
| 3 | 08:45:27 | instruction that I gave you about the patient files who are |
| 4 | 08:45:31 | not -- who -- which involve the prescriptions which are not |
| 5 | 08:45:35 | the prescriptions which were made to the undercover officers. |
| 6 | 08:45:39 | Thank you. |
| 7 | 08:45:40 | Go ahead, Mr. Balding. |
| 8 | 08:45:42 | MR. BALDING:  Yes, Your Honor. |
| 9 | 08:45:43 | Q. I'm going talk to you about -- just briefly, about |
| 10 | 08:45:46 | another patient, I'll refer to him by his initials BJ.  This |
| 11 | 08:45:50 | is at Exhibit 36, which is in evidence.  And I'm going to |
| 12 | 08:45:54 | pull up various pages from that exhibit. |
| 13 | 08:45:58 | Do you recall reviewing the file of an individual by |
| 14 | 08:46:00 | the initials BH from the files you were asked to review? |
| 15 | 08:46:04 | A. BJ? |
| 16 | 08:46:05 | Q. Yes. |
| 17 | 08:46:06 | A. Yes. |
| 18 | 08:46:06 | Q. And now, I've put up -- I'm going to go through a few |
| 19 | 08:46:11 | specific documents and ask you some questions. |
| 20 | 08:46:15 | What is the date on this -- or first of all, is this |
| 21 | 08:46:19 | a prescription to a BJ from the defendant? |
| 22 | 08:46:23 | A. Yes. |
| 23 | 08:46:23 | Q. With the defendant's name checked, excuse me. |
| 24 | 08:46:27 | And the date on this prescription, can you read that |
| 25 | 08:46:31 | for the jury? |

08:46:31   A. November 16.

08:46:38   Q. Does that appear to be 2017?

08:46:40   A. It certainly could be.  It's a 1 and I suppose that is a

08:46:44   7.

08:46:44   Q. I'll just go through the file and maybe it will be more

08:46:47   clear which year is that is.

08:46:48        But what is the type of medications being prescribed

08:46:57   in the portion of the exhibit that I have blown up?

08:46:59        And again this is page 1 of Exhibit 36.

08:47:01   A. Yes.  Oxycodone, 30 milligrams, BID, which means twice

08:47:07   daily as needed for severe pain, number 60.

08:47:11   Q. And what does the 60 refer to?

08:47:14   A. The number of tablets.

08:47:16   Q. And the 30MG, relatively speaking, what is the strength

08:47:21   of that when it comes to prescribing oxycodone?

08:47:23   A. If you take it twice a day as directed, that would be

08:47:29   60 milligrams a day, times 1.5, is the conversion factor,

08:47:33   that would be 90 milligrams per day MME.

08:47:39        THE COURT:  And that was the morphine equivalent,

08:47:41   Doctor?

08:47:42        THE WITNESS:  Yes, morphine equivalent dosing.

08:47:51        MR. BALDING:  Just one moment, Doctor.

08:48:04   Q. I've gone to page 12 of Exhibit 36.

08:48:07        And is this another prescription written by

08:48:11   defendant to patient BH -- or BJ, excuse me?

1 08:48:15    A. Yes.

2 08:48:17    Q. And does this appear to be approximately two months

3 08:48:24    earlier, sometime in September of 2017?

4 08:48:27    A. Yes.

5 08:48:27    Q. And there is several prescriptions, but I'm going to

6 08:48:33    highlight one of them.

7 08:48:36          Can you explain to the jury what this prescription

8 08:48:39    is for?

9 08:48:40    A. It's the same medicine, it's the oxycodone 30 milligrams

10 08:48:46    BID, or twice daily, number 60.

11 08:49:08    Q. Turn now to Exhibit 36, page 17.

12 08:49:12          And chronologically it's a bit out of order, but is

13 08:49:16    this another prescription written by the defendant to patient

14 08:49:19    BJ?

15 08:49:20    A. Yes.

16 08:49:20    Q. Does this appear to be in between the first two we looked

17 08:49:24    at, or around October of 2017?

18 08:49:27    A. It appears to be 10, either 17 or 19, 2017.

19 08:49:40    Q. And what is the prescription that I've highlighted for?

20 08:49:46    A. Oxycodone, 30 milligrams, number 60.

21 08:49:50    Q. So in this file, it shows at least three oxycodone

22 08:49:58    prescriptions of the same amounts were issued between

23 08:50:02    September and -- approximately September and November of

24 08:50:04    2017, is that correct?

25 08:50:06    A. Yes.

1  08:50:07  Q. I'm going to show you another page from that exhibit.

2  08:50:24  This is Exhibit 36, page 19.

3  08:50:26        Do you see that up on the screen?

4  08:50:29  A. Yes, I do.

5  08:50:29  Q. Does that appear to be a urine drug test of patient BJ

6  08:50:38  that was collected on or about September 21, 2017?

7  08:50:42  A. Yes.

8  08:50:42  Q. Would that have been the date of the -- I guess the

9  08:50:46  second prescription we looked at, the September prescription,

10  08:50:50  or approximately that date?

11  08:50:51  A. Yes.

12  08:51:01  Q. Looking at the results, is the prescription positive for

13  08:51:08  anything?

14  08:51:10  A. It's positive for marijuana metabolites.

15  08:51:14  Q. Is it positive for any opioids or oxycodone specifically?

16  08:51:17  A. I see opiates.

17  08:51:26  Q. And it's -- other than the marijuana, is it positive for

18  08:51:30  anything else?

19  08:51:30  A. No, it's negative for opiates.

20  08:51:39  Q. I'm going to show you another drug test.  This is page 24

21  08:51:55  of that Exhibit 36.

22  08:51:58        Does this appear to be a drug test collected

23  08:52:02  November 16, 2017, for patient BH (sic)?

24  08:52:04  A. Yes.

25  08:52:22  Q. And, again, is this test positive for oxycodone?

1 08:52:27   A. Oxycodone isn't specifically listed.  It's negative for

2 08:52:32   opiates.

3 08:52:33   Q. And it's positive for what?

4 08:52:37   A. Marijuana metabolites.

5 08:52:39   Q. Based on the prescriptions and your review of the file

6 08:52:42   and these drug tests, do you have any concerns when you

7 08:52:45   reviewed this file?

8 08:52:46   A. I do.

9 08:52:47   Q. What are they?

10 08:52:48   A. The patient is receiving a fairly high dose of oxycodone.

11 08:53:00   The urine drug tests that are being performed -- the purpose

12 08:53:06   of the urine drug test is to see a number of things,

13 08:53:09   including are other things showing up, or are the medications

14 08:53:12   you are prescribing testing positive?  Neither of the urine

15 08:53:19   drug tests show evidence of oxycodone, and both of them are

16 08:53:24   positive for marijuana.

17 08:53:26   Q. If the initial drug tests had showed negative for

18 08:53:30   oxycodone occurred prior to the actual prescription, would

19 08:53:33   that -- would that cause -- would that be unusual?

20 08:53:38           MS. MURPHY:  Objection.  Leading.

21 08:53:39           THE COURT:  Overruled.

22 08:53:41           THE WITNESS:  Could you re-ask the question?  I'm

23 08:53:43   not --

24 08:53:43   Q. That's a bad question.  It was a good objection.

25 08:53:46           What I'm trying to get at is, if it was the first

08:53:50    visit that the patient made, and so the defendant had not yet

08:53:54    prescribed oxycodone, would it be unexpected to not find it

08:53:58    in the blood test that he submitted that day?  In other

08:54:01    words, the first urine test we looked at.

08:54:03            MS. MURPHY:  Objection.  Leading.

08:54:05            THE COURT:  Overruled.

08:54:07            THE WITNESS:  If the patient came in with a history

08:54:11    of previously being on oxycodone, one would expect it to be

08:54:16    positive.

08:54:17            On the other hand, if a patient comes in and said,

08:54:20    you know, I'm not taking anything, or I'm not taking

08:54:23    oxycodone, then it's not a surprise that that oxycodone would

08:54:27    not -- or similar, would not show up positive.

08:54:51    Q. I'm showing you the notes from the September 21, 2017,

08:54:57    meeting with BJ.  Do you see those?  It's page 3 of

08:55:01    Exhibit 36.

08:55:02    A. I do.

08:55:02    Q. And in the corner that I'm highlighting, does it indicate

08:55:10    any past history of oxycodone prescription?

08:55:12    A. Well, it says oxycodone 30 milligrams.  I can't conclude

08:55:22    necessarily from that -- that looks like that was the

08:55:27    treatment given that date.

08:55:28    Q. Thank you.

08:55:30            All right.  Is there any indication of prior use of

08:55:32    oxycodone?

08:55:34  A. Can you highlight up higher on under medications?  On the

08:55:38  other side.  Kind of underneath the date.  There you go.

08:55:46        Oxycodone, 30 milligrams, number 90.  So it would

08:55:53  appear to indicate that the patient is taking oxycodone

08:55:56  30 milligrams.  Number 90 would designate 90 per month, or

08:56:04  three per day.

08:56:08  Q. Moving on.  You prepared multiple reports for this case,

08:56:13  is that correct?

08:56:14  A. Yes.

08:56:14  Q. And I want to ask you, when you prepared those reports,

08:56:21  had you been made aware of the fact of defendant's visits

08:56:25  with the undercovers and the relative durations of those

08:56:28  visits?

08:56:32  A. Well, the first report -- my recollection is the first

08:56:35  report --

08:56:41  Q. Had you been provided with --

08:56:42        MS. MURPHY:  Objection.  The witness hasn't answered

08:56:44  yet.

08:56:45        THE COURT:  I think the witness has reached the

08:56:47  limits of his answer.  So the objection is overruled.

08:56:50        Mr. Balding, you may ask your next question.

08:56:54  Q. Had you been provided the copies of the recordings for

08:56:57  most of the visits prior to your first review?

08:57:01  A. I'm trying to remember whether I got them before the

08:57:04  first or the second report.

1   08:57:08          The report would indicate whether I -- I think I had

2   08:57:12   for the first report, but it may have been before the second,

3   08:57:15   I just don't recall.

4   08:57:16   Q. And had you been aware of the relative brevity of the

5   08:57:23   visits that the undercovers had made with the defendant when

6   08:57:25   you wrote your reports?

7   08:57:27   A. When I watched or listened to the recordings, I could

8   08:57:31   tell how long or short the visits were, yes.

9   08:57:35   Q. And had you been made aware -- or did you learn through

10  08:57:39   your review of the cash payments the defendants were making

11  08:57:43   to the clinic for their visits prior to the reports?

12  08:57:47   A. Yes.  In fact, it was highlighted by UC1, I think in the

13  08:57:52   second visit, where he comments specifically about that.

14  08:57:56   Q. And had you noticed anything about the number -- the

15  08:57:58   relative number of patients in the waiting room at some of

16  08:58:01   the visits that you reviewed?

17  08:58:02   A. On some of the visits there appeared to be quite a few

18  08:58:06   individuals in the waiting room, yes.

19  08:58:08   Q. And in your report, did you write that -- did you write

20  08:58:13   anything about the defendant appearing to make prescribed

21  08:58:17   controlled substances to a large number of individuals for

22  08:58:20   large monetary gain?

23  08:58:23          MS. MURPHY:  Objection.  Leading.

24  08:58:24          THE COURT:  Sustained.  And also, I don't see --

25  08:58:26   look, if you want to ask the witness a question and then the

08:58:29  report could be used by the other side to impeach, you don't

08:58:31  really have the right to go into what he wrote on a prior

08:58:34  occasion.

08:58:35   Q. Was your -- were conclusions in your report based on any

08:58:39  specific analysis of defendant's financial records?

08:58:42   A. No.

08:58:42   Q. Did you know when you wrote the report specifically how,

08:58:47  if at all, defendant was being compensated?

08:58:49   A. No.

08:58:49   Q. Does defendant's compensation in this case, or any money

08:58:54  she may have made or may not have made, affect your opinions

08:58:57  as to the issues we've talked about yesterday and today?

08:59:00   A. No.

08:59:07          MR. BALDING:  No further questions, Your Honor.

08:59:09          THE COURT:  Cross-examination.

08:59:13          Ladies and gentlemen, you can stand up and stretch

08:59:16  for a moment while Ms. Murphy gets ready.

08:59:19          MS. MURPHY:  Thank you.

08:59:42          THE COURT:  Ms. Murphy, you may proceed when you are

08:59:44  ready.

08:59:45          MS. MURPHY:  Thank you.  I just need one moment to

08:59:47  get set up, Your Honor.

08:59:47                          CROSS-EXAMINATION

08:59:50  BY MS. MURPHY:

08:59:50   Q. Good morning, Dr. Munzing.

09:00:03  A. Good morning.

09:00:04  Q. You know what perjury is, right?

09:00:06  A. I'm not an attorney, but I have the general concept, yes.

09:00:12  Q. It means you lie under oath, right?

09:00:17  A. As I say, I'm not an attorney, I don't know the official

09:00:20  legal definition of it.

09:00:22  Q. Well, when you testify, you take the stand, right?

09:00:27  A. Correct.

09:00:27  Q. And you swear to tell the truth.

09:00:29  A. Correct.

09:00:30  Q. Because you are giving evidence to a jury.

09:00:35  A. Correct.

09:00:35  Q. A jury that is going to make a decision about someone's

09:00:39  life.

09:00:40  A. Correct.

09:00:41  Q. Now, perjury is a federal crime, right?  You know that?

09:00:49  A. As I say, I'm a -- I'm not an attorney, so I don't know

09:00:56  the specifics of that.

09:00:57  Q. Okay.  Well, you live in the United States?

09:01:01  A. Yes.

09:01:01  Q. You are an educated person?

09:01:03  A. Yes.

09:01:04  Q. You know that perjury is a federal crime?

09:01:09      MR. BALDING:  Objection, Your Honor.  Asked and

09:01:10  answered.

1 09:01:10          THE COURT:  Overruled.  It's cross-examination.  So
2 09:01:13  I'll allow a certain leeway.
3 09:01:16          THE WITNESS:  I don't know if it's a federal crime
4 09:01:18  or a state crime.
5 09:01:19  Q. Regardless, if you commit a crime like perjury, you could
6 09:01:23  go to jail?
7 09:01:23  A. That's correct.
8 09:01:24  Q. And as a doctor, you could lose your license?
9 09:01:29  A. That's correct.
10 09:01:30  Q. Now I want to talk to you about bias.
11 09:01:35          Bias is where you have a view that is slanted in
12 09:01:39  favor or not in favor of one side or another, correct?
13 09:01:43  A. I would say that that is probably a definition.  There is
14 09:01:48  probably many definitions of bias.
15 09:01:49  Q. But you agree that is a definition?
16 09:01:52  A. Yeah.
17 09:01:53  Q. Now, bias can be unconscious?
18 09:01:55  A. True.
19 09:01:56  Q. It can be conscious.
20 09:01:57  A. Correct.
21 09:01:58  Q. It can affect the way you see things.
22 09:02:02  A. True.
23 09:02:02  Q. I want to talk to you about all of the money the Federal
24 09:02:07  Government has agreed to pay you for your work.
25 09:02:10          Now, you testified on direct yesterday that you had

1 09:02:12  to get special permission from Kaiser to be an expert for the

2 09:02:16  government, correct?

3 09:02:17   A. For the Federal Government, correct.

4 09:02:19   Q. And you've prepared dozens of reports for the Federal

5 09:02:22  Government, not just in this case, but in other cases?

6 09:02:24   A. Correct.

7 09:02:25   Q. And you've testified in dozens of cases.

8 09:02:28   A. In general or for the government?

9 09:02:33   Q. For the Federal Government.

10 09:02:34   A. I don't think it's dozens.

11 09:02:36   Q. Okay.  More than five?

12 09:02:39   A. Yes.

13 09:02:40   Q. More than 10?

14 09:02:43   A. I think it's just under that.

15 09:02:45   Q. Okay.  You've given testimony in DEA licensing hearings.

16 09:02:52   A. I have.

17 09:02:52   Q. You've given lectures to the DEA.

18 09:02:56   A. I have.

19 09:02:57   Q. And to federal prosecutors.

20 09:02:59   A. Yes.

21 09:03:00   Q. And you are paid for your time to testify.

22 09:03:04   A. To testify, yes.

23 09:03:05   Q. You are paid to prepare your reports.

24 09:03:08   A. Correct.

25 09:03:09   Q. And you testified on direct yesterday that you made

09:03:13   1   $6,000 for yesterday's testimony -- or you will make.

09:03:17   2    A. Yes.

09:03:17   3    Q. And you will make another 6,000 for today?

09:03:20   4    A. Correct.

09:03:20   5    Q. And each time you work as an expert for the Federal

09:03:25   6   Government, you negotiate a contract.

09:03:31   7    A. They generally send the contract.  It's not really a

09:03:37   8   negotiated contract.

09:03:38   9    Q. Oh, so they send you the contract and you agree to what

09:03:42  10   they send you?

09:03:44  11    A. There is often many pages pertaining to lots of

09:03:51  12   different -- lots of different things.  And so that is not

09:03:54  13   really a negotiation, it's like, you need to agree, you know,

09:03:59  14   to those things.

09:04:00  15    Q. Okay.  So it's a contract?

09:04:02  16    A. It's a contract.

09:04:03  17    Q. Now -- and after you do your work on other contracts, you

09:04:07  18   send an invoice to the government and they pay you for your

09:04:10  19   work.

09:04:11  20    A. Correct.

09:04:11  21    Q. Now, since 2014, the Federal Government has contracted

09:04:16  22   with you 326 times to pay you approximately $3.3 million for

09:04:24  23   your work, correct?

09:04:29  24    A. The -- I'm not exactly sure where you are getting those

09:04:34  25   numbers, especially the 300 something times.  But I won't

09:04:39  1    object to what you are saying, I just am not sure if it's

09:04:42  2    completely accurate.

09:04:43  3     Q. All right.  Well, let's pull up Defense Exhibit 441,

09:04:47  4    which I understand has already been admitted.

09:04:51  5              THE COURT:  441 has been admitted.

09:04:55  6              MS. MURPHY:  Can we please publish it to the jury?

09:04:58  7    I'm not sure if I need to press --

09:05:01  8              THE COURT:  Since it's admitted, Ms. Murphy, you may

09:05:03  9    publish this or anything else admitted to the jury without

09:05:07 10    asking me.

09:05:08 11              MS. MURPHY:  Thank you, Your Honor.

09:05:22 12              Apologies.  We are having some tech issues.  Here we

09:05:30 13    go.

09:05:31 14     Q. Can you see that exhibit?

09:05:34 15     A. Yes.

09:05:34 16     Q. This is an official printout from the website

09:05:41 17    USAspending.gov.  Do you see that?

09:05:43 18     A. I do.

09:05:44 19     Q. And it reports contracts between you and the Federal

09:05:50 20    Government.  You see that?

09:05:55 21              It says, total awarded amount 3.3 million.

09:05:58 22     A. Yes, I see that.

09:05:59 23     Q. And it says from 326 transactions.

09:06:04 24     A. I see that.

09:06:05 25     Q. All right.  Let me go to Defense Exhibit Number 442,

09:06:11  1  which has also been admitted.

09:06:13  2          Now, this shows those transactions over time.  You

09:06:15  3  see that chart?

09:06:16  4  A. I do.

09:06:17  5  Q. I want to focus here on fiscal year 2019.  You see that?

09:06:23  6  A. I do.

09:06:24  7  Q. I'm going to draw a circle around it.

09:06:28  8          So that's the highest bar in this chart, right?

09:06:31  9  A. Yes.

09:06:32  10  Q. And you see on the left-hand axis, $900,000 over there?

09:06:38  11  A. Yes.

09:06:39  12  Q. That means that in the year 2019 the Federal Government

09:06:43  13  contracted with you to the tune of almost a million dollars.

09:06:50  14  A. Those were the contracts, not necessarily what was paid.

09:06:53  15  Q. Okay.  So they were contracts that, if you performed the

09:06:56  16  work that the government asked you to do, they would pay you

09:06:59  17  on those contracts?

09:07:00  18  A. Correct.

09:07:01  19  Q. And that is the same year that you prepared one of the

09:07:04  20  reports here?

09:07:06  21  A. I believe so, yes.

09:07:07  22  Q. And it's also the same year that Ms. Rahbarvafaei was

09:07:10  23  charged with these crimes.

09:07:13  24  A. I don't -- I don't know exactly when she was charged.

09:07:18  25  Q. Now, I want to go next to 443.

1  09:07:39          Now, you see this exhibit.  This is Defense
2  09:07:41  Exhibit 443.  You see that?
3  09:07:45  A. I see a page there, yes.
4  09:07:49  Q. Yes.
5  09:07:49          And this breaks down the spending by which federal
6  09:07:52  agency has contracted with you.  You see that?
7  09:07:54  A. Yes.
8  09:07:57  Q. It says, Department of Justice.
9  09:08:00  A. Yes.
10 09:08:01  Q. So the Department of Justice includes the DEA?
11 09:08:04  A. Yes.
12 09:08:04  Q. It includes the FBI?
13 09:08:06  A. Correct.
14 09:08:07  Q. It includes U.S. Attorney's Offices?
15 09:08:10  A. As far as I know, yes.
16 09:08:12  Q. Now, you testified on direct about your -- what you call
17 09:08:20  red flags.
18 09:08:21          I want to talk to you about what you recommend in
19 09:08:23  your own article and what Ms. Rahbarvafaei did.
20 09:08:28  A. Okay.
21 09:08:32  Q. Now, in your article you talked about on direct, that is
22 09:08:35  the one in the Permanente journal?
23 09:08:38  A. Yes.
24 09:08:38  Q. And you wrote about monitoring in that journal?
25 09:08:41  A. Correct.

Q. And you recommend urine drug screening initially.

A. Yes.

Q. And then at least every six months.

A. Yes.

Q. And in your article, you don't recommend drug screening every single month.

A. Correct.

Q. And here, focusing on UC1, Detective Mimms, over five months, Ms. Rahbarvafaei had two urine tests ordered.

A. Correct.

Q. And for UC number 2, this is Sergeant Delery, over four months, she had two urine tests ordered.

A. Correct.

Q. And when their tests were inconsistent, she tapered their medications.

A. She decreased the number prescribed, yes.

Q. Tapering means decreased.

A. It may.

Q. She reduced the medications.

A. She reduced the medications.

Q. Now, in your own article, you recommend an appointment every three months.

A. Yes.

Q. She saw undercover 1 every month for five months.

A. Yes.

1 09:09:52  Q. She saw undercover number 2 three times over four months.

2 09:09:58  A. Correct.

3 09:09:59  Q. Now, in your article, you also recommend additional

4 09:10:02  laboratory testing, like kidney and liver testing.

5 09:10:05  A. Correct.

6 09:10:06  Q. Ms. Rahbarvafaei ordered full blood panels for both

7 09:10:10  undercovers, correct?

8 09:10:11  A. Correct.

9 09:10:12  Q. And the strongest medication she prescribed to either one

10 09:10:16  of them was hydrocodone.

11 09:10:18  A. Correct.

12 09:10:18  Q. At most, two pills per day.

13 09:10:25  A. For those undercovers, that's correct.

14 09:10:26  Q. At most two pills per day for those undercovers.  We are

15 09:10:31  only focusing on the undercovers.

16 09:10:33  A. Yes.

17 09:10:33  Q. You agree that hydrocodone is the milder of the opioids?

18 09:10:37  A. It is milder than some, stronger than others.

19 09:10:44  Q. Now, every time she prescribed pain medication to the

20 09:10:48  undercovers, she gave them a nonopioid option, correct?

21 09:10:56  A. She -- she also prescribed nonopioids, that's correct.

22 09:10:59  Q. That's right.

23 09:11:00      Naproxen, right?

24 09:11:02  A. Yes.

25 09:11:02  Q. That is like Advil?

09:11:05   A. It's not identical to Advil, but it's in the same

09:11:08   category.

09:11:09   Q. It's an NSAID, right?

09:11:10   A. Yes.

09:11:10   Q. And every time she prescribed an opioid to those other

09:11:15   patients that you were talking about, you know, the others

09:11:17   that Mr. Balding crossed you on -- or directed your

09:11:21   examination on, she also gave a nonopioid option?

09:11:25   A. I believe so, yes.

09:11:26         THE COURT:  Excuse me, Ms. Murphy.  What is an

09:11:28   NSAID?

09:11:29         MS. MURPHY:  I'm sorry.

09:11:29         THE COURT:  I'm not asking you, rather, if you would

09:11:31   please elucidate through the witness.

09:11:34         MS. MURPHY:  Sure.

09:11:34   Q. Can you tell us what an NSAID is?

09:11:36   A. Yeah.  It stands for nonsteroidal antiinflammatory drug.

09:11:42   Examples are Advil, Motrin, Naproxen, et cetera.

09:11:48         THE COURT:  So NSED?

09:11:50         THE WITNESS:  NSAID.

09:11:52         THE COURT:  Thank you.

09:11:52   Q. Those are things you can buy over the counter?

09:11:55   A. Nowadays, yes, you can, at the lower dosages, absolutely.

09:12:00   Q. And again, Ms. Rahbarvafaei never prescribed more than

09:12:04   two pills per day to any of these undercover agents or

109:12:08   officers?

209:12:09   A. That's correct.

309:12:11   Q. And she told undercover 1, take it -- regarding the

409:12:15   tramadol, take it only when the pain is serious?

509:12:19   A. I think she used severe.  But serious or severe, yes.

609:12:22   Q. You agree that she told them, take it only if the pain is

709:12:26   serious, or if your recollection is severe?

809:12:29   A. Yes.

909:12:30   Q. And she told undercover 2, I don't want you to take it if

1009:12:33   you don't need it?

1109:12:35   A. Correct.

1209:12:42   Q. I want to talk about your training.

1309:12:44        You are not board certified in pain management?

1409:12:47   A. I am not.

1509:12:48   Q. You -- to become board certified in pain management, you

1609:12:52   would have to go through a residency in pain management.

1709:12:56   A. Currently that's correct.

1809:12:59   Q. And you haven't done that?

1909:13:00   A. I have not.

2009:13:01   Q. You would have to have specific training.

2109:13:04   A. Correct.

2209:13:04   Q. You haven't done that?

2309:13:05   A. That's correct.

2409:13:06   Q. You are not board certified in addiction medicine either.

2509:13:10   A. No, I'm not.

```
 1 09:13:11   Q. I want to talk about how a medical professional can tell
 2 09:13:15   if someone is in pain.
 3 09:13:17            Now, as a doctor, you can't read people's minds?
 4 09:13:20   A. No, you can't.
 5 09:13:21   Q. There is no machine for that?
 6 09:13:23   A. No.
 7 09:13:24   Q. You don't have lie detectors at Kaiser?
 8 09:13:27   A. We do not.
 9 09:13:28   Q. You aren't a detective?
10 09:13:30   A. I'm sorry?
11 09:13:31   Q. You aren't a detective.
12 09:13:32   A. I am not.
13 09:13:32   Q. And pain is subjective?
14 09:13:34   A. Pain is subjective, yes.
15 09:13:38   Q. It is what the patient says it is.
16 09:13:40   A. Patients perceive pain differently, and patients will
17 09:13:45   relate to how severe they feel their pain is.
18 09:13:48   Q. So pain is what the patient tells you it is?
19 09:13:52   A. The patients tell you pain -- how the patient is relating
20 09:13:58   to the pain is what they tell you, yes.
21 09:14:00   Q. Well, you wrote two reports for this case.
22 09:14:03   A. I did.
23 09:14:03   Q. And you also talked at great length yesterday about the
24 09:14:08   standard of care, which we'll get to, but I want to focus on
25 09:14:11   this.
```

1 09:14:11          One of your sources was a 2014 guideline published

2 09:14:15   by the Medical Board of California.

3 09:14:16   A. Correct.

4 09:14:17   Q. And this is a guideline you relied on in coming to your

5 09:14:22   conclusions about this case.

6 09:14:23   A. It's one of many guidelines I relied upon, yes.

7 09:14:25   Q. Well, it's a guideline for California, so it's an

8 09:14:28   important one, right?

9 09:14:29   A. Correct.

10 09:14:29   Q. And in that very guideline -- in that very guideline, the

11 09:14:43   Medical Board of California gives us some definitions in

12 09:14:46   pain.  And it tells us that pain is what the patient says it

13 09:14:52   is, correct?

14 09:14:53   A. If -- I don't have that in front of me, but if you are

15 09:14:57   reading from that, I will accept that what you are saying is

16 09:15:00   correct.

17 09:15:01   Q. Well, we have the exhibits up there.  Any time you want

18 09:15:03   to look at them, just let me know.

19 09:15:05          It also states that with the rare exception of

20 09:15:08   patients who intentionally deceive, a patient self report and

21 09:15:13   pain behavior are likely the most reliable indicators of pain

22 09:15:16   and pain severity.

23 09:15:19   A. I believe that is what they wrote.

24 09:15:21   Q. That's the guideline that you rely on, among others.

25 09:15:25   A. Correct.

1  09:15:25   Q. Now, because pain is subjective, I want to talk about how

2  09:15:30   people might experience pain differently.

3  09:15:33        Now, you agree that all patients are different?

4  09:15:35   A. Correct.

5  09:15:35   Q. For example, one person could have a shoulder injury and

6  09:15:39   say the pain is on a level 6.

7  09:15:42   A. Is that a question?

8  09:15:43   Q. It is.

9  09:15:44   A. Yes.

10  09:15:44   Q. It's an example.

11  09:15:45   A. Okay.

12  09:15:47   Q. Another person could have the same presenting type of

13  09:15:50   injury, and they could say their pain is on a level 10.

14  09:15:53   A. That's certainly possible.

15  09:15:55   Q. Some women can give birth without an epidural.

16  09:16:00   A. That's correct.

17  09:16:01   Q. Other women get the epidural right away.

18  09:16:05   A. That's correct.

19  09:16:05   Q. Someone could have a migraine and it could be at a level

20  09:16:09   10.

21  09:16:11   A. Correct.

22  09:16:12   Q. Another person could have a migraine and it could be at a

23  09:16:15   level 7.

24  09:16:15   A. Correct.

25  09:16:16   Q. Now -- and a patient can be suffering from pain with no

```
1 09:16:21   history -- a history of trauma or injury.
2 09:16:25    A. That is correct.
3 09:16:29    Q. Now, you testified on direct about the standard of care.
4 09:16:32   I want to talk about where you see all those sources coming
5 09:16:36   from.
6 09:16:36        I'm focusing first -- I'm going to go back to what
7 09:16:43   the Medical Board of California said.
8 09:16:47        Now, those guidelines actually state that they are
9 09:16:52   not intended to mandate the standard of care.
10 09:16:57   A. And I fully agree with that.
11 09:16:58   Q. And they say that deviations from the guidelines will
12 09:17:03   occur.
13 09:17:05   A. They may occur, yes.
14 09:17:07   Q. And those deviations may be appropriate depending on the
15 09:17:11   unique needs of individual patients.
16 09:17:14   A. Correct.
17 09:17:15   Q. Nowhere in these guidelines does it say that violating
18 09:17:20   these recommendations alone is a federal drug felony.
19 09:17:25   A. I completely agree.
20 09:17:27   Q. In fact, not one of the guidelines that you testified
21 09:17:33   about yesterday actually mandate a standard of care in the
22 09:17:38   State of California.
23 09:17:38   A. They don't -- you are right, they do not -- they are
24 09:17:42   guidelines to be applied, you know, as appropriate.  But they
25 09:17:48   are not -- essentially, they are not the standard of care.
```

1 09:17:52   Q. They are not the standard of care?

2 09:17:56   A. None of the guidelines individually is the standard of

3 09:17:59   care.

4 09:18:00   Q. Let's talk about the American Society of Interventional

5 09:18:04   Pain Physicians.  That is ASIPP.

6 09:18:06        You recall testifying about that?

7 09:18:09   A. Yes.

8 09:18:10   Q. Now, they actually give a disclaimer in their guidelines.

9 09:18:14   They say the guidelines are based on the best available

10 09:18:17   evidence and do not constitute inflexible treatment

11 09:18:21   recommendations.

12 09:18:22        You understand that?

13 09:18:22   A. Yes.

14 09:18:23   Q. And due to the changing body of evidence, this document

15 09:18:26   is not intended to be a standard of care.

16 09:18:29   A. Correct.

17 09:18:29   Q. Let's move on to the Federation of State Medical Boards.

18 09:18:33        You remember testifying about them?

19 09:18:34   A. Correct.  Yes.

20 09:18:37   Q. But in that guideline, again, there is a quote, "Specific

21 09:18:41   limitation and restriction that these guidelines do not

22 09:18:44   operate to create any specific standard of care."

23 09:18:47   A. Correct.

24 09:18:48   Q. Then we have the American Academy of Pain Medicine.

25 09:18:53        You testified about them, too.

09:18:54    A. Yes.

09:18:54    Q. Nowhere in the entire document does it say that it

09:18:59    mandates a standard of care.

09:19:01    A. That's correct.

09:19:01    Q. In fact, on the first page it says, "There is currently

09:19:05    no nationally accepted consensus for the treatment of chronic

09:19:09    pain not due to cancer."

09:19:13    A. Correct.

09:19:13    Q. And then we have the Agency Medical Directors' Group.

09:19:18              You remember testifying about them?

09:19:19    A. Yes.

09:19:20    Q. This is a group for the State of Washington, correct?

09:19:24    A. It is used much more broadly than the State of

09:19:27    Washington, but my understanding is that they come from the

09:19:29    State of Washington.

09:19:30    Q. It's not for the State of California.  That would be the

09:19:33    California Medical Board.

09:19:35    A. The Medical Board would certainly oversee the State of

09:19:39    California.

09:19:39    Q. And even so, this Washington body says that these are

09:19:46    just best practices in the State of Washington.  That is what

09:19:50    they say in their guideline?

09:19:52    A. Yeah, I think they call them guidelines.  But they may --

09:19:55    they may refer to them as best practices.

09:19:56    Q. You agree that best practices is not the same as the

standard of care?

A. Best practices would fit within the, as I talked yesterday, the range of standard of care.  But you don't require the best practices to meet the minimal level of standard of care.

Q. You don't require best practices to meet the minimal level of standard of care.

A. Correct.

Q. You also mentioned the Centers for Disease Control and Prevention.

A. Correct.

Q. We all know that as the CDC.

A. Yes.

Q. And you discussed them when you testified about the standard of care.

A. I discussed those guidelines as one of the contributing factors of the standard of care, yes.

Q. And you would have been referring to the 2016 CDC guidelines, correct?

A. Yes.

Q. Now, you are aware that the very authors of those CDC guidelines have actually written publically to say that those 2016 guidelines, the guidelines that you are relying on, have been misapplied by doctors?

A. I understand that, and I agree with that.

09:21:11  Q. Now, looking at the 2016 guidelines themselves, even

09:21:19  before the authors said they were being misapplied, it says

09:21:23  in the guidelines themselves that the recommendations in the

09:21:25  guideline are voluntary rather than prescriptive standards.

09:21:30  A. Correct.

09:21:30  Q. Prescriptive standards means mandatory.

09:21:33  A. Yes.

09:21:33  Q. So they are not mandatory?

09:21:36  A. The guidelines are not mandatory.

09:21:38  Q. And another thing, those guidelines are for primary care

09:21:42  clinicians, correct?

09:21:43  A. Yes.  That was written for primary care.  The intent was

09:21:49  for primary care, that's correct.

09:21:51       The elements certainly can put patients at risk

09:22:00  depending on where they are getting prescribed.  But the

09:22:04  intent of that, and it was specifically written for primary

09:22:07  care.

09:22:07  Q. Well, you didn't write the guidelines.

09:22:09  A. I did not.

09:22:10  Q. You have never worked for the CDC.

09:22:12  A. I have not.

09:22:13  Q. You don't know these authors personally.

09:22:15  A. I have heard lectures from one or more of the authors.

09:22:20  Q. But you don't know what they intended unless they wrote

09:22:23  it in the guideline.

1 09:22:25    A. That's correct.

2 09:22:28    Q. And the guideline itself says that they apply to primary

3 09:22:34    care clinicians.

4 09:22:35    A. Correct.

5 09:22:36    Q. Now, doctors who specialize in pain management, I'm

6 09:22:39    talking about specializing, those are not the same as primary

7 09:22:45    care clinicians, correct?

8 09:22:46    A. They are not.

9 09:22:47    Q. Now, I want to go back to this topic of red flags.

10 09:22:53         Now, the California Medical Board never uses the

11 09:22:56    term "red flags" in its guidelines, correct?

12 09:22:58    A. I don't believe that they use that.

13 09:23:01    Q. Neither does the CDC in its 2016 guidelines.

14 09:23:05    A. No.

15 09:23:06    Q. You used them in the article that you wrote for Kaiser

16 09:23:10    Permanente.

17 09:23:10    A. I do.

18 09:23:10    Q. I want to talk about how you interpret your red flags.

19 09:23:15         Now, when you use the term "red flag," you said this

20 09:23:19    on direct -- and tell me if I'm misstating this -- it could

21 09:23:24    be something that is a little bit suspicious, but doesn't

22 09:23:27    necessarily mean it's a problem.

23 09:23:28    A. I would agree with that.

24 09:23:29    Q. And one of the red flags you would say is someone coming

25 09:23:32    in and saying, I want a particular medicine, Vicodin, Norco,

09:23:37    a specific medicine.

09:23:39    A. That is something that we are taught to pay attention to.

09:23:42    Q. Well, you've had lots of people do that.

09:23:45    A. I'm sorry?

09:23:46    Q. You've had lots of people do that.

09:23:47    A. Actually, I've had some people do that, not a lot of

09:23:51    people coming in asking for a specific drug.

09:23:53    Q. Hum.  You've testified in other cases before, right?

09:23:58    A. Yes.

09:23:58    Q. Do you remember testifying -- I just want to make sure,

09:24:02    your testimony is that you haven't had many people doing

09:24:06    that?

09:24:07    A. I've had some people doing it -- if we are talking pain

09:24:11    medicine, I've had some people doing that.  Sometimes people

09:24:14    come in also asking for antibiotics.  But I would say if you

09:24:19    look at the majority of the patients, majority are not doing

09:24:23    that.  But I've had -- over the years I've had many people do

09:24:26    that.

09:24:26    Q. Okay.  Well, you testified in -- before a jury in the

09:24:31    matter versus Dr. Kiansi Boni.  Do you remember that?

09:24:36    A. Vaguely.

09:24:37    Q. Okay.

09:24:39    A. I mean, I remember testifying before him -- about that

09:24:42    case.

09:24:42    Q. You were under oath at that time?

```
10 09:24:44    A. Yes.

20 09:24:45    Q. Just like you were today?

30 09:24:46    A. Correct.

40 09:24:47    Q. You swore to tell the truth?

50 09:24:49    A. Yes.

60 09:24:49    Q. And that your testimony was accurate?

70 09:24:51    A. Yes.

80 09:24:51    Q. And that it was truthful?

90 09:24:53    A. Correct.

100 09:24:53   Q. Now, I want you to turn to Defense Exhibit 382.

110 09:25:09        MR. BALDING:  Your Honor, may the government have a

120 09:25:10   moment?  We have not been provided a copy of defense

130 09:25:13   exhibits.

140 09:25:15        THE COURT:  Does the government not have the

150 09:25:20   binders?

160 09:25:20        MR. BALDING:  We do not have them, Your Honor.

170 09:25:49        MS. MURPHY:  Let me know when you have that in front

180 09:25:51   of you.

190 09:25:52    A. I have 382.

200 09:25:53    Q. All right.  So you see the front cover page, it says,

210 09:25:56   transcript of the proceedings, and it says the name of the

220 09:25:58   defendant, Kiansi Blaise Boni?

230 09:26:01    A. Yes.

240 09:26:01    Q. All right.  I want you to turn to page -- we'll start at

250 09:26:14   27 at the bottom.  And you are talking about red flags here,
```

09:26:21  and you say -- this was your sworn testimony -- some of the

09:26:24  red flags may include someone coming in and saying, I want a

09:26:29  particular medicine, Vicodin, Norco, a specific medicine.

09:26:32       And then you say, I have lots of people do that.

09:26:35       You see that?

09:26:36  A. Where on the page?

09:26:38  Q. I'm sorry, I skipped over to the next page.  Up at the

09:26:41  top.

09:26:41       THE COURT:  28 of 39, line 2, Doctor.

09:26:49  Q. Do you see that up at the top of page 28?

09:26:54  A. I do see that.

09:26:55  Q. Were you testifying that -- you say, I have lots of

09:26:58  people do that, most of them are legitimate, some of them are

09:27:02  not.  Right?

09:27:05  A. I would agree that that -- I guess I have many people who

09:27:12  have done it.  Less than the majority.  Again, many are

09:27:18  legitimate, some are not.

09:27:20  Q. Actually, you said, most of them are legitimate, but some

09:27:24  of them are not.  That was your testimony.

09:27:26  A. Okay.

09:27:28  Q. And you've been fooled before, in spite of a very

09:27:32  thorough history and a very thorough exam, correct?

09:27:36  A. Can you restate that, please?

09:27:38  Q. That you have been fooled before in spite of a very

09:27:41  thorough history and a very thorough exam?

09:27:43 1   A. Yes.

09:27:44 2   Q. I want to talk about the red flags that you identified

09:27:50 3   here.

09:27:51 4        Now, one red flag that you talked about was that

09:27:54 5   undercovers -- the undercovers here mentioned getting

09:27:57 6   medication from someone in their family.

09:27:59 7        You remember that?

09:27:59 8   A. Correct.

09:28:00 9   Q. Another red flag you talked about was aberrant drug

09:28:05 10  testing.

09:28:05 11  A. Correct.

09:28:05 12  Q. Aberrant is another word for inconsistent?

09:28:08 13  A. Yes.

09:28:08 14  Q. Now, about getting medication from family, you wrote in

09:28:12 15  your own article that rare diversion -- diversion meaning

09:28:16 16  getting it outside of a prescription -- rare diversion of a

09:28:20 17  few tablets to a family member for emergent, acute pain or a

09:28:25 18  one-time aberrant, or let's say inconsistent finding, on a

09:28:29 19  urine drug screen may warrant a documented discussion with

09:28:32 20  the patient and closer monitoring.

09:28:34 21       You wrote that in your article.

09:28:35 22  A. Correct.

09:28:35 23  Q. Now, you don't recommend stopping the medication

09:28:38 24  immediately?

09:28:40 25  A. One needs to individualize the specifics.   And there are

09:28:45   1   no broad -- this is what you have to do in every situation.

09:28:50   2   Q. There is no broad you have to do it in every situation?

09:28:53   3   A. One needs to individualize the situation.

09:28:57   4   Q. And one thing that you may do in a situation is reduce

09:29:01   5   the medication.

09:29:04   6   A. That is something that one may do, yes.

09:29:05   7   Q. Let's talk about how Ms. Rahbarvafaei handled the

09:29:10   8   inconsistent urine tests here.

09:29:13   9           With both undercovers, she discussed the

09:29:15   10   inconsistent drug tests with them, correct?

09:29:18   11   A. She -- yes, she mentioned portions of the inconsistent

09:29:22   12   urine drug test, yes.

09:29:23   13   Q. And then she reduced their prescriptions.

09:29:26   14   A. She reduced the number of tablets.

09:29:28   15   Q. She reduced each of them by 15 pills.

09:29:31   16   A. Correct.

09:29:31   17   Q. Now, you were paid to write reports about the

09:29:52   18   undercovers, which we have discussed.  But I now want to talk

09:29:55   19   about some of the other reporting that you wrote for this

09:29:57   20   case.

09:29:59   21   A. Okay.

09:29:59   22   Q. Okay?

09:30:00   23           Now, you testified -- you are testifying only about

09:30:04   24   patients at Good Neighbor Clinic, correct?

09:30:06   25   A. That's my understanding, yes.

09:30:09   Q. And these were all files that the government selected for
09:30:12   you to review, correct?

09:30:14   A. That is correct.

09:30:15   Q. You've never seen -- besides these fake patients, the
09:30:19   undercover officers, you've never seen any of these patients
09:30:24   in your whole life.

09:30:25   A. I have not.

09:30:26   Q. You have never spoken with them.

09:30:27   A. Correct.

09:30:28   Q. You don't know --

09:30:30   A. Excuse me, I -- I have met one of the undercovers in a
09:30:38   different role, having nothing to do with this case.   I
09:30:42   didn't even know that he was involved in this case.

09:30:43   Q. Oh, so you knew one of the undercovers from another
09:30:46   matter?

09:30:47   A. I didn't know at the time, but now that I know who the
09:30:51   undercover is, I now know that I have met him before.

09:30:55   Q. You met him before working on another case?

09:30:58   A. Yes.

09:30:58   Q. Another case where you were being paid for your work?

09:31:01   A. Yes.   He was working with the DEA.

09:31:06   Q. And so you worked with him again on this case?

09:31:08   A. Until fairly recently I didn't even know that he was
09:31:14   involved in this case.

09:31:15   Q. Now, your conclusions are based only on the patient files

1 09:31:21  given to you, and the prescription data, correct?

2 09:31:25   A. Are we talking about the undercovers?

3 09:31:26   Q. No, we are now just focusing on the other patients that

4 09:31:30  you looked at.

5 09:31:31   A. Yes.  That's correct.

6 09:31:32   Q. You agree that sometimes when you write reports, you make

7 09:31:36  mistakes?

8 09:31:38   A. Yes.

9 09:31:38   Q. Okay.  I want to talk about the mistakes you made in your

10 09:31:41  reports here.

11 09:31:42        So I think it might be easiest for you to take out a

12 09:31:45  copy of the report.  I'm referring specifically to Government

13 09:31:47  Exhibit 55.  It should be in -- I think it's in the brown

14 09:31:52  box.

15 09:31:54        THE COURT:  Ladies and gentlemen, it's customary for

16 09:31:58  opinion witnesses to write reports and to be shared with the

17 09:32:02  other side.  That lets everyone know what the subject of the

18 09:32:06  testimony will be, what the opinions will be, the reasons for

19 09:32:08  it.  The reports themselves aren't testimony.  They aren't

20 09:32:13  evidence.  They won't be with you in the jury room.  It's

21 09:32:16  just a -- as I said, a means by which in this case the

22 09:32:21  government could let the defense know what Dr. Munzing's

23 09:32:24  testimony would be.  And then it will be the reverse when we

24 09:32:27  are dealing with the defense witness.

25 09:32:31        But so as I said, don't expect to see the entire

1 09:32:35  report in the jury room, but both sides have the right, if

2 09:32:40  there appears to be an inconsistency in the testimony here in

3 09:32:43  court, to point that out.

4 09:32:44          The important thing is the testimony here in court,

5 09:32:47  which is subject to cross-examination, including an

6 09:32:51  examination of the prior report.

7 09:32:54          Go ahead, Ms. Murphy.

8 09:32:56          MS. MURPHY:   Thank you.

9 09:32:57  Q. I would like to direct you to page 48 of your report.

10 09:33:01  Let me know when you have that in front of you.

11 09:33:11  A. Okay.  I'm there.

12 09:33:12  Q. Okay.  Now, this is about a patient -- I'm going to use

13 09:33:15  his initials, CF.

14 09:33:17  A. Correct.

15 09:33:17  Q. Now, you wrote there that he received three prescriptions

16 09:33:20  for hydrocodone.

17 09:33:23  A. I think those are the ones I documented from the slips I

18 09:33:30  saw in the records.

19 09:33:31  Q. From the slips in the patient file that the government

20 09:33:33  gave you?

21 09:33:33  A. Correct.

22 09:33:34  Q. That includes a script for January 10th, 2019?

23 09:33:39  A. Yes.

24 09:33:39  Q. All right.  Now, can you please pull what's been marked

25 09:33:42  as Defense Exhibit 427?

09:33:47    A. I'm sorry, can you say that again?

09:33:49    Q. I shouldn't have walked away.

09:33:50        Could you please pull Defense Exhibit 427.

09:33:59    A. Do you want me to keep up the other folder?

09:34:02    Q. I think it may be easier for you to keep your report in

09:34:05    front of you, and the other document.

09:34:07        If it's okay with the Court, I would ask that the

09:34:10    witness be allowed to actually take his report outside of the

09:34:12    binder and then we can put it back at the end?

09:34:14        THE COURT:  You may, Doctor, if it would make it

09:34:16    easier for you.

09:34:17        THE WITNESS:  I just wondered if the first folder

09:34:20    that you had me get out -- do you want me to go back to this

09:34:23    one?

09:34:23    Q. Are you looking at the report or are you looking at

09:34:27    the --

09:34:27    A. No.

09:34:27    Q. -- exhibit?

09:34:28    A. This is 382?

09:34:39        THE COURT:  I don't have Exhibit 427, Ms. Murphy.

09:34:44        MS. MURPHY:  You don't?  Okay.  I'm sorry, Your

09:34:46    Honor.  It's in binder 5.

09:34:53        MR. DRISCOLL:  May I approach?

09:34:54        THE COURT:  You may.

09:35:00        I have a binder, I just don't have 427 in it.

```
1 09:35:12    Again, this doesn't --

2 09:35:17            THE WITNESS:  You said 427?

3 09:35:18            MS. MURPHY:  Yes, 427.

4 09:35:22            THE WITNESS:  I have no pages there.

5 09:35:25            MS. MURPHY:  Okay.  Then let me get you a copy.

6 09:36:03            We do have it in trial director, if we can pull it

7 09:36:06    on up on the screen.

8 09:36:07            THE COURT:  Well, but it hasn't been admitted yet.

9 09:36:08            Let me see it.  What is it?  Let me see what it is.

10 09:36:55            Is this a CURES report?

11 09:36:57            MS. MURPHY:  No, Your Honor, that is a patient file

12 09:36:59    that the government produced in discovery regarding this

13 09:37:01    patient.

14 09:37:02            THE COURT:  Is this one of the ones already admitted

15 09:37:03    in -- from 32 to 40?

16 09:37:07            MS. MURPHY:  It is slightly different, which I will

17 09:37:09    get into.

18 09:37:09            THE COURT:  All right.  Then you may show it to the

19 09:37:12    jury then, and then we'll admit it when it's your case in

20 09:37:17    chief.

21 09:37:19            MS. MURPHY:  May I ask if the witness could have

22 09:37:21    that copy so that he can look as I'm testifying?  I apologize

23 09:37:24    for the problems with this, Your Honor.

24 09:37:32     Q. All right.  Can you please -- so you have Defense

25 09:37:36    Exhibit 427 in front of you?
```

A. That's what this is?

Q. And you recognize that as Mr. Field's patient file that the government gave to you to review?

A. It appears to be.

Q. And you recognize it because you reviewed it already?

A. Yes.

Q. Would you say that that is a fair and accurate representation of the file that was given to you?

A. Yes.  I don't have it, you know, page for page to compare page for page, but it appears to be a fair and accurate representation.

THE COURT:  This is represented to be a version of the patient file that was admitted as Exhibit 32.

Counsel, if you would please use the initials CF and refrain from using the actual name of the patient.

MS. MURPHY:  Oh, yes.  Thank you.

THE COURT:  This isn't an undercover, this a real patient.

MS. MURPHY:  Right.

THE COURT:  So please keep that in mind.

MS. MURPHY:  Your Honor, I would seek to admit Defense Exhibit 427.

THE COURT:  All right.  427 is admitted.

(Exhibit 427 received in evidence.)

MS. MURPHY:  Ms. Pelaez, would you please go to page

09:38:44    7?  I think it's maybe the next page.  It's the very --

09:39:17    Q. You see that?  It's a little bit sideways.

09:39:21    A. Can you turn it the other way?  If not, I can.

09:39:30    Q. We'll do this:  You said that there were three

09:39:33    prescriptions in this file.

09:39:39    A. I believe that I documented three specific prescriptions

09:39:44    in the file.

09:39:44    Q. Okay.  And you said that each of them were for patient

09:39:49    CF.

09:39:50    A. Correct.

09:39:53          MS. MURPHY:  Can we please go to the last page of

09:39:55    Defense Exhibit 427?

09:40:16    Q. Now, you see that name at the top there, right?

09:40:21    A. I do see the name at the top.

09:40:23    Q. That is not a prescription for CF.

09:40:26    A. Now I see that it's not a prescription for CF.

09:40:30    Q. So you counted a prescription for the completely wrong

09:40:34    patient?

09:40:37    A. It would appear that that prescription was written -- it

09:40:41    was in CF's file, but it evidently is for another patient.

09:40:47    Q. Probably just got into the file, right?

09:40:51    A. I have no idea.

09:40:55    Q. You have no idea.  But you made a mistake counting that?

09:40:57    A. I listed that.  I was obviously more focused on the

09:41:02    prescriptions I saw in CF's file, and I must not have seen

09:41:07  that the name at the top was different.

09:41:09  Q. Now, the government has already introduced their version

09:41:12  of CF's file.  That is Government Exhibit 32.  I would like

09:41:16  to take a look at that.

09:41:23  A. 32?

09:41:34  Q. Is it on the screen in front of you?

09:41:41  A. There is a page on the screen.

09:41:42  Q. Okay.  And it's got the redactions up at the top.  I just

09:41:45  want to make sure you are seeing what I'm seeing.

09:41:47  A. Yes.

09:41:47  Q. And I want to make sure this is being published to the

09:41:51  jury.

09:41:51          So let's go to the very last page.  You recall that

09:41:53  the last page of the original patient file for this patient

09:41:57  was the prescription for that patient?

09:42:01  A. Yes.

09:42:02  Q. And you --

09:42:03          THE COURT:  You mean the name -- what you mean is

09:42:05  the prescription that it had the female name and the gender F

09:42:09  on it?

09:42:10          MS. MURPHY:  Yes, that's correct.

09:42:11  Q. It was the prescription for the wrong patient that you

09:42:13  counted, correct?

09:42:14  A. Correct.

09:42:14  Q. And that was a mistake for you to include?

109:42:18  A. I would not include that if I were doing it again, that's

209:42:23  correct.

309:42:23  Q. Now -- sorry.  Were you not done?

409:42:25  A. Once I -- once I knew that the name was different.

509:42:29  Q. Now, the government introduced this patient file as their

609:42:36  own exhibit, correct, at Exhibit 32?

709:42:39  A. I --

809:42:41  Q. Do you have it in front of you?

909:42:44  A. I assume so.

1009:42:45  Q. And the very last page, you can see is completely blacked

1109:42:49  out.  You see that?

1209:42:56  A. I do.

1309:42:57  Q. So that means that the government blacked out the

1409:43:00  prescription that you miscounted, correct?

1509:43:05  A. It's blacked out.  Who did what, I can't say.

1609:43:10  Q. Well, it's the government's exhibit.  Right?

1709:43:14        MR. BALDING:  Objection.  Argumentative.

1809:43:14        THE COURT:  Sustained.

1909:43:18        THE WITNESS:  It is the government's exhibit.  But

2009:43:20  who blacked that out --

2109:43:22        MR. BALDING:  The objection was sustained, I

2209:43:23  believe.

2309:43:23        THE COURT:  Doctor, there is no question pending.

2409:43:27        THE WITNESS:  Oh, sorry.

2509:43:27  Q. I want to talk about another mistake you made with this

09:43:30   patient, Mr. CF.

09:43:32         You wrote in your report that his urine test was

09:43:34   inconsistent because it didn't show hydrocodone.  This is at

09:43:39   page 49 of your report, if you want to take a look at it.

09:43:53         Are you there yet?

09:43:53   A. Yes.

09:43:54   Q. Okay.  So you wrote that his urine test was inconsistent

09:43:57   because it didn't show hydrocodone?

09:44:00   A. I did write that.

09:44:01   Q. All right.  But that urine test was taken on November

09:44:03   29th, correct?  You have that in --

09:44:08   A. Can you direct me what page?

09:44:10   Q. If you go to page 17.  I'm going to direct you now to

09:44:14   Government Exhibit 32, this is the same file.  I want to make

09:44:21   sure you are looking at the right exhibit.

09:44:41   A. I think it's page 18.

09:44:43   Q. So are you talking about the urine test?

09:44:45   A. Yes.

09:44:46   Q. Okay.  And it was taken on November 29th?

09:44:50   A. Correct.

09:44:50   Q. That was the very day he was first seen by

09:44:54   Ms. Rahbarvafaei, correct?

09:45:01   A. Yes, it appears to be.

09:45:03   Q. So if he, say, is having his first visit with

09:45:09   Ms. Rahbarvafaei, she hasn't prescribed him any medication

yet, she says, I need you to do a urine test, and he does the urine test in the office, the urine test is not going to show any hydrocodone because he hasn't filled the prescription yet, correct?

A. Correct.  Except for at the top of the page where it would be medications being taken, Norco is listed.

Q. But this was the first time she was seeing him.

A. Correct.

Q. So if she's looking to see if he's taking the medications that she's prescribing to him, this test isn't going to show that because she had never seen him before this day, correct?

A. But if the patient is taking that medicine from someone else, part of doing a urine drug test the first visit is seeing, you know, are you -- are you using medicine from someone else?  Do you have anything else in your system?

Q. Well, it could happen that this patient said, you know, I was seeing a doctor about a month ago and they prescribed me Norco.  So he could say that, correct?

A. Sure.

Q. And maybe he hadn't taken the Norco in a couple of weeks, correct?

A. Correct.  And --

Q. And then maybe that is why it doesn't show up on the urine tests.

A. That is certainly correct.

```
09:46:38   1   Q. You actually made this mistake with multiple patients
09:46:42   2   that you reviewed here.  I want to talk about another one.
09:46:45   3          THE COURT:  Counsel, please ask questions.  Don't
09:46:48   4   make statements of fact.  You are not a witness.
09:46:50   5          MS. MURPHY:  Thank you, Your Honor.
09:46:51   6   Q. If you could go to Government Exhibit 40.
09:46:56   7          I want to make sure you still have your report in
09:46:58   8   front of you, too, so we can look at them side by side.
09:47:03   9   A. Let's see.
09:47:05  10   Q. This is for patient PS.
09:47:07  11   A. Should I give 427 back to the Judge?
09:47:12  12   Q. That's fine.  Thank you.
09:47:16  13   A. I'm sorry, which page are we going to?
09:47:19  14   Q. So on -- first on your report, Government Exhibit 55, go
09:47:23  15   to page 91.
09:47:38  16          Just let me know when you are there.
09:47:47  17   A. Okay.  I'm there.
09:47:48  18   Q. You wrote that her January 25th, 2018 test was
09:47:52  19   inconsistent because it was negative for hydrocodone, even
09:47:56  20   though she was being prescribed Norco, which is another term
09:47:59  21   for hydrocodone.  You see that?
09:48:01  22   A. On the January 25th, 2018?
09:48:09  23   Q. Yeah.
09:48:11  24   A. I said it was aberrant.  That was not the only aberrancy.
09:48:17  25   Q. I'm focusing here on the hydrocodone, okay?
```

09:48:22    So on January 25th, 2018, I want to focus now -- go

09:48:26    to Exhibit 40.  Do you have that in front of you?  Government

09:48:29    Exhibit 40.  This is the patient file.

09:48:59    A. I have it.  It's -- okay.

09:49:05    Q. Okay.  Thank you.

09:49:07    Now, you wrote -- or, not you wrote.  But let's go

09:49:13    to the actual lab report at page 85 of Government Exhibit 40.

09:49:19    You want to pull it up?

09:49:26    Do you have that in front of you, page 85?

09:49:29    A. Yes.

09:49:39    Q. So that shows no metabolites for hydrocodone, correct?

09:49:45    A. It's under the category of opiates, and it's negative.

09:49:52    Q. But again, January 25th, 2018, was the same day as her

09:49:56    first visit with Ms. Rahbarvafaei.

09:50:00    A. Okay.

09:50:01    Q. You agree with that?

09:50:03    A. I would need to look at my records to confirm that, but I

09:50:07    will -- I'm not objecting that.

09:50:11    Q. You are taking my word for it?

09:50:13    A. Yes.

09:50:24    Q. Now, this isn't -- we all make mistakes, right?  We are

09:50:32    humans, like you, we make mistakes?

09:50:35    A. Everyone makes mistakes.

09:50:36    Q. You've made other mistakes in the past when preparing

09:50:40    reports like this, right?

1 09:50:41   A. I don't classify this as a mistake, but I have made -- I
2 09:50:45   have made errors in the past, yes.
3 09:50:48   Q. You wouldn't classify this as a mistake?
4 09:50:50        MR. BALDING:  Objection.  Argumentative.
5 09:50:52        THE COURT:  Overruled.
6 09:50:52        THE WITNESS:  No.  The January 25th, 2018, it was
7 09:50:57   negative for opiates.  It also was positive for another
8 09:51:01   substance, not prescribed, so it would be an aberrant
9 09:51:05   inconsistent result whether the opioid was positive or
10 09:51:10  negative.
11 09:51:11  Q. Well, if it's the first visit, though, she hasn't
12 09:51:14  prescribed them any medications yet.
13 09:51:15  A. Correct.
14 09:51:15  Q. So it's not aberrant as to the prescriptions she's given
15 09:51:20  them, correct?
16 09:51:21  A. But the result is an aberrant result.
17 09:51:23  Q. Well, you don't know what the patient told her about the
18 09:51:27  medications that they had been taking before, correct?
19 09:51:30  A. Correct.
20 09:51:32  Q. You don't know if she called their prior doctor and asked
21 09:51:36  them, hey, is this person taking this medication?
22 09:51:40  A. That's correct.
23 09:51:40  Q. You don't know if the person brought a bottle of pills to
24 09:51:44  her and said, hey, these are the medications I'm taking.
25 09:51:47  A. Correct.

109:51:48   Q. You don't know any of that?

209:51:49   A. I do not.

309:51:50   Q. Now, in another case, you agree -- you've made mistakes

409:51:56   in other cases before?

509:51:57   A. Correct.

609:51:58   Q. You once faulted a doctor for not referring a diabetic

709:52:04   patient for a foot exam, even though that patient did not

809:52:06   have feet.

909:52:09   A. I did.  It was not clear in the records, but

1009:52:15   retrospectively, that's correct.

1109:52:17   Q. Well, in fact, the records in that case said that the

1209:52:19   patient had had their feet removed as children.

1309:52:23   A. Yes.

1409:52:25   Q. And you were faulting the doctor there in a California

1509:52:29   Medical Board proceeding --

1609:52:31   A. Right.

1709:52:32   Q. -- because they didn't refer that patient to a foot exam

1809:52:34   for feet they did not have.

1909:52:36   A. Correct.

2009:52:37   Q. That was a mistake?

2109:52:38   A. That was an error.

2209:52:41   Q. Now, you testified about Ms. Rahbarvafaei's comments

2309:52:47   about the DEA watching.  You remember that?

2409:52:49   A. I did.

2509:52:50   Q. You agree we live in a nation of laws?

| | | |
|---|---|---|
| 1 | 09:52:53 | A. Yes. |
| 2 | 09:52:53 | Q. You try to follow the law. |
| 3 | 09:52:57 | A. To the best I can, absolutely. |
| 4 | 09:52:58 | Q. For example, I'm sure you file your taxes. |
| 5 | 09:53:02 | A. My accountant does, but yes. |
| 6 | 09:53:04 | Q. You have your accountant file your taxes for you? |
| 7 | 09:53:06 | A. Yes. |
| 8 | 09:53:08 | Q. And when you have your accountant file your taxes, you |
| 9 | 09:53:12 | want to make sure that your accountant is filling them out |
| 10 | 09:53:15 | correctly. |
| 11 | 09:53:16 | A. Correct. |
| 12 | 09:53:16 | Q. Not just because it's the right thing to do, right? |
| 13 | 09:53:21 | A. Correct. |
| 14 | 09:53:22 | Q. It's also because it's the law. |
| 15 | 09:53:24 | A. Yes. |
| 16 | 09:53:24 | Q. And you wouldn't want to be audited? |
| 17 | 09:53:28 | A. That's correct. |
| 18 | 09:53:29 | Q. You wouldn't want to be charged with federal crimes? |
| 19 | 09:53:32 | A. Correct. |
| 20 | 09:53:33 | Q. Now, you've lectured other physicians about prescribing |
| 21 | 09:53:37 | opioids, correct? |
| 22 | 09:53:38 | A. I have. |
| 23 | 09:53:38 | Q. And you tell them about the risks. |
| 24 | 09:53:44 | A. Specifically what risks are we talking about? |
| 25 | 09:53:48 | Q. Well, there is risks to the patient, you would say? |

```
1 09:53:51  A. Yes.
2 09:53:51  Q. And there is also risks to them as practitioners.
3 09:53:55  A. If you don't follow the laws, yes.
4 09:53:58  Q. Right.
5 09:54:00       Including legal consequences.
6 09:54:02  A. Correct.
7 09:54:02  Q. And you've said, anyone that has listened to your
8 09:54:06  lectures know that law enforcement is watching.
9 09:54:10  A. I may have said that.
10 09:54:15 Q. I would like to talk about physical exams.
11 09:54:19      You testified on direct that one must physically
12 09:54:22 touch someone during an examination.  Do you remember that?
13 09:54:25 A. When prescribing controlled substances.
14 09:54:30      MS. MURPHY:  I'm sorry, was there an objection?
15 09:54:32      MR. BALDING:  He answered.
16 09:54:33 Q. Now, you are aware that during the pandemic, the DEA
17 09:54:37 adopted policies that allowed DEA registered practitioners,
18 09:54:41 like Ms. Rahbarvafaei, to prescribe controlled substances
19 09:54:45 without having to interact with the person in person,
20 09:54:48 correct?
21 09:54:49      MR. BALDING:  Objection.  Relevance, Your Honor.
22 09:54:51 The pandemic --
23 09:54:52      THE COURT:  The jury will determine its
24 09:54:54 significance, but overruled.  She can ask the question and
25 09:54:57 the witness can answer.
```

09:54:58      THE WITNESS:  They have come out with different
09:55:01  regulations based on the pandemic.  Certainly the dates of
09:55:07  what I reviewed was pre-pandemic.
09:55:09  Q. Of course.  But this is the DEA coming up with these
09:55:13  rules, correct?
09:55:14  A. There is lots of people who come up with the rules.
09:55:17  Q. It's the DEA who said that it is okay to see a patient
09:55:25  via telemedicine and prescribe them controlled substances.
09:55:30  A. During the pandemic they came up with some changes to the
09:55:34  rules, yes.
09:55:34  Q. This is still the rule today.
09:55:37  A. It may very well still be the rule today.
09:55:39  Q. And if it's a new patient, a new patient you haven't seen
09:55:43  them once, you can evaluate them either in person or via
09:55:47  telemedicine.
09:55:48      MR. BALDING:  Objection.  Relevance.  Cumulative.
09:55:50      THE COURT:  Overruled.
09:55:53      THE WITNESS:  Are you using the broad term of
09:55:57  telemedicine including video?
09:55:59  Q. Yes.  Telemedicine meaning like a Zoom appointment.
09:56:03  A. Right.  So using video conferencing, video medicine, is
09:56:10  that, you know, one can do portions of the physical exam
09:56:18  using observation.  You can't touch the patient at that
09:56:22  point.
09:56:23  Q. Because they are not in front of you.

| | | |
|---|---|---|
| 1 | 09:56:26 | A. Correct. |
| 2 | 09:56:27 | Q. So you could ask them questions like, can you move your |
| 3 | 09:56:30 | arms up?  How does that feel?  You could do that? |
| 4 | 09:56:32 | A. Yes. |
| 5 | 09:56:32 | Q. You could ask them, can you move your leg?  How does that |
| 6 | 09:56:36 | feel?  You can do that? |
| 7 | 09:56:37 | A. Yes. |
| 8 | 09:56:37 | Q. You can ask them to tip their head around, ask them how |
| 9 | 09:56:41 | it feels? |
| 10 | 09:56:41 | A. Yes. |
| 11 | 09:56:41 | Q. You can't actually touch them? |
| 12 | 09:56:43 | A. Correct. |
| 13 | 09:56:47 | Q. Now, you testified at length about the standard of care |
| 14 | 09:56:52 | yesterday. |
| 15 | 09:56:54 | A. Yes. |
| 16 | 09:56:54 | Q. Now, to be clear, you were not testifying about |
| 17 | 09:57:00 | Ms. Rahbarvafaei's intent? |
| 18 | 09:57:02 | A. No. |
| 19 | 09:57:03 | Q. You do not know what was in her mind. |
| 20 | 09:57:05 | A. No. |
| 21 | 09:57:05 | Q. You do not know what was in her mind as she listened to |
| 22 | 09:57:10 | undercover 1 tell her that his pain was 10 out of 10. |
| 23 | 09:57:14 | A. That's correct.  I cannot read her mind. |
| 24 | 09:57:16 | Q. You do not know what was in her mind as she listened to |
| 25 | 09:57:20 | the other undercover tell her that his pain was excruciating. |

```
1  09:57:25   A. Correct.

2  09:57:25   Q. You weren't sitting there, looking at them with your own

3  09:57:29   eyes.

4  09:57:29   A. I was not.

5  09:57:30   Q. You offer no opinion on her intent when she was

6  09:57:35   prescribing any of these prescriptions.

7  09:57:38   A. I have no way of knowing her intent.

8  09:57:44          MS. MURPHY:  I have no further questions.

9  09:57:46          THE COURT:  Thank you.

10 09:57:47          Any redirect?

11 09:57:49          MR. BALDING:  Yes, briefly, Your Honor.

12 09:57:50          May I have a moment?

13 09:57:52          THE COURT:  You may.

14 09:57:53          And ladies and gentlemen, you may stand and stretch.

15 09:58:44          MR. BALDING:  Apologize, Your Honor, I didn't have a

16 09:58:46   copy of some of the defense exhibits.  I just need to make

17 09:58:48   sure I have the right pages.

18 09:58:50          THE COURT:  Mr. Balding, stay within the scope.

19 09:58:52          And more importantly, Ms. Murphy, your recross will

20 09:58:56   be strictly limited to what has been raised in the redirect.

21 09:58:59          MS. MURPHY:  Of course.  Thank you.

22 09:58:59                    REDIRECT-EXAMINATION

23 09:59:11   BY MR. BALDING:

24 09:59:11   Q. Dr. Munzing, in the examinations you reviewed, did the

25 10:00:04   defendant ever ask undercover 1 to do the types of things
```

1 10:00:11   that defense counsel just asked you in terms of visibly

2 10:00:14   observing them moving their body parts, other than the leg

3 10:00:17   lift?

4 10:00:17    A. My recollection is, undercover 1, it was just kind of

5 10:00:21   moving the legs.

6 10:00:22    Q. And with undercover 2, other than, can you raise your

7 10:00:25   arms, which we heard but didn't see, was there any other, I

8 10:00:29   would say quasiphysical examination that was conducted?

9 10:00:32         MS. MURPHY:  Objection.  Leading.  Argumentative.

10 10:00:34         THE COURT:  Overruled.

11 10:00:35         THE WITNESS:  My recollection is primarily moving

12 10:00:43   the arms.

13 10:00:44    Q. You talked about being fooled by patients before.  Do you

14 10:00:48   recall that testimony?

15 10:00:48    A. I do.

16 10:00:49    Q. Can you explain, are there steps you take to try to avoid

17 10:00:55   being fooled even if those steps fail to detect someone that

18 10:00:59   is trying to fool you?

19 10:01:00    A. Sure.  As I mentioned before, is that one takes a

20 10:01:05   complete history, does an examination, looks at any records

21 10:01:10   that may or may not be there.  Typically if their intent is

22 10:01:15   to fool you, they won't come in with any records.

23 10:01:19         And then in California, we can -- not only can we,

24 10:01:28   but we are required to check CURES to find out are they

25 10:01:31   getting medicines from somebody else.

And we -- you know, I order a urine drug test.  That is our kind of what we do.  It takes about three days for us to get the urine drug test back.  And so if I -- if everything sounds like everything is right, based on history, exam, all the information I have, I may give three or four days of medication until -- within three or four days, I'll have the urine drug test.

I talk to the patient about getting old records.  If you order old records the normal way, it may take months to get them.  But if the patient has been seeing somebody locally, I ask them, and usually they are very willing to do this, if they are transferring care, to go to the hospital where they were getting care, or to the doctor and try to retrieve at least a summary of the prior records.

Now, sometimes they don't -- they haven't been seeing anyone, and so you can't get the prior records.  But at least I can get the urine drug test, and get some initial information.

So I give a very short supply, a few days' worth.  And then if things come back such that I feel more comfortable, I may give two weeks worth, or occasionally a month's worth, if -- generally not a month's worth if I don't have sufficient additional information.

Q. Thank you.

MR. BALDING:  May I just have one more moment,

```
 1 10:03:22   Your Honor?

 2 10:03:23           THE COURT:  You may.

 3 10:03:24           (Pause in proceedings.)

 4 10:03:38   Q. So, Dr. Munzing, you were asked a few questions about

 5 10:03:51   patient CF in cross-examination.  Do you recall that

 6 10:03:54   testimony?

 7 10:03:54   A. I do.

 8 10:03:55   Q. And one of the things that defendant talked about --

 9 10:04:01   excuse me -- defense counsel asked you about was the aberrant

10 10:04:06   drug tests relating to the initial visit.  Do you recall that

11 10:04:09   testimony?

12 10:04:09   A. Right.  Yes.

13 10:04:10   Q. Now, looking at your report -- do you recall testifying

14 10:04:15   that that initial prescription was on approximately

15 10:04:19   November 29, 2018, for 90 tablets of hydrocodone?

16 10:04:24   A. I do remember that.

17 10:04:25   Q. And as defense counsel asked you, that appears to have

18 10:04:28   been the first day that the defendant saw that patient.

19 10:04:32   A. Yes.

20 10:04:32   Q. Now, I'm going to pull up Exhibit 32, page 22, which is

21 10:04:38   from this patient file.

22 10:04:50           Do you see Exhibit 22 (sic)?

23 10:04:52   A. I do.

24 10:04:52   Q. And does this appear to be a CURES report that was pulled

25 10:04:57   and that was in the patient file?
```

1 10:05:03   A. Yes.  And I am -- obviously the first and last names and

2 10:05:08   other information has been blacked out.

3 10:05:11   Q. But if I represent that this is a redacted version of

4 10:05:15   CF's patient file, does this appear to be something you would

5 10:05:18   have reviewed in reviewing his file?

6 10:05:20   A. Yes.

7 10:05:21   Q. And do you see that the CURES data appears to show a

8 10:05:27   prescription that this individual had filled on a particular

9 10:05:36   date?  Do you see what has been highlighted?

10 10:05:38   A. Yes.  The date of -- the date it was filled was

11 10:05:41   November 12th, 2018.

12 10:05:43   Q. And what's the type of drug?

13 10:05:45   A. Hydrocodone.

14 10:05:47   Q. And is this the kind of data that could have been

15 10:05:53   available to defendant when she was seeing him a few weeks

16 10:05:56   later and before she had actually prescribed hydrocodone?

17 10:05:59   A. Yes, indeed.  CURES is real time.  I mean, it's -- we can

18 10:06:04   get the information real time.  If they fill a prescription,

19 10:06:09   it may take a few days, or sometimes even a little bit longer

20 10:06:13   to actually be uploaded.  But we can actually retrieve that

21 10:06:19   information.  And not only can we, we are required to update

22 10:06:24   and review that information before prescribing.

23 10:06:29        And it takes about, maybe three to five minutes to

24 10:06:32   sign onto CURES and to pull up the report.

25 10:06:36   Q. So I'm pulling up -- it appears that this particular

10:06:39  document wasn't printed until after that first visit, but

10:06:41  does that change your opinion as to whether or not CURES

10:06:44  could have been run at the time of the first visit,

10:06:46  November 29, 2018?

10:06:48   A. It certainly could have been run, yes.

10:06:55   Q. Now, you also testified about a mistake you made in

10:06:58  counting one of the prescriptions that was in -- what was

10:07:02  initially given to you as purporting to be the patient file

10:07:06  for CF.  Do you recall that?

10:07:07   A. Correct.

10:07:07   Q. And that last page of the exhibit, which wasn't included

10:07:14  in the government's exhibit, isn't actually relating to CF,

10:07:17  so it's not officially part of what the defendant did when

10:07:21  treating CF.  Is that fair to say?

10:07:23   A. Yes.

10:07:27   Q. And you didn't testify about CF in direct examination,

10:07:31  did you?

10:07:31   A. No.

10:07:32   Q. Specifically at least as it referred to the mistake you

10:07:37  made in your report.

10:07:38       So you didn't testify that CF had, in fact, issued

10:07:41  the prescription that's not been included in Exhibit 32, did

10:07:44  you?

10:07:44   A. I think you should re --

10:07:50       THE COURT:  CF didn't issue the prescription.

THE WITNESS:  Yeah.

Q. Excuse me.  The prescription that you referenced that defendant issued to CF, but actually hadn't issued to CF, that was not something you testified about in your direct examination, was it?

A. No.

Q. Now do you recall testifying about a mistake you made with regard to referring -- or faulting a doctor for not referring someone to -- for diabetic tests despite not having feet?

A. Yes, I remember that.

Q. What type of departure had you found that to be, if you recall?

A. Yes.  That was a simple -- I called that a simple departure, certainly not criminal.  And it was a -- I counted that as a minor departure, or simple departure.

Q. And that testimony was not -- was that in a civil hearing or a criminal case?

A. It was not a criminal case.  It was a civil hearing.

Q. But you did make a mistake?

        But you did make a mistake, is that correct?

A. Yes.  It was paper records.  It was difficult to find. And I obviously did not see that buried within the many pages of records.

Q. Now, you talked about -- one moment.

10:09:30          Now, when you testified about the standard of care,

10:09:32    I think -- is it correct that no individual source provides

10:09:38    what you are testifying about as to the standard of care?

10:09:42    A. Yes.  I agree with that.

10:09:43    Q. And is your view informed by many sources, but the

10:09:49    general topics we are talking about are a result of

10:09:53    consistency amongst those sources?

10:09:55          MS. MURPHY:  Objection.  Leading.

10:09:56          THE COURT:  Sustained.

10:09:57    Q. How did you -- I'll move on.

10:10:06          Now, even though certain sources might not use the

10:10:11    term "red flag," is the general concept of red flags present

10:10:14    in the sources you reviewed?

10:10:16          MS. MURPHY:  Objection.  Leading.

10:10:17          THE COURT:  Overruled.

10:10:19          THE WITNESS:  Yes.  They highlight areas of concern.

10:10:24    They don't use the words "red flag."  I use those, and many

10:10:31    others use those, but it's not kind of a medical term.

10:10:36          But they do highlight certainly prescribing areas of

10:10:44    concern.  And I have been to many training sessions, both as

10:10:49    the lecturer, and as the -- hearing other people lecture and

10:10:55    talking about, you know, red flags that are, you know, are

10:11:00    there to keep, you know, keep an eye on, and if you see them,

10:11:08    it doesn't mean that anything terrible is happening, but kind

10:11:11    of look further.

10:11:12   Q. I think you were asked about your article.  Do you recall

10:11:15   that testimony?

10:11:16   A. Yes.

10:11:16   Q. And I believe -- and if I get the wording wrong, I

10:11:22   apologize.  But in general, something to the effect of, rare

10:11:26   diversion of a few tablets at one time may warrant a

10:11:30   documented discussion with patients.

10:11:31        Is that something you agree with, or previously

10:11:33   wrote?

10:11:33   A. Yes.  And obviously we are talking about, you know, every

10:11:38   patient is different.  And so it often is based on, what is

10:11:42   your history with the patient?  If this is a brand new

10:11:47   patient, you may not have any history with him.  If you have

10:11:51   taken care of them for 10 years, and you know them well, and

10:11:59   you have monitored them over the years, how one -- how you or

10:12:05   I would react to a certain situation may be different than

10:12:09   someone who I've never met before.

10:12:11   Q. And in reviewing this case, when UC1 or UC2 mentioned

10:12:16   similar things, diversion of some tablets, did you see any

10:12:21   documented discussion or any discussion at all following up

10:12:25   along those lines?

10:12:25   A. No.

10:12:28        MR. BALDING:  May I have a moment, Your Honor?

10:12:30        THE COURT:  You may.

10:12:31        (Pause in proceedings.)

1  10:12:56          MR. BALDING:  I have nothing further, Your Honor.

2  10:12:57          THE COURT:  Thank you.

3  10:12:58          Recross?

4  10:12:59          MS. MURPHY:  Thank you, Your Honor.

5  10:12:59                        RECROSS-EXAMINATION

6  10:13:04  BY MS. MURPHY:

7  10:13:04   Q. Dr. Munzing, you just testified earlier about the CURES

8  10:13:07  data for the undercovers -- or, I'm sorry, CURES data in

9  10:13:12  general in California.

10 10:13:14   A. What specific are you --

11 10:13:16   Q. I'm just speaking generally, you just on redirect talked

12 10:13:19  about CURES data.

13 10:13:20   A. Talked about CURES data.

14 10:13:21   Q. You said that it's required to look it up in California?

15 10:13:24   A. It is currently.

16 10:13:25   Q. Yeah.  It wasn't always required, correct?

17 10:13:28   A. No.

18 10:13:28   Q. In fact, it wasn't required in the State of California

19 10:13:32  until October 2018.

20 10:13:34   A. I believe that that is -- I believe that is when it came

21 10:13:37  into effect, yes.

22 10:13:39   Q. That was after Ms. Rahbarvafaei saw these undercovers,

23 10:13:41  correct?

24 10:13:42   A. Yes.

25 10:13:44   Q. I want to just focus a little bit on CF.  The government

10:13:47    showed you a copy of the CURES data that was printed

10:13:51    December 2018, correct?  You -- or was faxed 2018,

10:13:57    December 2018.

10:13:58     A. Yes.

10:13:58     Q. That was after her first visit with CF?

10:14:00     A. Correct.

10:14:01     Q. And that actually would have confirmed to

10:14:04    Ms. Rahbarvafaei that, oh, this patient had been receiving

10:14:07    Norco from another prescriber before they saw me, correct?

10:14:10     A. Correct.

10:14:11     Q. So that means that if he told her during that first

10:14:18    visit, yeah, I get Norco, that wouldn't have been a lie.

10:14:25     A. That would not have been a lie.

10:14:29          MS. MURPHY:  Your Honor, may I just have one moment

10:14:31    with my cocounsel?

10:14:32          THE COURT:  You may.

10:14:33          (Pause in proceedings.)

10:14:38          MS. MURPHY:  Nothing further.  Thank you.

10:14:41          THE COURT:  Any further?

10:14:43          MR. BALDING:  Just one question, Your Honor.

10:14:43                     RE-REDIRECT EXAMINATION

10:14:46    BY MR. BALDING:

10:14:46     Q. With CF, if he told defendant he was obtaining

10:14:52    hydrocodone from someone else, and CURES confirmed that,

10:14:55    would then the drug test showing negative be an aberrant drug

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 10:15:01   test?

2 10:15:04          In other words -- sorry, let me rephrase.

3 10:15:07          If CF had told defendant that CF was receiving

4 10:15:12   hydrocodone from another doctor, and CURES, in fact, showed

5 10:15:15   he had filled a prescription for hydrocodone prior to the

6 10:15:18   urine drug test, would that alter your opinion or your

7 10:15:22   finding in your report that a drug test on November 29th of

8 10:15:27   that month that showed negative for hydrocodone was aberrant?

9 10:15:32          MS. MURPHY:  Objection.  Leading.  Argumentative.

10 10:15:33          THE COURT:  Overruled.

11 10:15:35          THE WITNESS:  No.  I mean, that -- the aberrancies,

12 10:15:42   there is two of them.  Certainly the opioid.  Knowing that

13 10:15:46   the patient was receiving hydrocodone from someone else, it

14 10:15:52   was available on CURES, but presumably the defendant knew

15 10:15:57   because it's written in -- it's written in the progress note

16 10:16:01   the patient was taking that.  And the urine drug test a few

17 10:16:07   weeks, a couple of weeks later was negative.  And so that

18 10:16:10   would be an aberrancy.

19 10:16:14          MR. BALDING:  Nothing further, Your Honor.

20 10:16:15          THE COURT:  Any recross?

21 10:16:17          MS. MURPHY:  No, Your Honor, thank you.

22 10:16:18          THE COURT:  Thank you.

23 10:16:18          Dr. Munzing, you are excused.

24 10:16:20          Ladies and gentlemen, we are going to take our

25 10:16:22   morning break.

10:16:24          Try to be ready at 10:35, 20 minutes from now.  I

10:16:30   know with 16 of you, that might not be possible, but let's

10:16:34   aim for that.

10:16:35          Remember what I told you, don't discuss the case,

10:16:37   even amongst yourselves, and do nothing to investigate the

10:16:40   case, including using your phones.

10:16:42          Thank you.

10:16:43          (Thereupon, the jury retired from the courtroom.)

10:17:19          THE COURT:  All right.  Does the government intend

10:17:22   to rest?

10:17:22          MR. BALDING:  Subject to just confirming our

10:17:26   exhibits, I think, yes, Your Honor.

10:17:28          THE COURT:  Subject to -- I'll allow you to do it in

10:17:30   front of the jury, but subject to confirming the exhibits,

10:17:33   the government will rest.  The Rule 29 motions will be deemed

10:17:37   to be made, we can argue them later, obviously outside the

10:17:41   presence of the jury.  So the defense should be prepared to

10:17:46   proceed.

10:17:47          MS. MURPHY:  Thank you, Your Honor.

10:17:48          THE COURT:  Thank you.

10:17:55          (Thereupon, there was a brief recess.)

10:38:22          (Thereupon, the jury returned to the courtroom.)

10:38:28          THE COURT:  Ladies and gentlemen, welcome back.

10:38:34          All of you are here, as are the defendant and the

10:38:36   lawyers.

| | | |
|---|---|---|
| 1 | 10:38:37 | Does the government have any further witnesses? |
| 2 | 10:38:40 | MR. BALDING:  No, Your Honor.  The government rests. |
| 3 | 10:38:42 | THE COURT:  Thank you. |
| 4 | 10:38:42 | Does the defendant wish to present a case? |
| 5 | 10:38:47 | MS. MURPHY:  Yes, Your Honor. |
| 6 | 10:38:48 | We would call to the stand Dr. Murphy. |
| 7 | 10:39:18 | THE CLERK:  This way, please. |
| 8 | 10:39:28 | Raise your right hand. |
| 9 | 10:39:29 | THEREUPON: |
| 10 | 10:39:29 | DR. JAMES PATRICK MURPHY, |
| 11 | 10:39:29 | called in these proceedings and being first duly sworn |
| 12 | 10:39:29 | testifies as follows: |
| 13 | 10:39:37 | THE CLERK:  Please be seated. |
| 14 | 10:39:52 | Please state and spell your name for the record. |
| 15 | 10:39:54 | THE WITNESS:  My name is James Patrick Murphy.  It's |
| 16 | 10:40:00 | J-A-M-E-S, P-A-T-R-I-C-K, M-U-R-P-H-Y. |
| 17 | 10:40:07 | THE CLERK:  Thank you. |
| 18 | 10:40:07 | THE COURT:  Ladies and gentlemen, the instruction |
| 19 | 10:40:10 | that I gave you in regard to Dr. Munzing applies also to |
| 20 | 10:40:15 | Dr. Murphy. |
| 21 | 10:40:16 | Again, he's an opinion witness.  He doesn't have any |
| 22 | 10:40:20 | firsthand knowledge of the facts here or what occurred at the |
| 23 | 10:40:26 | clinic.  He is being presented, as the law allows, for |
| 24 | 10:40:31 | someone of his education, experience, to offer opinions and |
| 25 | 10:40:38 | to give the reasons for those opinions. |

1 10:40:40          You may accept or reject those opinions.  You may

2 10:40:44  give them as much weight as you think they deserve in the

3 10:40:47  jury room, as is true with all witnesses.

4 10:40:52          I'll remind you of this at the end of the case, but

5 10:40:55  for now, I just wanted to say that what I said to you in

6 10:40:58  regard to Dr. Munzing applies equally to Dr. Murphy.

7 10:41:02          Counsel, you may proceed.

8 10:41:04          MR. DRISCOLL:  Thank you, Your Honor.

9 10:41:04                    DIRECT EXAMINATION

10 10:41:05  BY MR. DRISCOLL:

11 10:41:05   Q. Dr. Murphy, just a brief introductory question.  No

12 10:41:10  relation to my cocounsel, Ms. Murphy, sitting at counsel's

13 10:41:13  table, correct?

14 10:41:14   A. That is correct.

15 10:41:14   Q. Thank you, Dr. Murphy.

16 10:41:17          Where do you currently work?

17 10:41:18   A. My office is in New Albany, Indiana.

18 10:41:22   Q. What do you do for a living?

19 10:41:23   A. I'm a pain management specialist.  And I'm also an

20 10:41:28  addiction specialist.  And I'm also an anesthesiologist.

21 10:41:32   Q. What is your educational background?

22 10:41:35   A. I have my undergraduate degree in English from

23 10:41:38  West Minister College in Fulton, Missouri.  I went to medical

24 10:41:42  school in my hometown of Louisville, Kentucky at the

25 10:41:46  University of Louisville School of Medicine.

1  10:41:49          After that I did my internship in psychiatry at the

2  10:41:53   Naval Hospital in San Diego, California.  After that I did

3  10:41:56   training at the Naval Aerospace Medical Institute in

4  10:42:00   Pensacola, Florida, and learned to be a Naval flight surgeon.

5  10:42:04          Then after my Navy active duty time, I came back to

6  10:42:08   Louisville, did an anesthesia residency.  After my residency

7  10:42:12   in Louisville, I did a pain fellowship at the Mayo Clinic.

8  10:42:19          And I also have a master's degree in medical

9  10:42:21   management from the University of Southern California.

10 10:42:23   Q. Dr. Murphy, why did you decide to specialize in pain

11 10:42:28   management?

12 10:42:29   A. I was initially going down the pathway of becoming a

13 10:42:32   family practice doctor.  I mean, I actually got the award

14 10:42:35   when I graduated for being top family practice doctor -- or

15 10:42:39   student at the University of Louisville.  But I wanted to be

16 10:42:43   a psychiatrist when I actually won my internship.  But during

17 10:42:48   that time I decided that -- and again, I was a Naval flight

18 10:42:51   surgeon, so I was on the Enterprise, and I saw the planes and

19 10:42:55   dealt with the physiology there.  And I thought anesthesia

20 10:43:00   would be a great field for me.  So I liked that as well.  So

21 10:43:03   then I went into anesthesiology.

22 10:43:05          I wasn't as satisfied with anesthesiology, because I

23 10:43:08   missed having patients.  As a flight surgeon, you have -- you

24 10:43:11   are kind of a primary care doctor for the pilots and the

25 10:43:14   families as well, and I missed having that interaction.

1 10:43:16          So pain management was a subspecialty of

2 10:43:21   anesthesiology.  And pain is a very sensory, emotional

3 10:43:25   experience.  You can have long-term relations with patients.

4 10:43:29   So I decided that I wanted to specialize in pain management

5 10:43:33   because of my anesthesia background, so I could do the

6 10:43:36   injections, things of that nature, and procedures, as well as

7 10:43:38   take care of patients on a long-term basis.  And incorporate

8 10:43:41   some of that psychiatric training that I had as well.

9 10:43:47          So it seemed like a good fit for me.

10 10:43:47   Q. Do you have any certifications in pain management?

11 10:43:49   A. I do.

12 10:43:50   Q. What certifications?

13 10:43:51   A. I'm certified by the American Board of Medical

14 10:43:55   Specialties through the American Board of Anesthesiology as a

15 10:44:00   subspecialist in pain management.

16 10:44:03          I also have a certification from the American Board

17 10:44:07   of Pain Medicine, which is another separate board.

18 10:44:10          So I have two board certifications in pain

19 10:44:14   management.

20 10:44:14   Q. And what does it mean to specialize in pain management?

21 10:44:18   A. Well, it means that I'm a specialist.  It means that I

22 10:44:22   have a degree of experience and training in pain management

23 10:44:27   that exceeds what a primary care doctor or some other

24 10:44:32   specialty might have.

25 10:44:33          So they would send me consults, they would send me

10:44:37  patients for my expert evaluation about pain issues.

10:44:40  Q. And I know this isn't the appropriate medical term, but

10:44:44  it's commonly referred to as this, are you certified in

10:44:47  addiction medicine or substance abuse disorder?

10:44:49  A. It's actually addiction medicine.  And yes, I am board

10:44:53  certified in addiction medicine as well.

10:44:54  Q. By which boards?

10:44:56  A. Well, I have actually had three certifications in

10:45:00  addiction medicine, the American Society of Addiction

10:45:02  Medicine, the American Board of Addiction Medicine, and most

10:45:06  recently, I have been certified through the American Board of

10:45:11  Preventative Medicine as a subspecialist in addiction

10:45:15  medicine.

10:45:15  Q. Do you also teach about pain management?

10:45:18  A. I do.

10:45:18  Q. Where do you teach?

10:45:19  A. I teach -- well, foremost, through the University of

10:45:25  Louisville.  I am on the faculty of the University of

10:45:28  Louisville School of Medicine.  And I teach doctors and

10:45:31  residents and medical students about pain management and

10:45:35  addiction medicine as well, and sometimes anesthesiology.

10:45:39       I also teach physicians throughout the state of

10:45:41  Kentucky on a regular basis about these issues, as well.

10:45:46  Q. Do you also give continuing education or lectures?

10:45:50  A. I do.

1 10:45:51   Q. Have you given any such lectures to laypersons or

2 10:45:58   attorneys?

3 10:45:59   A. Oh, yes.  Well, I've given seminars to various groups,

4 10:46:04   whether it be, you know, at the Mayo Clinic to fellow

5 10:46:08   physicians there, all the way down to community groups.  And,

6 10:46:12   yes, attorneys as well.  And certainly the most recent

7 10:46:16   seminar I gave was to the Kentucky Department of Public

8 10:46:20   Defenders Conference they had in Louisville, Kentucky a few

9 10:46:26   months ago.

10 10:46:26   Q. Are you a member of any medical associations that deal

11 10:46:29   with pain management?

12 10:46:30   A. Yes, I am.

13 10:46:31   Q. Which ones?

14 10:46:32   A. Well, I am a member of the American Society of Addiction

15 10:46:39   Medicine.  And obviously, you know, that is addiction, but

16 10:46:44   pain and addiction kind of go hand in hand.  You really need

17 10:46:47   to know about pain if you are going to treat addiction as

18 10:46:50   well.

19 10:46:50         I am the alternate director for region 10 of the

20 10:46:56   country for the American Society of Addiction Medicine.  I am

21 10:46:59   the American Society of Addiction Medicine's representative

22 10:47:04   on the American Medical Association's Substance Use and Pain

23 10:47:08   Care Task Force.

24 10:47:09         That is a task force that the American Medical

25 10:47:13   Association brought together basically all of the

10:47:16  specialties.  We have representatives from all of the

10:47:18  specialties pretty much on this task force.  We work together

10:47:22  to come up with best ideas about how moving forward, how to

10:47:25  move the art of medicine and the science of medicine forward

10:47:28  in a proper way.

10:47:29  Q. Have you published articles?

10:47:31  A. Yes, I have.

10:47:32  Q. Can you explain what it means to be peer reviewed?

10:47:36  A. Well, the sense of being peer reviewed is -- that is

10:47:44  when, when I think of it, and most people, I mean, in my

10:47:47  position think of it, is when you have an article that you

10:47:51  submit to a journal, and they give it to editors and people

10:47:57  to -- and they send it out to review it to see if it's worthy

10:48:00  of publication.

10:48:01        I'm actually one of the editors -- actually not an

10:48:03  editor, but one of the reviewers for the American Medical

10:48:08  Association's Journal of Ethics.  So I've done peer review

10:48:11  and I've had articles that have been peer reviewed.

10:48:13  Q. Have you ever testified as an expert before?

10:48:15  A. Yes, I have.

10:48:16  Q. How many times?

10:48:17  A. This would be the 13th time, to the best of my knowledge

10:48:23  that I have been testifying in court.  One of those was twice

10:48:27  for the same case.  And one of those was not in a physician

10:48:34  case.

1  10:48:34            So I have testified 13 times.

2  10:48:38   Q. What's your hourly rate for your testimony here?

3  10:48:40   A. I have -- I quoted $500 per hour.

4  10:48:45   Q. And how much have you been paid to date for this case?

5  10:48:48   A. I believe I have been paid $8,500 so far.

6  10:48:52   Q. And how much do you anticipate your final invoice being?

7  10:48:55   A. Well, I looked at that, and I'm going to ask for the

8  10:48:59   total to be $41,000, give or take a little bit.

9  10:49:02   Q. Have you ever declined to testify in a case?

10 10:49:04   A. Yes, I have.

11 10:49:05   Q. Why was that?

12 10:49:06   A. Well, if I -- I'm usually asked to testify whether or not

13 10:49:11   the case is -- the legitimate medical purpose in the usual

14 10:49:17   course of professional practice.  And so I'm asked, and if I

15 10:49:20   feel like that I can't get behind the case or it doesn't have

16 10:49:26   merit, then I will -- I will decline that.  I will give them

17 10:49:30   my opinion, obviously, then I will decline to testify.

18 10:49:33            MR. DRISCOLL:  Your Honor, I would ask the Court to

19 10:49:35   admit Dr. Murphy's testify as an expert under Rule 702.

20 10:49:39            THE COURT:  He has been testifying.  Ladies and

21 10:49:40   gentlemen, it's for you to decide his credentials, as was

22 10:49:43   true with Dr. Munzing.  If he had no basis to offer an

23 10:49:45   opinion, it wouldn't be allowed, but clearly it is.

24 10:49:48            So go ahead.

25 10:49:50   Q. Dr. Murphy, now I want to talk to you about pain.  What

1 10:49:53   is pain?

2 10:49:53    A. Pain is, you know, as simple as what hurts.  You know,

3 10:50:00   it's what you think -- how you feel.  We have more scientific

4 10:50:04   explanations of it.

5 10:50:05        The International Association For the Study of Pain

6 10:50:08   is the group that actually comes up with the definitions.

7 10:50:13   And their definition -- and I'm going to paraphrase this, but

8 10:50:16   I've almost got it exact, I think, it's a sensory and

9 10:50:18   emotional experience that is -- it's unpleasant, and it's

10 10:50:25  defined in terms that would be considered with damage to your

11 10:50:28  tissues or something of that nature.

12 10:50:30        So it's a sensory, as well as an emotional

13 10:50:32  experience.  Or, what hurts.

14 10:50:36   Q. Do you have an example of what pain is?

15 10:50:39   A. Okay.  Here is a good way to think about it.  Pain is not

16 10:50:43  like two tin cans with a wire between them, you know, where

17 10:50:48  if I bang my finger on this table here, it's going to hurt.

18 10:50:54  But it's not as simple as like, you know, two tin cans with a

19 10:50:57  wire to my brain telling my finger hurts.  There is a pathway

20 10:51:01  like that.  And it does go pretty quick.  Feels like a

21 10:51:05  lightning bolt sometimes.  But it's a chemical reaction, it's

22 10:51:08  not a lightning bolt.

23 10:51:09        At the same time, there are other pathways from that

24 10:51:11  finger through my spinal cord to various parts of my brain,

25 10:51:16  some of which are memory aspects of my brain, the trick and

1 10:51:20   trigger memory, some of them are motivational aspects, and

2 10:51:24   which are emotional aspects.  Some of them are unconscious,

3 10:51:26   to where my heart rate go up.  I'm not controlling that.

4 10:51:29         So pain is a very complex experience, and it's more

5 10:51:33   than just I'm feeling pain in my finger or pain somewhere.

6 10:51:37   It involves virtually every aspect of your being.  It's the

7 10:51:41   most common thing that -- about the most common symptom that

8 10:51:46   we all share.  It's a very common experience.  It's the

9 10:51:49   number one reason why people seek health care in this

10 10:51:51   country, because they have a pain issue.

11 10:51:53   Q. Is it unique to the patient?

12 10:51:55   A. Absolutely.  Every patient's pain is unique to them.

13 10:52:02   Q. Dr. Murphy, what is the usual course of professional

14 10:52:06   practice?  What does that mean to you?

15 10:52:08   A. The usual course of professional practice is essentially

16 10:52:13   acting like a doctor, acting like a nurse practitioner in

17 10:52:16   this case.  You know, what do they do?  What are the actions

18 10:52:19   that they do?

19 10:52:20         And you know, I have been doing this for 30 years,

20 10:52:23   or more, and I know what it is.  I know what the usual

21 10:52:28   course -- I know what we do.

22 10:52:29         And you know, it's -- I've asked some of my

23 10:52:33   colleagues about that, how can I explain this in a simple

24 10:52:35   sort of way?  One of my colleagues said, we diagnose and we

25 10:52:39   treat, we diagnose and we treat.  But there is more to it

1 10:52:43   really.  It's a little more complex than that, but still

2 10:52:45   quite simple.

3 10:52:46          There is three aspects of it.  There are provider

4 10:52:51   aspects, whether it be a physician or a nurse practitioner,

5 10:52:54   provider aspects.  There are patient-related aspects.  And

6 10:52:58   thirdly, there are process aspects.

7 10:53:02          Now, this is actually quite simple.  They all begin

8 10:53:05   with a P, okay?

9 10:53:06          The provider aspects are intuitive.  We've all got

10 10:53:11   education.  We've all been to school.  We all get degrees.

11 10:53:16   Every doctor or nurse practitioner has to be licensed.  And

12 10:53:20   if you prescribe, you get a DEA license, if you prescribe

13 10:53:25   controlled substances.

14 10:53:26          And thirdly, you have a scope of practice.  I mean,

15 10:53:30   I'm an anesthesiologist.  I'm not trained to do heart

16 10:53:33   surgery.  A primary care doctor is trained to take care of

17 10:53:38   the basics of health care.  You know, obstetrician delivers

18 10:53:42   babies.  So we have a scope of practice.

19 10:53:44          So that is the provider aspects of it.

20 10:53:47   Q. What about, what is the patient aspect, the second P?

21 10:53:50   A. The second P is the patient.

22 10:53:52          Again, there is three aspects of that.

23 10:53:54          First of all, the patient comes with a medical

24 10:53:57   issue, a medical problem.  Regardless of what it is, they

25 10:54:01   have a problem, and they seek out the services of a provider.

1 10:54:04    And then the second aspect of that is a relationship

2 10:54:08    is formed, where it's unique to the provider and the patient.

3 10:54:12    We develop a patient/provider relationship.

4 10:54:15    And the third aspect is that in that relationship,

5 10:54:18    we try to do things that benefit the patient, help them get

6 10:54:23    well.

7 10:54:23    So that is the patient aspects of it.

8 10:54:26    Q. So those are the first two aspects, what is the third?

9 10:54:29    A. The third is the process aspects.

10 10:54:31    The process aspects are essentially that diagnose

11 10:54:35    and treat part of it.  You know, providers, nurse

12 10:54:39    practitioners, doctors, we diagnose and we treat.

13 10:54:42    So we can break down diagnosis.  And I don't even

14 10:54:46    have to opine on that, because there is a really great

15 10:54:51    authority on this in this country, it's the National

16 10:54:55    Academies of Sciences, Engineering and Medicine.  And in

17 10:55:02    2015, they came out with a great textbook, that you can get

18 10:55:05    online, it's available free, it's called Improving Diagnosis

19 10:55:09    in Health Care.

20 10:55:10    Chapter 2 of that book is entitled The Diagnostic

21 10:55:14    Process.  And it really explains well what this is.

22 10:55:18    What it is, fundamentally, is that you -- the

23 10:55:22    provider gathers enough information, enough information, and

24 10:55:28    then they interpret it, they incorporate that in their

25 10:55:32    relationship with the patient.  And through their clinical

10:55:34 judgment, they work toward a diagnosis.  And then they can

10:55:38 treat.

10:55:39          This information can come from anywhere.  And it

10:55:43 depends on the circumstances.  It can be old records, it can

10:55:46 be what the patient says.  Some of it's subjective

10:55:48 information, what the patient tells you.  Some of it's more

10:55:52 objective information, like studies, or MRIs, or lab reports,

10:55:56 even physical exams.  You know, all of those things can be

10:55:59 more objective information.

10:56:00          You get enough of that information, and then you

10:56:02 incorporate that, through your clinical judgment you work

10:56:06 toward a diagnosis.  And then you treat.

10:56:08          And the treatment can be any of a number of things.

10:56:10 It's the judgment at that time under that circumstances, with

10:56:15 the aim being that it is reasonable and it is in an attempt

10:56:20 to improve the well-being of the patient, to benefit the

10:56:23 patient.

10:56:23  Q. So, Dr. Murphy, now I want to talk about this diagnostic

10:56:28 process you have been discussing.

10:56:30          Does this happen over time, or does it happen, you

10:56:33 know, in a vacuum?  How does this happen?

10:56:35  A. It happens from the minute you encounter the patient.

10:56:39 And it does happen over time.  It doesn't have to be

10:56:42 complete.  And, in fact, you can begin treating before you

10:56:45 have a firm diagnosis.  That happens all the time.

10:56:49    Think about antibiotics, think about if somebody has
10:56:54  pneumonia, they almost always start them on antibiotic while
10:56:58  they are waiting for the labs to come back.  It happens in
10:57:01  almost anything.  We have a working diagnosis, and you can
10:57:03  begin treatment based upon the symptoms as you are continuing
10:57:06  to refine that diagnosis.

10:57:08    In fact, when you see them back for followups, that
10:57:11  is real important in determining what happens next.  Because
10:57:15  based upon the results of the treatment, you can also -- it
10:57:21  helps you define and refine the diagnosis as well.

10:57:23    And just because a treatment works doesn't mean you
10:57:27  have the right diagnosis.  Just because the treatment doesn't
10:57:30  work doesn't mean you are wrong.  But, again, it's all part
10:57:34  of a process that goes on over time.

10:57:36  Q. So does the usual course of professional practice, does
10:57:40  it encapsulate best practices all the way down to worst
10:57:44  practices?

10:57:44  A. Well, the usual course of professional practice is what a
10:57:48  physician or a nurse practitioner does.  And some physicians
10:57:52  have good days and they practice what we would consider best
10:57:55  practices, the best way you can do it.  And then there are
10:57:59  physicians and nurse practitioners that may not be as up to
10:58:02  speed on things.  But if they are doing the things that they
10:58:08  are expected to do, that you expect a doctor or a nurse
10:58:13  practitioner to do, then they are in the usual course of

1 10:58:17   professional practice.

2 10:58:19          So, yes, it does encompass a wide range of

3 10:58:21   activities and outcomes.

4 10:58:23   Q. And where does standard of care fall within this

5 10:58:25   umbrella?

6 10:58:26   A. Standard of care is something different.  Standard of

7 10:58:29   care is what the average physician would do in that

8 10:58:33   situation, specific to that situation, under the same

9 10:58:37   circumstances.

10 10:58:38         So what would I consider the average or reasonable

11 10:58:41   physician to do with that patient at that time?  So it's

12 10:58:43   specific to person, place and time.

13 10:58:46         And we don't really talk about standard of care much

14 10:58:49   in medical school and our training, that comes up in civil

15 10:58:52   suits a lot, because if you deviate from the standard of care

16 10:58:57   and the patient's harmed, there may be a malpractice suit,

17 10:59:01   there may be.

18 10:59:01         But standard of care is what the average physician

19 10:59:03   would do in the circumstances with the same patient at the

20 10:59:06   same time.

21 10:59:07   Q. Dr. Murphy, are you familiar with tramadol and

22 10:59:11   hydrocodone?

23 10:59:12   A. Yes.

24 10:59:13   Q. Can you explain what tramadol is?

25 10:59:16   A. Tramadol is a Schedule IV drug.  It's a very mild -- you

1 10:59:23  know, some people call it an opioid.  It's really not an

2 10:59:27  opioid.  Tramadol is its own substance, its own chemical

3 10:59:32  thing.

4 10:59:33       We really don't know how tramadol works.  We think

5 10:59:36  it attaches to some opioid receptors, but we're not quite

6 10:59:41  sure.  It seems to be like an opioid, so people consider it a

7 10:59:45  very mild opioid.  It's one of the introductory medicines

8 10:59:47  that we use for patients.

9 10:59:49       It's -- it is a medication that is quite effective.

10 10:59:55  It's prescribed very often in this country.  It's one of the,

11 10:59:58  you know, basic first medicines that is we use a lot of

12 11:00:02  times.

13 11:00:02  Q. Has it always been a controlled substance?

14 11:00:04  A. No.  When tramadol first came out, it was not a

15 11:00:09  controlled substance.  You could actually have samples of it

16 11:00:12  in your office and give to patients to take home, you know,

17 11:00:15  and try it.  So you can't do that with a controlled

18 11:00:17  substance.  But, you know, we would have samples.  And we

19 11:00:20  would try people on that.

20 11:00:21       So I think around like 2014 or so they decided -- by

21 11:00:26  "they," that means the DEA, I guess, decided they would call

22 11:00:29  it a controlled substance.  So they made it a Schedule IV

23 11:00:32  controlled substance.

24 11:00:33  Q. And it's Schedule IV, not Schedule III, correct?

25 11:00:35  A. Correct.  It's a Schedule IV.

1 11:00:38   Q. So you read a report in this case, but you called it a

2 11:00:42   Schedule III there.  That was just a mistake?

3 11:00:44   A. Yeah.  I caught that the other day.  It's a Schedule IV.

4 11:00:47   Q. What severity of pain is tramadol approved to treat?

5 11:00:50   A. It's -- well, you can treat any pain with tramadol.  You

6 11:00:55   can treat the mildest pain to the most severe pain.  But the

7 11:01:00   FDA approved indication I believe is for moderate to --

8 11:01:04   moderate to moderately severe pain.

9 11:01:07   Q. What about hydrocodone?

10 11:01:14  A. Hydrocodone is another one of those medicines that used

11 11:01:18  to be a lower schedule.  Hydrocodone was a Schedule III drug,

12 11:01:23  and that meant that you could call it in, give multiple

13 11:01:27  refills on it.

14 11:01:28       But then about the same time that they moved

15 11:01:30  tramadol up, they turned hydrocodone into a Schedule II drug.

16 11:01:35       Now, hydrocodone is an opioid.  It's an opioid that

17 11:01:38  is doesn't really occur in nature, they kind of created it in

18 11:01:41  a lab.  But it's an opioid that attaches to opioid receptors,

19 11:01:46  it treats pain, it fights pain.

20 11:01:48       And it's usually combined with a acetaminophen.  So

21 11:01:54  a Norco or a Lortab or a Vicodin have acetaminophen with it.

22 11:02:00  There is a drug called Vicoprofen, that's attached to Motrin,

23 11:02:03  basically, to ibuprofen.  So it's attached to another

24 11:02:05  medicine, and it's an oral form.

25 11:02:07       There is also hydrocodone that is extended release.

11:02:11   So there are like 12- and I think 24-hour pills available now

11:02:16   by prescription that don't have the acetaminophen with it.

11:02:19          So hydrocodone is an opioid that we use for moderate

11:02:24   to severe pain.

11:02:24   Q. And so both of these medications -- sorry, Your Honor,

11:02:29   let me restart that one.  That was not well worded.

11:02:31          Medical science changes?

11:02:35   A. Yes.

11:02:36   Q. It's an evolving field and the science is constantly

11:02:41   evolving?

11:02:41   A. Of course it is.

11:02:42   Q. And we've seen that here with tramadol and hydrocodone,

11:02:46   including with how it's classified as controlled substances.

11:02:50   A. Yes.

11:02:50   Q. Dr. Murphy, are pain management practitioners allowed to

11:02:56   prescribe tramadol to treat pain?

11:02:58   A. Yes.

11:03:02   Q. They just need a DEA license?

11:03:05   A. Yes.

11:03:05   Q. Same thing for hydrocodone?

11:03:09   A. Yes.

11:03:10   Q. So, Dr. Murphy, now I want to switch from this kind of

11:03:16   background talk to the records you reviewed in this case.

11:03:21          What records have you reviewed?

11:03:23   A. I reviewed the two undercover officers that were posing

11:03:31  as patients, I reviewed those records.  I reviewed nine

11:03:34  additional charts that were given to me.  I reviewed some

11:03:41  prescription data that was given to me.  And I reviewed

11:03:47  Dr. Munzing's two reports and then an article he wrote for

11:03:51  the -- his company, Kaiser Permanente, that he wrote that.

11:03:58  That is what I reviewed.

11:03:59  Q. And you've also been in court the past two days.  So you

11:04:02  watched Dr. Munzing testify?

11:04:03  A. Yes.

11:04:06  Q. So I'm going to start with going through the first

11:04:09  undercover.  You've reviewed his videos?

11:04:15  A. Oh, yes.  I also reviewed the videos and the transcripts

11:04:19  of the two undercovers.

11:04:21  Q. Videos, audios, the recordings, you've seen them?

11:04:25  A. Yes.

11:04:25  Q. You saw them yesterday as well?

11:04:26  A. Yes.

11:04:27  Q. Undercover 1 has five visits with Nurse Rahbarvafaei --

11:04:35  Nurse Practitioner Rahbarvafaei.

11:04:36         Sorry, Your Honor.

11:04:38         With our client, correct?

11:04:40  A. Yes.

11:04:40  Q. What was your impression of those appointments?

11:04:44  A. They were fine.  I mean, she approached the patient, she

11:04:52  met him on the first visit, she was very pleasant with him.

1 11:04:57  She had -- she had data in the records already, that he

2 11:05:02  filled out forms explaining his past history, talked about

3 11:05:05  alcohol use and drug use in his history.  There is this

4 11:05:09  California form for healthy living they fill out, a TB form.

5 11:05:15  He had vital signs already.

6 11:05:17       She meets him, she is very pleasant, she brings him

7 11:05:19  back to the room.  They establish that relationship.  And

8 11:05:22  there is a rapport, you can tell a rapport is going on there.

9 11:05:25       And then she goes about the process of gathering

10 11:05:28  information.  She asked him some questions that -- about the

11 11:05:31  diabetes and things of that nature.  She's going through

12 11:05:33  allergies.  She's getting her information together, because

13 11:05:36  what he has is a really common condition.  He has, you know,

14 11:05:41  some either neck or shoulder pain, something that just

15 11:05:45  doesn't seem to be way out of the ordinary.  So it's a very

16 11:05:48  common sort of condition.

17 11:05:50       She gathers enough information there.

18 11:05:52       She does -- I mean, it appears to me that she is

19 11:05:55  clearly asking this patient to do some things, so there is

20 11:05:59  some sort of examination going on.

21 11:06:01       And she's face to face with this patient.  There is

22 11:06:05  no way she is not observing things that he is doing.  So

23 11:06:09  she's getting some information from that encounter as well.

24 11:06:14       Then she makes her assessment, her diagnosis, her

25 11:06:19  working diagnosis, and provides a plan of care, which is very

1  11:06:22   reasonable, very conservative.  And then provides followup

2  11:06:25   for that.

3  11:06:26            That is entirely legitimate medical purpose and

4  11:06:30   usual course of professional practice.

5  11:06:33            And then ongoing, the followup, she continues this

6  11:06:37   relationship, gathers more information.  She adjusts her

7  11:06:40   treatment as things come up in a very reasonable way, and

8  11:06:46   always seems to be very pleasant with those -- with the

9  11:06:50   undercover 1 and undercover 2, by the way, even though, you

10 11:06:53   know, they are kind of pushy sometimes, and they are

11 11:06:57   complaining about some of the treatments that she might

12 11:07:00   giving.  But she sticks by her policies, and what she's going

13 11:07:04   to do.  And she's still very pleasant.

14 11:07:05            And then she provides the -- her treatment in a very

15 11:07:09   reasoned and consistent way.

16 11:07:13            So I felt like, I guess specifically undercover 1,

17 11:07:17   it was without question legitimate medical purpose in the

18 11:07:22   usual course of professional practice.

19 11:07:23   Q. And that would be for her prescription of tramadol in

20 11:07:27   that -- in that visit?

21 11:07:30   A. In the first visit?

22 11:07:31   Q. As well as eventually Norco, all of those you would say

23 11:07:35   were within the usual course of professional practice and for

24 11:07:37   a legitimate medical purpose?

25 11:07:39   A. Without question.  And she also prescribed other agents

1 11:07:43  with it.  She provided what we call multimodal care, so it

2 11:07:49  wasn't going to just rely on tramadol, for example, or even

3 11:07:52  hydrocodone.  She provided a muscle relaxant and an

4 11:07:56  antiinflammatory, for example, things hopefully that the

5 11:07:59  patient could take on a regular base basis so they could only

6 11:08:04  take what we consider the stronger medicine, the tramadol, on

7 11:08:06  an as-needed basis.

8 11:08:08  Q. And is it appropriate to provide tramadol as needed 60

9 11:08:13  pills for a month?

10 11:08:14  A. Absolutely.

11 11:08:16  Q. To treat pain?

12 11:08:17  A. Of course.

13 11:08:18  Q. And treating pain, you have to listen to the patient's

14 11:08:22  complaints about pain.

15 11:08:23  A. Of course you do.

16 11:08:24  Q. And so it would be important if someone tells you their

17 11:08:30  pain gets up to a 10?

18 11:08:31  A. Absolutely.

19 11:08:32  Q. If someone tells you some other medications actually work

20 11:08:36  for them?

21 11:08:37        MR. BALDING:  Objection.  Leading.

22 11:08:38        THE COURT:  Sustained.

23 11:08:42  Q. In these visits, one of the undercovers says that he has

24 11:08:46  tried his girlfriend's Norco.

25 11:08:48        MR. BALDING:  Objection.  Leading.

1 11:08:48          THE COURT:  Overruled.

2 11:08:50   Q. Do you recall that?

3 11:08:50   A. Yes.

4 11:08:52   Q. Was Ms. -- was Ms. Rahbarvafaei's response to that

5 11:08:59   appropriate?

6 11:09:01   A. I think so.

7 11:09:02   Q. Even with him telling her that he had tried a family

8 11:09:05   member's medication, she could still prescribe him tramadol

9 11:09:08   for his pain?

10 11:09:08   A. Of course she could.  That happens often.  I mean, that

11 11:09:12   is -- that somebody takes somebody else's medicine and tries

12 11:09:16   something when they are -- that is extremely common.  That

13 11:09:19   happens all the time.

14 11:09:21          And to think that I would not want to treat somebody

15 11:09:25   because they have been honest enough to tell me that, you

16 11:09:28   mean, I wouldn't be treating anybody if that was the case.

17 11:09:31   We can't patients to feel like they can talk to us.  If I

18 11:09:34   reacted harshly or said, I'm going to kick you out or I'm not

19 11:09:37   going to treat you if you tell me anything like this, first

20 11:09:40   of all, the patient would never tell me anything.

21 11:09:42          And that trust that we are trying to build and that

22 11:09:45   relationship is the most important thing.  Not the drug

23 11:09:50   screen, not the CURES reports, not anything of those things.

24 11:09:53   The most important thing is that we develop a trusting

25 11:09:56   relationship, so that we can move forward with your care.

1  11:09:59          And I thought her reaction to that was very

2  11:10:04   reasonable, especially for the first visit.

3  11:10:07    Q. Is there any requirement to physically examine, to

4  11:10:11   physically touch a patient who comes in and complains about

5  11:10:15   pain?

6  11:10:15    A. No.

7  11:10:15    Q. Is there any requirement to order urine drug testing?

8  11:10:19    A. No.

9  11:10:19    Q. Was there any requirement to do so at every visit?

10 11:10:22    A. No.

11 11:10:25          When we say "requirement," I'm speaking in terms of

12 11:10:28   in the usual course of professional practice.  Now, there may

13 11:10:31   be an instance where a state or a local jurisdiction may say,

14 11:10:38   you know, for your first visit, or before you prescribe, you

15 11:10:40   must run a CURES report.

16 11:10:43          In Kentucky we have what is called a KASPER report.

17 11:10:46   And I mentioned I'm in Indiana, but I'm on the border of

18 11:10:51   Indiana and Kentucky, and I work with patients to both states

19 11:10:54   to a degree, because I'm right on the border in Louisville.

20 11:10:55          But Indiana has what is called the Inspect.

21 11:10:59   Kentucky has the KASPER, K-A-S-P-E-R.

22 11:11:02          And you are supposed to run that report or try to

23 11:11:05   review it, or at least if you can't run it, explain why you

24 11:11:09   didn't run it before you prescribe that first one.  That

25 11:11:13   hasn't always been the case, but that is the case currently

1 11:11:17   now.

2 11:11:17          So, yes, that is a requirement.  But the -- in terms

3 11:11:22   of whether or not we are -- you know, it's necessary in terms

4 11:11:29   of taking care of the patient, it's -- if you don't do that,

5 11:11:34   it doesn't invalidate at all the visit that you've had.

6 11:11:38          And you can gather plenty of information to make a

7 11:11:41   proper decision without those reports.

8 11:11:42   Q. Is it common when you are practicing, when you are

9 11:11:47   diagnosing, to talk with patients about costs?

10 11:11:49   A. I'm sorry, what?

11 11:11:52   Q. About costs.  Sorry.

12 11:11:54   A. You say costs?

13 11:11:55   Q. Yes.

14 11:11:55   A. Oh, yeah, absolutely.

15 11:11:57   Q. About insurance?

16 11:11:58   A. Of course.

17 11:12:03   Q. What is the benefit of urine drug testing?

18 11:12:07   A. Well, it depends.  It varies.

19 11:12:15          Urine drug testings are very misunderstood.  And

20 11:12:20   that is a problem in medicine these days.  The CDC

21 11:12:24   guidelines, for example, that came out in 2016 were very

22 11:12:28   candid about this.  They mention that this recommendation

23 11:12:33   that you do urine drug screens is based on what they consider

24 11:12:37   very poor quality evidence.  And that patients have been

25 11:12:42   harmed in the process of people misinterpreting these urine

1 11:12:48   drug screens.

2 11:12:48           So while urine drug screens seem to be a good idea,

3 11:12:54   you don't necessarily have to do them to do a good job with

4 11:12:58   your patient.  When you do them, how you react to them and

5 11:13:01   what you do is based upon your relationship with that patient

6 11:13:04   and the circumstances.

7 11:13:06           So there is no credible guideline, clinical

8 11:13:10   guideline, that I'm aware of, that says what you must do with

9 11:13:15   a urine drug screen result.

10 11:13:18  Q. And these relationships, the circumstances surrounding

11 11:13:22  medical appointments, they develop over time?

12 11:13:27  A. Yes.

13 11:13:28  Q. Is it also helpful to gather additional diagnostic or

14 11:13:39  objective evidence when you are building this relationship

15 11:13:42  with a patient?

16 11:13:43  A. Yes.

17 11:13:44  Q. Why is that?

18 11:13:45  A. Well, you know, during this process, we are trying to

19 11:13:49  gather information about their -- you know, not only about

20 11:13:52  their condition, but their life as well, and their -- you are

21 11:13:55  getting to know the patient better.  Because the better I

22 11:13:59  know my patient, the better I can really, you know, come up

23 11:14:02  with a plan of care that is going to improve their life.

24 11:14:04          So you establish that, and you learn that over time.

25 11:14:07  And so as things come in, as you learn more things, you see

11:14:10    how they respond to treatments, as you review all the

11:14:14    records, as more information comes in, you can refine your

11:14:16    diagnosis, and you can maybe come up with more improved

11:14:19    treatment options.

11:14:23         MR. DRISCOLL:  Ms. Pelaez, will you please pull up

11:14:24    Government Exhibit 30 at page 18.

11:14:42    Q. Dr. Murphy, is this an MRI from UC1's patient file?

11:14:46    A. What I would say is this appears to be a MRI report from

11:14:59    UC1's patient file.

11:15:01    Q. Thank you.

11:15:03         Thank you for correcting me, it's the report.

11:15:04         And does it show any handwriting or markings on it?

11:15:08    A. Yes.

11:15:10    Q. And is that because normally in visits, do you

11:15:17    document -- do you take notes on documents as you are

11:15:19    flipping through them in medical appointments?

11:15:23    A. That happens very frequently.

11:15:26    Q. And is it important to you when you are practicing

11:15:30    medicine, when you are practicing pain management, that a

11:15:33    patient actually follows directions and brings back a

11:15:37    diagnostic image for you to look at?

11:15:39    A. Yes.  That is important.

11:15:40    Q. And why is that important?

11:15:42    A. Well, it's another way that the patient can show that

11:15:46    they are doing what you asked them to do.  You know, again,

1  11:15:48  you are building that trust.  You are learning -- they want

2  11:15:52  to learn they can trust you.  We want to learn we can trust

3  11:15:55  them.

4  11:15:55          So when you ask them to do something and they follow

5  11:15:58  through, that helps build that trust.

6  11:16:00  Q. And, Dr. Murphy, does this finding on an MRI result, does

7  11:16:31  this mean the patient is in no pain?

8  11:16:35  A. No, not at all.

9  11:16:38  Q. Why is that?

10  11:16:39  A. These are -- these are findings that the radiologist says

11  11:16:44  are physical findings that are apparent on the MRI.  And that

12  11:16:54  really has some bearing on the diagnosis, but no bearing on

13  11:16:58  the amount of pain the patient is having.  Just because it's

14  11:17:01  a 1 millimeter central disc protrusion, well, that could be

15  11:17:07  leaking the contents of the disc, which is very irritating to

16  11:17:11  the nerves in the area.  It's called the nucleus pulposus.

17  11:17:15          So you can actually have a normal looking disc that

18  11:17:18  has a micro tear in the disc.  I used to do discograms on

19  11:17:27  people that are essentially normal MRIs.  And what I would

20  11:17:29  find when I injected dye in the disc, that the dye is leaking

21  11:17:33  out of the disc, indicating that the disc has a tear in it,

22  11:17:36  that wasn't obvious on the MRI.  And that gave me an

23  11:17:39  indication that that was the source of the pain.

24  11:17:42          So, no, this has very little to do with how much

25  11:17:46  pain -- actually, it has nothing to do with how much pain the

1 11:17:51   patient has.  It gives an idea as to where the source of the

2 11:17:54   pain might be.

3 11:17:54    Q. So you can be in pain with a result like this?

4 11:17:57    A. Absolutely.

5 11:17:58    Q. You can be in pain despite a diagnostic image not showing

6 11:18:03   anything wrong with you?

7 11:18:04    A. Correct.

8 11:18:08           MR. DRISCOLL:  May I have one moment, Your Honor?

9 11:18:10           THE COURT:  You may.

10 11:18:10          MR. DRISCOLL:  Thank you.

11 11:18:12          (Pause in proceedings.)

12 11:18:44    Q. Is it important to you when a patient brings back urine

13 11:18:51   drug testing results?

14 11:18:52    A. Yes.

15 11:18:54    Q. When a patient is honest with you, or telling you why

16 11:18:57   they've -- they have a result that may be inconsistent with

17 11:19:01   your treatment plan?

18 11:19:03          MR. BALDING:  Objection.  Leading.  Argumentative.

19 11:19:04          THE COURT:  Overruled.  It's just setting it up.

20 11:19:09          THE WITNESS:  I'm sorry, would you ask me again,

21 11:19:11   please?

22 11:19:11    Q. Of course.  Of course.  You are testing my memory right

23 11:19:16   now, though.

24 11:19:17          When a patient -- when you ask a patient to do a

25 11:19:20   urine drug screening or to get an MRI and they actually

1 11:19:24  follow through with that, that is a relevant piece of

2 11:19:26  information to your diagnosis and your treatment?

3 11:19:28   A. Yes.

4 11:19:28   Q. Is it also relevant when they come in and they bring in a

5 11:19:33  result that is inconsistent with your treatment?

6 11:19:35   A. Yes.

7 11:19:37   Q. And when they give you an explanation for why?

8 11:19:40   A. Yes.

9 11:19:42   Q. Why is that?

10 11:19:45   A. Well, it's building that communication.

11 11:19:50        And you know, when I see a result, for example, in a

12 11:19:57  urine drug screen that I was not expecting, you know, I first

13 11:20:02  of all want to ask myself, what kind of drug screen was this?

14 11:20:06  Was it a -- and there are multiple types.  There are some

15 11:20:10  that are like pregnancy tests, it's called radioimmunoassay,

16 11:20:16  and there is multiple false positives and false negatives on

17 11:20:19  these.

18 11:20:20        Was it a test that was run with gas chromatography

19 11:20:23  or liquid chromatography, which are entirely specific that

20 11:20:27  can tell me exactly down to the microgram what is in there?

21 11:20:31  Where was it done, for example?  And was it even this

22 11:20:33  patient's sample?

23 11:20:35        I mean, there is so many ways that these urine tests

24 11:20:38  can be misinterpreted.  And that is why when I see the

25 11:20:43  information, it -- most important to me that it will trigger

1  11:20:46  a conversation with the patient.

2  11:20:48       I don't know if they are being honest with me or not

3  11:20:50  about why it's that way.  But, you know, part of it is how I

4  11:20:54  react to it, how I can go moving forward.  Because, of

5  11:20:59  course, it's very important what they did to get to that

6  11:21:01  point.  But the most important point, the most important

7  11:21:06  thing you need to do in that visit is going forward will they

8  11:21:11  leave there, and then do what you ask them to do?  Will they

9  11:21:14  do things that are more healthy for them?

10  11:21:16       I know patients have lied to me about their drug

11  11:21:18  screens and whatever.  And I have not held them down for

12  11:21:23  that, and say, I don't believe you or what not.

13  11:21:25       But I, you know, going forward, you know, I

14  11:21:28  incorporate that into my thinking and my care.  And I allow

15  11:21:31  them to build that trust.  It does take time.  It does take,

16  11:21:35  you know, sometimes a lot of time.

17  11:21:37       And sometimes I get it wrong.  But the drug screens

18  11:21:43  are simply part of that process.  They are so fraught with

19  11:21:49  issues, and false positives and false negatives.  And really

20  11:21:54  it's about what you do with it and how you incorporate that

21  11:21:57  into your care that matters.

22  11:22:00  Q. Talking about how you incorporated it into your care, is

23  11:22:03  it appropriate to taper a medication in response to a result

24  11:22:05  like that?

25  11:22:06  A. It may be.  That is one of the options.  But if your

1  11:22:13   decision is to maintain them on the same medicine, if that is

2  11:22:18   in the patient's best interests in your clinical judgment,

3  11:22:21   that is appropriate.  It may be appropriate to stop them all

4  11:22:23   together in some cases.  It may be appropriate to taper them.

5  11:22:26   It may be appropriate that, after you've talked to them, you

6  11:22:29   really should increase their medication.

7  11:22:32            There is a condition called pseudoaddiction, that we

8  11:22:36   know of in medicine in pain management, where patients will

9  11:22:39   do things that on the surface appear to be aberrant addictive

10 11:22:44   behaviors.  But really it's when they are not adequately

11 11:22:48   treated.

12 11:22:48            And we know that if you go ahead and treat their

13 11:22:50   pain, follow them up, that behavior then goes away.  That's a

14 11:22:55   term called pseudoaddiction or false addiction.

15 11:22:58            So really, there is no one way that you have to

16 11:23:01   react to a result like this.  It's depending upon your

17 11:23:06   clinical judgment based upon the circumstances with that

18 11:23:08   individual patient.

19 11:23:19            MR. DRISCOLL:  One moment, Your Honor, my apologies.

20 11:23:24   Q. Is it also important to your diagnostic treatment plan,

21 11:23:30   your working diagnosis, if someone brings back a consistent

22 11:23:34   urine drug test result?

23 11:23:36   A. Yes.

24 11:23:37   Q. Is that important if they had previously brought back one

25 11:23:41   that was inconsistent?

1 11:23:42    A. Yes.

2 11:23:43    Q. And why is that?

3 11:23:44    A. Well, you know, some of the same limitations apply to the

4 11:23:50    consistent report as apply to the inconsistent one.

5 11:23:53         You know, again, what -- I'm not going to just

6 11:23:58    guarantee give you the medicine or whatever, based upon a

7 11:24:01    good drug screen report.  I'm looking at the context of my

8 11:24:05    over all context here.

9 11:24:06         However, when I ask somebody -- I'm trying to modify

10 11:24:09    their behavior, and I say, you know, some of the ways that we

11 11:24:14    can build trust is by these drug screens.  And clearly, if

12 11:24:17    the drug screens don't give me unexpected results, I'll feel

13 11:24:22    more comfortable prescribing you this medication.

14 11:24:24         And what I want to do is, it's called behavior

15 11:24:27    modification.  I'm trying to get the patient, for whatever

16 11:24:29    reason, to basically follow through with the proper behavior.

17 11:24:35         So, yes, it does help me when that comes back

18 11:24:41    normal.

19 11:24:43    Q. And so looking at undercover 1, you reviewed all five

20 11:24:48    prescriptions for controlled substances here?

21 11:24:51    A. Yes, I did.

22 11:24:52    Q. Is it your professional opinion that each of those

23 11:24:55    prescriptions was within the usual course of professional

24 11:24:58    practice?

25 11:24:58    A. It is.  Each of those prescriptions was for a legitimate

1 11:25:02  medical purpose, and in the usual course of professional

2 11:25:05  practice for an advanced practice nurse.

3 11:25:08  Q. And was the dosages of the Norco or of the tramadol, was

4 11:25:14  that concerning to you?

5 11:25:14  A. Oh, not at all.  Those were low doses.  Those were

6 11:25:20  introductory doses.

7 11:25:21  Q. Why is that?  Can you explain?

8 11:25:22  A. Well, the tramadol is a very mild opioid.  And I mean,

9 11:25:28  there was only like two pills, I mean, per day.  Or 60 for

10 11:25:33  the month, averages two pills a day, that is a very low

11 11:25:38  amount.  And it was prescribed as needed.

12 11:25:42      Hydrocodone is, you know, not the strongest opioid.

13 11:25:46  And again, there was only, you know, two pills per day on the

14 11:25:50  average prescribed.  One was 5 milligrams.  Which, by the

15 11:25:55  way, a 5-milligram tramadol -- hydrocodone is the same as a

16 11:26:00  50-milligram tramadol.  So that is really, again, we consider

17 11:26:04  an introductory, very low dose.

18 11:26:07      So they were relatively low doses, and they were in

19 11:26:10  small amounts.

20 11:26:11  Q. And is it appropriate to prescribe Norco after tramadol?

21 11:26:19  A. Well, of course it is.  I mean, you could prescribe it

22 11:26:22  before tramadol.  They are both pain medicines.  And you

23 11:26:26  prescribe the medication based upon the needs of the patient.

24 11:26:29  Q. Now I want to turn your attention to the second

25 11:26:32  undercover.  You reviewed his audio and recorded videos?

1 11:26:35   A. I did.

2 11:26:36   Q. As well as his patient file?

3 11:26:38   A. Yes.

4 11:26:38   Q. In his first visit, as you recall, Ms. Rahbarvafaei

5 11:26:47   prescribes tramadol.  What was your impression of that

6 11:26:51   appointment?

7 11:26:51   A. Well, that appointment was very similar to undercover 1.

8 11:26:57   She met the patient.  She was very kind.  She was clearly

9 11:27:03   trying to establish a relationship there.  Brought him back

10 11:27:08   to the room after he had already had vital signs, filled out

11 11:27:12   some other form.  She asked him additional information, very

12 11:27:16   similar to what she had done with the first undercover agent.

13 11:27:19   And she gathered her information, and then clearly made an

14 11:27:23   assessment with the diagnosis, and prescribed a plan of care

15 11:27:26   which was multimodal and very reasonable for what that

16 11:27:29   patient complained of.

17 11:27:31   Q. And is that appropriate to prescribe tramadol if a

18 11:27:35   patient tells you their pain is in their neck and shoulder?

19 11:27:38   A. It's appropriate to prescribe it when they have pain,

20 11:27:43   period.  It doesn't matter where the pain is.  So, of course,

21 11:27:47   neck and shoulder, but it's really, you are treating a

22 11:27:49   symptom.  You are treating pain.

23 11:27:50   Q. And is it of relevant information for you if the pain is

24 11:27:54   tingling or radiating to another body part?

25 11:27:57   A. Yes.

1  11:27:57    Q. Why is that?

2  11:27:58    A. When you ask those questions, physicians are trying to

3  11:28:02    see if maybe there is a neuropathy involved as well, if there

4  11:28:06    is nerve damage.  We call peripheral neuropathy.  They'll

5  11:28:06    describe that as tingling.  That's part of the symptoms that

6  11:28:06    are going to be associated with neuropathy.

7  11:28:13             Also, if it's in the neck, for example, people have

8  11:28:16    shoulder pain in the neck, but if it radiates to your hand or

9  11:28:21    your arm, it could be a disc problem or a pinched nerve.

10 11:28:25             So we ask those questions to find out what the

11 11:28:30    diagnosis might be.  So we are getting information based upon

12 11:28:34    those answers.

13 11:28:34    Q. And you are using the patient's reported complaints to do

14 11:28:39    that?

15 11:28:39    A. Yes.

16 11:28:39    Q. Why is that important?

17 11:28:40    A. Well, that is all you have.  You can do what is called an

18 11:28:44    electromyography, where you stick needles in the muscles, and

19 11:28:49    you can see sometimes if there is damage to those nerves.

20 11:28:52    They are not always accurate, either.  But there is also MRIs

21 11:28:56    you can do.  But there is really the patient's report of

22 11:28:58    pain.  The report of pain is the most important part, the

23 11:29:04    questions you ask.

24 11:29:05             The founder of modern medicine, Sir William Osler,

25 11:29:11    who founded Johns Hopkins, he famously said in terms of his

1  11:29:15  diagnosis, listen to the patient, they will tell you the

2  11:29:19  diagnosis.

3  11:29:20        And that is the most important thing, listening to

4  11:29:22  the patient.  Gathering the information.  Yeah, there is

5  11:29:24  other things you can do, but listening to the patient is the

6  11:29:27  most important aspect of the diagnosis.

7  11:29:30  Q. Is there a requirement that you have to spend a certain

8  11:29:34  amount of time with a patient before you prescribe tramadol?

9  11:29:36  A. No, there is not.

10  11:29:38  Q. Why is that?

11  11:29:39  A. Well, it's not about time.  It's about the information

12  11:29:45  you gather.  Do you have enough information?  Remember that

13  11:29:48  diagnostic process, do you have enough information to, based

14  11:29:53  on your clinical judgment, make a reasonable diagnosis and

15  11:29:56  then a reasonable plan of care?

16  11:29:57        You can do that very quickly if you are efficient.

17  11:30:00  And if the condition is pretty simple, it doesn't take that

18  11:30:04  long.  I mean, there is, you know, walk-in clinics at CVS and

19  11:30:10  places like that where you can have a quick visit and get

20  11:30:13  treatments like that.

21  11:30:14        If a patient, however, has really a lot of

22  11:30:17  complexities, you know, it may take a lot longer.  But then

23  11:30:21  again, you can come up with an initial treatment very

24  11:30:25  quickly.  It may not be what you would do if you had a more

25  11:30:28  extensive visit.  But your initial visit is simply just that,

1 11:30:32   that is initially getting to know the patient.  And it is

2 11:30:37   whatever the clinical situation necessitates at that time.

3 11:30:41   Q. For this first visit for undercover 2, do you have an

4 11:30:45   impression about Nurse Practitioner Rahbarvafaei's

5 11:30:49   prescription of tramadol?

6 11:30:50   A. Yes.

7 11:30:51   Q. What is that opinion?

8 11:30:52   A. It was a reasonable treatment for what he complained of,

9 11:30:56   and what the information that she got.  It was a legitimate

10 11:31:00   medical purpose.  It was the usual course of professional

11 11:31:02   practice.

12 11:31:02   Q. Moving to the second visit with UC2, what was your

13 11:31:10   impression of that visit?

14 11:31:11   A. That -- you know, that actually occurred like two months

15 11:31:16   later, I think.  There was an appointment missed in there, I

16 11:31:20   think.

17 11:31:20        So it was reestablishing with the patient.  And it

18 11:31:24   was kind of similar.  I mean, she already knew the patient,

19 11:31:26   so she didn't have to ask all those questions again.  So it

20 11:31:30   could be reestablishing the relationship.  And it was fine.

21 11:31:35   It was a brief -- it was an efficient visit.  It was fine.

22 11:31:39   Q. And the UC2 actually brought in an MRI at this visit,

23 11:31:45   correct?

24 11:31:45   A. Yes.

25 11:31:47   Q. And he also explained that the MRI didn't help his back

1 11:31:51 pain at all.

2 11:31:53  A. I'm sorry, the MRI is, doesn't help back pain, it's a

3 11:31:58 diagnostic tool.

4 11:31:59  Q. So you use -- when you are prescribing medications, do

5 11:32:02 you use diagnostic tools as well as the patient's complaints

6 11:32:05 about their pain?

7 11:32:06  A. You mostly use their complaints.  You also use the

8 11:32:10 diagnostic tools to help you formulate the plan of care that

9 11:32:15 you are going to -- you are going to use.

10 11:32:18        So the answer is, yes, you use both.

11 11:32:20  Q. Was it concerning to you that he also brought in a

12 11:32:25 urinalysis test result and told Nurse Practitioner

13 11:32:28 Rahbarvafaei that he had tried his grandmother's medication

14 11:32:31 because he was in so much pain?

15 11:32:35  A. Well, of course.  I mean, you want -- you don't want

16 11:32:39 people to do that.  You understand that that is common, as I

17 11:32:42 said earlier.  I don't want to overreact to that, but I do

18 11:32:45 want to react to that.  And I believe that she did react to

19 11:32:49 that.  She basically said, I'm not going to prescribe this

20 11:32:55 stronger medicine until I have some behavior modification.

21 11:32:58 You can prove to me you are going to do what I ask you to do.

22 11:33:01        So, yeah, it has a level of concern for sure.

23 11:33:04  Q. But reducing the amount of pills you prescribe, was that

24 11:33:08 appropriate?

25 11:33:09  A. It might have been.  It was a reasonable -- very

1 11:33:12  reasonable thing to do.  And in this case I had no problem

2 11:33:16  with her doing that at all.

3 11:33:18  Q. And so what is your opinion about that prescription?

4 11:33:21  A. That prescription was clearly for a legitimate medical

5 11:33:24  purpose in the usual course of professional practice.

6 11:33:27  Q. Moving to her third visit with the undercover 2.  What

7 11:33:33  was your impression of that appointment?

8 11:33:34  A. You know, I don't see the specifics in front of me.  I

9 11:33:40  don't remember it being very alarming at all.  She, again,

10 11:33:45  evaluated the patient.  She adjusted her care based upon what

11 11:33:48  she saw there.  I felt it was very reasonable.

12 11:33:52  Q. Did you think it was appropriate for her to prescribe

13 11:33:55  Norco at this point?

14 11:33:57  A. It was appropriate for her, based upon her clinical

15 11:34:02  judgment.  It was within reason for her to do that,

16 11:34:05  absolutely.

17 11:34:05  Q. Was it important to your conclusion there that the

18 11:34:08  patient had complained that tramadol was still not really

19 11:34:11  doing the trick?

20 11:34:12  A. Of course.

21 11:34:16       MR. DRISCOLL:  May I have one moment, Your Honor?

22 11:34:17       THE COURT:  You may.

23 11:34:19       MR. DRISCOLL:  Thank you.

24 11:34:19       (Pause in proceedings.)

25 11:34:39  Q. So, Dr. Murphy, you also looked at some additional

1 11:34:43   patient files beyond the undercovers.

2 11:34:45    A. Yes.

3 11:34:46    Q. You reviewed those files?

4 11:34:47    A. I did.

5 11:34:49    Q. But you didn't have video recordings of that visit?

6 11:34:53    A. No.

7 11:34:53    Q. So your review is limited to just what is in those

8 11:34:56   records?

9 11:35:01    A. Yes.

10 11:35:03   Q. Why is that important?

11 11:35:04   A. Why is my review of just the records important?  I'm

12 11:35:11  sorry.  I don't understand the question.

13 11:35:12   Q. I'm sorry.  It was a bad question.

14 11:35:14         How is it different when you are reviewing cold

15 11:35:17  records than when you actually have a video file or can see

16 11:35:20  the parts of the examination?

17 11:35:24   A. Well, it's kind of like when I'm the physician and the

18 11:35:27  patient comes to see me, the more information that I have,

19 11:35:32  the more I'm able to make what I consider to be a more

20 11:35:35  accurate assessment.  When I have some audio, when I have

21 11:35:38  some video, that helps me out.

22 11:35:40         But I want to say about the audio and the video,

23 11:35:43  that is very incredibly poor quality audio and video.  And I

24 11:35:49  think that there was some transcripts that they tried to --

25 11:35:52  you know, that doesn't show everything that goes on in those

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 11:35:56   visits.

2 11:35:57            And there is more that, you know, observation, there

3 11:36:02   is more things that go on, I'm sure that are not shown on the

4 11:36:05   videos.  It doesn't show everything.  It does show some

5 11:36:07   information, though.  So I'm able to take that information,

6 11:36:10   which is limited, add it to the records that I have, and then

7 11:36:14   I come up with what is like my clear assessment that on those

8 11:36:18   undercover patients, it was legitimate medical purpose, usual

9 11:36:23   course of professional practice.

10 11:36:25            In the patients that didn't have the video, I didn't

11 11:36:28   have that additional information, so I had to rely on the

12 11:36:32   records only.

13 11:36:37            MR. DRISCOLL:  Ms. Pelaez, will you pull up

14 11:36:39   Government Exhibit 34?

15 11:36:53            Can you blow up the bottom right-hand corner,

16 11:36:56   please?

17 11:37:03            THE COURT:  Ladies and gentlemen, the initials of

18 11:37:05   this patient are CH.  This is not the CF file, Exhibit 32 and

19 11:37:12   423 that we saw earlier this morning.

20 11:37:16            Mr. Driscoll, you may go ahead.

21 11:37:18   Q. You've seen this before, Dr. Murphy?

22 11:37:21   A. Yes.

23 11:37:31   Q. And what is this portion of Nurse Rahbarvafaei's progress

24 11:37:36   note, what does this say?

25 11:37:38   A. Well, to me it says, call Dr. Silverstein to not write

1 11:37:49  pain meds.  Second notice.  Patient doesn't like tramadol.

2 11:37:59  And then I can't really determine the rest of that, because

3 11:38:07  it's in the rest of the exhibit.

4 11:38:10  Q. Let's focus on the call Dr. Silverstein to not write pain

5 11:38:15  meds.  Is this an appropriate response for a pain management

6 11:38:19  nurse practitioner to do?

7 11:38:20  A. Yes.  This indicates to me that the Nurse Practitioner

8 11:38:27  Rahbarvafaei was trying to get this patient to not go to

9 11:38:32  other doctors, or to not have medicines written by other

10 11:38:36  practitioners.

11 11:38:37         That is -- again, it's very appropriate that the

12 11:38:42  patients get controlled substances from one provider only.

13 11:38:46  So she's addressed that to hopefully make that happen.

14 11:38:50  Q. And she's noted it in her file.  Why is noting it down

15 11:38:54  important there?

16 11:38:54  A. I'm sorry, what?

17 11:38:55  Q. Is it important that she notes it in her file as well

18 11:38:58  there?

19 11:38:58  A. Yes.

20 11:39:02  Q. And now I'm going to pull up Government Exhibit 40, at

21 11:39:09  page 26.

22 11:39:21         And before I do that, Dr. Murphy, why is it

23 11:39:24  important to note in your file that you are concerned about

24 11:39:27  doctor shopping?

25 11:39:27  A. Well, for one, you want to -- you want to know what the

1  11:39:36  patients are taking.  And if somebody is going to multiple

2  11:39:41  doctors, and I don't know what I'm giving to somebody else,

3  11:39:43  and they don't know what -- we don't want patients to be

4  11:39:47  getting two prescriptions for the same thing from different

5  11:39:52  doctors, especially if it's controlled substances.  We want

6  11:39:54  to know what they are taking, to the best of our abilities.

7  11:40:03        MR. DRISCOLL:  And can you -- Ms. Pelaez, can you

8  11:40:06  zoom in on the middle part, consult?

9  11:40:15   Q. So Dr. Murphy, here under consult it says, drug rehab

10 11:40:22  stat, explain the risk of death.

11 11:40:24        Why is that important?

12 11:40:25   A. Well, this is where Nurse Practitioner Rahbarvafaei is

13 11:40:29  reacting to the urine drug screen results that were positive

14 11:40:33  for -- cocaine was a major thing there.  So, you know,

15 11:40:40  obviously that is a real concern.  We don't want patients

16 11:40:44  taking cocaine while they are on these medications, it's very

17 11:40:48  dangerous.

18 11:40:49        So she has explained to the patient about the risks

19 11:40:54  of death with doing that sort of behavior, and combining

20 11:40:58  medications, I would imagine.

21 11:41:00        And then drug rehab stat.  And the stats, that is

22 11:41:06  all capitalized, so she feels like this patient needs to go

23 11:41:10  and talk to a drug counselor or get some -- a further

24 11:41:15  evaluation in that regard as soon as possible.

25 11:41:20        MR. DRISCOLL:  Thank you, Your Honor.  One moment.

1  11:41:22          (Pause in proceedings.)

2  11:41:42   Q. Dr. Murphy, going back to the undercover visits, what was

3  11:41:48   your -- what were your impressions of those visits?

4  11:41:53   A. The undercover visits?

5  11:41:55   Q. Yes.

6  11:41:57          MR. BALDING:  Objection.  Vague.

7  11:41:58          THE COURT:  If the witness understands the question,

8  11:42:01   overruled.

9  11:42:03          THE WITNESS:  Yeah, I can tell you my impression.

10 11:42:06          First of all, was that -- I mean, Nurse Practitioner

11 11:42:10   Rahbarvafaei was clearly acting in the way that a nurse

12 11:42:14   practitioner does.

13 11:42:14          And I also want to point out that nurse

14 11:42:17   practitioners don't -- they don't practice in a vacuum.

15 11:42:19   There is a doctor somewhere.  They have supervision.  They

16 11:42:23   have policies.  They have -- you know, she's in a clinic that

17 11:42:27   is owned by somebody else, and she's an employee there, and

18 11:42:32   she's using forms that they have come up with.  She's in that

19 11:42:35   system acting as a nurse practitioner.  She's part of the

20 11:42:39   team-based care.  And she's functioning in that regard.

21 11:42:43          She's very efficient.  She's very -- seems very

22 11:42:47   kind.  She establishes great rapport with the patients.  She

23 11:42:54   tries to build that trust, you can see that, you can hear

24 11:42:56   that in her voice.

25 11:42:57          And the actual actions that she takes, they are

1 11:43:00   entirely what you do when you see a patient.  You gather the

2 11:43:03   information, enough that you need, based on the circumstances

3 11:43:07   to have a plan of care.  She does all of that.

4 11:43:09          I thought that both of those cases in every visit,

5 11:43:13   every prescription that you wrote, I want you to know that,

6 11:43:17   it was fine.

7 11:43:19          MR. BALDING:  Objection.

8 11:43:19          THE COURT:  Sustained.

9 11:43:20          Doctor, please address your remarks to counsel.

10 11:43:23          THE WITNESS:  I apologize.

11 11:43:25   Q. Dr. Murphy, so is it your opinion that each of those

12 11:43:28   prescriptions for tramadol, as well as hydrocodone, were

13 11:43:31   within the usual course of professional practice?

14 11:43:33   A. Yes.

15 11:43:34   Q. And for a legitimate medical purpose?

16 11:43:36   A. Yes.

17 11:43:39          MR. DRISCOLL:  Nothing further, Your Honor.

18 11:43:40          THE COURT:  Thank you.

19 11:43:41          Ladies and gentlemen, while the government gets

20 11:43:43   ready for its cross-examination, feel free to stand and

21 11:43:45   stretch.

22 11:44:02          Ladies and gentlemen, let's take a quick break then,

23 11:44:05   but let's keep it as short as possible.

24 11:44:11          Remember what I told you, don't investigate or

25 11:44:13   discuss the case.

1  11:44:14              (Thereupon, the jury retired from the courtroom.)

2  11:44:48              THE COURT:  Doctor, you may step down.

3  11:44:50              Mr. Balding, do you have a sense of how long the

4  11:44:53   cross-examination will be?

5  11:44:54              MR. BALDING:  I'll try to keep it about an hour,

6  11:44:57   Your Honor.  I wouldn't think it would be longer than that.

7  11:44:59   It might be shorter.

8  11:45:00              THE COURT:  And --

9  11:45:02              MR. BALDING:  I'm terrible at guesstimating, because

10 11:45:02   I thought it would be a lot shorter yesterday, so I

11 11:45:06   apologize.  But an hour to an hour and a half, perhaps.

12 11:45:08              THE COURT:  Does the -- has the defense reached a

13 11:45:12   decision on whether the defendant will testify?

14 11:45:15              MS. MURPHY:  I think that is something we can talk

15 11:45:16   about during this quick break.

16 11:45:17              THE COURT:  All right.

17 11:45:18              MS. MURPHY:  We'll be happy to let Your Honor know.

18 11:45:20              THE COURT:  Thank you.

19 11:45:21              All right.  At most use the restroom yourself and

20 11:45:31   then come right back.

21 11:45:32              (Thereupon, there was a brief recess.)

22 11:56:19              (Thereupon, the jury returned to the courtroom.)

23 11:56:51              THE COURT:  Ladies and gentlemen, all of you are

24 11:56:53   here, as are Ms. Rahbarvafaei and the lawyers.  The witness

25 11:57:00   is on the stand, still under oath.

1 11:57:02        Mr. Balding, you may proceed with your

2 11:57:04  cross-examination.

3 11:57:05        MR. BALDING:  Thank you, Your Honor.

4 11:57:05                    CROSS-EXAMINATION

5 11:57:07  BY MR. BALDING:

6 11:57:07   Q. Just barely, good morning, Dr. Murphy.

7 11:57:11        I'm going to ask you a few things, but first I want

8 11:57:14  to clarify something.  Tramadol obviously is an important

9 11:57:18  substance in this case.  You understand that, correct?

10 11:57:20   A. Yes.

11 11:57:21   Q. I think you said on direct that -- if I've got the quote

12 11:57:25  right, tramadol is really not an opioid.  And then later, I

13 11:57:30  believe you said tramadol is a mild opioid.

14 11:57:32        Do you recall those two things?

15 11:57:34   A. Tramadol is -- we are not really sure what tramadol is,

16 11:57:39  but a lot of people, for the sake of categorization, will

17 11:57:44  consider it a mild opioid.  Scientifically, we don't know

18 11:57:47  what it is, so --

19 11:57:48   Q. My question was, you said it was really not an opioid,

20 11:57:51  and then you said it's a mild opioid.  You are saying -- is

21 11:57:55  the answer that scientifically, you don't know, and that some

22 11:57:58  people classify it as a mild opioid?

23 11:58:00   A. I would like to give you my answer to that.

24 11:58:02   Q. Please.

25 11:58:03   A. Tramadol is a chemical that has some opioid properties.

1 11:58:07  It is not necessarily a drug that is an opioid.  We don't

2 11:58:13  know how it works.  But it is classified by some

3 11:58:17  organizations -- it's lumped in with the opioid.  So it is --

4 11:58:22  it's okay in terms like this, to speak of it as a mild

5 11:58:28  opioid.  But when I am speaking to you as a physician

6 11:58:31  scientifically, I want you to be aware of the fact that we

7 11:58:34  don't know really how it works.

8 11:58:36   Q. When the phrase "opioids" is used in Medical Board

9 11:58:42  publications, or more officially, would that be including

10 11:58:46  tramadol in your opinion or not including tramadol?

11 11:58:49            MR. DRISCOLL:  Objection.  Vague.

12 11:58:50            THE COURT:  Overruled.

13 11:58:51            THE WITNESS:  I think it varies.  I think it varies.

14 11:58:53  I think some do, some don't.

15 11:58:55   Q. Okay.  At any rate, tramadol is a controlled substance,

16 11:59:01  correct?

17 11:59:02   A. Yes.

18 11:59:02   Q. It's currently classified a Schedule IV, as you testified

19 11:59:08  earlier?

20 11:59:08   A. Yes.

21 11:59:09   Q. Now, you spoke of the standard of care.  Do you recall

22 11:59:12  that testimony?

23 11:59:13   A. Yes.

24 11:59:14   Q. I believe you said it's what an average physician or

25 11:59:19  nurse practitioner would do.  Is that accurate?

11:59:20   A. Not exactly.  There is more to the definition than that.

11:59:26   Q. Please --

11:59:26   A. I think I may have used the word average, but it's what a

11:59:30   reasonable physician would do in that same patient under the

11:59:33   same circumstances.  It's dependent on person, place and

11:59:37   time.

11:59:37   Q. Okay.  You filed -- you submitted a report in this case,

11:59:41   didn't you?  Two reports, in fact.

11:59:44   A. Yes.

11:59:46   Q. I would like you to turn to Exhibit 56.  There is a copy

11:59:51   probably to your right on the bottom of that -- no.  If you

11:59:57   look to your right.

11:59:59        THE COURT:  Ms. Sanchez, would you please assist

12:00:04   Dr. Murphy?

12:00:04        MR. BALDING:  See the white binders, below the white

12:00:07   binders.

12:00:08        THE COURT:  Down there.  Volume 1 has --

12:00:13        MR. BALDING:  Volume 2.  Thank you, Your Honor.

12:00:22   Q. And if you look at Exhibit 56 -- if you would like, you

12:00:27   can take it out of the binder, if it's helpful.

12:01:11        Again, just so I have it clear, the standard of care

12:01:14   is what a reasonable -- could you say it again?  I'm sorry, I

12:01:19   don't want to get it wrong.  I missed it the first time.

12:01:20        THE COURT:  Which page, Mr. Balding?

12:01:22        MR. BALDING:  I'm just asking him to repeat his

1 12:01:23    testimony before I go to this.

2 12:01:25              THE COURT:  Go ahead.

3 12:01:26              THE WITNESS:  Standard of care has various

4 12:01:28    definitions.  Okay?  But generally speaking, it's what a

5 12:01:32    reasonable physician would do under the same circumstances

6 12:01:36    with the same patient.

7 12:01:37    Q. And in your report, if you look at page 22 -- Do you have

8 12:01:43    page 22?

9 12:01:45    A. Yes.

10 12:01:45    Q. Towards the top, it says the standard of care -- the

11 12:01:49    definition of standard of care can be summarized as what a

12 12:01:52    minimally competent physician in the same field would do in

13 12:01:55    the same situation with the same resources.

14 12:01:57              Is that consistent with what your definition was

15 12:02:01    just before I asked this question?

16 12:02:02    A. In a sense.  What I -- as you can see in my report, that

17 12:02:07    is italicized, so that is a direct quote from somebody else.

18 12:02:13    And I give the reference there in case you need to look it

19 12:02:16    up.  But that is what this reference exactly said, that is

20 12:02:20    their quote.

21 12:02:20    Q. So your report references the standard of care, and it

22 12:02:27    slightly differs, or at least in some way of your version of

23 12:02:30    the standard of care today?

24 12:02:30    A. Not necessarily.  The way it reads here, as I say, the

25 12:02:34    standard of care does not demand perfection.  The definition

1  12:02:39   of, quote, standard of care, can be summarized as, and then I
2  12:02:45   give the quote.
3  12:02:47        So I chose the word, can be summarized, meaning that
4  12:02:51   is not the only definition, but it can be summarized as what
5  12:02:57   I gave you in my report.
6  12:02:58   Q. Now, how about the usual course of professional practice,
7  12:03:02   how does that -- how do you define that?  And I think it was
8  12:03:07   earlier -- sorry.
9  12:03:09        Essentially, acting like a doctor or acting like a
10 12:03:14   nurse practitioner, is that how you would summarize that?
11 12:03:16   A. Actually, I got that from -- I heard some lawyer say, and
12 12:03:22   it was really, I think it made sense, it was the Department
13 12:03:26   of Justice attorney said that in a court proceeding, and I
14 12:03:29   thought that makes a lot of sense.  It's acting like a
15 12:03:33   doctor.
16 12:03:33        So I like that.  I think that is a useful way.  But
17 12:03:36   it's a lot more than that.  I talked about those three Ps;
18 12:03:41   the provider, the patient and the process.
19 12:03:46        So you can be simple about it, but, you know, it's
20 12:03:50   important to understand what all goes into that as well.
21 12:03:53        And it's -- I think I elaborate on that here, so we
22 12:04:00   can read this, if you want to.
23 12:04:02   Q. Well, I don't want to be simple or complex, I just want
24 12:04:06   you to give us your version of the usual course of
25 12:04:08   professional practice, because that is what you are offering

1 12:04:10   your opinion on, correct?

2 12:04:12   A. Yes.  It's --

3 12:04:13   Q. No, please.

4 12:04:15   A. -- right here in my report.

5 12:04:17   Q. Go ahead.

6 12:04:17   A. I say here, distinct from the standard of care, the usual

7 12:04:29   course of professional practice encompasses a wide range of

8 12:04:33   actions, from minimally acceptable to best practices.

9 12:04:39   Minimally acceptable practice is the lower threshold of the

10 12:04:43   usual course of professional practice.

11 12:04:45   Q. So is it fair to say that the usual course of

12 12:04:49   professional practice encompasses some range below which you

13 12:04:54   are outside that course of professional practice?

14 12:04:56   A. I'm sorry, would you ask me that again?

15 12:04:59   Q. By defining some range of practices as within the usual

16 12:05:06   course of professional practice, would you agree that there

17 12:05:09   would be some conduct that would be outside or below that

18 12:05:12   range?

19 12:05:13   A. You know, rather than say below that range, I would

20 12:05:17   say -- because really the course of professional practice is

21 12:05:20   what the doctor or the nurse practitioner does.  So if you

22 12:05:25   are not doing those things, it's not really a threshold in a

23 12:05:29   sense.  If you are not doing those things, then you can be

24 12:05:32   considered possibly to be outside the course of professional

25 12:05:36   practice.

1 12:05:36  Q. All right.  Let's talk about some of the things that a

2 12:05:42  doctor or a physician or a nurse practitioner would be

3 12:05:44  expected to do when acting as such.  Okay?

4 12:05:49       Now, you talked about getting a patient's history.

5 12:05:55  It's important that a physician not merely take the patient's

6 12:05:58  word when they are giving them their medical history, isn't

7 12:06:00  that right?

8 12:06:01  A. Not necessarily.  There would be situations where that is

9 12:06:05  all I would rely upon is the patient's word.  The important

10 12:06:08  thing is, do I trust the patient, what they are telling me?

11 12:06:12  And can I act upon that?

12 12:06:15       You know, so, yeah, there are situations where

13 12:06:18  absolutely, the patient's word would be all I would go upon.

14 12:06:22  Q. So on a first meeting with a patient where all you have

15 12:06:25  to go on is their word, there are circumstances in which you

16 12:06:28  do no further steps to verify the information you are getting

17 12:06:31  from the patient, is that your testimony?

18 12:06:32  A. Would you ask me that again, please?

19 12:06:34  Q. In an initial visit with a patient that you've never met

20 12:06:39  before, and you have done nothing to check anything on their

21 12:06:41  background, is it your testimony that it is possible to take

22 12:06:45  their word for it with regard to what they say and do no

23 12:06:49  further background check?

24 12:06:50  A. It is possible to take their word and then act upon that

25 12:06:55  as a physician or nurse practitioner.  That would be -- that

1  12:07:00   could be acceptable in certain circumstances.

2  12:07:03   Q. And the standard of care -- is it your testimony that the

3  12:07:06   standard of care does not require a physician to take any

4  12:07:09   steps to verify information given to them by a patient?

5  12:07:14   A. That's not what I said.

6  12:07:16   Q. Okay.  How is that incorrect?

7  12:07:17   A. Would you ask me the question again, please?

8  12:07:19   Q. If it's not what you said, I don't want to ask the wrong

9  12:07:23   question, so let me ask you this:  Does the standard of care

10 12:07:26   allow for a physician to take no steps to verify information

11 12:07:32   provided to that physician by a patient in an initial

12 12:07:36   consultation?

13 12:07:37   A. The standard of care is based upon the person, the place,

14 12:07:41   and the circumstances.  There could be circumstances clearly

15 12:07:45   where you would take the patient's word only and act upon

16 12:07:49   that.

17 12:07:50          So in certain circumstances, that clearly could be

18 12:07:54   within the standard of care.

19 12:07:55   Q. How about a physical examination?  The standard of care

20 12:08:00   would require a physician to conduct some sort of physical

21 12:08:02   examination, wouldn't it?

22 12:08:03   A. No.  Not in every circumstance.

23 12:08:06   Q. Okay.  Would it be standard to conduct a physical

24 12:08:12   examination and a deviation from ordinary to not conduct a

25 12:08:15   physical examination of a patient?

1  12:08:16   A. It would be standard to acquire the information you need

2  12:08:22   to make the proper assessment and diagnosis.

3  12:08:25          As I think it was alluded to earlier, during COVID,

4  12:08:31   we don't -- are not required in certain circumstances to even

5  12:08:39   see a patient face to face.  You can do it by telemedicine,

6  12:08:43   and then the followup visits can be by phone.

7  12:08:46          So it depends upon the circumstances what type of

8  12:08:49   information you need.

9  12:08:52   Q. You have a website, don't you, Doctor?

10 12:08:54   A. Yes.

11 12:08:55   Q. And in that website, there is a link to an article you

12 12:08:59   authored called Five Step Initial Approach to Caring for the

13 12:09:03   Displaced Pain Patient on Chronic Opioid Therapy.  Do you

14 12:09:07   recall that article?

15 12:09:08   A. Yes.

16 12:09:15          MR. BALDING:  Your Honor, may I approach?

17 12:09:16          THE COURT:  You may.

18 12:09:20          And for identification, this will be marked as which

19 12:09:22   exhibit?

20 12:09:25          MR. BALDING:  58.

21 12:09:40          THE COURT:  Exhibit 58 for identification is before

22 12:09:42   the witness.

23 12:09:45   Q. Now, Dr. Murphy, this article you've got refers

24 12:09:51   specifically to displaced pain patients on chronic opioid

25 12:09:54   therapy, correct?

1  12:09:57   A. Yes.

2  12:09:58   Q. And how would that differ from just an ordinary pain

3  12:10:01   management practitioner?

4  12:10:04   A. I'm sorry, would you ask me that again, please?

5  12:10:09   Q. Are the steps in here generally applicable to pain

6  12:10:13   management or only to chronic displaced -- or chronic opioid

7  12:10:17   therapy patients or displaced pain patients?

8  12:10:21   A. This advice that I give here is directed toward

9  12:10:25   clinicians that have patients that arrive to them having been

10 12:10:31   displaced or orphaned, if you will, from another pain

11 12:10:36   practice.

12 12:10:37        So a lot of these things I think are good ideas and

13 12:10:40   good advice to do regardless depending on the circumstances,

14 12:10:44   but this is specifically to give guidance to clinicians that

15 12:10:48   receive patients that otherwise have been cared for by

16 12:10:50   somebody else and now cannot have access to their provider.

17 12:10:53   Q. Are they also useful for general pain therapy management

18 12:10:59   treatment?

19 12:10:59   A. I thought about that, and I think a lot of this advice in

20 12:11:02   here would be applicable as good advice, you know, across the

21 12:11:06   board.

22 12:11:06   Q. Well, looking at page 2 of that exhibit, under the title

23 12:11:11   5 Steps -- of course, the article is entitled 5 Step

24 12:11:15   Approach.  Step one says, history and physical exam.  Do you

25 12:11:19   see that?

1  12:11:19   A. Yes, that is the heading.  History and physical exam,

2  12:11:23   step one.

3  12:11:23   Q. And so you would agree that a medical history and a

4  12:11:26   physical examination are useful tools in evaluating pain?

5  12:11:31   A. Both of those are definitely useful tools.

6  12:11:33   Q. Now, you also talk about -- before the steps, you say,

7  12:11:38   always exercise compliance with statutory requirements.  Do

8  12:11:41   you see that sentence, just above the five steps on --

9  12:11:47   A. Yes.

10 12:11:47   Q. Now, you testified earlier that regardless of the usual

11 12:11:52   course of professional practice, each jurisdiction might have

12 12:11:55   specific laws that need to be followed.  Do you recall that

13 12:11:58   testimony?

14 12:11:59   A. Yes.

15 12:12:02   Q. And this is a link to another site that contains further

16 12:12:09   links to state-by-state medical boards or other licensing

17 12:12:12   agencies.  Isn't that correct?

18 12:12:14   A. Yes.

19 12:12:16   Q. Now, the events in this case took place in California.

20 12:12:20   You are aware of that, right?

21 12:12:21   A. Yes.

22 12:12:21   Q. And the link from your article links to a spreadsheet

23 12:12:35   that further links to the Medical Board of California

24 12:12:39   guidelines for prescribing controlled substances for pain,

25 12:12:42   would you agree?

1   12:12:43   A. I hope it does.  That was my intent.

2   12:12:46   Q. It does.  Well, if I represent that it does, would that

3   12:12:50   sound about right?

4   12:12:51   A. Yes.

5   12:12:51   Q. And that was a document you heard Dr. Munzing being

6   12:12:54   questioned about by defense attorneys earlier today.  Do you

7   12:12:57   recall that?

8   12:12:57   A. I heard something to that effect, that they were talking

9   12:13:01   about some California guidelines.

10  12:13:02   Q. I've got copies, but I think there might be one in yours,

11  12:13:07   I don't -- I can give my copy.

12  12:13:17         MR. BALDING:  Your Honor, if we could mark this next

13  12:13:19   for identification as Exhibit 59?

14  12:13:21         THE COURT:  59 for identification.

15  12:13:26         MR. BALDING:  May I approach?

16  12:13:26         THE COURT:  You may.

17  12:13:52   Q. I've handed you -- or you have been handed a document

18  12:13:55   called Guidelines For Prescribing Controlled Substances For

19  12:13:58   Pain by the Medical Board of California dated November 2014.

20  12:14:02   Do you have that document in front of you?

21  12:14:04   A. Yes.

22  12:14:05   Q. And again, this is the document link from your article to

23  12:14:09   help the reader know if they are following or complying with

24  12:14:16   requirements in a particular jurisdiction, here, California,

25  12:14:19   correct?

1 12:14:19   A. I don't know.

2 12:14:21   Q. You don't know what, I'm sorry?

3 12:14:23   A. I don't know, -- ask me the question again, please.

4 12:14:27   Q. I'm saying, your article links to this when it comes to

5 12:14:29   the California authority to go to.

6 12:14:31   A. I have no idea.  I don't know what the article links to

7 12:14:34   this or not.

8 12:14:35   Q. I thought we just -- I just asked you -- you said you

9 12:14:38   hope it did, when I asked you if your article links to the

10 12:14:42   various state guidelines or other statutory laws?

11 12:14:46   A. I said I hope it does.

12 12:14:48   Q. Would it refresh your recollection if I actually showed

13 12:14:50   you the website, the intermediate link that then links to the

14 12:14:56   Medical Board of California?

15 12:14:57   A. No, I don't -- I put the link up there and that goes to

16 12:15:00   the Federation of State Medical Boards, that is so doctors

17 12:15:05   can, from various states they are in, find out what their

18 12:15:08   guidelines are or regulations might be in their states.  I

19 12:15:10   haven't gone through every link, obviously, so you've handed

20 12:15:14   me a guideline 2014.  I would assume that it's from there,

21 12:15:18   but I don't like assuming.  But if you tell me, I'm not going

22 12:15:21   to, you know, argue with you on that.  But I just don't know.

23 12:15:29   Q. That's fine.

24 12:15:30         Take a few extra minutes.

25 12:15:32         MR. BALDING:  May I approach, Your Honor?

1 12:15:33          THE COURT:  You may.

2 12:15:37          MR. BALDING:  Exhibit 60.  Your Honor, if this

3 12:15:45 exhibit could be marked for identification as Exhibit 60.

4 12:15:49          THE COURT:  It will be so marked.

5 12:15:51  Q. Now, Dr. Murphy, I've handed you what appears to be a

6 12:15:55 printout of the Federation of State Medical Board's pain

7 12:15:58 management policies board-by-board overview.  Do you see

8 12:16:01 that?

9 12:16:01  A. Yes.

10 12:16:01  Q. And on page 2 does it appear to have, under the heading

11 12:16:04 statute/regulation/guideline/policy, and state CA or

12 12:16:08 California, two links, one to the California Business and

13 12:16:11 Professions Code, and one to the Medical Board of California

14 12:16:15 2014 Guidelines For Prescribing Controlled Substances For

15 12:16:18 Pain?

16 12:16:20  A. Yes.  On this piece of paper it would appear to be a

17 12:16:24 link, because it's underlined for those two things.

18 12:16:27  Q. And then does that refresh your recollection, or do you

19 12:16:34 believe now that the document Exhibit 59 is what is linked

20 12:16:37 to -- from your article through that intermediary link?

21 12:16:41  A. I don't know.

22 12:16:42  Q. Okay.

23 12:16:42  A. And the reason why is because I don't know when you

24 12:16:44 downloaded this.  You know, when I put this on the website,

25 12:16:48 it may have been to something else.  But, you know, I just --

1  12:16:54  I'm saying that you've handed me a piece of paper that you

2  12:16:56  probably, I would assume, downloaded soon from an article I

3  12:17:00  wrote years ago.  And they update these websites, they update

4  12:17:07  the links, so I just don't know for sure.

5  12:17:09        But I'm not going to, you know, belabor this point.

6  12:17:12  And I want you to know that I can't tell you for certain that

7  12:17:16  this was the printout that I was referring to in my article.

8  12:17:20  Q. Assuming I'm not going to hold you to every page of this

9  12:17:22  being the exact correctness -- as we go through it, if you

10 12:17:27  see something that doesn't look consistent with your

11 12:17:29  understanding of the Medical Board of California's guidelines

12 12:17:32  in 2014, please let me know.  But otherwise, I'll ask you a

13 12:17:36  few questions.  Is that fair?

14 12:17:36  A. Certainly.

15 12:17:37  Q. Okay.  So on page 9 of Exhibit 59, that is the

16 12:17:45  guidelines.  Do you see page 9?

17 12:17:48  A. Yes.

18 12:17:49  Q. Do you see the heading Patient Evaluation and Risk

19 12:17:53  Stratification?

20 12:17:54  A. Yes.

21 12:17:55  Q. Now, it says, does it not, that when considering

22 12:18:02  long-term use of opioids for chronic noncancer pain, given

23 12:18:06  the potential risk of opioid analgesics, careful and thorough

24 12:18:11  patient assessment is critical.  Do you see that?

25 12:18:13  A. Yes.

1 12:18:13   Q. Do you agree with that?

2 12:18:24         Doctor, would you agree with that sentence?

3 12:18:25   A. I'm looking at it.

4 12:18:36         Yes.

5 12:18:36   Q. And it also talks about risk stratification is one of the

6 12:18:41   most important things a physician can do to mitigate

7 12:18:43   potentially adverse consequences of opioid prescribing.  And

8 12:18:48   the nature and extent of the clinical assessment depends on

9 12:18:50   the type of pain and the context in which is occurs.  This

10 12:18:53   includes but is not limited to -- and the first thing listed

11 12:18:55   is completing a medical history and physical examination.

12 12:18:59         Would you agree with that?

13 12:19:00   A. No.  The -- and this is why:  This is from 2014, and that

14 12:19:07   is two years prior to the 2016 CDC guidelines.  And the CDC

15 12:19:16   guidelines has a recommendation about risk stratification,

16 12:19:20   and they take this stuff into consideration.  And those 2016

17 12:19:23   CDC guidelines clearly say, very honestly, that the risk

18 12:19:29   stratification that we think we can do with these sort of

19 12:19:33   things is flawed.  It's based upon poor evidence.  And,

20 12:19:38   therefore, the ability to do risk stratification with things

21 12:19:43   of this nature is flawed, very difficult.

22 12:19:45         Thus, thinking that you can categorize a patient's

23 12:19:48   risk based upon these sort of things is not current knowledge

24 12:19:53   and it is flawed.  And this was put out before the 2016 CDC

25 12:20:01   guidelines.

1 12:20:01   Q. So regardless of your opinion as just stated, is it fair

2 12:20:04   to say that a practitioner practicing in California would be

3 12:20:09   subject to this guideline, not your broader description?

4 12:20:15        MR. DRISCOLL:  Objection.  Legal conclusion.

5 12:20:16        THE COURT:  Overruled.

6 12:20:17        THE WITNESS:  That wasn't my opinion fully.  That

7 12:20:19   was the opinion of the CDC.

8 12:20:22   Q. And you link in your article and instruct to always

9 12:20:26   exercise compliance with statutory requirements.  And earlier

10 12:20:29   you testified local requirements are important, right?

11 12:20:32   A. Okay.  Two questions there.

12 12:20:34        I did say always exercise compliance with statutory

13 12:20:38   requirements.  That was my recommendation.

14 12:20:41        In this article when I wrote it, I'm not sure when

15 12:20:44   it was, 2019 maybe, so I stand by that statement.

16 12:20:52        And there was a second part of the question?

17 12:21:01   Q. The importance of following local or state requirements.

18 12:21:05   A. It's definitely important to know your local and state

19 12:21:08   requirements, and to exercise compliance with them.

20 12:21:13   Q. Would it be within the usual course of professional

21 12:21:15   practice to ignore one's own state requirements?

22 12:21:19   A. It would be wrong to ignore them.  However, in the usual

23 12:21:23   course of professional practice -- I can tell you from

24 12:21:26   Kentucky's standpoint, we have guidelines like this.  Most

25 12:21:30   doctors don't know they exist.  Most doctors haven't read

1 12:21:34  them.  They practice medicine as they think they best can,

2 12:21:38  but we don't read these things.

3 12:21:41      I'm telling you in my article here, all the

4 12:21:45  practitioners that read this, please go on this and look at

5 12:21:48  them.  But unfortunately in the usual course of professional

6 12:21:51  practice, actually the standard, they don't do it.  They

7 12:21:57  practice medicine based upon how they were taught.  They

8 12:21:59  practice medicine based upon those basics that I told you

9 12:22:03  earlier, taking care of the patient, gathering information,

10 12:22:06  coming up with an assessment.

11 12:22:09  Q. Now, to the extent you disagree with the portion I just

12 12:22:12  read from this document, do you disagree that completing a

13 12:22:16  medical history and physical examination is important?

14 12:22:19  A. Is that a yes or no question?  I'm sorry.

15 12:22:26  Q. Do you disagree that completing a medical history and

16 12:22:29  physical examination, do you disagree with that statement as

17 12:22:33  set forth in this document?

18 12:22:36  A. I don't think it says that.  I'm not sure where you are

19 12:22:49  seeing that.

20 12:22:49  Q. If you look under Patient Evaluation and Risk

21 12:22:52  Stratification, it lists a number of things that can assist

22 12:22:58  with things a physician can do to mitigate potentially

23 12:23:03  adverse consequences of opioid prescribing.

24 12:23:05      Do you see that?

25 12:23:05  A. Yes.

1  12:23:06   Q. And then the list, it says, this includes but is not

2  12:23:08   limited to -- and the first item on the list is completing a

3  12:23:11   medical history and physical examination.

4  12:23:14          Would you agree with that portion of this document?

5  12:23:16   A. Yes.  I think that it is helpful and useful to complete a

6  12:23:23   medical history, and a physical examination if you can do

7  12:23:27   that.  I think it is helpful.

8  12:23:29   Q. If you look at page -- appendix 5, page A31 toward the

9  12:23:35   back of the document.  Actually, page A-32, my apologies.

10 12:23:47          You see the second full paragraph starting with

11 12:23:49   information?

12 12:23:50   A. Yes.

13 12:23:52   Q. And this document states, information provided by the

14 12:23:55   patient is a necessary but insufficient part of the

15 12:23:58   evaluation process.

16 12:24:01          You don't agree with that, do you, doctor?

17 12:24:04   A. Depending upon the situation, the information provided by

18 12:24:08   the patient may be all that you need.

19 12:24:11   Q. So you believe that it is -- it could be a sufficient,

20 12:24:16   not just necessary part of the evaluation process?

21 12:24:21   A. I'm sorry, would you ask me that again?

22 12:24:25   Q. So this document says that in layman's terms, you can't

23 12:24:28   just take the patient's word for it.  Would you agree with

24 12:24:31   that?

25 12:24:31   A. I don't know what this says.  This document says,

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1 12:24:35  information provided by the patient is a necessary but

2 12:24:38  insufficient part of the evaluation process.

3 12:24:41  Q. Would you agree that another way to say that sentence is

4 12:24:44  to say that you cannot rely solely on information provided by

5 12:24:50  the patient as part of the evaluation process?

6 12:24:52  A. I'm reading what it says.  And their statement there is

7 12:24:57  not exactly correct.  I mean, that is something that, as I

8 12:25:01  said, on its face value -- I'll be -- I'll tell you, I was an

9 12:25:06  English major.  I know what words mean, I know what

10 12:25:09  statements mean.  And what this says is that information

11 12:25:11  provided by the patient is a necessary but insufficient part

12 12:25:14  of the evaluation process.

13 12:25:17         That is not entirely true, because -- and there are

14 12:25:21  circumstances where just what the patient tells you is all

15 12:25:24  that you need, depending on the circumstances.  That is the

16 12:25:27  truth.

17 12:25:28  Q. And it goes on to say, reports of previous evaluations

18 12:25:31  and treatments should be confirmed by obtaining records from

19 12:25:35  other providers if possible.

20 12:25:36         Would you agree with that?

21 12:25:37  A. Yes.  I would agree with that in most cases.  And I think

22 12:25:46  that over time that is a good policy to have.

23 12:25:48  Q. So going back one page to A-31 on that same document,

24 12:25:57  just one page earlier, the heading is Patient Evaluation and

25 12:26:02  Risk Stratification.

1 12:26:03          Now, you've already explained how you feel about

2 12:26:05   risk stratification, but bear with me, I'm going to ask you a

3 12:26:09   few more things about this document.

4 12:26:10          First, the second full paragraph it says, the nature

5 12:26:14   and extent of the evaluation depends on the type of pain and

6 12:26:17   the context to which it occurs.

7 12:26:19          Would you agree with that?

8 12:26:19    A. Yes.

9 12:26:22    Q. For example, meaningful assessment of chronic pain,

10 12:26:25   including pain related to cancer or noncancer origins usually

11 12:26:28   demands a more detailed evaluation than an assessment of

12 12:26:32   acute pain.

13 12:26:34          Would you agree with that?

14 12:26:34    A. Well, that is their -- that is their opinion.  And if

15 12:26:42   that is their opinion, they can have their opinion.

16 12:26:44    Q. I understand their opinion.  I'm asking your opinion,

17 12:26:47   Doctor.

18 12:26:52    A. I would change the word "usually" to "may" or "can."

19 12:27:01    Q. Can you explain the difference between acute pain and

20 12:27:04   chronic pain, as you understand it?

21 12:27:05    A. As I understand it, acute pain is something that happens

22 12:27:10   immediate and it starts -- and it's in the context of right

23 12:27:16   now.  Or we usually talk about it being in a few days or a

24 12:27:20   few weeks.

25 12:27:22          Chronic pain is generally described as pain that

1 12:27:25   persists beyond the original trauma period, or even after the

2 12:27:30   condition is healed.  Generally, if people have pain for

3 12:27:34   three months or longer, a lot of people consider that chronic

4 12:27:37   pain.

5 12:27:40   Q. Now, going to the next paragraph, it says, for every

6 12:27:44   patient, the initial workup should include a systems review

7 12:27:47   and relevant physical examination, as well as laboratory

8 12:27:51   investigations as indicated.

9 12:27:52        You don't agree with that statement, do you, Doctor?

10 12:27:54   A. I very much agree with that statement.

11 12:27:56   Q. So you agree that for every patient the initial workup

12 12:27:59   should include a relevant physical examination?

13 12:28:06   A. Yes.  I think, if possible, then you should have a

14 12:28:09   relevant physical examination, if you can.

15 12:28:11   Q. I'm not asking if possible.  It does say for every

16 12:28:15   patient, right?

17 12:28:16   A. It also says "should."  You know, it doesn't say "must."

18 12:28:19   It says "should."

19 12:28:20        So this is consistent with what I was saying.  I

20 12:28:23   think the authors here chose their words correctly, because

21 12:28:26   there are situations where you don't have to do a physical

22 12:28:28   examination.  And they said "should."  And I agree with that

23 12:28:33   qualifying statement.

24 12:28:33   Q. So allowing for the possibility of a rare instance in

25 12:28:40   which it's not absolutely necessary, in general, a physical

1 12:28:44  examination is a good idea when prescribing pain medication,

2 12:28:47  including opioids, right?

3 12:28:48  A. Yes.

4 12:28:54  Q. Now, in this case, you reviewed the documents and you

5 12:28:58  reviewed the undercover recordings.  You would agree that

6 12:29:04  defendant never physically examined undercover 1, wouldn't

7 12:29:08  you?

8 12:29:08  A. Of course not.  I have no idea.  I mean, it appears to me

9 12:29:12  she examined the patient.

10 12:29:14  Q. She conducted a physical examination of the patient?

11 12:29:16  A. I'm sorry, what?

12 12:29:17  THE COURT:  Please don't talk over each other.

13 12:29:19  Mr. Balding, ask your question and give the witness

14 12:29:22  a chance to answer.

15 12:29:23  Q. So your testimony is that the defendant did physically

16 12:29:25  examine UC1?

17 12:29:27  A. No, your question to me was did she not, and I said, it

18 12:29:31  looks to me like she did.

19 12:29:33  Q. So I'm confirming, you are testifying here that she did

20 12:29:35  physically examine UC1, is that correct?

21 12:29:39  A. Based upon the records that I reviewed and based upon

22 12:29:44  those videos, yes, there was a physical examination that took

23 12:29:47  place.  That is my opinion.

24 12:29:49  Q. What was the physical examination?  Can you point out a

25 12:29:52  specific portion of it?

1  12:29:53    A. Well, I tell you what, a physical examination encompasses

2  12:29:58    more than just me asking somebody to move their leg or me

3  12:30:02    grabbing their arm and seeing how it goes.  It's every part

4  12:30:05    of the physical aspects.  It begins when I first meet the

5  12:30:08    patient.  I notice how they are dressed, I notice how they

6  12:30:12    are walking, I notice the tone of the voice, how loud they're

7  12:30:16    talking, how fast they are talking, their emotion, how -- if

8  12:30:18    they sound angry.  What is their thought process?  Is there a

9  12:30:22    flight of ideas?  Are they coherent about their thinking?

10 12:30:25    Then I watch them walk, I watch them come into my office and

11 12:30:28    sit down in the chair.  Are they squirming?  Are they doing

12 12:30:31    things of that nature?

13 12:30:31          There is so much you can -- when I ask them

14 12:30:36    questions, what are their facial expressions?  You know,

15 12:30:38    there is so much you can do by just observing somebody.

16 12:30:40          And then if I ask somebody to move something, and

17 12:30:42    I'm observing that, that is clearly a physical examination.

18 12:30:45    I do not have to touch them to complete that or to do an

19 12:30:51    adequate physical examination.

20 12:30:52    Q. Would a physical examination at least relate to the

21 12:30:56    reported areas of pain?

22 12:30:58    A. I'm sorry, what?

23 12:31:01    Q. Would an appropriate physical examination, even if it

24 12:31:03    didn't involve touching, at least involve observing the areas

25 12:31:06    that are being complained of?

1 12:31:07   A. It depends upon the situation.  It can.  But it depends

2 12:31:11   on the circumstances.

3 12:31:12   Q. So here, you know, someone is complaining of shoulder

4 12:31:15   pain, and the defendant asks him to move his leg, that is

5 12:31:18   appropriate in your opinion?  Or that is sufficient in your

6 12:31:21   opinion?

7 12:31:23   A. When I assess somebody and they are coming for a chronic

8 12:31:28   pain condition, I also know that people don't have just one

9 12:31:32   area of pain.  The most common pain complaint is low back

10 12:31:38   pain.

11 12:31:38         So it's quite reasonable to evaluate other parts of

12 12:31:41   the body as well.  I mean, why wouldn't this -- you know,

13 12:31:45   this working -- hard working, you know, otherwise ambulating

14 12:31:51   male, why would he not possibly have low back pain as well?

15 12:31:55   It's adding some completeness to the evaluation.

16 12:31:57         So I think it's very fine that she asked him to move

17 12:32:06   his legs.

18 12:32:07   Q. But it wouldn't be a substitute for the rest of the

19 12:32:09   evaluation, would it?

20 12:32:09   A. It's part of the overall evaluation.  It wouldn't be a

21 12:32:12   substitute for everything, it's simply a component of the

22 12:32:14   overall evaluation.

23 12:32:15   Q. Now you'd agree that opioids carry with them certain

24 12:32:18   risks, wouldn't you?

25 12:32:18   A. All medicines carry risks, even oxygen has risks.  So

1 12:32:24   every substance can be damaging to you, it just depends upon

2 12:32:29   the dose and how it's used.  Opioids are no different than

3 12:32:32   any other medication, they have benefits and they have risks.

4 12:32:36   Q. Opioids are subject to much higher regulations than just

5 12:32:40   other oxygen or other substances, correct?

6 12:32:43   A. Correct.

7 12:32:44   Q. And that's, in part, because of their higher risks and

8 12:32:48   the need to know about those risks before distributing those

9 12:32:51   opioids?

10 12:32:52   A. That is not always true, no, that is not completely true.

11 12:32:56         I can explain why that -- the answer to that is.

12 12:33:02   Q. I'm sorry?

13 12:33:02   A. I can explain --

14 12:33:03   Q. If you need more time to give your answer, please.

15 12:33:05   A. Oh, thank you.

16 12:33:06         We know at that is not exactly true.  Because when

17 12:33:10   we look at the DEA classification of drugs, we talk about

18 12:33:15   heroin being a Schedule I, no obvious -- they say no medical

19 12:33:19   use for heroin.  Although heroin used to be an

20 12:33:23   over-the-counter medicine, a cough medicine.  It was widely

21 12:33:25   used back in the 1920s.  So medicine -- heroin is a medicine.

22 12:33:29   But is not recognized by the government as having a medical

23 12:33:32   use.

24 12:33:32         Cocaine is a Schedule I drug.  We use cocaine all

25 12:33:38   the time in surgery for patients that have dental procedures,

1  12:33:41   for example, nasal procedures.

2  12:33:43          Marijuana, which is legal in this state, to the best

3  12:33:47   of my knowledge, and a lot of people use marijuana, is

4  12:33:51   federally a Schedule I drug.  The DEA categorizes marijuana

5  12:33:57   as though it was heroin or cocaine.

6  12:34:00          So we know marijuana has medical properties.  We

7  12:34:05   know it does.  However, it's classified as a Schedule I.

8  12:34:10          Therefore, I can't tell you exactly how or why the

9  12:34:15   DEA classifies their drugs, but they do.  And they do talk

10 12:34:20   about being more addictive.  We know that that is what they

11 12:34:23   say.  Scientifically, clinically, that is not always true.

12 12:34:29   Q. You don't particularly like the DEA, do you, Doctor?

13 12:34:31   A. I don't -- I like the DEA, I like -- I think their job is

14 12:34:38   extremely important.  The DEA helps protect us, and I

15 12:34:43   absolutely support their activities.

16 12:34:44   Q. Do you think there is too much regulation for doctors and

17 12:34:48   nurse practitioners that prevents them from prescribing these

18 12:34:51   schedule -- controlled substances that you've just discussed?

19 12:34:54   A. Not necessarily.  I think there are -- there are

20 12:34:58   regulations that need to be appropriate regulations.  And

21 12:35:01   sometimes they miss the mark.  They try to go after the

22 12:35:03   prescribing, the number of pills, for example.  And people

23 12:35:09   get harmed in the process.  Like, for example, when you limit

24 12:35:11   the number of prescriptions that somebody can get, legitimate

25 12:35:14   pain patients do not get access to their medicine.

1  12:35:17          In fact, over the last 10 years, it might surprise

2  12:35:21  you to know that the number of prescribing, the pills has

3  12:35:24  gone down 44 percent in the last decade, the number of pills.

4  12:35:27  However, in the same time period, the number of overdoses

5  12:35:30  from opioids has gone up over 300 percent.

6  12:35:37          So to think that we just need to regulate one aspect

7  12:35:41  of this, the prescribing, and we're going to get the

8  12:35:43  achievement that we want, the data that we have now does not

9  12:35:47  justify that.

10 12:35:48          I do believe in regulations.  These were medications

11 12:35:51  that we do have to have regulations for, but they need to be

12 12:35:54  proper, they need to be done correctly, so that the proper

13 12:35:57  outcome and safety can happen.  We don't always get this

14 12:36:00  right.

15 12:36:01  Q. You do realize this is a criminal case, correct, Doctor?

16 12:36:05  A. Yes.

17 12:36:06  Q. And it's not your role to -- do you think it's your role

18 12:36:09  to determine whether the law charged is appropriate or not?

19 12:36:13  A. Of course not.

20 12:36:14  Q. And you realize -- do you think it's appropriate for you

21 12:36:19  to change your opinion to prevent defendant from being

22 12:36:22  convicted of a criminal charge?

23 12:36:23  A. Do I think it's important to -- I don't know what you are

24 12:36:27  asking me.

25 12:36:27  Q. Do you think it's appropriate for your views on the

1 12:36:30  propriety of drug laws to influence how you review this case?

2 12:36:35   A. You are going to have to ask me that a better way, I'm

3 12:36:39  sorry.  The propriety of drug laws?

4 12:36:40   Q. Do you think your views on whether or not drug laws are

5 12:36:44  appropriate, or whether or not the classification of certain

6 12:36:47  drugs is appropriate should influence your review of this

7 12:36:51  case?

8 12:36:52   A. So whether my views on the classification of drugs by the

9 12:36:58  DEA, how should it influence my opinion on this case?

10 12:37:02   Q. I asked, do you think it's appropriate for it to

11 12:37:06  influence your opinion?

12 12:37:06   A. Of course it's appropriate.

13 12:37:13   Q. Now, you feel passionately, in fact, about doctors being

14 12:37:16  regulated when it comes to prescribing pills, don't you?

15 12:37:20   A. You know, I wouldn't use the word passionate about it.  I

16 12:37:23  mean, obviously I believe that -- first and foremost, I'm a

17 12:37:29  physician, and I have an oath.  And I have my -- what I want

18 12:37:33  to do is to provide the best -- you know, pain care for

19 12:37:35  people.  I want them to have better quality of life.

20 12:37:38           If that is passion, that is -- I'm guilty of that.

21 12:37:41  But I want what is best for my patients, and I want

22 12:37:45  physicians and nurse practitioners, providers, to be able to

23 12:37:48  do that.

24 12:37:49   Q. Are you familiar with the Dr. Suess poem How the Grinch

25 12:37:55  Stole Christmas?

1 12:37:55   A. Yes.

2 12:37:56   Q. And are you familiar with in that story the kind of the

3 12:38:00   protagonist or the Who family -- or the Who village is the

4 12:38:04   good guys and the Grinch is kind of the bad guy.  Fair?

5 12:38:08   A. Well, you know, I think the Grinch --

6 12:38:13            THE COURT:  Yeah, just --

7 12:38:15            MR. BALDING:  It will become relevant very quickly,

8 12:38:18   Your Honor.

9 12:38:18            THE COURT:  Immediately.

10 12:38:19           THE WITNESS:  The Grinch is an antihero.

11 12:38:20           MR. DRISCOLL:  Objection, Your Honor.

12 12:38:21           THE COURT:  The objection is overruled, based on the

13 12:38:23   next --

14 12:38:23           MR. DRISCOLL:  My apologies.

15 12:38:25           THE WITNESS:  How the Grinch Stole Christmas is, the

16 12:38:28   Grinch is an antihero.  And the Grinch, if you really read

17 12:38:34   the poem, you understand the Grinch acts the way he does

18 12:38:38   because he misunderstands Christmas.  He also has a heart

19 12:38:42   that is two sizes too small, if you read the Grinch.

20 12:38:45           And over the course of the poem, the Grinch actually

21 12:38:51   becomes the hero.  So the Grinch has a hero's journey.  So

22 12:38:55   he's not really a good guy or a bad guy.  He's simply an

23 12:38:59   individual who has a journey, and we see that in that

24 12:39:03   wonderful Christmas poem.

25 12:39:05   Q. And you took the Grinch that Stole Christmas, and you

1 12:39:10 made a version of the poem called How the Ghost Stole Pain

2 12:39:14 Care, applying it to pain prescribing, did you not?

3 12:39:16  A. I did.

4 12:39:24       MR. BALDING:  Can this be marked for identification

5 12:39:26 as Exhibit 61?

6 12:39:28       May I approach, Your Honor?

7 12:39:28       THE COURT:  You may.

8 12:39:46  Q. I'll represent this was taken as screen shots from a

9 12:39:49 full-length seven-minute video.  Do you recall seeing that

10 12:39:53 video?

11 12:39:54  A. Oh, I've seen this video, yes.

12 12:39:56  Q. And it's got animation, narration, video.  It's quite a

13 12:40:02 high production value.  Would you agree?

14 12:40:04  A. I didn't do the production value, I didn't put it

15 12:40:07 together.  I wrote the poem.  And I think it came out great.

16 12:40:12 I like it.

17 12:40:13  Q. So on the second page, it's titled How the Ghost Stole

18 12:40:17 Pain Care, and then the third page, by James Patrick Murphy.

19 12:40:20 So these are screen shots of that poem, correct?

20 12:40:23  A. Yes.  This was published by the -- I was president of the

21 12:40:26 Greater Local Medical Society, and so I -- this is kind of

22 12:40:30 my -- I did this for them over for the Halloween sort of

23 12:40:34 time.  And the Medical Society published this on their

24 12:40:37 website, and they put this together for me.

25 12:40:39  Q. Starting with the fifth page of the exhibit.  I

1 12:40:42  apologize, they are not numbered, but it's the one with the

2 12:40:44  time stamp says 00 colon 25 on the bottom left.

3 12:40:52       Do you see that page?

4 12:40:55  A. I'm sorry, I don't see -- oh, 00:25?

5 12:40:59  Q. Yes.

6 12:41:00  A. Yes, I got it right here.

7 12:41:01  Q. So you wrote, every Louisville doctor liked pain care a

8 12:41:05  lot, but the chilling pain ghost of the clinic did not.  The

9 12:41:08  ghost hated pain pills no matter the season.  If you want to

10 12:41:11  know why, I will tell you the reason.

11 12:41:13       Did you write that?

12 12:41:14  A. Yes.

13 12:41:15  Q. And so in this context, the ghost, like the Grinch, hates

14 12:41:23  something, correct?

15 12:41:25  A. The ghost hated pain pills.

16 12:41:27  Q. And in the Grinch, the Grinch hated Christmas, right?

17 12:41:31  A. I think so.  I'm not quite exactly sure, but I think that

18 12:41:33  is the case.

19 12:41:34  Q. And you say, in the next page, the children proof caps

20 12:41:45  didn't screw on quite right, it could be perhaps that the

21 12:41:48  threads were too tight.  Or maybe the banshee's screams were

22 12:41:53  in vein, because no one believed that he had phantom pain.

23 12:41:56  But really, the most likely reason of all was that his dose

24 12:41:57  was two sizes too small.  So whatever the reason, the dose of

25 12:42:00  the threads, he haunted the clinic, so hating the meds.

1 12:42:03        Did you write that?

2 12:42:03    A. Yes.

3 12:42:05    Q. Again, in this, are you trying to compare the Grinch to

4 12:42:12    some sort of regulator who would take away the ability to

5 12:42:15    prescribe pain pills?

6 12:42:17    A. No.  No.  First of all, it's not the Grinch, it's the

7 12:42:21    ghost.

8 12:42:22    Q. My apologies.

9 12:42:23    A. Apology is accepted.

10 12:42:25        But the -- you know, the Grinch didn't like

11 12:42:28    Christmas.  I think we all agree that Christmas is an okay

12 12:42:32    thing.  The Grinch was wrong.

13 12:42:33        The ghost didn't like pain care, didn't like pain

14 12:42:37    pills.  The ghost finds out later, like Christmas, it's

15 12:42:40    actually maybe can be a pretty good thing.

16 12:42:42        So I forgot what your question was, but I'm sorry.

17 12:42:50    Q. It's all right.

18 12:42:54        And then if we start on the page -- I think it's

19 12:42:57    just confirming what you just said, but a few pages long, it

20 12:43:00    says, and then, oh, the pills, oh, the pills, pills, pills,

21 12:43:04    pills, that's one thing he hated, the pills, pills, pills,

22 12:43:06    pills.

23 12:43:07        Is that consistent with he -- the ghost hates pills,

24 12:43:10    right?

25 12:43:10    A. Well, you know, the ghost hates a lot of things, I think.

1  12:43:15   I think the ghost represents somebody who is just misguided,

2  12:43:19   just doesn't understand what pain management is really all

3  12:43:21   about.  And the ghost finds out later on -- so you are going

4  12:43:24   to find out hopefully what the answer to this is.

5  12:43:26   Q. Oh, he comes around, he comes to love pills, just like

6  12:43:29   you, Doctor?

7  12:43:30   A. Not necessarily.  He doesn't.  The ghost --

8  12:43:32   Q. We'll get to that.

9  12:43:33   A. Yeah.

10 12:43:34   Q. I'm sorry?

11 12:43:36        THE COURT:  Counsel, I think the jury's gotten your

12 12:43:38   point here.  We are not going to go through --

13 12:43:41        MR. BALDING:  One more, or two more, Your Honor.  I

14 12:43:43   think there is some important different things to point out.

15 12:43:46   And I'll be brief.

16 12:43:48        THE COURT:  All right.

17 12:43:48        MR. BALDING:  If the Court will allow.

18 12:43:49        THE COURT:  One more.  I think you are making --

19 12:43:54   you've made your point, but this is just not the way to do

20 12:43:58   this.

21 12:43:59        MR. BALDING:  I'm trying to get into the passion

22 12:44:02   with which he views this subject, Your Honor, that's all.

23 12:44:04   Q. And finally, if you look at the page that starts 0356, it

24 12:44:10   talks about the ghost.  The last thing he left was the pain

25 12:44:13   legislation to torment and trigger the doc's resignation.

1 12:44:17   And onto his ivory tower he flew to judge those below from

2 12:44:21   his smug point of view.

3 12:44:23           Did you write this?

4 12:44:25   A. I'm sorry, where are you at?  On which one?

5 12:44:25   Q. 356 on the bottom, is the time stamp.

6 12:44:28   A. Oh, 356?  Okay.

7 12:44:32           THE COURT:  This page, Doctor.

8 12:44:35           THE WITNESS:  Okay.  Thank you.

9 12:44:45           You are not going to go to the part where he took

10 12:44:47   all the x-ray machines and everything?

11 12:44:49   Q. I was prepared to go through the whole thing, but I think

12 12:44:51   the Court thinks it's a waste of time.

13 12:44:53           THE COURT:  Doctor, what we go through will be

14 12:44:55   determined by me based on what is helpful to the jury.  So

15 12:44:58   let's have the one more page and then move on.

16 12:45:00   Q. It's this last page about antagonizing pain legislation,

17 12:45:07   and characterizing the ghost as being on an ivory tower to

18 12:45:10   judge those below from his smug point of view.

19 12:45:10           Is this how you view the DEA?

20 12:45:12   A. Oh, of course not.  The DEA is fine people.  And they do

21 12:45:16   a very important job.  I support the DEA.  Absolutely.

22 12:45:19           But you know, nobody is perfect, and I think that

23 12:45:24   people can get things wrong.  I think that the ghost here

24 12:45:29   just didn't really understand what pain care was all about.

25 12:45:33   And you know, we talk about that being in an ivory tower, you

1  12:45:38   know.  And the legislation -- I mean, granted, I'll tell you,

2  12:45:44   there is a lot of physician issues with -- and prescriber

3  12:45:47   issues with various legislations.

4  12:45:50        As I told you earlier, most doctors don't read the

5  12:45:52   legislation.  I have stood up and given seminars before where

6  12:45:57   I'm trying for the Kentucky Board of Medical Licensure, talk

7  12:46:01   to an entire room of doctors and explain to them, you can

8  12:46:04   still do this.  I'm going to simplify the regulations for

9  12:46:07   you.

10 12:46:07        And I remember the first time I did this, a doctor

11 12:46:09   who I recognized as being a physician leader in our city,

12 12:46:12   stood up in front of all the doctors and said, Dr. Murphy, I

13 12:46:15   have one for you.  I said, sure what is it?  He said, if I

14 12:46:19   just quit prescribing pain medicine all together, do I have

15 12:46:22   to bother with this?

16 12:46:23        And I thought, and I gave the worst answer I could

17 12:46:26   possibly give.  I said, no, which kind of true, if you don't

18 12:46:31   prescribe, it doesn't apply to you.  He said, thank you.

19 12:46:33   That is all I needed.  Stood down.  And I saw heads nods, and

20 12:46:37   I thought, oh, my gosh.  People are not going to treat pain

21 12:46:40   because of this.

22 12:46:41        And that is what all of these -- this legislation

23 12:46:46   has the potential of doing.  And I think that if we do it

24 12:46:49   correctly, and do it right, and do it in a proper way, I

25 12:46:53   think it's fine.  We do have to have regulations for these

1 12:46:55   things.  It's just all over the board in different

2 12:46:59   jurisdictions, and it does limit access to people who need it

3 12:47:04   and are deserving of pain care.

4 12:47:14    Q. If you go back to Exhibit 59, that I handed to you, that

5 12:47:20   is the guidelines from the Medical Board of California.

6 12:47:29         You see page 10 of that document?  Do you see that,

7 12:47:57   page 10?

8 12:47:57    A. Yes.

9 12:47:57    Q. All right.  The top it says, opioid medications may not

10 12:48:00   be the appropriate first line of treatment for a patient with

11 12:48:04   chronic pain.  Other measures, such as nonopioid analgesics,

12 12:48:09   nonsteroidal anti-inflammatory drugs, antidepressants,

13 12:48:12   antiepileptic drugs, and nonpharmacologic therapies, for

14 12:48:18   example, physical therapy, should be tried, and the outcomes

15 12:48:20   of those therapies documented first.

16 12:48:23         Do you agree with that?

17 12:48:23    A. I agree with the way it's written.  They use the word

18 12:48:26   "may."  Opioid medications may not be the appropriate first

19 12:48:31   line treatment.

20 12:48:32         And by using the word "may," the authors are saying

21 12:48:36   that they may also be the first line treatment.  So I'm okay

22 12:48:39   with that.

23 12:48:39         And I also -- later on they say "should be tried."

24 12:48:42   They are giving their opinion that should be -- the opioid

25 12:48:47   therapy should be considered only -- should be considered

1 12:48:50  only when other more therapies have proven inadequate.

2 12:48:53         So words like "should" and "may," I find those to be

3 12:48:58  fine utilizations of the words in documents such as these.

4 12:49:04   Q. And you just read part of it, but you agree that opioid

5 12:49:08  therapy should be considered only when other potentially

6 12:49:10  safer and more effective therapies have proven inadequate.

7 12:49:15  You agree?

8 12:49:15   A. I would say that I don't agree exactly with the way that

9 12:49:19  is written.  It should -- it would be better written if they

10 12:49:23  said opioid therapy should be considered when -- not -- get

11 12:49:29  rid of the word "only."  Just say opioid therapy should be

12 12:49:32  considered when other potentially safer and more effective

13 12:49:38  therapies have been assessed as potentially inadequate.

14 12:49:48  Because you don't know exactly -- if you are giving people

15 12:49:50  multiple medications, multimodal therapy, I'm giving you

16 12:49:53  muscle relaxants, anti-inflammatories, I'm not sure exactly

17 12:49:58  what is making you well.  It may be that the opioid is

18 12:50:01  actually the best drug for you.

19 12:50:03         For example, an older person that has bad kidneys,

20 12:50:06  you can't give them Motrin.  You can't give them Alive.

21 12:50:10  Somebody with a bad liver, you can't give them Tylenol.  That

22 12:50:14  would be the wrong thing for them.  In those cases the opioid

23 12:50:18  might be the best first line treatment for that.

24 12:50:20         That is not just my opinion, the American Academy of

25 12:50:24  Geriatrics has said that in the past as well.

1  12:50:27          So these are -- you know, statements that are

2  12:50:30  definitive, I don't agree with them, and that is -- but this

3  12:50:35  statement is close to being acceptable.

4  12:50:39          You know, when I -- when Kentucky put out their

5  12:50:42  Medical Board regulations, I was grateful that I was invited

6  12:50:46  over when they were turning their -- the law into the

7  12:50:50  regulations, and I got to sit down with the lawyer in

8  12:50:52  Kentucky.  And we went through and we worked on a lot of the

9  12:50:56  words.  He wanted so many of these words to be "must" and

10 12:50:59  "shall," with, you know, black and white.

11 12:51:02          And I said, you know, medicine is not like that.

12 12:51:04  Medicine is about individual circumstances.  And we don't

13 12:51:08  always get it right.  We have to have some flexibility.

14 12:51:11          So I was able to add flexible words into this final

15 12:51:15  document.  We did a pretty good job.  It's still not great.

16 12:51:18  And I wish that we could do another job with it.

17 12:51:21          But I don't know who wrote this.  This is from

18 12:51:23  California.  I would assume they have -- they had doctors

19 12:51:27  helped write this.  I have no idea who the authors were.

20 12:51:31  It's a government document and, you know, it's not perfect.

21 12:51:35  It could be improved.

22 12:51:38  Q. You would agree that the document doesn't distinguish

23 12:51:40  between mild or more stronger opioids, right?

24 12:51:47  A. I mean, on this page?

25 12:51:49  Q. The portion we just referenced on page 10.

1  12:51:51   A. On page -- it says opioid medications.

2  12:51:53   Q. Right.

3  12:51:54   A. So --

4  12:51:55   Q. Now, on your -- I'm sorry.

5  12:51:57          Back to your article, the five step, which has been

6  12:52:02   marked as Exhibit 58.  The five step initial approach

7  12:52:07   article.  Do you have that?

8  12:52:08   A. I do.

9  12:52:09   Q. Go to page 10 of 15 on the bottom.  Do you see that

10  12:52:16   starts with a chart?  Do you see that page?

11  12:52:19   A. Yes.

12  12:52:20   Q. Now, the table is titled Recognizing Opioid Misuse and/or

13  12:52:25   Addiction in Patients on Chronic Opioid Therapy, do you see

14  12:52:28   that?

15  12:52:28   A. Yes.

16  12:52:30   Q. And on the left, it talks about components of addiction,

17  12:52:34   on the right it talks about possible expressions in patients

18  12:52:37   on chronic opioid therapy, right?

19  12:52:39   A. Yes.

20  12:52:40   Q. Now, in the second column, second row of the body, I

21  12:52:48   guess it's the third row of the chart, but the second

22  12:52:51   substantive row, it talks about recurring requests for

23  12:52:57   increases in opioids.  And then number 3, dismisses nonopioid

24  12:53:02   treatment.  And 4, focuses on medication and not on other

25  12:53:04   activities.

1 12:53:05          Would you agree that these were things that UC1 and

2 12:53:09    UC2 did in their visits?

3 12:53:11     A. Well, this -- this chart here is -- wasn't my -- I didn't

4 12:53:28    author this.  This comes from Dr. Manchikanti, who I think I

5 12:53:33    remember a reference here earlier to the American Society of

6 12:53:35    Interventional Pain Physicians.  Dr. Manchikanti, he's from

7 12:53:39    Kentucky, Paducah, Kentucky, and I know him.  He started the

8 12:53:42    American Society of Interventional Pain Physicians.  I'm an

9 12:53:46    interventional pain physician, too, I do those procedures.

10 12:53:49   I'm not a member of that society, but I do know

11 12:53:51   Dr. Manchikanti.

12 12:53:52          And you know, this -- I'm not sure where it comes

13 12:53:57   from, but their guidelines say that they are strictly

14 12:54:01   guidelines, and they are not to be considered standards of

15 12:54:04   care.

16 12:54:04          I think these are put in there because -- and I put

17 12:54:08   this in my report, because I wanted physicians to understand

18 12:54:13   that if these things happen, you know, these could be

19 12:54:17   indications of further explanation.

20 12:54:20          But I think that -- I recall that both of those

21 12:54:28   patients, or at least one of them did ask for a stronger

22 12:54:31   opioid.  They asked for Norco as opposed to tramadol.

23 12:54:39          I think that in one instance she gave Norco 5s when

24 12:54:43   the patient was on tramadol 50.  That is not an increase.

25 12:54:48   That is -- if you use those tables, which are flawed, by the

1  12:54:51   way, the morphine milligram equivalents.  But if you use

2  12:54:58   those tables, she gave him the exact same amount of opioid

3  12:55:01   strength.

4  12:55:01        But the idea is that, is the medication not working?

5  12:55:06   Can we get you a medication now that works?

6  12:55:08        And patients are constantly asking for increases in

7  12:55:12   opioids.  People call my office all the time and they will

8  12:55:15   say, I need to increase in my pain medicine, I need this and

9  12:55:19   I need that.  And I'll tell my staff, well, what they are

10  12:55:22   really saying is their pain is not well controlled, so let's

11  12:55:25   figure out what I can do to help them get their pain under

12  12:55:29   better control, or what is the reason they are asking for

13  12:55:31   that?

14  12:55:31        And when -- I guess, in these other things here,

15  12:55:36   dismisses nonopioid treatments.  I'm not sure that these

16  12:55:41   undercover agents, acting as legitimate patients, I'm not

17  12:55:46   sure they were dismissing.  They were just saying that, hey,

18  12:55:49   they didn't work for me.  That is not dismissing.  That is

19  12:55:52   saying, I tried it, they are not effective for me.  And

20  12:55:55   that's information that is valid.  That is what I want

21  12:55:59   patients to tell me.

22  12:56:07   Q. Are you familiar with the concept of informed consent?

23  12:56:10   A. Yes.

24  12:56:10   Q. That means describing the benefits, the risks and the

25  12:56:14   alternatives of a particular drug with a patient, right?

1  12:56:16   A. No.

2  12:56:16   Q. What is it?

3  12:56:17   A. Informed consent is not a piece of paper, it's not a

4  12:56:24   document.  And this is according to the American Medical

5  12:56:28   Association.  I agree with this.  Informed consent is a

6  12:56:31   process.  It is communication between the provider and the

7  12:56:36   patient, so that the patient can have what we call in

8  12:56:40   medicine the ethic of autonomy.  That means the patient can

9  12:56:44   make their own decisions.

10  12:56:46        So what I'm trying to do in getting this informed

11  12:56:50   consent, is provide the patient with enough information to

12  12:56:55   make a decision with me, make a decision on what we are

13  12:56:59   doing.  So they can agree to having it done.

14  12:57:01        It's not a piece of paper.  It is a process.  And it

15  12:57:05   varies from situation to situation.

16  12:57:06        And I'll tell you this:  When I first we want to the

17  12:57:09   Mayo Clinic in 19 -- I think 1997, so not that long ago

18  12:57:14   really, but 1997, I arrived there, and when I started working

19  12:57:17   there, I asked them, I said, well, we are going to do a

20  12:57:21   procedure on somebody, I need to get an informed consent

21  12:57:25   form.  And they said at the Mayo Clinic, we don't have

22  12:57:28   informed consent forms here.  And I was like, well, we had

23  12:57:31   them in my office in Elizabethtown, Kentucky.  Mayo Clinic

24  12:57:36   doesn't have an informed consent?  They go, no, we expect you

25  12:57:39   as a physician, as a Mayo Clinic physician, to discuss this

1 12:57:43  with your patients.  You can write it down and document it

2 12:57:45  the record that you did this.  We don't have forms for this.

3 12:57:47        And I thought that was really, really interesting.

4 12:57:49  And I thought it was cool.  I thought they expected us to

5 12:57:52  communicate with our patients.

6 12:57:54        So informed consent is a process by which we

7 12:57:58  communicate with patients so they can have autonomy in their

8 12:58:01  decision making.

9 12:58:03        MR. BALDING:  Your Honor, my apologies.  I want to

10 12:58:05  inform the Court, I believe my estimate for how long I would

11 12:58:09  go would be a little low based on the way things are going.

12 12:58:11        THE COURT:  Let's take our second break, since we

13 12:58:14  had the earlier break.  Let's try to get going again at 1:15.

14 12:58:18  We'll go to 2:30, or a little thereafter, depending on what

15 12:58:23  is going on.

16 12:58:24        So remember what I told you, ladies and gentlemen,

17 12:58:26  don't discuss or investigate the case.

18 12:58:28        (Thereupon, the jury retired from the courtroom.)

19 12:58:58        THE COURT:  Dr. Murphy, you may step down.

20 12:59:04        Anything before we break?

21 12:59:07        MR. BALDING:  Nothing.

22 12:59:08        MS. MURPHY:  A couple of matters.  I might just wait

23 12:59:10  until Dr. Murphy --

24 12:59:11        THE COURT:  Doctor, if you would leave the

25 12:59:13  courtroom, please.  And Dr. Munzing as well.

1 12:59:27          MS. MURPHY:  So, Your Honor, we had -- at our last

2 12:59:30   little mini break we talked about whether Ms. Rahbarvafaei

3 12:59:33   would be testifying.

4 12:59:34          I would request -- just given how late we are in the

5 12:59:37   day already, I would request the night to go over that with

6 12:59:40   her, and then --

7 12:59:41          THE COURT:  We'll see how late it goes.  I mean, I'm

8 12:59:43   not -- it's -- we'll see on the timing.  If it's 10 minutes,

9 12:59:48   if it's 2:20, the answer is yes.  If it's 2:00, the answer is

10 12:59:51  no.  Talk to her right now.

11 12:59:54         It's just -- you've had essentially since the day

12 12:59:57  you were hired to make the decision, which isn't to say it

13 13:00:00  won't be a decision appropriately made in the moment, but

14 13:00:03  this is the moment.

15 13:00:04         So the answer for anymore time than say ten minutes

16 13:00:09  is no.  You will either rest or you will put her on.

17 13:00:12         MS. MURPHY:  All right.  Your Honor, I do just want

18 13:00:14  to say, we gave the government the courtesy of letting

19 13:00:16  Dr. Munzing testify on another day.  This is a very big

20 13:00:20  decision for her.  Given that we are going to have to come

21 13:00:23  back for closing arguments anyway, I respectfully would

22 13:00:27  request the rest of the day.

23 13:00:28         THE COURT:  I understand that.  It is certainly a

24 13:00:30  big decision.  It is often said in private practice that you

25 13:00:33  are paid to make that decision, and all the other work you do

1 13:00:35  for the client is free.  So I understand that.

2 13:00:38          Nonetheless, I have told you what the situation is.

3 13:00:41  Like I said, if we are around 2:20 or so, then sure.  But if

4 13:00:45  any more time than that, then the decision will have to be

5 13:00:48  made.

6 13:00:49          MS. MURPHY:  All right.  Thank you.

7 13:00:51          (Thereupon, there was a brief recess.)

8 13:17:05          THE COURT:  You all may sit down until the jury

9 13:17:09  enters the courtroom.

10 13:17:28          (Thereupon, the jury returned to the courtroom.)

11 13:18:03          THE COURT:  Welcome back, ladies and gentlemen.

12 13:18:05          All of you are here, as are the defendant and the

13 13:18:10  lawyers.  The witness is on the stand, still under oath.

14 13:18:14          Counsel, you may proceed with your

15 13:18:17  cross-examination.

16 13:18:18  Q. Dr. Murphy, it's important for physicians to keep good,

17 13:18:23  appropriate, accurate medical records, correct?

18 13:18:27  A. Yes.

19 13:18:29  Q. The medical records should reflect what actually happened

20 13:18:33  at visits with the patient, correct?

21 13:18:35  A. Yes.

22 13:18:35  Q. And it would be inappropriate to document something as

23 13:18:38  happening when it did not, in fact, happen, correct?

24 13:18:41  A. Yes.

25 13:18:42  Q. And there are reasons for that, such as patient safety,

1 13:18:48   correct?

2 13:18:49    A. Yes.

3 13:18:49    Q. Now, you testified earlier that you frequently hear about

4 13:18:56   limited instances of diversion.  For example, using a single

5 13:18:59   pill or a few pills from someone else.  Correct?

6 13:19:01    A. Yes.

7 13:19:02    Q. Would it be important to document those kinds of

8 13:19:05   instances in the file even if you are not going to confront

9 13:19:08   or do anything else about it?

10 13:19:10    A. You know, I -- I think it's up to your judgment.

11 13:19:15        Sometimes these records can be misinterpreted.  If

12 13:19:19   somebody tells me something like that, I may not want that on

13 13:19:24   your medical record.  You might end up going to some other

14 13:19:27   doctor sometime and they will see that and they won't treat

15 13:19:30   you, because they don't understand that it's kind of common

16 13:19:32   behavior, or how I view it.

17 13:19:34        So, you know, I use my judgment as opposed to, you

18 13:19:39   know, what -- the type of things I put in their medical

19 13:19:42   records, what is important.

20 13:19:43        So, no, you don't always have to document that.

21 13:19:47    Q. How about -- let me ask you this:  If you had a

22 13:19:51   prescription previously for Norco from a legitimate

23 13:19:54   prescriber, another doctor, and on the patient's first visit

24 13:19:59   with you, they told you about that, would you document that

25 13:20:01   in the file?

1 13:20:03   A. That would be something that would be worthwhile to

2 13:20:05   document.  I'm not sure I would always do that, but that is

3 13:20:08   something that you could document.

4 13:20:10   Q. What are reasons you wouldn't document that?

5 13:20:12   A. Well, I don't always document everything that goes on in

6 13:20:15   a record or in a visit.  I document -- the reason for

7 13:20:18   documentation, number one, is that I have an idea, I know

8 13:20:23   what I did with that patient.  It's for me, going forward.

9 13:20:28   That is the number one reason that I -- you know, that I have

10 13:20:31   the records.

11 13:20:32        The other reasons people have medical records is

12 13:20:33   to -- for billing purposes, and they do it for legally, and

13 13:20:39   to kind of cover, you know, your bases for things.  There is

14 13:20:44   also data collection.

15 13:20:45        But by far the number one reason why we document

16 13:20:49   things in the record, it should be, is so that we know going

17 13:20:52   forward what we've done with that patient.

18 13:20:54   Q. Isn't it also important, though, in case the patient gets

19 13:20:59   transferred to someone else or a displaced pain patient, that

20 13:21:02   the prior doctor kept good records?  In other words, not just

21 13:21:06   for the treating doctors, but for future doctors it's

22 13:21:11   important to keep good records, right?

23 13:21:12   A. You know, good records are a good policy, period.  Having

24 13:21:15   good records is good medical practice.

25 13:21:17        So I always recommend, and I always welcome good

1  13:21:22  complete medical records.

2  13:21:23   Q. Now, if a patient reported taking a controlled substance

3  13:21:33  through diversion, for example, taking it from a relative, as

4  13:21:38  opposed to a legitimate prescriber, and you documented that,

5  13:21:43  would you also note that it was through diversion, or would

6  13:21:45  there be a way to distinguish in your records that it was

7  13:21:48  diversion as opposed to from a legitimate prescriber?

8  13:21:51   A. Okay.  Can you break that down for me, give me a shorter

9  13:21:55  question?

10  13:21:55   Q. If I'm looking at your patient records that you are

11  13:22:00  keeping, that are accurate, correct?

12  13:22:03   A. Okay.

13  13:22:04   Q. And you want -- you reflect -- you put down that a

14  13:22:08  patient has previously taken a controlled substance before

15  13:22:11  meeting you, say Norco.  You following me?

16  13:22:13   A. Okay.

17  13:22:14   Q. Would there be a way for me to determine whether that was

18  13:22:17  through a legitimate prescription or through diversion?

19  13:22:21   A. Would there be a way for you, as an attorney for the

20  13:22:24  Department of Justice to determine or --

21  13:22:26   Q. I'm sorry.  If I'm a medical doctor looking at your

22  13:22:29  records, would you note that something was through -- one

23  13:22:33  second.

24  13:22:36       What I'm trying to get at is, if you were told by a

25  13:22:40  patient that they received a prescription -- that they did

1 13:22:43  not receive a prescription, but they took a controlled

2 13:22:45  substance through diversion, say from a relative, and you

3 13:22:50  document that in the file as a medical history of having

4 13:22:54  taken that prescription, would you also document that it was

5 13:22:57  through diversion?

6 13:22:59   A. You know, I think if I document that they received it

7 13:23:03  from a family member, that is all I need to say.  That is

8 13:23:09  exactly what happened.

9 13:23:11   Q. All right.  Now, you mentioned in the context of urine

10 13:23:18  drug tests, that a physician should make a clinical judgment

11 13:23:23  whether to taper medication, keep it the same, or change

12 13:23:26  medication.  Do you recall that?

13 13:23:27   A. Probably in my report, so that sounds like a reasonable

14 13:23:34  plan.

15 13:23:35   Q. I think you said it earlier today, but if I'm wrong --

16 13:23:38  would it be appropriate to make a clinical judgment, not a

17 13:23:41  reflexive lower or raise of medication in the face of a urine

18 13:23:46  drug test that shows, say, a prescription opioid that wasn't

19 13:23:51  prescribed?

20 13:23:51   A. Yes.

21 13:24:06   Q. Now, if a patient tells a physician that a particular

22 13:24:10  medication is not working, what would be the reason to

23 13:24:14  continue prescribing that medication?

24 13:24:15   A. The reason -- the main reason was that I, as the

25 13:24:22  clinician, believe that continued prescribing of that

1 13:24:29  medication more so benefits the patient than harms the

2 13:24:32  patient.

3 13:24:33       So I balance the -- of the many decisions I could

4 13:24:38  make there, if I made that decision, it would be because, in

5 13:24:41  my judgment, continuing to prescribe that medication

6 13:24:45  presented more benefit to the patient than harm.

7 13:24:47  Q. Is that something you would discuss with a patient?

8 13:24:50  A. Well, not like that necessarily.  I mean, it's -- I mean,

9 13:24:55  I would -- in the context of that relationship, I'm trying to

10 13:24:58  establish that I'm doing things because I want to help the

11 13:25:01  patient.  And so, you know, I don't want to always have to

12 13:25:04  tell the patient everything I do, oh, by the way, this is

13 13:25:07  because I believe the benefit outweighs the harm.  I'm there

14 13:25:10  to help the patient, so we -- in that relationship, the

15 13:25:13  patient hopefully understands that, and those decisions are

16 13:25:18  made on that basis.

17 13:25:18  Q. I apologize.  I'm trying to talk about a more specific

18 13:25:22  instance.  I'm talking about the case in which you have

19 13:25:25  prescribed a controlled substance, and the patient comes back

20 13:25:28  and says, I'm not taking it, it didn't work.  Do you have

21 13:25:31  that in mind?

22 13:25:32  A. Yes.

23 13:25:32  Q. And you are saying, it may be appropriate to continue

24 13:25:36  prescribing that medication.  Is that your testimony?

25 13:25:38  A. Yes.

1  13:25:38   Q. And I'm asking if, in that hypothetical, would you also

2  13:25:43   explain to the patient why you are continuing to prescribe a

3  13:25:46   medication that the patient has told you doesn't work?

4  13:25:49   A. I would hope so.  Because that would be good medical

5  13:25:52   practice.  So I would -- I would -- hopefully that I would be

6  13:25:55   able to do that.

7  13:25:57   Q. What is a DTR in the context of a physical examination?

8  13:26:01   A. That usually means deep tendon reflex.

9  13:26:06   Q. And how does one conduct a deep tendon reflex or a DTR?

10 13:26:13   A. They palpate the tendon, and then see what happens.

11 13:26:21   Q. Is it kind of like the hit the knee and see if it

12 13:26:25   reflexes, is that the test?

13 13:26:27   A. That is one way of doing it.

14 13:26:28   Q. And does that require actual touching of the patient?

15 13:26:30   A. That will require something or somebody to touch that

16 13:26:37   tendon, yes.

17 13:26:38   Q. And is a DTR of plus 2 considered normal?

18 13:26:42   A. I'm not sure exactly what they are.  There is various

19 13:26:48   pluses to those things.  So I'm not sure what normal would

20 13:26:51   be.

21 13:26:51   Q. Now, you testified earlier that with respect to each of

22 13:27:00   the -- you reviewed each of the recordings and undercover

23 13:27:05   visits.  I'm going to show you a few of those recordings.

24 13:27:26          Pulling up the audio recording from Exhibit 1.  I'm

25 13:27:29   starting it at approximately the 40-second mark.

1 13:27:34        This would be the March 22nd, 2018 visit of UC1.  So
2 13:27:39   the second visit of UC1.
3 13:28:00        I think I put my speaker on mute.
4 13:28:03        I apologize, Your Honor.  May I have a moment?
5 13:28:06        THE COURT:  You may.
6 13:28:49        (Thereupon, the audio was played.)
7 13:30:29   Q. Doctor, you would agree that it's improper to write a
8 13:30:31   prescription in response to a patient's complaint about
9 13:30:35   paying for their visit, correct?
10 13:30:36   A. I'm sorry?
11 13:30:38   Q. Would you agree that it's improper for a physician to
12 13:30:40   write a prescription in response to a patient's complaint
13 13:30:44   about the amount of money they paid for their visit?
14 13:30:48   A. The amount of -- well, the finances of a patient and
15 13:30:54   whether they can afford certain treatments and therapies is
16 13:30:58   absolutely important in determining what the care is going to
17 13:31:00   be.  So it enters into the calculation of what you should
18 13:31:07   give that patient, by all means.
19 13:31:09   Q. So you heard earlier when he talks about taking his
20 13:31:12   girlfriend's Norco, and she's tired of taking -- her Norco,
21 13:31:18   you remember that?
22 13:31:19   A. Yes.
23 13:31:19   Q. And we talked earlier about minor diversion and things
24 13:31:22   like that.  I'm not going to ask you about that.  I'm going
25 13:31:24   to ask a hypothetical to see where the usual course of

1 13:31:28   professional practice may end in your mind.  Is that fair?

2 13:31:31    A. Okay.

3 13:31:31    Q. So if he had said, I need the Norco and I need to give

4 13:31:37   some of it back to her, would it be appropriate for the

5 13:31:41   doctor to prescribe -- or for the nurse practitioner to

6 13:31:44   prescribe Norco in that circumstance?

7 13:31:46    A. It would be appropriate if it was medically necessary.

8 13:31:53   It would be appropriate to prescribe.  It would not be

9 13:31:55   appropriate for him to get it back to his girlfriend because

10 13:32:00   he borrowed some from her.

11 13:32:01    Q. So you are saying it would be appropriate for a physician

12 13:32:04   who knows that diversion has been talked about to continue to

13 13:32:09   prescribe for that patient?

14 13:32:11    A. Not necessarily.  It depends upon the circumstances.  It

15 13:32:15   depends upon the -- how -- you know, what type of diversion

16 13:32:18   is going on here, what the circumstances are.

17 13:32:21         In a case like this, this to me sounds very common

18 13:32:25   and very understandable.  This is what people do, especially

19 13:32:28   when they live together and somebody has medications and

20 13:32:33   somebody doesn't, they often times share them.

21 13:32:36         For me to think as a doctor that is never going to

22 13:32:38   happen is fantasy.  You know that happens.

23 13:32:40         What I want to do going forward to try to give my

24 13:32:43   patient the right medication and try to get them to not do

25 13:32:48   that so that the whole household is functioning in an

1 13:32:53   appropriate manner going forward.

2 13:32:54   Q. Let me take it a step further.  And, again, I'm not

3 13:32:58   suggesting this happened here, but I'm taking a hypothetical,

4 13:33:01   fair?

5 13:33:01   A. Okay.

6 13:33:02   Q. If UC1 had said instead, I want to take half these pills

7 13:33:06   and sell them, and I'm going to use the other half, surely,

8 13:33:11   you would agree that she should not prescribe in that

9 13:33:13   circumstance, correct?

10 13:33:14   A. Correct.

11 13:33:15   Q. Okay.

12 13:33:20   A. That is my opinion.

13 13:33:22   Q. But to do that, in your opinion, would be outside the

14 13:33:24   usual course of professional practice, correct?

15 13:33:29          I mean, there is no doctor that hears that and

16 13:33:31   thinks that is okay, right?

17 13:33:32   A. No, that is not true.  There are some doctors who hear

18 13:33:34   that and in certain circumstances think that is okay.

19 13:33:38   Q. But those doctors would be outside the usual course of

20 13:33:40   professional practice?

21 13:33:41   A. This doctor did not think that was the case.

22 13:33:45          For example, I'll tell you, I heard this once, and I

23 13:33:48   don't remember the exact doctor, but I was at a meeting and

24 13:33:51   the doctor was in the -- was in the gallery, you know,

25 13:33:56   talking, and it was a seminar about prescribing.  And this

1  13:33:59  doctor had a patient who had heart failure and also had

2  13:34:03  chronic pain.  And this doctor was prescribing pain medicine

3  13:34:09  for this patient, knowing that the patient was selling some

4  13:34:13  of it, to pay for her heart medicine so she could survive and

5  13:34:18  not die from heart failure.

6  13:34:20       He had justified in his mind that that was okay.

7  13:34:25       Personally, I -- I know that that probably happens.

8  13:34:30  I really think it is a horrendous thing.  I hope that never

9  13:34:34  happens with what some of my patients.  And I would not -- I

10  13:34:37  would not advocate for that.  I would find some other way.

11  13:34:40       But I can tell you that it does happen in medical

12  13:34:44  care.  And the idea is that they are trying to put the

13  13:34:47  well-being of their patient first.

14  13:34:52  Q. The presence of a legitimate medical need, in other

15  13:34:57  words, if you think a patient legitimately has pain, and

16  13:35:00  should be prescribed opioids, that doesn't allow you to

17  13:35:05  ignore a patient that would tell you, I'm going to go sell

18  13:35:09  these drugs, right?

19  13:35:10  A. Of course not.  You should not ignore that.

20  13:35:12  Q. So a simple -- a single medical need that might be

21  13:35:15  legitimate doesn't legitimize any prescription for that need,

22  13:35:18  correct?

23  13:35:19  A. Correct.

24  13:35:28  Q. When we talk about legitimate medical purpose, you are

25  13:35:31  familiar, of course, with the hypocratic oath doctors swear

1 13:35:35  first do not harm, correct?

2 13:35:36   A. You know, the hypocratic oath is Hippocrates, who was a

3 13:35:44  Greek, and that has been changed over the years.  So I'm

4 13:35:46  familiar with the hypocratic oath, but I don't think doctors

5 13:35:49  necessarily swear to that anymore.  They swear to variations

6 13:35:53  of that.

7 13:35:56   Q. So a legitimate medical purpose would be something where

8 13:35:59  the risks don't outweigh -- sorry.  It wouldn't be a

9 13:36:06  legitimate medical purpose in risks outweighed benefits,

10 13:36:09  right?

11 13:36:13   A. Well, if in the physician's mind the risks outweighed the

12 13:36:20  benefits, it would very unlikely be a legitimate medical

13 13:36:26  purpose.

14 13:36:26   Q. For example, you wouldn't treat a minor wound with a

15 13:36:30  dangerous drug, right?

16 13:36:31   A. I might.

17 13:36:33   Q. Okay.  So --

18 13:36:35   A. It all depends upon the dosage and how I'm treating.

19 13:36:38   Q. You wouldn't treat a paper cut with fentanyl, right?

20 13:36:41   A. I might.

21 13:36:42   Q. Okay.  You might treat a paper cut with fentanyl?

22 13:36:45   A. Yeah, depending upon how bad the cut is and what else was

23 13:36:49  available.

24 13:36:49          Fentanyl is a very appropriate, useful medication.

25 13:36:54  We use it in medicine all the time, use it in hospitals,

1 13:36:57  emergency rooms use them.  It's usually -- it's potent, but

2 13:37:01  it's -- given the proper way, it's a very good medicine,

3 13:37:05  perhaps the most common medicine that we give in surgery.

4 13:37:08  So, yes, if somebody would come to see me as an

5 13:37:11  anesthesiologist, and they were having a surgical repair, for

6 13:37:14  example, of their paper cut, I might put them on a -- put

7 13:37:19  them on a fentanyl drip.

8 13:37:20  Q. You wouldn't prescribe heroin, though, would you?

9 13:37:22  A. We can't prescribe heroin.

10 13:37:23  Q. But what if it -- what if you really thought it had a

11 13:37:27  legitimate purpose to treat a particular patient, you still

12 13:37:29  wouldn't prescribe it because it's illegal, right?

13 13:37:31  A. Yeah, you could never get that filled.  However --

14 13:37:34  however, there are instances where heroin might actually be

15 13:37:37  the proper drug for the patient.

16 13:37:41          For example, if the patient is addicted to heroin,

17 13:37:43  and they -- that is the only drug available, otherwise they

18 13:37:46  are going into tremendous ill, I might allow them to use the

19 13:37:51  heroin that they have in an environment that is safe for

20 13:37:55  them.

21 13:37:56          But you can't prescribe it because it's a Schedule I

22 13:38:00  drug.

23 13:38:25  Q. Now, on direct you testified about patient PS,

24 13:38:33  Exhibit 40, do you recall that?  The patient file you looked

25 13:38:35  at about drug rehab stat?

1 13:38:38   A. Yes.

2 13:38:39   Q. So that was page 26 of Exhibit 40, I believe, where you

3 13:39:06   talked about the note says drug rehab stat.  And that was on

4 13:39:11   August 16th, 2018, right?

5 13:39:15   A. Yes.  That would appear to be the date.

6 13:39:17   Q. I'm flipping up the next note, which appears to be

7 13:39:32   September 18th, 2018.  Do you see that?

8 13:39:35   A. Yes.

9 13:39:36   Q. Is there any indication in the notes that any followup

10 13:39:39   was done on the referral to rehab?

11 13:39:41   A. I don't see any notes on that.

12 13:40:03   Q. And on page 14 of Exhibit 40, it appears that on that

13 13:40:08   same date, September 13, 2018, that oxycodone was again

14 13:40:15   prescribed, right?

15 13:40:23   A. Can I see the date again?

16 13:40:25   Q. Sorry.  Was it September 13, 2018, I believe?

17 13:40:32   A. My interpretation is that is September 13th, 2018.

18 13:40:36   Q. I mean, you can look at the previous note.  I think it's

19 13:40:39   consistent with that note, do you agree?

20 13:40:42   A. Yes.

21 13:40:51   MR. BALDING:  Your Honor, may I have a moment?

22 13:40:53   THE COURT:  You may.

23 13:40:54   (Pause in proceedings.)

24 13:41:32   Q. You would agree that it's not proper for a physician to

25 13:41:34   make promises about a future prescription before the actual

1 13:41:39   visit where they prescribe that, correct?

2 13:41:42    A. It might be okay to do that.  It's, again, behavior

3 13:41:46   modification.  If I'm trying to get a patient to do the right

4 13:41:49   thing and say, you know, well, we can return back to what was

5 13:41:53   working for you if you do some things that I'm asking you to

6 13:41:57   do.

7 13:41:57         So, yeah, it could be very reasonable to give them

8 13:42:01   that expectation.

9 13:42:03         MR. BALDING:  No further questions, Your Honor.

10 13:42:04        THE COURT:  Thank you.

11 13:42:05        Redirect.  Stay within the scope, please.

12 13:42:05                   REDIRECT-EXAMINATION

13 13:42:05

14 13:43:04   BY MR. DRISCOLL:

15 13:43:04    Q. Dr. Murphy, we heard on cross-examination about a silly

16 13:43:07   Grinch poem you wrote.

17 13:43:09    A. I'm sorry, what?

18 13:43:10    Q. We heard about a silly Grinch poem you had written.  Do

19 13:43:14   you remember that?

20 13:43:16        THE COURT:  Counsel, it's for the jury to decide if

21 13:43:18   it's silly or not.  You can ask him if he thinks it's silly,

22 13:43:22   but don't characterize the evidence.

23 13:43:25        MR. DRISCOLL:  Of course.

24 13:43:26    Q. Did you intend that poem to be entertaining?

25 13:43:29    A. I mean, the poem had a message, and it's an important

1 13:43:33   message, and sometimes you present these messages in a way

2 13:43:37   that people will find them pleasurable or entertaining to

3 13:43:41   listen to.

4 13:43:42        So I wanted the message to get out.  And the main

5 13:43:46   purpose, though, was that it not be entertaining, the main

6 13:43:52   purpose was the message of the poem.

7 13:43:53   Q. And was that point that well intentioned regulators can

8 13:43:57   sometimes get things wrong?

9 13:43:58   A. Well, it wasn't about regulators, it was about well

10 13:44:01   intentioned -- people that don't understand pain care.  And

11 13:44:03   it's widespread.  I mean, there is a lot of misinformation

12 13:44:07   about pain care out there.  It's not just regulators alone,

13 13:44:11   it's not people that look into this.  It's the public in

14 13:44:14   general don't understand pain care like they should.

15 13:44:17        And it's part of my duty on the American Medical

16 13:44:21   Association's substance abuse and pain care task force to

17 13:44:25   help get the message out there is that is correct, based on

18 13:44:27   evidence, based on science, based on what we know now.

19 13:44:30   Q. Is that because you want to treat pain?

20 13:44:32   A. I want to benefit the patient.  I want the patients to do

21 13:44:36   well.  I want the patients to be well.  And there is so much

22 13:44:40   untreated pain in this country, it's a tremendous epidemic in

23 13:44:46   and of itself.  I want them to have access to that.

24 13:44:48   Q. And is there a risk of undertreating pain?

25 13:44:51   A. Absolutely.

13:44:51   1   Q. Can you explain what that would be?

13:44:54   2   A. We lose billions of dollars each year in just people not

13:45:00   3   productive, because they can't work, because of pain.  Also,

13:45:04   4   there is tremendous amount of suffering involved.

13:45:07   5             MR. BALDING:  Objection.  This is outside the scope.

13:45:08   6             THE COURT:  You can finish this answer, Doctor.

13:45:11   7             And then move on, Mr. Driscoll.

13:45:14   8             MR. DRISCOLL:  Of course.

13:45:16   9   Q. Please continue.

13:45:17   10   A. There is a tremendous amount of suffering involved.  And

13:45:20   11   the -- also on the individual basis, people need to have

13:45:23   12   access.  People -- the number one reason why people see a

13:45:27   13   physician is because they have pain.  The American Medical

13:45:32   14   Association defines the practice of medicine in terms of,

13:45:36   15   it's a process -- it's a moral obligation we have as

13:45:40   16   physicians to alleviate suffering.

13:45:42   17             So that really is the primary purpose of the

13:45:47   18   practice of medicine is to care for patients, and to

13:45:50   19   alleviate suffering.  That is why we treat pain.

13:45:54   20   Q. What does clinical judgment mean to you?

13:45:56   21   A. Clinical judgment is how a physician or nurse

13:46:03   22   practitioner or provider processes the information that they

13:46:06   23   have in terms of making decisions.  And that is based upon

13:46:09   24   their knowledge, it's based upon their experience, it's based

13:46:14   25   upon their intuition as well.

1 13:46:16        And it becomes their judgment in terms of what the

2 13:46:20   plan of care they are going to make, in the best interests of

3 13:46:23   their patient.

4 13:46:24   Q. So two clinicians faced with the same set of

5 13:46:28   circumstances can decide to treat in different ways?

6 13:46:31   A. Of course they can.

7 13:46:32   Q. And is that appropriate?

8 13:46:33   A. Well, it can -- it certainly can be appropriate.

9 13:46:38   Q. And can you explain why?

10 13:46:40   A. Well, in the course of professional practice, in treating

11 13:46:45   people, what we want is an outcome for the patient that

12 13:46:49   improves their life.  And there are many ways to get there.

13 13:46:54        What I would do as a board certified pain specialist

14 13:46:58   might be different than what a family practice person would

15 13:47:01   do, or a nurse practitioner would do, based upon the tools

16 13:47:04   that they have.

17 13:47:05        But at the end of the day, what we are trying to do

18 13:47:07   is take the information that we have in the context of that

19 13:47:10   patient as an individual, and get them toward a decision that

20 13:47:14   improves the quality of their life.  There are multiple

21 13:47:17   pathways to that.

22 13:47:18        If I am not used to treating pain, if I'm not -- if

23 13:47:22   I treat a lot of things, I may -- I'm not a specialist in it,

24 13:47:26   I may have a way of doing things that works for me, but it

25 13:47:29   doesn't mean that somebody else can't have their way of doing

1 13:47:33   it.

2 13:47:33          I promise you, psychiatrists treat chronic pain, but

3 13:47:37   they treat it differently than an anesthesiologist would do,

4 13:47:41   or even a family practice doctor.  But their goal is going in

5 13:47:44   the same pathway.  They may choose different ways to get

6 13:47:48   there, but the ultimate goal is a correct and right decision

7 13:47:51   for that patient to get well.

8 13:47:53   Q. And by getting well, it's alleviating suffering from a

9 13:47:56   patient that complains or suffers from pain?

10 13:47:59          MR. BALDING:  Objection.  Leading.

11 13:48:00          THE COURT:  Sustained.

12 13:48:01   Q. Can you explain what you mean by "getting well" for a

13 13:48:05   patient?

14 13:48:06   A. Well, patients have a medical need.  They come because

15 13:48:10   they have a medical need.  And we try to get them well.  We

16 13:48:13   try to move them in the direction to treat that medical need.

17 13:48:17   That is what I mean by "getting well."

18 13:48:21   Q. And tramadol is a medication that is approved to treat

19 13:48:26   that medical need, pain?

20 13:48:29   A. Yes.

21 13:48:29   Q. It's appropriate to prescribe?

22 13:48:32   A. If it's in the best interests of the patient.  If you

23 13:48:36   have determined in your clinical judgment it's in the

24 13:48:39   patient's best interests, it is entirely appropriate to

25 13:48:42   prescribe tramadol.

1 13:48:43   Q. As well as hydrocodone?

2 13:48:44   A. As well as hydrocodone.

3 13:48:45   Q. Are there reasons why you would continue to prescribe

4 13:48:58   hydrocodone or a controlled substance to someone who suffers

5 13:49:02   from addiction?

6 13:49:02   A. Yes.

7 13:49:05        First of all, the bottom line is, in my judgment, I

8 13:49:08   would decide, in my clinical judgment, that the benefit

9 13:49:11   outweighs the risk.  And one of the reasons why the benefit

10 13:49:17   can outweigh the risk is that, A, just because someone has

11 13:49:21   some aberrant behaviors, just because somebody is doing

12 13:49:25   something that doesn't exactly sound right, it doesn't mean

13 13:49:29   they have addiction.

14 13:49:30        Addiction is a disease.  Addiction is a brain

15 13:49:33   disorder.  And just because somebody, their behavior looks

16 13:49:36   like addiction, doesn't mean it's addiction.  Okay?

17 13:49:39        So, A, I may have a diagnosis wrong.  So I may want

18 13:49:43   to still prescribe their pain.  Because I also know that one

19 13:49:47   of the tremendous triggers for the aberrant behavior, which I

20 13:49:50   mentioned is pseudoaddiction earlier -- and also the

21 13:49:53   recurrence of somebody having this disease of addiction is

22 13:49:57   untreated pain.  Untreated pain is one of the strongest

23 13:50:02   indicators or triggers to re-triggering addiction in

24 13:50:06   somebody.

25 13:50:06        So, yes, there could be an instance where I would

13:50:09  need to treat their pain with controlled substances, even

13:50:12  though they -- even though they had the disease of addiction.

13:50:15  And that is not just my opinion, that is the opinion of the

13:50:18  American Society of Addiction Medicine.

13:50:21  Q. And diagnoses change over time.  Would you say that is a

13:50:27  fair description of the patient/provider process model when

13:50:31  looking at the usual course of professional practice?

13:50:33  A. Yes.

13:50:34      We try to think of things -- we like things to be

13:50:37  black and white.  And I've told people before, you know, when

13:50:39  I look at you as a patient, you know, from far away, if I

13:50:43  just look at records or just this and that, you know, of

13:50:47  somebody's description of what is going on, it's like looking

13:50:50  at the shoreline from the plane.  I'm going to fly home to

13:50:53  Louisville before too long, and I'll fly over the beach and

13:50:56  I'll see that shore line.  It is a straight line, it's curvy

13:51:00  here, but it's not moving.  But if I'm on that beach, I'm

13:51:03  having that personal relationship, I know, with every wave

13:51:05  that comes in, it changes.

13:51:08      And that is how a relationship should be with your

13:51:12  provider, your nurse practitioner, or your doctor.  They

13:51:15  should know you not from far away in that airplane, but they

13:51:18  should know you from being on that beach with you.  They

13:51:21  should be able to see the changes that occur over time, and

13:51:23  react to that.  And that is what this nurse practitioner did.

1 13:51:28   Q. And your treatment plan will evolve over that time, too,

2 13:51:31   is that right?

3 13:51:31   A. Definitely.

4 13:51:32             MR. BALDING:  Outside the scope.

5 13:51:34             THE COURT:  Overruled.

6 13:51:37   Q. Was that a yes, Dr. Murphy?

7 13:51:39   A. I said definitely.

8 13:51:40   Q. Why is that?  Why does the treatment -- why does the

9 13:51:43   treatment plan change over time?

10 13:51:44   A. You treat somebody based upon the circumstances that you

11 13:51:49   have.  So it's dependent upon the person, the place and the

12 13:51:53   time.

13 13:51:54             So obviously as things go forward, things are going

14 13:51:58   to change, and you make your judgments based upon the

15 13:52:01   circumstances that you have, leading up to that.  But also,

16 13:52:05   most importantly, the circumstances at that time.

17 13:52:07   Q. And you were also shown a transcript and played a portion

18 13:52:12   of one of the undercover visits where there was talk about

19 13:52:16   nausea.  Is nausea a common side effect of Tylenol?

20 13:52:20   A. Yes.  It's a common side effect of a lot of medications,

21 13:52:24   and certainly Tylenol can cause nausea.

22 13:52:26   Q. And when you are deciding -- when a clinician is deciding

23 13:52:30   which medication to prescribe for pain, is that a relevant

24 13:52:34   piece of information?

25 13:52:35   A. Of course it is.

1 13:52:36   Q. And is that -- why is that?

2 13:52:39   A. Well, you know, one of the things you want to know is

3 13:52:42   what -- you know, what bad things maybe the drug is doing to

4 13:52:47   you.  And one of the things that a lot of these medications,

5 13:52:51   including the opioids, and including Tylenol -- and I want to

6 13:52:55   remind you that the Tylenol is not just a part of codeine,

7 13:52:59   Tylenol is a part of Norco, and those drugs as well.  You

8 13:53:02   just want to know all of the side effects that you can,

9 13:53:06   whether it be sedation, constipation, things like that.

10 13:53:09          And asking somebody about nausea is an entirely

11 13:53:11   appropriate question to ask somebody on these medications.

12 13:53:14   Q. And then, Doctor, you've testified about a relevant

13 13:53:20   examination.  What does that mean to you?

14 13:53:22   A. Well, the physical examination is part of that objective

15 13:53:26   information that I can use in my decision making process, in

16 13:53:30   my diagnostic process.  So I have lots of information that I

17 13:53:35   can utilize.

18 13:53:38          If I had the opportunity to do a physical

19 13:53:41   examination, I want to add that, if I feel like that is

20 13:53:43   necessary, then hopefully I'll be able to do that.

21 13:53:47          It's a component of me gathering the necessary

22 13:53:50   information.  It's not mandatory in every case.

23 13:53:54   Q. And this goes back to the patient provider process model?

24 13:53:57   A. Yes.  Based upon the circumstances that you have there.

25 13:54:01   The reason they are there, what is going on, what are other

1 13:54:04  information you have.  Do you have enough information?

2 13:54:05          This is not my opinion, this is the opinion of the

3 13:54:09  American Academies of Sciences, Engineering and Medicine, as

4 13:54:16  I said earlier.  These are all components that you can use to

5 13:54:21  gather information.  None of them are mandatory.  It's

6 13:54:24  mandatory that you have enough information to make the

7 13:54:27  decision that you are going to make.

8 13:54:30   Q. So it's mandatory to have enough information for you to

9 13:54:34  exercise your clinical judgment, make a diagnosis and treat

10 13:54:38  pain?

11 13:54:38   A. Yes.

12 13:54:40          MR. DRISCOLL:  Nothing further, Your Honor.

13 13:54:44          THE COURT:  Any recross?

14 13:54:46          MR. BALDING:  No, Your Honor.  Thank you.

15 13:54:47          THE COURT:  All right.  Doctor, you are excused,

16 13:54:49  thank you.

17 13:54:51          All right.  The defense may call its next witness.

18 13:54:54          MS. MURPHY:  Your Honor, we call Saloumeh

19 13:54:56  Rahbarvafaei to the stand.

20 13:55:19          THE CLERK:  Please raise your right hand.

21 13:55:23  THEREUPON:

22 13:55:23  Saloumeh Rahbarvafaei

23 13:55:23  called in these proceedings and being first duly sworn

24 13:55:30  testifies as follows:

25 13:55:30          THE CLERK:  Please be seated.

1  13:55:42        Please state and spell your name for the record.

2  13:55:45        THE WITNESS:  Saloumeh Rahbarvafaei,

3  13:55:51   S-A-L-O-U-M-E-H, R-A-H-B-A-R-V-A-F-A-E-I.

4  13:55:55        THE CLERK:  Thank you.

5  13:55:59        THE COURT:  If you could bring some water.

6  13:56:01        THE CLERK:  Yes, Your Honor.

7  13:56:35        THE COURT:  Ms. Murphy, you may proceed.

8  13:56:38        MS. MURPHY:  Thank you, Your Honor.

9  13:56:38                    DIRECT EXAMINATION

10  13:56:39  BY MS. MURPHY:

11  13:56:39   Q. Ms. Rahbarvafaei, putting yourself back when you saw

12  13:56:44  these two undercover patients, what were you thinking when

13  13:56:49  you prescribed these medications to them?

14  13:56:52   A. I was thinking they are regular patients.  Like some --

15  13:56:59  you know, all other patients that I was seeing in the clinic.

16  13:57:03  And I was thinking, I'm treating pain.

17  13:57:08   Q. What made you think that?

18  13:57:09   A. They clearly stated in the -- you know, in the very first

19  13:57:17  visit that they are suffering from pain.  That was their

20  13:57:21  major chief complaint, as some other patients, like most

21  13:57:27  parents in the pain clinic.

22  13:57:30   Q. Now, focusing on that first -- those first visits, what

23  13:57:34  in particular gave you the impression that they were in pain?

24  13:57:37   A. They specifically mentioned that, they are there for

25  13:57:42  pain.  And I don't -- yeah.

1  13:57:49   Q. Now, your follow-up visits, you know, some of them were

2  13:57:53   less than seven minutes.  Why was that?

3  13:57:56   A. I really -- obviously the clinic was very busy, and I

4  13:58:04   really did not have a chance to spend more time.  I had a lot

5  13:58:08   of patients.  I had a lot of more complicated patients that

6  13:58:12   I -- you know, I had to spend more time on them.  So these

7  13:58:15   undercover patients, they are not complicated.  And I thought

8  13:58:22   like I can manage it in less amount of time, and then I can

9  13:58:26   spend more time with other patients.  It's like you are --

10 13:58:30   exactly like studying for an exam, but there are some

11 13:58:34   chapters that, you know, you know, you don't have to spend

12 13:58:37   much time.  There are some chapters that is you have to spend

13 13:58:40   all night to study.

14 13:58:41   Q. What about the way that they presented seemed not so

15 13:58:46   complicated to you?

16 13:58:47   A. I mean, they could walk, they could -- they didn't have

17 13:58:53   any cane.  They didn't have any walker.  They didn't have

18 13:58:56   much of the background.  Obviously they are not in acute

19 13:59:01   pain, they are not -- they don't have broken bone, they don't

20 13:59:04   have any like recent accidents.  The major chief complaint is

21 13:59:09   just pain.

22 13:59:09   Q. Now, compared to other patients that are more

23 13:59:14   complicated, what are some examples of more complicated

24 13:59:16   patients where you might spend some more time with them?

25 13:59:19   A. Like I had -- I can give you so many examples.  I had so

1 13:59:23 many different patients.  You know, they are coming, they

2 13:59:28 cannot even walk.  They are older.  They have broken bone.  I

3 13:59:33 had patients -- one time, this one I never forget, I had

4 13:59:37 patients came with -- you know, the problem, she was there

5 13:59:43 for a headache, and then tingling of the face, and then

6 13:59:46 complaining of have seizure.  And then she was saying like

7 13:59:49 she has like some type of parasite, like worm in her brain,

8 13:59:53 which I couldn't understand.  It was like -- I had to Google

9 13:59:56 it.  I had to call the doctor.  I had to spend almost like

10 14:00:00 one hour to figure that out.

11 14:00:03    Q. Now, you mentioned that the clinic was busy.  You are

12 14:00:08 talking about the Good Neighbor Clinic?

13 14:00:09    A. Right.

14 14:00:09    Q. Now, who decided how many patients you saw at the Good

15 14:00:14 Neighbor Clinic?

16 14:00:14    A. It was between the doctor and then the office, they --

17 14:00:18 you know, I was not dealing with the scheduling.

18 14:00:21    Q. And when you say "the doctor," who do you mean?

19 14:00:23    A. My supervising physician that hired me, Dr. Ali Sabbaghi.

20 14:00:27    Q. And at the Good Neighbor Clinic, how many patients

21 14:00:31 typically do you think you would see?

22 14:00:32    A. It was a lot of patients.  But like really varied

23 14:00:38 between -- I had days like 35, even up to 60 patients.

24 14:00:43    Q. Now, what made you think that it was okay to see that

25 14:00:47 many patients in a day?

14:00:48    A. It was something that I -- from the very first day of my

14:00:55    start working with Dr. Ali Sabbaghi, who is a pain

14:00:59    specialist, it was, you know, something that I observed.  I

14:01:02    learned.  He had a lot of patients.  And this was kind of not

14:01:06    surprising.

14:01:09    Q. Now, did Dr. Sabbaghi ever give you instructions on how

14:01:16    long to spend on, say, a follow-up visit?

14:01:19    A. We had a lot of, like, discussions.  Really depend.  Like

14:01:24    depend on the day.  We had busy days that he was like rushing

14:01:28    me through, you know, it's just a followup, why you are

14:01:31    spending too long?  Yes.

14:01:34    Q. Now, may I please -- you know, I don't know that you have

14:01:40    this in front of you.  I'll wait until later.

14:01:43           Did Dr. Sabbaghi ever give you feedback for your

14:01:45    work?

14:01:46    A. Yes.  Through the text messages, sometimes he just wanted

14:01:53    to on site talk to me, or he called me.

14:02:00    Q. Why didn't you ever physically touch these undercover

14:02:04    agents?

14:02:04    A. Again, like, maybe I did not put my hand specifically on

14:02:10    the patient touching them physically, but, you know, the

14:02:15    assessment -- my assessment, my physical assessment started

14:02:19    already with the time that I met with the patient, the way

14:02:24    they walking, they are talking.  I think one of them even

14:02:28    shake my hands or something.

1  14:02:29          So the physical assessment starts right there.

2  14:02:33          So -- and I ask a lot of questions.  I ask if they

3  14:02:37    had any accidents.  I ask if they have any surgeries.  You

4  14:02:42    know, what was really happening.  I was trying to figure out

5  14:02:44    what is really happening.  The major chief complaint was

6  14:02:49    pain, and I was just trying to figure out what is the

7  14:02:52    problem.

8  14:02:53    Q. I want to go to your post-arrest interview.  We saw that

9  14:03:01    last week.

10 14:03:04          What was going through your mind during your

11 14:03:07    interview with the agents?

12 14:03:09    A. I had no idea, you know, exactly what is going on.  By

13 14:03:15    the time I was getting interviewed, I knew it was related

14 14:03:18    about one of my jobs, but not exactly like what is going on?

15 14:03:21    What are the allegations are.  So was not really sure.

16 14:03:27    Q. You mentioned you thought it was about one of your jobs.

17 14:03:31    Were you working other jobs at the time?

18 14:03:33    A. Right.  I was working night shift as a registered nurse

19 14:03:38    in a hospital.  And I also was teaching as a clinical

20 14:03:41    instructor at West Coast University.

21 14:03:44    Q. Now, going back to the interview, what was your

22 14:03:52    understanding of what it was about?

23 14:03:53    A. My understanding, it was not really clear.  Of course,

24 14:04:01    the prosecutor came for a quick amount of time, and then he

25 14:04:04    said, you know valuable stuff that, you know, we are looking

114:04:08  for those.  And I was not sure what I know that I don't know.

214:04:14           But I knew it was related to pain management.

314:04:20  Q. Now, at this point -- this is 2019 that that happened,

414:04:22  correct?

514:04:23  A. Yes.

614:04:23  Q. At this point, how long had you been a nurse?

714:04:28  A. Nurse practitioner for about two-and-a-half years.  And

814:04:32  registered nurse probably about three and a half -- or less

914:04:36  than four years.

1014:04:38  Q. And where did you graduate from?

1114:04:40  A. I graduated from Azusa Pacific University.

1214:04:44  Q. And why did you choose to be a nurse?

1314:04:46  A. I mean, that was something I always wanted.  I always

1414:04:52  wanted to be a medical provider, and I did not have the

1514:04:59  opportunity -- growing up in Iran, I did not have that

1614:05:02  opportunity, so when I was here, there was, you know, a lot

1714:05:05  of good opportunities that I'm, like, finally this is the

1814:05:10  time that I can proceed to what I want.

1914:05:12           To me, nursing is like the combination of research,

2014:05:17  art, and also helping the patient in the most vulnerable time

2114:05:22  of their life.  So it had it all.  That was great.  That was

2214:05:25  a great profession.

2314:05:27  Q. You mentioned where you grew up, Iran.

2414:05:33           Was medicine something that you pursued when you

2514:05:35  lived in Iran?

A. I wish I could, but that was not my option back then.

Q. What do you mean it wasn't your option back then?

A. So in Iran, people usually after they grade graduate from high school, they take one exam -- like everybody takes one exam once a year.  And based on the grade that you get, then the government will choose which school you go, or what major you take.

        And unfortunately by the number that I got, I got into -- I still got into a really good school, but my major was healthcare management, but not medicine.

Q. And what is the difference between healthcare management and medicine?  Or what I should say is, how did you feel about that?

A. It was still, you know, great.  But then for me, I would really like to have that face-to-face interaction with the patient.  I did not like to do like more of the office work.

Q. So what did you do?  Did you -- you finished school, then what happened?

A. Yeah.  I had no choice, so I finished school quickly, and then I started working at the company that my dad was working.

Q. Now, eventually you came to the United States, right?

A. Right.

Q. And when did that happen?

A. I came -- I was about 23, 24 years old.

14:07:06  Q. And you became a citizen at one point?

14:07:08  A. Right.

14:07:08  Q. Now, when you came to the United States, what was it like

14:07:14  for you when you got here?

14:07:18      MR. CHO:  Objection, Your Honor.  Relevance.

14:07:19      THE COURT:  I'll allow it, just see where we are

14:07:21  going on it.  I'll allow this question to be asked.

14:07:24      But keep it tied to the case, Ms. Murphy.

14:07:26      You can answer the question, Ms. Rahbarvafaei.

14:07:28      THE WITNESS:  So, I mean, coming to the US, is the

14:07:31  dream of almost everybody, especially girls in Iran.  But

14:07:36  what I had in my mind, like any other -- any other people in

14:07:40  Iran, like, they think of LA as like Beverly Hills, Malibu,

14:07:45  but it was not like that, it was a lot harder.  I did not

14:07:48  know any English when I got here.  I had to work so hard.  It

14:07:54  was, you know, a little bit different than what I taught.  It

14:07:58  was -- life was not easy.

14:08:00  Q. How did you learn English?

14:08:02  A. I took classes.  I started with, you know, going to those

14:08:08  adult schools.  I was trying to just talk to people, just

14:08:11  have conversation.  I eventually went to college, and I was

14:08:17  learning slowly.

14:08:18  Q. And what about money, how did you support yourself?

14:08:21  A. I was working at a bakery at once.

14:08:26  Q. And where is that?

1 14:08:27   A. The one I was working in Reseda.

2 14:08:31   Q. Now, you did eventually go to nursing school, correct?

3 14:08:36   A. Yes.

4 14:08:37   Q. And how long did you work on English before you went to

5 14:08:40   nursing school?

6 14:08:41   A. It took me really long time.  I think about seven years,

7 14:08:46   I should say.

8 14:08:47   Q. And why did you want to go back to school?

9 14:08:50   A. Because now I have the opportunity to proceed that -- you

10 14:08:56   know, I really wanted that and it was missing.  So that is

11 14:09:00   why.

12 14:09:01   Q. Now, you mentioned that you went to Azusa Pacific.

13 14:09:05   A. Yes.

14 14:09:06   Q. Where is that?

15 14:09:06   A. It's in Azusa, kind of close to Pasadena.

16 14:09:12   Q. And what kind of program was it?

17 14:09:14   A. I got into ELM program, which is like an accelerated

18 14:09:17   program.  I was getting my bachelors in 16 months, which

19 14:09:24   usually people get it in four years.  And then after you

20 14:09:28   finish your bachelors, you can continue and get your masters.

21 14:09:31   Q. And what was it like for you being in nursing school?

22 14:09:36   A. It was tough.  When I got into the school, I also had a

23 14:09:41   newborn.  It was not easy.  Probably if it took for other --

24 14:09:48   my classmates to study something for two hours, for me it

25 14:09:53   took for hours and hours.

1 14:09:54   Q. And why is that?

2 14:09:55   A. Just I don't have to go through the dictionary.  Not just

3 14:09:58   to study, I had to also study my English.  So it was a little

4 14:10:02   bit challenging.  Plus I did not have much of the child, you

5 14:10:05   know, care.

6 14:10:05   Q. What did the accelerated program consist of?

7 14:10:10   A. So it was a nursing program.  It was consist of different

8 14:10:15   nursing courses, specifically starts with fundamental in

9 14:10:22   nursing, I would say different med surge -- medical surgical,

10 14:10:25   OBGYN, pediatrics.  And then also clinical rotations in

11 14:10:32   hospitals for 12 hours for each semester, depends on the

12 14:10:37   topic.

13 14:10:37   Q. That was for, sorry, did you say 16 months or 18 months?

14 14:10:40   A. Sixteen months.

15 14:10:42   Q. Now, what did you learn about treating pain in nursing

16 14:10:49   school?

17 14:10:50   A. I learned that in a very first semester in fundamental in

18 14:10:55   nursing, we learned that pain is very subjective, whatever

19 14:11:01   patient tell you.  And then you have to treat it as what it

20 14:11:04   is, and do not judge.

21 14:11:05   Q. But what if someone is lying to you in order to get pain

22 14:11:12   medication?

23 14:11:13   A. I mean, I had a situation that patient lied, and then you

24 14:11:19   try to figure out, like, what is the reason why they are

25 14:11:23   lying?  And you try to still keep that, you know, therapeutic

14:11:28  relationship between you and the patient, and try to kind of

14:11:32  address stuff.  But it's not like you are going to not treat

14:11:34  a patient.

14:11:36  Q. So do patients ever do things to you that suggested that

14:11:42  maybe they aren't telling the truth?

14:11:44  A. Yeah.  So many different things.  Like I saw patients --

14:11:51  like we catch some patients that they change their urine cup

14:11:55  when they ask to do the urine test.  Or they said they -- you

14:12:00  know, they come back just couple days after and they said

14:12:04  their prescription got lost or got stolen.  We have stories.

14:12:08  Q. How were you -- so I should back up.

14:12:11       Who trained you in pain management?

14:12:13  A. Dr. Sabbaghi, who is a pain specialist.

14:12:18  Q. And how -- and did he train you on how to respond to

14:12:22  situations like that?

14:12:23  A. Yes.

14:12:27  Q. And how did he train you?

14:12:29  A. He was more likely, don't try to judge the patient, don't

14:12:33  try to be a police.  But you have to address it, you have to

14:12:37  just do the proper thing.

14:12:39       For example, if the urine test is not -- you know,

14:12:43  it's not consistent, cut the medications, and then do another

14:12:48  urine test, and figure out why they did it.

14:12:51       So those are during our discussion we had with

14:12:55  Dr. Sabbaghi.

14:12:56 Q. Did patients ever get upset with you, if you, for
14:13:03 example, cut their medications?

14:13:04 A. A lot of times.

14:13:06 Q. And what kinds of things would happen?

14:13:08 A. You know, I have been -- I have been called F word,
14:13:16 B word, discriminating me, go back to your country, you don't
14:13:19 know what you are doing.  I had patient I ask for urine test,
14:13:22 he was like, just pull down his pants and then peed in the
14:13:29 office.  That was pretty traumatizing.

14:13:30        And then I remember after that I was trying
14:13:32 sometimes to just keep the door open and I'm alone by the
14:13:35 patient in the room.

14:13:36 Q. That last example you gave, where did that happen?

14:13:39 A. At Good Neighbor Clinic.

14:13:41 Q. I want to go back to your education a bit.

14:13:46        What did you do after you finished the accelerated
14:13:50 program?  And can you tell us when you finished that?

14:13:52 A. Yes.  I think it was around 2000 -- end of 2012.  And
14:13:58 then because I was in ELM program, I just continue.  I just
14:14:02 took my board.  Now I was a registered nurse.  I started
14:14:06 working in a hospital.

14:14:07        It was -- I was working in med surg, night shift.
14:14:13 And during the day I was going to school.

14:14:15 Q. What is a med surg?

14:14:17 A. Medical surgery, usually post surgery patients.

1 14:14:21   Q. And you were going to school at the same time?

2 14:14:23   A. During the day, yes.

3 14:14:24   Q. Was and that for your nurse practitioner --

4 14:14:26   A. That's right.

5 14:14:27   Q. -- degree?

6 14:14:27        What is the difference between a nurse and a nurse

7 14:14:31   practitioner?

8 14:14:31   A. So nurse practitioners can diagnose and then they can

9 14:14:36   prescribe.  Those are the main differences.

10 14:14:39   Q. Now, why did you want to be a nurse practitioner when you

11 14:14:43   could have just stayed a nurse?  You already had the degree.

12 14:14:47   A. I mean, that was something that I really wanted to do.

13 14:14:49   It was close to be a medical doctor, and I had the

14 14:14:53   opportunity now, you know, in the US, like why not.

15 14:14:56   Q. Now, at some point did you get any offers to work as a

16 14:15:00   nurse practitioner when you graduated?

17 14:15:02   A. Yes.  I was -- even before I graduated, I remember it was

18 14:15:08   like a couple of weeks before my graduation, that my DON,

19 14:15:13   director of nursing, reached out to me and said, there is a

20 14:15:17   doctor, there's a surgeon in our hospital looking for a nurse

21 14:15:20   practitioner, and are you interested?  And that was really

22 14:15:23   great, because I was not even graduated and now I have like a

23 14:15:27   job offer.

24 14:15:28   Q. And when you say "medical director," who do you mean?

25 14:15:31   A. Not medical director.

1 14:15:32   Q. I'm sorry.

2 14:15:34   A. Director of nursing in the hospital.

3 14:15:36   Q. What is -- who is that?

4 14:15:37   A. Ms. Melody Bradley.

5 14:15:41   Q. And what did she tell about this doctor?

6 14:15:44   A. I mean, this doctor, I did not know him personally,

7 14:15:48   because I was working night shift.  He was doing surgeries

8 14:15:51   during the day in the hospital.  But he did have very good

9 14:15:55   reputation.  He was a good surgeon.  And he was Persian.

10 14:16:02   That was another thing that my DON mentioned.  And he said --

11 14:16:06   I mean, she said, he never had a nurse practitioner.  He got

12 14:16:09   really busy, so now he's looking for a practitioner.

13 14:16:12   Q. Did it matter to him that you were Persian?

14 14:16:15   A. I don't know.  I remember he was like -- he liked the

15 14:16:18   fact that I was bilingual.

16 14:16:21   Q. Now, what was the position with Dr. Sabbaghi supposed to

17 14:16:28   be, if you -- like back then, what was your understanding?

18 14:16:30   A. My understanding was I supposed to help him as a

19 14:16:36   practitioner, when -- like we supposed to work together.  And

20 14:16:42   Dr. Sabbaghi had contract with different clinic, he was going

21 14:16:46   to different clinics.  And my understanding, like, I'm going

22 14:16:49   to those different clinics with him, and I'm going to help

23 14:16:53   him.

24 14:16:54   Q. So did he train you?

25 14:16:56   A. He did.

1 14:16:57   Q. And what did that training consist of?

2 14:16:59   A. The training -- I remember for like for the first month I

3 14:17:04   was just shadowing him, just following him, see like how

4 14:17:08   things happening.  Because you know, it was a specialty.  I

5 14:17:14   was a family nurse practitioner, it was a little bit like I

6 14:17:19   didn't have a specialty in pain management really.  So I was

7 14:17:22   kind of just shadowing him for the first month.

8 14:17:25   Q. And when you were shadowing him, what were some of the

9 14:17:28   things you watched him do?

10 14:17:29   A. I watched him do physical examinations, like getting

11 14:17:35   history, doing procedures, like doing joint injections, doing

12 14:17:42   some type of like nerve conduction study, all those.

13 14:17:46   Q. What is a nerve conduction study?

14 14:17:48   A. It's like a machine that you shock the nerves, and then

15 14:17:51   you get the reaction based on that, so you can figure out if

16 14:17:54   there is any problem -- if there is any nerve damages.

17 14:17:58   Q. Did he train you on -- or what I should say, did you

18 14:18:02   shadow him on initial visits with a patient?

19 14:18:06   A. I did.

20 14:18:07   Q. And walk us through how he would handle an initial visit

21 14:18:12   with, for example, someone complaining about knee pain.

22 14:18:18   A. I mean, it was really different.  He was trying to get

23 14:18:21   some information, background information.  And when I started

24 14:18:25   working with Dr. Sabbaghi, I was not going to Good Neighbor

25 14:18:30   Clinic, it was like other clinics, and it was more of the

14:18:34  workers' comp patients, it was more of like Medicare eligible

14:18:41  patients.  So those patients already have a lot of -- like a

14:18:43  lot of history when they come to pain management.

14:18:46          So I was watching him like go over the -- you know,

14:18:52  all the information that other doctors send it to him.  I

14:18:57  watched him doing his own -- you know, his assessment.

14:19:01  Q. Did you ever see him do physical assessments of patients?

14:19:06  A. Yes.

14:19:06  Q. And what did that consist of?

14:19:08  A. It was really different for every patient.  It was not

14:19:13  the same thing for everyone.  So I watched him doing like

14:19:16  touching patients.  Sometimes just asking questions.

14:19:18  Sometimes like, you know, really different.

14:19:23  Q. What about ordering things like MRIs or CAT scans, did he

14:19:30  have a policy on those?

14:19:31  A. We really didn't have any policy.  He -- like I have been

14:19:37  told it's better to get the MRI, better than x-ray, that was

14:19:41  one thing that, because x-ray will not show much of the

14:19:44  tissue injuries, or herniated disc.  Get the x-ray if you

14:19:49  have to, but then try to get MRI.

14:19:51          And then he trained me kind of to look at the report

14:19:54  of the MRI and then see what does it mean.  And then how we

14:19:59  can treat that based on the -- like, the report on the MRI.

14:20:04  Q. What about urine screenings, was there a policy or a

14:20:09  guideline from him on that?

A. Policy or guidelines, like we are talking about, like those are not written anywhere.  It was just part of the training, or part of, you know, our conversation.  Yes, he wanted to get urine test for the first time.  He wanted to get urine test periodically.

     And then if there is any problem or inconsistency with the urine, he wanted to act properly.

Q. And so what would his -- was there any training -- or what was your understanding of some of the things you could do if a urine test was inconsistent?

A. It really depends on the situation.  We had times that we had to discontinue the medication.  We had times that we had to just cut the medication.  We had times that we really didn't cut the medications.  It was, you know, different situation, depend on the patient.

Q. What would be a situation where you wouldn't cut the medication?

A. I think, you know, for example, if patients coming, and they are saying they -- like other doctors, for example -- I remember this patient.  This patient was getting medication from us, and then she had a surgery -- she had a surgery, so a surgeon was prescribing also pain medication after surgery.  So now patient coming to the visit, the urine test shows like two different medications.

     And then we verified.  And I consult -- I mean,

1 14:21:52  Dr. Sabbaghi even was there.  We did not cut the medication.

2 14:21:55   Q. Now, when it came to actually prescribing medications,

3 14:22:00  and I'm talking about like controlled substances, opioids,

4 14:22:04  what was your understanding of Dr. Sabbaghi's practice, as he

5 14:22:09  trained you?

6 14:22:10   A. I'm not sure if I'm understanding the question.

7 14:22:14   Q. That's okay.  It wasn't a great question.

8 14:22:16          Did Dr. Sabbaghi have sort of steps for you to

9 14:22:21  follow when it came to prescribing medication, in a sort of

10 14:22:25  general sense?

11 14:22:25   A. Yes.  He -- you know, he liked to start with tramadol.

12 14:22:32  He says like tramadol is like the -- not that strong.  Start

13 14:22:36  with tramadol, if patients are not on any pain medication eve

14 14:22:41  before.  So you start with tramadol, you have no background,

15 14:22:43  they don't have much of the -- like you don't know if they

16 14:22:47  have any problems, you don't have any MRI, you don't have

17 14:22:50  much of information, then you start with tramadol.  That is a

18 14:22:55  lower dose of opioids.  And then you just followup.  You do

19 14:22:59  your MRI.  You do your blood work.  You do your examinations,

20 14:23:02  maybe you get some history, and then you follow after.

21 14:23:05   Q. Now, with the undercovers here, you went from tramadol to

22 14:23:11  hydrocodone.  Why did you skip Tylenol?

23 14:23:15   A. They obviously said they don't want to take it.  They

24 14:23:22  have side effects with it.

25 14:23:25          And like practicing medicine, writing prescriptions

1 14:23:27   is not like -- it's by trial, it's not -- it's like there is

2 14:23:33   no law that you have to just choose this medication.  You can

3 14:23:38   use your judgment and see like which medication is better for

4 14:23:41   the patient.

5 14:23:42          But, of course, we had -- like we had protocol if we

6 14:23:46   have no idea about anything, okay, so you can start with

7 14:23:50   tramadol.  But still, it's not like the law that you have to

8 14:23:54   follow the steps.  That was my understanding.

9 14:23:56   Q. Now, you asked one of them if it made him nauseous.  Do

10 14:24:01   you remember saying that?

11 14:24:01   A. Yes.

12 14:24:01   Q. Were you trying to coach him there?

13 14:24:04   A. No.  The first thing came to my mind, okay, you don't

14 14:24:09   want to take tramadol, do you have nausea?  Because that was

15 14:24:12   a really common complaint of a lot of patients.

16 14:24:15   Q. Now, tramadol is an opioid?

17 14:24:20   A. Right.

18 14:24:20   Q. Why did you tell the agent during your interview that you

19 14:24:26   never give an opioid during the first visit, if you give

20 14:24:30   tramadol, which is an opioid.  Why would you say that?

21 14:24:33   A. In my mind, I was not counting tramadol as opioids.  I

22 14:24:37   was like thinking oxycodone, morphine, you know, other strong

23 14:24:40   medication.  I was not really counting tramadol as opioids.

24 14:24:44   Q. Why were you thinking like that?

25 14:24:45   A. I don't know.  Because like -- tramadol is like -- it is

14:24:50 opioids, it's Schedule IV.  My understanding and my training,

14:24:56 you know, it can safely be prescribed.  And I did not write

14:24:59 many, I just wrote 60 pills.  And, you know, in drug book, in

14:25:06 nursing schools, we know like FDA approves giving

14:25:13 100-milligram tramadol for every four hours as needed for

14:25:17 moderate to severe pain, which is like, if we calculate like

14:25:21 360 pills.  So giving 60 Norcos, I did not count it as like

14:25:26 writing.  It was just safe.

14:25:30  Q. Now, you may have said this already, so I'm sorry.  Just

14:25:35 tell me if I'm repeating.  How long did you shadow

14:25:37 Dr. Sabbaghi before you started working on your own?

14:25:40  A. About a month.

14:25:41  Q. And did he -- would he periodically review your work with

14:25:47 you?

14:25:47  A. Yes.  And I was assuming, because he was reaching out to

14:25:52 me, if there is anything, you know, in the file that he

14:25:54 wanted to discuss, he text me, or he just bring the file and

14:25:57 talk to me.  So, yes.

14:26:00  Q. And were there times where you reached out to him for

14:26:02 guidance?

14:26:03  A. A lot of times.

14:26:04  Q. And how would you do that?

14:26:06  A. If he is in the office, of course, I go to him.  But if

14:26:09 he's not in the office, I had to text him or call him until

14:26:12 he gets back to me.  He was busy.  You know, he is a surgeon.

14:26:17 He was in surgery most of the time.  So if not right away,

14:26:21 but he get back to me.

14:26:23  Q. How many clinics -- I'm going to focus on the time of

14:26:27 these undercover visits.  So beginning, I guess,

14:26:33 February 2018.  How many other clinics was Dr. Sabbaghi

14:26:38 sending you to to work?

14:26:40  A. There was some -- there was one in the Valley.  There was

14:26:45 one in Beverly Hills.  There was, I think one -- around four.

14:26:53 Four or five.

14:26:54  Q. Was this your only job at this point in 2018?

14:26:58  A. No.  I continue working night shift as a registered

14:27:02 nurse.  And I was working adjunct faculty at West Coast

14:27:08 University.

14:27:08  Q. Did you consider this your full-time job?

14:27:11  A. No.  That was my part-time.

14:27:12  Q. What would you have considered your full-time job at the

14:27:18 time?  Or if you had to --

14:27:19  A. Working in the hospital was my full-time job.  I was

14:27:22 working like almost three nights.

14:27:23  Q. Is that considered full-time?

14:27:24  A. Yes, because it's 12 hours.

14:27:26  Q. How did Dr. Sabbaghi pay you?

14:27:35  A. He was paying me flat rate.  Like for the full day, $600.

14:27:43 If it's half a day, like half of it.  Yeah, that was --

14:27:47  Q. Was that always the arrangement?

A. No.  At the beginning -- at the very beginning, I started

working, like he was paying me $40 per hour on 1099, which it

was less than what I was making in the hospital as a

registered nurse.  But it was okay, it's the training.

          A couple of months later, I think he increased it to

45.  And then, you know, it was increasing little by little

every couple of months or so.

Q. At one point in time he was paying you hourly?

A. That's right.

Q. And were there -- did he ever give you like extra payment

if you -- like depending on the patients you saw?  What was

the arrangement in connection with the number of patients in

the past?

A. Right.  So we figured like he is paying me $40, that was

like, you know, less than what I was getting paid in the

hospital.  So he agreed to give me, I think, 45 plus if I am

seeing patients by myself.  And I'm talking about like we are

working together, we are in the same clinic, we are working

together.  If he is -- if I'm the one just, you know, seeing

the patients -- mainly follow up.  Because our arrangement

was, I see the follow-up patient and he see the new patients.

          So if I see the patients by myself, then he's going

to give me extra for each patients, like it was around $5 or

so.

Q. And how long did that arrangement last?

1 14:29:22   A. I think a couple of months.

2 14:29:24   Q. And did it -- were there problems with it?

3 14:29:29   A. Yes.  It really was not working, because we always had to

4 14:29:33   argue, like, that is the patient I saw, that is the patient

5 14:29:35   you saw.  Or I had to have a list of patients.  So really did

6 14:29:39   not work.

7 14:29:39   Q. So did you come up with another arrangement?

8 14:29:43   A. Yes.  Then we decided to, he's going to give me flat rate

9 14:29:47   for $600 for the full day, and 300 for half a day, no matter

10 14:29:52   how many patients, no matter what kind of patients.

11 14:29:54   Q. And whose idea was that to do that, that arrangement?

12 14:29:57   A. We agreed together, yeah.

13 14:29:59   Q. When it came to the number of patients, you said earlier

14 14:30:15   that at Good Neighbor Clinic it could be sometimes 30, 35,

15 14:30:19   even up to 60. Am I getting that right?

16 14:30:22   A. Yes.

17 14:30:23   Q. Okay.  Now, how many patients on a typical day would be

18 14:30:27   new patients versus follow-up patients?

19 14:30:29   A. Like really depends.  We had days that we had no new

20 14:30:34   patients, and there are days that you have six, seven new

21 14:30:38   patients.

22 14:30:39   Q. And how were you trained to handle new patients versus

23 14:30:43   follow-up patients?

24 14:30:46   A. I mean, our arrangement was Dr. Sabbaghi will see the new

25 14:30:53   patients, and I'm going to see the follow-up patients,

1 14:30:57   because it's much easier.  They are already having their

2 14:31:01   treatment plan, and I'm just following up to see if the

3 14:31:03   treatment plan works, if like they have side effects with the

4 14:31:06   medication.

5 14:31:07          It was just, you know, the arrangement was like

6 14:31:09   that.

7 14:31:10          But is that the question?  Sorry.

8 14:31:14   Q. That's okay.

9 14:31:17          How was it supposed to be at the Good Neighbor

10 14:31:19  Clinic?

11 14:31:19   A. It's supposed to be the same.  But eventually those days

12 14:31:25  that we are going to Good Neighbor Clinic, it's one of the --

13 14:31:30  one of those days that Dr. Sabbaghi is supposed to be in

14 14:31:33  surgery center, so he was not really there.

15 14:31:44   Q. When did he tell you that you were going to be working at

16 14:31:47  Good Neighbor Clinic, if you remember?

17 14:31:52   A. I don't remember exact the date, but I heard -- one of

18 14:31:57  the clinic that he was going, it was closing.  And he said,

19 14:32:03  we are going to -- we are going to move all the patients to

20 14:32:06  Good Neighbor Clinic.

21 14:32:07   Q. Did he tell you anything about the clinic before you

22 14:32:10  went?

23 14:32:11   A. No, not really.

24 14:32:12   Q. And what was your understanding of how things were

25 14:32:16  supposed to work there?

1  14:32:17   A. Same as like other clinics.

2  14:32:20   Q. What do you mean by that?

3  14:32:21   A. Like we are going together.  I'm going to see mainly the

4  14:32:24   follow-up patients.  He's going to see the new patients.  And

5  14:32:28   it's going to be the same.  It's going to be computer, you

6  14:32:31   know, charting, which was not happening at Good Neighbor.

7  14:32:36   Most clinics we had -- most of them we had computer charting.

8  14:32:40        He did not mention -- like he didn't mention really

9  14:32:44   anything.  I just had the address and I showed up the first

10 14:32:47   day.

11 14:32:48   Q. And how often -- at least at the beginning, how often

12 14:32:53   were you supposed to be going to Good Neighbor Clinic?

13 14:32:54   A. Once a month.

14 14:32:56   Q. And when you first get there, do you remember sort of

15 14:33:01   your first impression, what it was like?

16 14:33:04   A. First impression?  I realized this is like a busy clinic,

17 14:33:10   underserved clinic with underserved patients.  It was a

18 14:33:16   little bit different from other clinics.

19 14:33:18        THE COURT:  Ms. Murphy, let me know when you are

20 14:33:20   moving on from the initial impressions of the Good Neighbor

21 14:33:23   Clinic and then we'll break for the day.

22 14:33:25        MS. MURPHY:  Okay.  This is actually a good pause

23 14:33:30   for me right now.

24 14:33:30        THE COURT:  Ladies and gentlemen, we'll start again

25 14:33:32   tomorrow at 8:30.

1 14:33:33     Don't investigate the case.  Don't throw away all

2 14:33:37 the work you have put into the case by doing anything online

3 14:33:42 or fining out about Ms. Rahbarvafaei.  Any information you

4 14:33:45 need about her or anything else you will have.  And don't

5 14:33:51 talk about the case to anyone or allow anyone to discuss the

6 14:33:54 case with you.

7 14:33:55     Thank you.

8 14:33:56     (Thereupon, the jury retired from the courtroom.)

9 14:34:32     THE COURT:  Ms. Rahbarvafaei, you may step down.

10 14:34:38     Is there a new version or joint version of the jury

11 14:34:47 instructions for me to look at?

12 14:34:50     MS. MURPHY:  Your Honor, we have been working on our

13 14:34:52 version.  We can confer with the government immediately after

14 14:34:54 this, and try to get something to you in the early evening,

15 14:34:57 if that's all right.

16 14:34:58     THE COURT:  All right.  Why don't you -- and it

17 14:35:00 doesn't have to be all of you, it can just be one of you, of

18 14:35:03 course, because you have other things to do -- meet here.

19 14:35:06     I've got a hearing at 3:00, so why don't you be back

20 14:35:09 here at 4:00, and let's start talking about where we are with

21 14:35:13 the jury instructions.  And if you can get that document

22 14:35:18 ready, that would be great.

23 14:35:21     All right.  Thank you.

24 14:35:22     (Thereupon, the Court was in recess.)

25          *****     *****     *****

1

2    I certify that the foregoing is a correct transcript from the

3    record of proceedings in the above-titled matter.

4

5

6

7    --------------------------

8

9    Amy C. Diaz, RPR, CRR            August 28, 2022

10   S/  Amy Diaz

11

12   CONTINUED DIRECT EXAMINATION                        11

13   BY MR. BALDING

14   CROSS-EXAMINATION                                   21

15   BY MS. MURPHY

16   Exhibit 427                                         52

17                  REDIRECT-EXAMINATION                 66

18   BY MR. BALDING

19   RECROSS-EXAMINATION                                 75

20   BY MS. MURPHY

21   RE-REDIRECT EXAMINATION                             76

22   BY MR. BALDING

23   DR. JAMES PATRICK MURPHY                            79

24   DIRECT EXAMINATION                                  80

25   BY MR. DRISCOLL

1     CROSS-EXAMINATION                                    126

2     BY MR. BALDING

3                 REDIRECT-EXAMINATION                    185

4

5     BY MR. DRISCOLL

6                 DIRECT EXAMINATION                      195

7     BY MS. MURPHY

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25